1  Michael Gerard Fletcher (State Bar No. 070849)
   mfletcher@frandzel.com
2  Paige S. Poupart (State Bar No. 343547)
   ppoupart@frandzel.com
3  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   1000 Wilshire Boulevard, Nineteenth Floor
4  Los Angeles, California 90017-2427
   Telephone: (323) 852-1000
5  Facsimile: (323) 651-2577

6  Attorneys for Plaintiff
   Archway Broadway Loan SPE, LLC

7

8  **UNITED STATES BANKRUPTCY COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

10

| In re | Lead Case No. 2:24-bk-12079-VZ |
|---|---|
| SEATON INVESTMENTS, LLC, *et al.* | Jointly Administered with Case Nos.: 2:24-bk-12080-VZ; 2:24-bk-12081-VZ; 2:24-bk-12082-VZ :2:24-bk-12091-VZ; 2:24-bk-12074-VZ; 2:24-bk-12075-VZ; and 2:24-bk-12076-VZ. |
| Debtors and Debtors-in-Possession. | |

Affects:

☐ All Debtors
☐ Seaton Investments, LLC
☐ Colyton Investments, LLC
☐ Broadway Avenue Investments, LLC
☐ SLA Investments, LLC
☐ Negev Investments, LLC
☐ Alan Gomperts
☒ Daniel Halevy
☒ Susan Halevy

Chapter 11

Adversary Proceeding No.

---

ARCHWAY BROADWAY LOAN SPE, LLC, a Delaware limited liability company,

                Plaintiff,

        v.

SUSAN HALEVY, aka Sue Halevy, individually and in her capacity as Trustee of the HALEVY FAMILY TRUST DATED SEPTEMBER 8, 2010; 341 SOUTH CANNON LLC, a California limited liability company; DANIEL HALEVY, in his capacity as Personal Representative of the estate of non-debtor David Halevy, Deceased, and not in his individual capacity,

                Defendants.

**COMPLAINT ON PROBATE CREDITOR'S CLAIM, DEEMED REJECTED, FOR:**

1. **Declaratory Relief;**
2. **Breach of Guaranty (Broadway);**
3. **Breach of Guaranty (Negev);**
4. **Breach of Guaranty (SLA);**
5. **Liability of Trustee of Decedent's Revocable Trust;**
6. **Fraudulent Transfer;**
7. **Declaratory Relief re Constructive Trust and Equitable Lien;**
8. **Breach of Fiduciary Duty;**
9. **Conversion; and**
10. **Injunctive Relief.**

Hon. Vincent P. Zurzolo

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Plaintiff and Creditor Archway Broadway Loan SPE, LLC, successor in interest to Real Estate Income Fund I REIT, LLC, a Delaware limited liability company, fka Archway Real Estate Income Fund I SPE I, LLC ("**Plaintiff**"), hereby alleges as follows:

## I.    Jurisdiction and Venue

1.    This Court has jurisdiction over this matter under and by virtue of the provisions of 28 U.S.C. §§ 1334(a), (b), and (e), 28 U.S.C. § 157, 28 U.S.C. § 1367, and Rule 7001 of the Federal Rules of Bankruptcy Procedure. The venue is proper in this Court under and by virtue of the provisions of 28 U.S.C. §§ 1408 and 1409. The matters set forth in this adversary complaint constitute core proceedings under and by virtue of the provisions of 28 U.S.C. §§ 157(b)(2)(A) and (h). As a result thereof, this Court is authorized and empowered to enter final orders and judgments raised in this adversary complaint.

## II.    Introduction

2.    Decedent. Non-debtor decedent David Halevy ("**Decedent**") died on June 3, 2023. Administration of the Decedent's estate (**"Decedent's Estate"**) is now pending in a proceeding in the Los Angeles County Superior Court, in a matter entitled *Estate of David Halevy, Decedent*, assigned case number 24STPB01963 ("**Decedent's Estate Proceeding**"). Decedent's Estate is now legally and equitably responsible to the creditors of Decedent for the acts, omissions, statements, representations, and intentions of Decedent as if they had been the acts, omissions, statements, representations, and intentions of Decedent's Estate.

3.    Plaintiff. Plaintiff is and at all relevant times was a Delaware limited liability company doing business in the State of California.

4.    Defendant Debtor and Trustee Sue. Defendant Debtor Susan Halevy ("**Ms. Halevy**") individually is a debtor in these proceedings, and is sued herein both as a debtor and in her representative capacity as an individual who Plaintiff is informed and believes and thereupon alleges at all times material to the allegations of this complaint resided and now resides in Beverly Hills, California, Los Angeles County, and was and is the duly appointed and serving successor trustee ("**Trustee**") of the Halevy Family Trust dated September 8, 2010, a revocable,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1   self-settled, inter-vivos trust created and funded by the Decedent and Ms. Halevy ("**Decedent's**

2   **Trust**") prior to Decedent's death in Los Angeles County.

3       5.      <u>Defendant Debtor and Personal Representative</u>. Defendant Daniel Halevy

4   individually is a debtor in these proceedings and is sued herein both as a debtor in these

5   proceedings and in his capacity as Personal Representative of David Halevy, Deceased, and not in

6   his individual capacity ("**Mr. Halevy**"). Mr. Halevy is the duly appointed, qualified, and acting

7   personal representative of the Decedent's Estate pursuant to the Letters of Administration issued

8   February 20, 2024, in the Decedent's Estate Proceeding. In said capacity, Mr. Halevy (and any

9   subsequent personal representative appointed in the Decedent's Estate Proceeding) is hereafter

10  referred to as "**Administrator**."

11      6.      <u>South Cannon LLC</u>.  Defendant 341 South Cannon LLC is a California limited

12  liability company ("**South Cannon LLC**") and the current fee title owner of that certain parcel of

13  residential real property commonly known as 341 South Canon Drive, Beverly Hills, California

14  90212 ("**Canon Drive Property**").

15      7.      <u>Agency</u>.  Plaintiff is informed and believes, and thereon alleges, that at all relevant

16  times, each defendant named in the caption of this Complaint was and is the agent, servant, and/or

17  employee of each of the other defendants, and that all of the things alleged to have been done by

18  each defendant were done in the capacity of and as the agent of the other defendants.

19      8.      <u>Creditor's Claim</u>. On May 30, 2024, Plaintiff duly and timely filed a creditor's

20  claim in the amount of $18,327,141.08 against the Decedent's Estate with the Clerk of the Court

21  in the above-mentioned Decedent's Estate ("**Creditor's Claim**"). A true and correct copy of the

22  Creditor's Claim, conformed as filed with the Clerk of the Court, is attached hereto as **Exhibit 1**

23  and incorporated herein by reference. The Creditor's Claim was made on the required California

24  Judicial Council form (DE-172), under oath, with 154 total pages, including all supporting

25  documentation attached, as well as a verified statement of facts supporting the claim and the

26  amount claimed due.

27      9.      <u>Service of Creditor's Claim</u>. On May 30, 2024, Plaintiff served the Creditor's

28  Claim via U.S. Mail upon all person(s) indicated, including but not limited to Mr. Halevy as

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1  Personal Representative of Decedent's Trust, and filed same with the Clerk of the Court in the

2  Decedent's Estate Proceeding. A true and correct copy of the proof of service is attached hereto as

3  **Exhibit 2** and incorporated herein by reference.

4      10.    <u>Rejection of Creditor's Claim</u>. Mr. Halevy, as Administrator of the Decedent's

5  Estate, neither accepted nor rejected Plaintiff's Creditor's Claim within 30 days as required,

6  providing Plaintiff the option to deem the Creditor's Claim rejected, pursuant to California

7  Probate Code § 9256, as of July 5, 2024 ("**Rejection Date**").

8      11.    <u>Prerequisites Satisfied</u>. This Complaint in part sets forth the action of Plaintiff,

9  Decedent's creditor, on the unpaid probate Creditor's Claim that has been filed, served, and

10  deemed rejected in the Decedent's Estate Proceeding. Therefore, this action satisfies the

11  requirements of Probate Code §§ 9351 and 9354.

### III.    Facts in Connection with All Claims

12      12.    Plaintiff alleges that Defendants Mr. Halevy and Ms. Halevy are both holding

13  assets of the non-debtor decedent David, the precise nature, extent, and description of which are

14  not currently completely understood ("**Assets**"). It is therefore unclear at the present time whether

15  and to what extent the Assets do or do not constitute property of Ms. Halevy's personal

16  bankruptcy estate under and within the meaning of 11 U.S.C. § 541.

17      13.    Additionally, the Decedent and Ms. Halevy owned interests in Broadway Avenue

18  Investments LLC ("**Broadway Borrower**"), which is a debtor in its own jointly-administered

19  bankruptcy case herein. Pre-petition, Plaintiff made a loan to the Broadway Borrower in the

20  principal amount of $16,942,500.00, on July 21, 2021 ("**Broadway Loan**" or "**Loan**

21  **Obligations**").

22      14.    The debt owed to Plaintiff by Decedent is evidenced by in part by a Loan

23  Agreement ("**Broadway Loan Agreement**"), that certain Promissory Note in the original

24  principal sum of $16,942,500.00 dated July 21, 2021, signed by the Broadway Borrower

25  ("**Broadway Note**"), a Continuing Guaranty signed by the Decedent ("**Broadway Guaranty**"),

26  and any and all documents, instruments, and agreements executed in connection with the Loan,

27  which are hereinafter referred collectively as the "**Loan Obligation Documents**." True and

1    correct copies of the Broadway Loan Agreement, Note, and Guaranty are collectively attached as

2    **Exhibit 3**.

3         15.    To induce Plaintiff to make the Loan, Mr. Halevy in his personal capacity, Alan

4    Gomperts ("**Mr. Gomperts**") (also a debtor in these jointly-administered bankruptcy cases), and

5    the Decedent executed and delivered to Plaintiff the Broadway Guaranty, guarantying the Loan

6    Obligations as of July 21, 2021. Pursuant to the terms of the Broadway Guaranty, the guarantors,

7    Mr. Gomperts, Mr. Halevy, and the Decedent, jointly and severally, and absolutely and

8    unconditionally guaranteed to Plaintiff the prompt payment of all sums owed by Broadway to

9    Plaintiff pursuant to the Loan Obligations in accordance with the terms of the Loan Obligation

10   Documents. Mr. Gomperts, Mr. Halevy, and the Decedent shall sometimes hereinafter collectively

11   be referred to as the "**Broadway Guarantors**."

12                   **Defaults Under the Loan Documents**

13        16.    Broadway and the Broadway Guarantors defaulted under the terms of the Loan

14   Obligation Documents, including, without limitation, pursuant to Section 5.1(o) of the Broadway

15   Loan Agreement whereunder the Broadway Borrower was required to obtain a certificate of

16   occupancy by January 21, 2022, for the Broadway Property but failed to do so and by failing to

17   pay the Loan Obligation in full as of the scheduled maturity date, August 1, 2022.

18        17.    In connection with the default, and at Broadway's request, Broadway and Plaintiff

19   executed that certain Settlement and Loan Modification Agreement on April 14, 2023

20   ("**Settlement Agreement**"), which among other things, extended the maturity date of the Loan

21   Obligations to December 1, 2023 ("**Maturity Date**"), at which time the entire principal under the

22   Loan Obligations plus all accrued and unpaid interest thereon would be due and payable as

23   provided under the Loan Obligation Documents, and also the Loan Obligations principal balance

24   was reduced from $16,942,500.00 to $15,241,093.00. The defaults otherwise remained uncured. A

25   true and correct copy of the Settlement Agreement is attached as internal Exhibit 2 to the

26   Creditor's Claim, Exhibit 1 hereto. The Settlement Agreement was not a novation, release, or

27   modification of any of the terms, conditions, warranties, waivers, or rights set forth in the Loan

28   Obligation Documents.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**New Loans**

18.    Concurrently with the execution of the Settlement Agreement, Plaintiff made three (3) new loans in the aggregate amount of $4,000,000.00 (collectively, "**New Loan Obligations**") as alleged more particularly herein.

19.    One of the New Loan Obligations is a loan to Negev Investments, LLC ("**Negev**") (also a debtor in these jointly-administered bankruptcy cases) in the principal amount of $1,300,000.00 ("**Negev Loan**"), secured by the real property commonly known as 12800 Foxdale Drive, Desert Hot Springs, California. This loan is personally guaranteed by the Decedent ("**Negev Guaranty**"). A true and correct copy of the Negev Guaranty is attached as internal Exhibit 3 to the Creditor's Claim, Exhibit 1 hereto.

20.    Another one of the New Loan Obligations is a new loan in the principal amount of $125,000.00 to an entity named SLA Investments, LLC, California limited liability company ("**SLA Borrower**") (also a debtor in these jointly-administered bankruptcy cases) secured by the real property commonly known as 1040 S. Los Angeles Street, Los Angeles, California. For value received, and to induce Plaintiff to make the New Loan Obligations, Mr. Gomperts, Mr. Halevy, Decedent, and Decedent's spouse debtor and Defendant Debtor Ms. Halevy executed and delivered to Plaintiff a Continuing Guaranty dated April 14, 2023 ("**SLA Guaranty**"). Pursuant to the terms of the SLA Guaranty, Mr. Gomperts, Mr. Halevy, Decedent, and Ms. Halevy, jointly and severally, and absolutely and unconditionally, guaranteed to Plaintiff the prompt payment of all sums owed pursuant to the New Loan Obligations. A true and correct copy of the SLA Guaranty is attached hereto as **Exhibit 4** and incorporated by this reference.

21.    Any and all documents, instruments, and agreements executed in connection with the New Loan Obligations, which are hereinafter referred collectively as the "**New Loan Obligation Documents**."

**Decedent's Debt is Community Property**

22.    Plaintiff entered into the Loan Obligations and New Loan Obligations, and Decedent signed the Loan Obligation Documents and the New Loan Obligation Documents, at a time when Decedent and Ms. Halevy were husband and wife such that the Assets constitute

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1   community property of Decedent and Ms. Halevy and are liable to Plaintiff to discharge the

2   Obligations of non-debtor Decedent, whether held by Ms. Halevy individually or as Trustee of the

3   Trust, or held by Mr. Halevy.

**Transfer of Canon Drive Property**

5   23.   Plaintiff is informed and believes and thereon alleges that at some point just prior

6   to the Loan Obligations maturing, Ms. Halevy and other co-conspirators, and those aiding and

7   abetting Ms. Halevy, orchestrated a scheme to conceal Assets from Plaintiff. Plaintiff is informed

8   and believes and thereon alleges that this scheme involved Ms. Halevy making various transfers of

9   real property through Decedent's Trust and ultimately to South Cannon LLC, a dormant limited

10  liability company that she and her co-conspirators and aiders and abettors revived in September

11  2023, three months after Decedent's death and just shortly before the looming December 2023

12  Maturity Date of the Loan Obligations and New Loan Obligations owed to Plaintiff.

13  24.   More specifically, on or about November 28, 2000, Decedent and Ms. Halevy

14  individually purchased the Canon Drive Property, to which Decedent and Ms. Halevy took title as

15  husband and wife as community property with rights of survivorship. A true and correct copy of

16  the grant deed to the Canon Drive Property recorded in the official records of the County of Los

17  Angeles on November 28, 2000, as document 00-1845897, evidencing the purchase of the Canon

18  Drive Property by Decedent and Ms. Halevy and containing the full legal description of the Canon

19  Drive Property is attached hereto as **Exhibit 5**.

20  25.   Plaintiff is informed and believes and thereon alleges that on or about September

21  22, 2016, Ms. Halevy and Decedent transferred the Canon Drive Property from themselves as

22  individuals to themselves as trustees of the Decedent's Trust. A true and correct copy of the trust

23  transfer deed recorded in the official records of the County of Los Angeles on September 22,

24  2016, as document 2016-1153679, evidencing the conveyance of the Canon Drive Property to the

25  Decedent's Trust is attached hereto as **Exhibit 6**.

26  26.   Plaintiff is informed and believes and thereon alleges that on or about November 3,

27  2021, Ms. Halevy and Decedent caused to be organized and chartered in California that certain

28  limited liability company named 341 South Cannon LLC ("**South Cannon LLC**"), by causing the

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1   filing of its Articles of Organization with the California Secretary of State. A true and correct copy

2   of the Articles of Organization is attached hereto as **Exhibit 7**.

3       27.    Plaintiff is informed and believes and thereon alleges that on or about September 5,

4   2023, which is after Decedent's death in June 2023, Ms. Halevy caused to be filed a Statement of

5   Information with the California Secretary of State on behalf of South Cannon LLC. A true and

6   correct copy of that Statement of Information is attached hereto as **Exhibit 8**.

7       28.    Plaintiff is informed and believes and thereon alleges that on or about September

8   25, 2023, which is about three months after Decedent's death in June 2023, Ms. Halevy recorded

9   an Affidavit of Death of Trustee in the official records of the County of Los Angeles ("**Affidavit**

10  **of Death**"), as document 2023-0643326, stating that pursuant to the Decedent's Trust, she is the

11  surviving trustee of the Canon Drive Property. A true and correct copy of that Affidavit of Death

12  is attached hereto as **Exhibit 9**.

13      29.    Plaintiff is informed and believes and thereon alleges that on or about September

14  26, 2023, the day after the Affidavit of Death was recorded and about two months before the

15  December 2023 Maturity Date of the Loan Obligations owed to Plaintiff, Ms. Halevy as Trustee of

16  Decedent's Trust caused to be recorded a Grant Deed transferring the Canon Drive Property from

17  Decedent's Trust to Defendant Cannon Drive LLC ("**Canon Grant Deed**"), that certain limited

18  liability company which had been organized and chartered in November 2021 and reinstated by

19  Ms. Halevy a few weeks prior to the transfer ("**Transfer No. 1**"). A true and correct copy of the

20  Canon Grant Deed recorded in the official records of the County of Los Angeles on September 26,

21  2023, as document 2023-0646027, evidencing the conveyance of the Canon Drive Property from

22  Decedent's Trust to South Cannon LLC is attached hereto as **Exhibit 10**.

23      30.    Plaintiff is informed and believes and thereon alleges that on or about September

24  21, 2023, Mr. Halevy as "Manager" of Defendant Cannon Drive LLC, executed a Deed of Trust

25  ("**Deed of Trust**") in favor of beneficiaries, Eastern Financial Mortgage Corporation, a Florida

26  Corporation, and Yarden Consulting LLC, a Delaware limited liability company (collectively,

27  "**Cannon Lender**") in the principal amount of $1,300,000.00 ("**Cannon Loan**"). The Deed of Trust

28  provides that Defendant Cannon Drive LLC grants to Cannon Lender a lien on the Property to

1    secure payment of the "Indebtedness," as defined therein, which includes amounts due by the

2    Defendant Cannon Drive to the Cannon Lender under the Promissory Note, as described therein

3    ("**Transfer No. 2**" together with Transfer No. 1, the "**Transfers**"). A true and correct copy of the

4    Deed of Trust recorded in the official records of the County of Los Angeles Recorder's Office on

5    September 26, 2023, as document 2023-0646028 is attached hereto as **Exhibit 11**.

6         31.    Plaintiff is informed and believes and thereon alleges that as a result of the

7    Transfers and the Canon Loan, South Cannon LLC and Ms. Halevy received cash in an amount

8    well in excess of then existing encumbrances on the Canon Drive Property in an amount which

9    Plaintiff has yet to ascertain but which Plaintiff is informed and believes and thereupon alleges

10   was a sizeable six-figure sum for which there has never been any accounting ("**Canon Loan**

11   **Proceeds**").

**IV.    FIRST CLAIM FOR RELIEF**

**For Declaratory Relief – as Against Ms. Halevy, individually and as Trustee of Decedent's**

**Trust and Mr. Halevy**

15        32.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1

16   through 31 of this Complaint as though fully set forth herein.

17        33.    A dispute now exists concerning the interests of Mr. Halevy and Ms. Halevy in the

18   Assets, and whether and to what extent such Assets are, or are not, property of Ms. Halevy's

19   bankruptcy estate within the meaning of 11 U.S.C. 541(a).

20        34.    Plaintiff contends and alleges that all of the Assets are solely assets of Decedent's

21   Estate to be administered therein under California probate law solely for the benefit of those

22   creditors who have timely filed creditor's claims therein, as to which only Plaintiff has timely filed

23   the Creditor's Claim, and is therefore entitled to all of the Assets to satisfy the Obligations owed

24   to Plaintiff, and that such Assets are not property of the bankruptcy estates of Ms. Halevy or

25   Mr. Halevy.

26        35.    Plaintiff alleges that Mr. Halevy and Ms. Halevy contend to the contrary.

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

36.     A judicial declaration from this Court is now necessary and desirable to determine which of the Assets are not property of Ms. Halevy and Mr. Halevy bankruptcy estates and which of the Assets are available solely to satisfy Plaintiff's Creditor's Claim in Decedent's Estate.

37.     Plaintiff respectfully requests that this Court issue its declaratory judgment in that regard and declare that none of the Assets are property of Ms. Halevy and/or Mr. Halevy bankruptcy estates.

## V.     SECOND CLAIM FOR RELIEF

### Action on Rejected Probate Creditor's Claim (Breach of Broadway Guaranty) – As Against Mr. Halevy as Administrator

38.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 37 of this Complaint as though fully set forth herein.

39.     As set forth herein, during the Decedent's lifetime in July 2021, Decedent executed and delivered to Plaintiff the Broadway Guaranty. In reliance in part on the Guaranty of Decedent, Plaintiff extended credit to the Broadway pursuant to the terms of the Loan Obligation Documents.

40.     Decedent defaulted under the terms of the Loan Obligation Documents by, among other things, failing to obtain a certificate of occupancy pursuant to Section 5.1(o) of the Broadway Loan Agreement and failing to pay the Broadway Loan on its scheduled maturity date of August 1, 2022.

### Decedent Indebted to Plaintiff Prior to Death for Breach of Guaranty.

41.     Pursuant to the Broadway Guaranty, Decedent absolutely and unconditionally guaranteed to Plaintiff payment of the Indebtedness, which includes amounts due by the Broadway to Plaintiff. As particularly defined in Section 5(a) of the Broadway Guaranty, Decedent's "absolute" liability will not be modified, released, or impaired for any reason, including because any person dies.

### Unpaid and Rejected.

42.     Although demanded to be allowed and/or paid, no part of the amount of the Creditor's Claim (Exhibit 1) has been allowed or paid. The sum of not less than $18,327,141.08

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

on the Creditor's Claim, which evidences and sets forth the total amount of the Creditor's Claim as filed with the Clerk of the Court, has not been allowed or paid by the Decedent, by Mr. Halevy as Administrator, or otherwise. Instead, the Creditor's Claim has been deemed rejected and despite demand, has not been paid to Plaintiff.

**Liability.**

43.     Accordingly, Mr. Halevy as Administrator, in his capacity as the personal representative of the Decedent's Estate, is liable to Plaintiff in the sum of not less than $18,327,141.08 on the Creditor's Claim (Exhibit 1), plus pre-judgment interest thereon, at the maximum legal rate from the date of filing of the Creditor's Claim, May 30, 2024, through and including the date of entry of judgment. Plaintiff has duly performed all conditions precedent on its part required to be performed.

**Reasonable Litigation Expenses Including Attorneys' Fees.**

44.     Mr. Halevy as Administrator's failure to acknowledge the debts that Decedent owed to Plaintiff is and has been unreasonable, and therefore Plaintiff is also entitled to recover reasonable litigation expenses, including attorneys' fees, from Mr. Halevy as Administrator pursuant to Probate Code § 9354(c).

**VI.    THIRD CLAIM FOR RELIEF**

**Action On Rejected Probate Creditor's Claim (Breach of Negev Guaranty) – As Against Mr. Halevy as Administrator**

45.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46.     As set forth herein, during the Decedent's lifetime in April 2023, Decedent executed and delivered to Plaintiff the Negev Guaranty. In reliance in part on the on the personal guarantee of the Decedent, Plaintiff extended credit to the Negev Borrower pursuant to the terms of the New Loan Obligation Documents and Settlement Agreement.

47.     Decedent defaulted under the terms of the New Loan Obligation Documents and Settlement Agreement for, among other things, failing to pay the Negev Loan on its scheduled maturity date of December 1, 2023.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**Decedent Indebted to Plaintiff Prior to Death for Breach of Guaranty.**

48.     Pursuant to the Negev Guaranty, Decedent absolutely and unconditionally guaranteed to Plaintiff payment of the Indebtedness, which includes amounts due by the Negev Borrower to Plaintiff. As particularly defined in Section 5(a) of the Negev Guaranty, Decedent's "absolute" liability will not be modified, released, or impaired for any reason, including because any person dies.

**Unpaid and Rejected.**

49.     Although demanded to be allowed and/or paid, no part of the amount of the Creditor's Claim has been allowed or paid, and the sum of not less than $1,300,000.00 on the Creditor's Claim, which evidences and sets forth the total amount of the Creditor's Claim as filed with the Clerk of the Court, has been allowed or paid by the Decedent, by Mr. Halevy as Administrator, or otherwise. Instead, the Creditor's Claim has been deemed rejected and despite demand, have not been paid to Plaintiff.

**Liability.**

50.     Accordingly, Mr. Halevy as Administrator, in his capacity as the personal representative of the Decedent's Estate, is liable to Plaintiff in the sum of not less than $1,300,000.00 on the Creditor's Claim, plus pre-judgment interest thereon, at the maximum legal rate from the date of filing of the Creditor's Claim, May 30, 2024, through and including the date of entry of judgment. Plaintiff has duly performed all conditions precedent on its part required to be performed.

**Reasonable Litigation Expenses Including Attorneys' Fees.**

51.     Mr. Halevy as Administrator's failure to acknowledge the debts that Decedent owed to Plaintiff is and has been unreasonable, and therefore Plaintiff is also entitled to recover reasonable litigation expenses, including attorneys' fees, from Mr. Halevy as Administrator pursuant to Probate Code § 9354(c).

## VII.   FOURTH CLAIM FOR RELIEF

**Action On Rejected Probate Creditor's Claim (Breach of [SLA] Guaranty) – As Against Mr. Halevy as Administrator**

52.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53.     As set forth herein, during the Decedent's lifetime in April 2023, Decedent executed and delivered to Plaintiff the SLA Guaranty, Exhibit 4 hereto. In reliance on the Guaranty of the Decedent, Plaintiff extended credit to the SLA Borrower pursuant to the terms of the New Loan Obligation Documents and Settlement Agreement.

54.     Decedent defaulted under the terms of the New Loan Obligation Documents and the Settlement Agreement for, among other things, failing to pay the SLA Loan on its scheduled maturity date of December 1, 2023.

**Decedent was Indebted to Plaintiff Prior to Death for Breach of Guaranty.**

55.     Pursuant to the SLA Guaranty, Decedent absolutely and unconditionally guaranteed to Plaintiff payment of the Indebtedness, which includes amounts due by the SLA Borrower to Plaintiff. As particularly defined in Section 5(a) of the SLA Guaranty, Decedent's "absolute" liability will not be modified, released, or impaired for any reason, including because any person dies.

**Unpaid and Rejected.**

56.     Although demanded to be allowed and/or paid, no part of the amount of the Creditor's Claim has been allowed or paid, and the sum of not less than $125,000.00 on the Creditor's Claim, which evidences and sets forth the total amount of the Creditor's Claim as filed with the Clerk of the Court, has been allowed or paid by the Decedent, by Mr. Halevy as Administrator, or otherwise. Instead, the Creditor's Claim has been deemed rejected and despite demand, have not been paid to Plaintiff.

**Liability.**

57.     Accordingly, Mr. Halevy as Administrator, in his capacity as the personal representative of the Decedent's Estate, is liable to Plaintiff in the sum of not less than $125,000.00 on the Creditor's Claim, plus pre-judgment interest thereon, at the maximum legal rate from the date of filing of the Creditor's Claim, May 30, 2024, through and including the date

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

of entry of judgment. Plaintiff has duly performed all conditions precedent on its part required to be performed.

**Reasonable Litigation Expenses Including Attorneys' Fees.**

58.     Mr. Halevy as Administrator's failure to acknowledge the debts that Decedent owed to Plaintiff is and has been unreasonable, and therefore Plaintiff is also entitled to recover reasonable litigation expenses, including attorneys' fees, from Mr. Halevy as Administrator pursuant to Probate Code § 9354(c).

## VIII.   FIFTH CLAIM FOR RELIEF

**Action On Rejected Probate Creditor's Claim Action On Rejected Probate Creditor's Claim - For Liability of Trustee of Decedent's Revocable Trust As Against Ms. Halevy as Trustee of Decedent's Trust**

59.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 58 of this Complaint as though fully set forth herein.

**Nature of Trustee Liability.**

60.     Property over which a decedent held the power of revocation (that is, property held in a trust in which the decedent held or retained the power to change, alter, modify, or terminate the trust) as of the date of the decedent's death is subject to the claims of the decedent's creditors, to the extent the decedent's estate is "inadequate." *See* Probate Code §§ 19000 *et seq.* and 19001(a). The estate of such a revocable trust is subject to the settlor's (trustor's) creditors without any need for showing fraudulent intent or other means to undo the transfer to the trust.

**Inadequacy.**

61.     Here, Plaintiff is informed and believes and based thereon alleges that the assets of the Decedent's estate are minimal and therefore inadequate to satisfy the Creditor's Claim. There have been no inventories filed and nothing filed in the Decedent's Estate Proceeding by Ms. Halevy as Trustee of Decedent's Trust. Although the Decedent's Estate is therefore inadequate, Plaintiff is informed and believes and thereupon alleges that the Decedent's Trust is solvent and adequate, and therefore the assets of the Decedent's Trust, and the Trustee thereof, are liable for the full amount of the Plaintiff's Creditor's Claim as set forth herein.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**Liability.**

62.     Accordingly, Plaintiff is entitled to a determination that the Decedent's Estate is inadequate to satisfy the Plaintiff's Creditor's Claim and, therefore, Ms. Halevy, in her capacity as the Trustee of the Decedent's Trust is liable to Plaintiff in the sum of not less than $18,327,141.08 on Creditor's Claim, which is the total amount of the Creditor's Claim as filed with the Clerk of the Court, plus pre-judgment interest thereon, at the maximum legal rate from the date of filing of the Creditor's Claim, May 30, 2024, through and including the date of entry of judgment.

**Reasonable Litigation Expenses Including Attorneys' Fees.**

63.     Plaintiff is also entitled to recover from Ms. Halevy as Trustee of Decedent's Trust, all money damages recoverable on a claim against the personal representative of a decedent's estate, including reasonable litigation expenses, including attorneys' fees, pursuant to Probate Code § 9354(c).

## IX.     SIXTH CLAIM FOR RELIEF

**For Fraudulent Transfer (Cal. Civ. Code § 3439, *et seq*.) as Against Ms. Halevy, individually and as Trustee of Decedent's Trust, and South Cannon LLC**

64.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 63 of this Complaint as though fully set forth herein.

65.     Plaintiff was, at the time of the Transfers and the Canon Loan an existing creditor (as the word "creditor" is defined in California Civil Code § 3439.01(c)) of Decedent, Decedent's Estate, and Ms. Halevy, in that at all times mentioned herein, Plaintiff was and is a holder of a claim (as the word "claim" is defined in California Civil Code § 3439.01(b)) arising from the Creditor's Claim, the Loan, the Loan Documents, and the New Loan Obligations.

66.     Plaintiff's claims arising from the Creditor's Claim, the Loan, the Loan Documents, and the New Loan Obligations existed before the Transfers and the Canon Loan.

67.     Plaintiff is informed and believes and thereon alleges that Transfer No. 1 was essentially a gift made for no consideration (or reasonable equivalent value in exchange), to an insider of Ms. Halevy and her co-conspirators (not an arm's-length transaction), and that Ms. Halevy and her various co-conspirators and aiders and abettors concealed such transfer from

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Plaintiff for the purpose of with the express intent to hinder, delay, or defraud the creditors of Decedent, including but not limited to Plaintiff, for the express benefit of the Decedent's Estate, and/or Ms. Halevy.

68.    Plaintiff is further informed and believes, and thereon alleges, that the Canon Loan and Transfer No. 2 were made by Ms. Halevy and Defendant Cannon LLC with the express purpose and intent of putting the Assets outside the reach of existing and/or future creditors of Decedent, including but not limited to Plaintiff, for the express benefit of South Cannon LLC and Ms. Halevy.

69.    Plaintiff is further informed and believes and thereupon alleges that the foregoing aiding and abetting, and conspiracy, was knowingly entered into, agreed upon, acknowledged, supported, furthered, assisted, and coordinated by and between each of the Transfer Defendants.

70.    Plaintiff is informed and believes and thereupon alleges that Ms. Halevy and South Cannon LLC were at all times an insider of Decedent, Decedent's Trust, and Decedent's Estate, and South Cannon LLC was not a *bona fide* purchaser or transferee of the Assets, did not engage in the Transfers in good faith or reasonably, or for reasonable equivalent value and that the Transfers were not the result of an arms-length transaction.

71.    The Transfers are, and at all times material hereto were subject to and have been infected with, at least the following "badges of fraud" as alleged more particularly herein:

(a)    Plaintiff is informed and believes and thereon alleges that the Transfers were a transfer to a family-controlled entity, or otherwise to an "insider" (Cal. Civ. Code § 3439.04(b)(1));

(b)    Ms. Halevy and/or South Cannon LLC retained possession or control of the Assets after the Transfers (Cal. Civ. Code § 3439.04(b)(2)).

(c)    Ms. Halevy did not disclose any such Transfers of the Assets, but instead concealed the Transfers from Plaintiff after the Transfers notwithstanding the express knowledge of the claims of Plaintiff, before and after Decedent's death. Further, at all times after the Transfers of the Assets, Ms. Halevy has failed and refused, and continues to fail and refuse to

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

discuss the Transfers and the Assets with Plaintiff, evidencing a consciousness of guilt concerning the Transfers and the Assets (Cal. Civ. Code § 3439.04(b)(3));

(d)    Before the Transfers, the threat of legal action against Decedent, Decedent's Trust, Ms. Halevy, and the Assets was clear and unmistakable due to the looming maturity of the Broadway Loan Obligations and those New Loans and the guaranties associated therewith (Cal. Civ. Code § 3439.04(b)(4));

(e)    Plaintiff is informed and believes, and thereupon alleges, that the Transfers stripped Decedent and Decedent's Trust of substantial valuable Assets which had material value to the satisfaction of the claims of Plaintiff (Cal. Civ. Code § 3439.04(b)(5));

(f)    The net effect of the Transfers of the Assets has been that Ms. Halevy, individually and as Trustee of Decedent's Trust has removed and concealed valuable Assets belonging to Decedent, Decedent's Trust, and Decedent's Estate (Cal. Civ. Code § 3439.04(b)(7));

(g)    Decedent, Decedent's Trust, and Decedent's Estate have failed to receive material consideration for the Transfers, which transferred value received by Decedent and Decedent's Estate was not reasonably equivalent to what Ms. Halevy and South Cannon LLC received in return (Cal. Civ. Code § 3439.04 (b)(8));

(h)    Plaintiff is informed and believes and thereupon alleges that Ms. Halevy did not provide to Decedent's Trust or Decedent's Estate reasonable equivalent value in making the Transfers in that the value of the Assets transferred to and retained by Ms. Halevy materially outvalued the value of the Assets transferred to and retained by Decedent and/or Decedent's Estate;

(i)    Plaintiff is informed and believes, and thereupon alleges, that at the time of the Transfers, Decedent and Decedent's Trust were not handling Decedent's debts appropriately or performing as promised in the Loan Documents.

72.    Plaintiff is further informed and believes, and thereupon alleges, that Decedent and/or Decedent's Estate and/or the Trust did not receive reasonable equivalent value when the Transfers took place, in violation of California Civil Code § 3439.04.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

73.     Plaintiff is further informed and believes, and thereupon alleges, that Decedent and/or Decedent's Estate did not receive reasonable equivalent value when the Transfers took place in violation of California Civil Code § 3439.05.

74.     Pursuant to California Civil Code §§ 3439.04(a), 3439.05 (a), and 3439.07(a)(1), and the common law of fraudulent transfer, the Court should set aside, annul, and/or declare the Transfers void insofar as it pertains to the Assets. Further, pursuant to California Civil Code § 3439.07(a)(3)(A), the Court should also enjoin all further transfer of title of the Assets without prior Court approval. Pursuant to California Civil Code § 3439.07(a)(3)(C), the Court should also award damages to Plaintiff in an amount according to proof at time of trial.

75.     Plaintiff is informed and believes, and thereon alleges, that the Transfers were a void transaction within the meaning of, and pursuant to, the California Voidable Transactions Act, California Civil Code § 3439, et seq.

76.     As a result of the Assets voidable transactions, and in accordance with California Civil Code § 3439.07, among other remedies, Plaintiff is entitled to have the Transfers set aside to satisfy Plaintiff's claims.

77.     Plaintiff is informed and believes, and thereon alleges, that in acting as described herein, the Defendants, and each of them, acted with full knowledge of the facts set forth herein and with the specific intent of injuring Plaintiff by transferring the Assets so as to interfere with Plaintiff's rights under the Loan, Loan Documents, and New Loan Obligations, and acted with oppression, fraud, and malice, as defined in California Civil Code § 3294. Accordingly, Plaintiff is entitled to recover punitive and exemplary damages against the Defendants, and each of them, in an amount to be set by the trier of fact.

## X.    SEVENTH CLAIM FOR RELIEF

**For Declaratory Relief re Constructive Trust and Equitable Lien - as Against Ms. Halevy, individually and as Trustee of Decedent's Trust and Mr. Halevy**

78.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79.     Plaintiff contends as follows:

(a)     Ms. Halevy, individually and as Trustee of Decedent's Trust, and Mr. Halevy ("**Wrongful Transferors**"), has knowingly, wrongfully, and intentionally transferred the Assets ("**Wrongfully Transferred Properties**") for the purpose of defrauding Plaintiff, and entities in a class including Plaintiff, and evading payment of the obligations owed to all similarly situated parties such as, and including, Plaintiff solely as alleged herein. Plaintiff is informed and believes, and thereon alleges, that such Wrongfully Transferred Properties includes without limitation all and/or part of any proceeds received, or to be received, by the Wrongful Transferors, and/or each of them, and all other things of value obtained through the proceeds of the Transfers.

(b)     The Wrongful Transferors retention of the Wrongfully Transferred Properties is wrongful.

(c)     Defendants and each of their actions with respect to the Wrongfully Transferred Properties is wrongful.

(d)     Defendants, and each of them, would be unjustly enriched if allowed to retain the benefits which they have achieved by their wrongful conduct.

(e)     Consequently, Plaintiff is entitled to the issuance of a judicial decree that the Wrongful Transferors, and/or each of them, hold all of the Wrongfully Transferred Properties, in their, or any of their, possession, and/or which they, or any of them, have received or which they, or any of them, may in the future receive, including but not limited to any proceeds which they, or any of them, may receive as a constructive and involuntary trustee for the benefit of Plaintiff, and a constructive trust should be imposed thereon for the benefit of Plaintiff.

(f)     A constructive trust, together with equitable liens, should be imposed on any funds or other property that is rightfully subject to the Plaintiff's claims as herein alleged, including such funds or other property that Defendants, or any of them, have transferred, including but not limited to the Wrongfully Transferred Properties.

(g)     The funds or other property misappropriated should be traced to their ultimate disposition, and a constructive trust be placed on such property and the Wrongfully Transferred Properties.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

(h)    Wrongful Transferors, and/or each of them, should be required to disgorge and surrender to Plaintiff all proceeds, benefit, or economic advantage that they have achieved by virtue of their wrongful conduct solely for the benefit of Plaintiff on the obligations owed to Plaintiff as herein alleged by Ms. Halevy and Mr. Halevy.

80.    Plaintiff alleges that Defendants contend to the contrary.

81.    A judicial declaration is now appropriate and warranted that Defendants and each of them hold all Wrongfully Transferred Property as constructive and involuntary trustees for the benefit of Plaintiff, and that equitable liens are be impressed on any and all of the proceeds of such Wrongfully Transferred Properties.

## XI.    EIGHTH CLAIM FOR RELIEF

### For Breach of Fiduciary Duty – as Against Defendants Ms. Halevy, individually and as Trustee of Decedent's Trust

82.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 81 of this Complaint as though fully set forth herein.

83.    California Probate Code outlines various duties of trustees, including the duty of loyalty (Cal. Prob. Code § 16002); the duty to avoid conflicts of interest (Cal. Prob. Code § 16004); and the duty to control and preserve trust property (Cal. Prob. Code § 16006).

84.    At all relevant times herein, Ms. Halevy was and is the duly-appointed and serving successor trustee of the Decedent's Trust. Specifically, Ms. Halevy acted and/or held herself out to others as Trustee of Decedent's Trust by filing the Affidavit of Death stating that pursuant to Decedent's Trust, she is the successor Trustee and is acting as Trustee in order to transfer the Canon Drive Property to her then-wholly owned entity Cannon Drive LLC.

85.    In September 2023, Ms. Halevy, individually and as Trustee of Decedent's Trust, owed a duty to Plaintiff to not self-deal or divert, dissipate, or unduly risk assets of the Decedent's Trust that might otherwise be used to pay Plaintiff's claims as herein alleged as owed to Plaintiff on the obligations alleged above.

86.    Ms. Halevy breached this duty in her capacity as Trustee by diverting the Canon Drive Property from Decedent's Trust into her solely-owned limited liability company, South

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1    Cannon LLC, and taking and concealing and/or dissipating the proceeds of the loan she allowed to

2    be put on Canon Drive Property.

3        87.    Plaintiff is further informed and believes and thereupon alleges that some or all of

4    the Assets referenced in Decedent's Trust constituted the *res* of the Trust, such that Ms. Halevy as

5    Trustee of Decedent's Trust had a fiduciary duty to safeguard the *res* of Decedent's Trust to

6    discharge the obligations of the Trust, and the Trustees thereof, to third parties which included

7    Plaintiff in payment of debts including the Creditor's Claim.

8        88.    By acting as Trustee of Decedent's Trust and wrongfully taking possession of and

9    transferring trust assets for her direct and/or indirect personal benefit, Ms. Halevy breached her

10   fiduciary obligations as Trustee (trustee *de son tort*). *See King v. Johnston*, 178 Cal. App. 4th

11   1488, 1505–1506 (2009); *England v. Winslow*, 196 Cal. 260, 267 (1925); *Soar v. Ashwell*, 2 Q.B.

12   390 (1893).

13       89.    As a consequence of Ms. Halevy's Breaches, Plaintiff suffered damages including

14   loss of the ability to immediately execute and collect on its defaulted debt obligations alleged

15   above and recover not less than the value of the assert transferred, plus attorney's fees and costs in

16   amounts according to proof.

17              **XII.    NINTH CLAIM FOR RELIEF**

18       **For Conversion – as Against Ms. Halevy, individually and as Trustee of**

19                    **Decedent's Trust and Mr. Halevy**

20       90.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1

21   through 89 of this Complaint as though fully set forth herein.

22       91.    As referenced above, Plaintiff was entitled to Decedent's Assets due to Decedent's

23   default under the terms of the Loan Documents.

24       92.    As referenced above, Ms. Halevy, individually and as Trustee of Decedent's Trust

25   and Mr. Halevy ("**Conversion Defendants**") substantially interfered with and prevented the

26   possession of the Assets by Plaintiff by causing and/or aiding and abetting in causing the

27   Transfers.

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

93.     As referenced above, the Conversion Defendants interfered with and prevented the possession of the Assets by Plaintiff solely to apply to the obligations owed to Plaintiff as alleged above by taking possession of and/or aiding and abetting in the Transfers.

94.     As referenced above, although demanded to be allowed and/or paid, no part of the amount of the Creditor's Claim has been allowed or paid and the sum of not less than $18,327,141.08 on the Creditor's Claim, and the sum to be ascertained as to Creditors, which evidence and set forth the total amount of the Creditor's Claim as filed with the Clerk of the Court, have been allowed or paid by the Decedent, by Mr. Halevy as Administrator, or otherwise. Instead, the Creditor's Claim has been deemed rejected and despite demand, has not been paid to Plaintiff.

95.     As referenced above, Plaintiff did not consent to or know of the Transfers prior to the Transfers taking place. Plaintiff is not a volunteer in allowing Ms. Halevy, individually or on behalf of Decedent's Trust and Mr. Halevy, or any of them, to keep and maintain possession of the Collateral.

### XIII.   TENTH CLAIM FOR RELIEF

**For Injunction/Temporary Restraining Order – Against All**

96.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 95 of this Complaint as though fully set forth herein.

97.     Pursuant to Federal Rules of Bankruptcy Procedure Rule 7065 and Federal Rules of Civil Procedure Rule 65, Plaintiff is entitled to a temporary restraining order and preliminary and permanent injunctions restraining further disposition, sale, hypothecation, and/or transfer by the Transfer Defendants and/or Wrongful Transferors, or any of them, and/or any of their agents, employees, officers, directors, shareholders, trustees, and/or transferees, of any and all property and/or assets ("**Transferee Assets**"), including, *without limitation*, any and all property and/or assets owned and/or controlled by entities, which themselves are owned and/or controlled by any of the Transfer Defendants or Wrongful Transferors.

98.     Plaintiff is additionally entitled to a temporary restraining order and preliminary and permanent injunctions restraining further disposition, sale, hypothecation, and/or transfer by

1   the Transfer Defendants and/or Wrongful Transferors, or any of them, and/or any of their agents,

2   employees, officers, directors, shareholders, trustees, and/or transferees, of any proceeds from any

3   Transferee Assets, including without limitation a temporary restraining order and preliminary and

4   permanent injunctions restraining the disbursement, by escrow or otherwise, of the net proceeds

5   (gross sale proceeds less existing liens, property taxes, and bona fide, reasonable, arm's length

6   closing costs) from the sale of any Transferee Assets to any person or entity, or otherwise freezing

7   said proceeds, pending the outcome of this action and/or further order of the Court.

8       99.   Unless injunctive relief is granted, Plaintiff will suffer great and irreparable injury

9   in that, among other things, if any Transferee Assets are sold, the proceeds will likely be disbursed

10  to the Transfer Defendants and/or Wrongful Transferors, and each of them, and, based on their

11  prior conduct as alleged herein, made unavailable to satisfy Decedent and Ms. Halevy's Loan

12  Obligations to Plaintiff, rendering any judgment in this action ineffectual.

13  **XIV.   PRAYER FOR RELIEF**

14      **WHEREFORE**, Plaintiff prays for judgment against the defendants, and each of them, as

15  follows:

16      **1.    As to the First Claim for Declaratory Relief:**

17      For judgment against Ms. Halevy, individually and as Trustee of Decedent's Trust, and

18  Mr. Halevy, declaring that that all of the Assets are solely assets of Decedent's Estate to be

19  administered therein solely for the benefit of those creditors who have timely filed creditor's

20  claims therein, as to which only Plaintiff has timely-filed the Creditor's Claim and is therefore

21  entitled to all of the Assets to satisfy the Obligations owed to Plaintiff, and that such Assets are not

22  property of Ms. Halevy bankruptcy estate.

23      **2.    As to the Second Claim for Relief for Breach of Guaranty.**

24      For judgment against Mr. Halevy as Administrator, in his capacity as the personal

25  representative of the Decedent's Estate, for not less than $18,327,141.08 on the Creditor's Claim,

26  plus pre-judgment interest thereon, at the maximum legal rate from the date of filing of the

27  Creditor's Claim, May 30, 2024, through and including the date of entry of judgment.

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**3.    As to the Third Claim for Relief for Breach of Guaranty:**

For judgment against Mr. Halevy, as Administrator, in his capacity as the personal representative of the Decedent's Estate, for not less than $1,300,000.00 on the Creditor's Claim, plus pre-judgment interest thereon, at the maximum legal rate from the date of filing of the Creditor's Claim, May 30, 2024, through and including the date of entry of judgment.

**4.    As to the Fourth Claim for Relief for Breach of Guaranty:**

For judgment against Mr. Halevy, as Administrator, in his capacity as the personal representative of the Decedent's Estate, for not less than $125,000.00 on the Creditor's Claim, plus pre-judgment interest thereon, at the maximum legal rate from the date of filing of the Creditor's Claim, May 30, 2024, through and including the date of entry of judgment.

**5.    As to the Fifth Claim for Relief for Breach of Guaranty:**

For judgment determining and declaring that the Decedent's Estate is inadequate to satisfy the Plaintiff's Creditor's Claim and, therefore, Ms. Halevy, in her capacity as the Trustee of the Decedent's Trust is liable to Plaintiff in the sum of not less than $18,327,141.08 on Creditor's Claim, which is the total amount of the Creditor's Claim as filed with the Clerk of the Court, plus pre-judgment interest thereon, at the maximum legal rate from the date of filing of the Creditor's Claim, May 30, 2024, through and including the date of entry of judgment.

**6.    As to the Sixth Claim for Relief for Fraudulent Transfer:**

For judgment against Ms. Halevy, individually and as Trustee of Decedent's Trust, and South Cannon LLC: (a) setting aside, annulling, and declaring each of the Transfers and any documents of such Transfers void pursuant to California Civil Code § 3439.07(a); (b) enjoining further disposition of any of the Assets, the Canon Loan Proceeds, and/or proceeds thereof, pursuant to California Civil Code § 3439.07(a)(3)(A); (c) impressing an equitable lien over any and all proceeds derived by any defendant as a result of any of the Transfers and voidable transactions; or (d) alternatively, if for any reason the foregoing relief is unavailable, for damages against each of the Defendants to the extent necessary to satisfy Plaintiff's claims in full, in the amount of the value of the property that is the subject of the voided Transfers.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**7.** **As to the Seventh Claim for Declaratory Relief re Constructive Trust and Equitable Lien:**

For judgment against Defendants Ms. Halevy, individually and as Trustee of Decedent's Trust, and Administrator/Mr. Halevy: (a) declaring and decreeing that Defendants, and each of them, hold all of the void Transfers and all proceeds thereof, in their, or any of their, possession, and/or which they, or any of them, have received or which they, or any of them, may in the future receive, including but not limited to any proceeds which they, or any of them, may receive as a constructive and involuntary trustee for the benefit of Plaintiff, and a constructive trust should be imposed and impressed thereon for the benefit of Plaintiff; (b) imposing a constructive trust on any funds or other property, including the Transfers, that is rightfully Plaintiff's, including such funds or other property that Defendants have transferred, and requiring that the funds or other property misappropriated be traced to their ultimate disposition, and a constructive trust be placed on such property; and (c) requiring Defendants, to disgorge and surrender to Plaintiff all proceeds, benefit, or economic advantage which they have achieved by virtue of their wrongful conduct.

**8.** **As to the Eighth Claim for Relief for Breach of Fiduciary Duty:**

For judgment against Defendants Ms. Halevy, individually and as Trustee of Decedent's Trust for :(a) damages in the sum in an amount according to proof; (b) interest at the legal rate on all damages in an amount according to proof; and (c) all costs incurred in taking possession of the Assets in an amount according to proof.

**9.** **As to the Ninth Claim for Relief for Conversion:**

For judgment against Defendants Ms. Halevy, individually and as Trustee of Decedent's Trust, and Administrator/Mr. Halevy for (a) damages in the sum in an amount according to proof; (b) interest at the legal rate on all damages in an amount according to proof; and (c) all costs incurred in taking possession of the Assets in an amount according to proof.

**10.** **As to the Tenth Claim for Injunctive Relief:**

For a temporary restraining order and preliminary and permanent injunctions restraining:

(a) further disposition, sale, hypothecation, and/or transfer by the Transfer Defendants, and/or any of their agents, employees, officers, directors, shareholders, trustees, and/or transferees,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1  of any and all property and/or assets ("**Transferee Assets**"), including, <u>without limitation</u>, any and

2  all property and/or assets owned and/or controlled by entities, which themselves are owned and/or

3  controlled by any of the Transfer Defendants; and

4     (b)    further disposition, sale, hypothecation, and/or transfer by the Transfer Defendants,

5  and/or any of their agents, employees, officers, directors, shareholders, trustees, and/or transferees,

6  of any proceeds from any Transferee Assets; and

7     (c)    the disbursement, by escrow or otherwise, of the net proceeds (gross sale proceeds

8  less existing liens, property taxes, and bona fide, reasonable, arm's length closing costs) from the

9  sale of any Transferee Assets to any person or entity other than to Plaintiff, or otherwise freezing

10  said proceeds, pending the outcome of this action and/or further order of the Court.

11     **11.    As to all Claims for Relief:**

12     (a)    For the liability of the defendants to be joint and several;

13     (b)    For costs of suit herein incurred;

14     (c)    For reasonable litigation expenses, including attorneys' fees and costs, expended in

15  this proceeding; and

16     (d)    For such further and order relief as this Court may deem just and proper under the

17  circumstances.

18  DATED:  October 14, 2024          FRANDZEL ROBINS BLOOM & CSATO, L.C.
                                      MICHAEL GERARD FLETCHER
19                                    PAIGE S. POUPART

20

21

22                                    By:  _____/s/ Michael Gerard Fletcher_____

23                                         MICHAEL GERARD FLETCHER
                                           Attorneys for Plaintiff
                                           Plaintiff Archway Broadway Loan SPE, LLC

24

25

26

27

28

**FRANDZEL ROBINS BLOOM & CSATO, L.C.**
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# EXHIBIT 1

DE-172

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | TELEPHONE AND FAX NOS.: | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
ADAM L. STRELTZER, ESQ.        CBN175075
ADAM L. STRELTZER, ATTORNEY AT LAW
1801 CENTURY PARK EAST, SUITE 2400
LOS ANGELES        CA    90067

TELEPHONE AND FAX NOS.:
424-652-8010
Fax 424-652-2296

ATTORNEY FOR (Name): ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS: 111 N. HILL ST.
MAILING ADDRESS:
CITY AND ZIP CODE: LOS ANGELES, CA 90012
BRANCH NAME: CENTRAL DISTRICT-STANLEY MOSK COURTHOUSE

FOR COURT USE ONLY
Electronically FILED by
Superior Court of California,
County of Los Angeles
5/30/2024 9:48 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By D. Morales, Deputy Clerk

ESTATE OF (Name):

DAVID HALEVY

DECEDENT

| **CREDITOR'S CLAIM** | CASE NUMBER:<br>24STPB01963 |
|---|---|

You must file this claim with the court clerk at the court address above before the LATER of (a) four months after the date letters (authority to act for the estate) were first issued to the personal representative, or (b) sixty days after the date the *Notice of Administration* was given to the creditor, if notice was given as provided in Probate Code section 9051. You must also mail or deliver a copy of this claim to the personal representative and his or her attorney. A proof of service is on the reverse.

**WARNING:** Your claim will in most instances be invalid if you do not properly complete this form, file it on time with the court, and mail or deliver a copy to the personal representative and his or her attorney.

1. Total amount of the claim: $ 18,327,141.08
2. Claimant (name): ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC
   a. ☐ an individual
   b. ☐ an individual or entity doing business under the fictitious name of (specify):
   c. ☐ a partnership. The person signing has authority to sign on behalf of the partnership.
   d. ☐ a corporation. The person signing has authority to sign on behalf of the corporation.
   e. ☒ other (specify): Delaware Limited Liability Company
3. Address of claimant (specify): 1875 Century Park East, Suite 900, Los Angeles, CA 90067

4. Claimant is  ☒ the creditor  ☐ a person acting on behalf of creditor (state reason):
   Authorized Officer and Agent of ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a
   Delaware Limited Liability Company

5. ☐ Claimant is  ☐ the personal representative  ☐ the attorney for the personal representative.
6. I am authorized to make this claim which is just and due or may become due. All payments on or offsets to the claim have been credited. Facts supporting the claim are  ☒ on reverse  ☒ attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: May 29, 2024

Bobby Khorshidi a.k.a. Babak Khorshidi
................................................
(TYPE OR PRINT NAME AND TITLE)
Authorized Officer and Agent

▶

(SIGNATURE OF CLAIMANT)

**INSTRUCTIONS TO CLAIMANT**

A. On the reverse, itemize the claim and show the date the service was rendered or the debt incurred. Describe the item or service in detail, and indicate the amount claimed for each item. Do not include debts incurred after the date of death, except funeral claims.

B. If the claim is not due or contingent, or the amount is not yet ascertainable, state the facts supporting the claim.

C. If the claim is secured by a note or other written instrument, the original or a copy must be attached (state why original is unavailable.) If secured by mortgage, deed of trust, or other lien on property that is of record, it is sufficient to describe the security and refer to the date or volume and page, and county where recorded. (See Prob. Code, § 9152.)

D. Mail or take this original claim to the court clerk's office for filing. If mailed, use certified mail, with return receipt requested.

E. Mail or deliver a copy to the personal representative and his or her attorney. Complete the Proof of Mailing or Personal Delivery on the reverse.

F. The personal representative or his or her attorney will notify you when your claim is allowed or rejected.

G. Claims against the estate by the personal representative and the attorney for the personal representative must be filed within the claim period allowed in Probate Code section 9100. See the notice box above.

(Continued on reverse)

Form Approved by the
Judicial Council of California
DE-172 [Rev. January 1, 1998]
Mandatory Form [1/1/2000]

**CREDITOR'S CLAIM**
**(Probate)**

CEB
www.ceb.com

Probate Code, §§ 9000 et seq., 9153

| ESTATE OF *(Name)*: | CASE NUMBER: |
|---|---|
| DAVID HALEVY                                    DECEDENT | 24STPB01963 |

### FACTS SUPPORTING THE CREDITOR'S CLAIM
[X] **See attachment** *(if space is insufficient)*

| Date of item | Item and supporting facts | Amount claimed |
|---|---|---|
| | LOAN OBLIGATION: | |
| 07/21/2021 | Principal funding                    $ 16,942.500.00 | |
| | - Less all payments and credits (from 07/21/2021-06/02/2023) | |
| | + Plus all interest and charges (from 07/21/2021-06/02/2023) | |
| | Subtotal: | 14,517,141.08 |
| | NEW LOAN OBLIGATIONS: | |
| 04/14/2023 | Principal funding                     $ 4,000,000.00 | |
| | - Less all payments and credits (from 04/14/2023-06/02/2023) | |
| | + Plus all interest and charges (from 04/14/2023-06/02/2023) | |
| | Negev Guaranty subtotal: | 119,062.50 |
| | SLA Continuing Guaranty subtotal: | 2,452,687.50 |
| | Personal Guarantors Loan subtotal: | 1,238,250.00 |
| | (SEE ATTACHMENT) | |
| | **TOTAL:** | $ 18,327,141.08 |

**PROOF OF** [X] **MAILING** [ ] **PERSONAL DELIVERY    TO PERSONAL REPRESENTATIVE**
*(Be sure to mail or take the original to the court clerk's office for filing)*

1. I am the creditor or a person acting on behalf of the creditor.  At the time of mailing or delivery I was at least 18 years of age.
2. My residence or business address is *(specify)*:
300 Corporate Pointe, Suite 320, Culver City, CA 90230
3. I mailed or personally delivered a copy of this *Creditor's Claim* to the personal representative as follows *(check either a or b below)*:
a. [X] **Mail.** I am a resident of or employed in the county where the mailing occurred.
   (1) I enclosed a copy in an envelope AND
      (a) [ ] **deposited** the sealed envelope with the United States Postal Service with the postage fully prepaid.
      (b) [X] **placed** the envelope for collection and mailing on the date and at the place shown in items below following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.
   (2) The envelope was addressed and mailed first-class as follows:
      (a) Name of personal representative served: Daniel Halevy
      (b) Address on envelope: 8561 Horner St., Los Angeles, CA 90035
         COPY: David Soffer, Soffer Law Group, 345 N. Maple Dr #386, Beverly Hills, CA 90210
      (c) Date of mailing: May 30, 2024
      (d) Place of mailing *(city and state)*: Culver City, California
b. [ ] **Personal delivery.** I personally delivered a copy of the claim to the personal representative as follows:
   (1) Name of personal representative served:
   (2) Address where delivered:

   (3) Date delivered:
   (4) Time delivered:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Date: May 30 , 2023

. . . . . . . Adam L. Streltzer . . . . . . . .
        (TYPE OR PRINT NAME OF CLAIMANT)

▶ 
                                              (SIGNATURE OF CLAIMANT)

DE-172 [Rev. January 1,1998]          **CREDITOR'S CLAIM**          Page two
                                              (Probate)

CEB
www.ceb.com

| Estate of | Case Number |
|---|---|
| DAVID HALEVY | 24STPB01963 |

## Attachment to
## CREDITOR'S CLAIM (DE-172)

Decedent:        David Halevy ( "**Decedent**")
Date of Death:   June 3, 2023

The Decedent owned an interest in Broadway Avenue Investments LLC ("**Broadway Borrower**"). For value received, claimant Archway Real Estate Income Fund I SPE I, LLC, a Delaware limited liability company ("**Claimant Archway**") made a loan to the Broadway Borrower in the principal amount of $16,942,500.00, on July 21, 2021 ("**Loan Obligation**"). The Loan Obligation is evidenced in part by a loan agreement, promissory note, continuing guaranty (discussed below), and any and all other documents or instruments executed by Broadway Borrower in favor of Claimant Archway in connection with the Loan Obligation, which are hereinafter referred to individually and collectively as the "**Loan Obligation Documents**."

To induce Claimant Archway to make the Loan Obligation, Alan Gomperts ("**Alan**"), Daniel Halevy ("**Daniel**"), and the Decedent executed and delivered to Claimant Archway a continuing guaranty of the Loan Obligation on July 21, 2021 ("**Continuing Guaranty**"). Pursuant to the terms of the Continuing Guaranty, the guarantors Alan, Daniel, and the Decedent, jointly and severally, and absolutely and unconditionally, guaranteed to Claimant Archway the prompt payment of all sums owed by Broadway Borrower to Claimant Archway pursuant to the Loan Obligation in accordance with the terms of the Loan Obligation Documents. A true and correct copy of the Continuing Guaranty is attached hereto as **<u>Exhibit 1</u>** and incorporated herein by this reference. Alan, Daniel, and the Decedent shall sometimes hereinafter collectively be referred to as the "**Broadway Guarantors**."

The Broadway Borrower and Broadway Guarantors defaulted under the terms of the Loan Obligation Documents, including, without limitation, pursuant to Section 5.1(o) of the loan agreement whereunder the Broadway Borrower was required to obtain a certificate of occupancy by January 21, 2022, for the Broadway Property but failed to do so and by failing to pay the Loan Obligation in full as of the scheduled maturity date, August 1, 2022.

In connection with the default, and at Broadway Borrower's request, Broadway Borrower and Claimant Archway executed that certain Settlement and Loan Modification Agreement on April 14, 2023 ("**Broadway Settlement Agreement**"),

| Estate of | Case Number |
|---|---|
| DAVID HALEVY | 24STPB01963 |

which among other things, extended the maturity date of the Loan Obligation to December 1, 2023, at which time the entire principal under the Loan Obligation plus all accrued and unpaid interest thereon would be due and payable as provided under the Loan Obligation Documents, and also the Loan Obligation principal balance was reduced from $16,942,500 to $15,241,093. The defaults otherwise remained uncured. A true and correct copy of the Broadway Settlement Agreement is attached as **Exhibit 2** and incorporated herein by this reference. The Broadway Settlement Agreement was not a novation, release, or modification of any of the terms, conditions, warranties, waivers, or rights set forth in the Loan Obligation Documents.

Concurrently with the execution of the Broadway Settlement Agreement, Claimant Archway made three (3) new loans in the aggregate amount of $4,000,000.00 (collectively "**New Loan Obligations**"), including the following:

    (A)    A loan to Negev Investments, LLC ("**Negev**") in the principal amount of $1,300,000.00) ("**Negev Loan**"), secured by the real property commonly known as 12800 Foxdale Drive, Desert Hot Springs, California. This loan is personally guaranteed by the Decedent, secured by the Decedent's membership interest in Negev ("**Negev Guaranty**"). A true and correct copy of the Negev Guaranty is attached hereto as **Exhibit 3** and incorporated by this reference.

    (B)    A new loan in the principal amount of $125,000.00 to an entity named SLA Investments, LLC, California limited liability company ("**SLA Borrower**"), secured by the real property commonly known as 1040 S. Los Angeles Street, Los Angeles, California. For value received, and to induce Claimant Archway to make the New Loan Obligations, Alan, Daniel, Decedent, and Decedent's spouse Sue Halevy executed and delivered to Claimant Archway a Continuing Guaranty dated April 14, 2023 ("**SLA Continuing Guaranty** "). Pursuant to the terms of the Second Continuing Guaranty, Alan, Daniel, Decedent, and Sue, jointly and severally, and absolutely and unconditionally, guaranteed to Claimant Archway the prompt payment of all sums owed pursuant to the New Loan Obligations. A true and correct copy of the SLA Continuing Guaranty is attached hereto as **Exhibit 4** and incorporated by this reference.

| Estate of | Case Number |
|---|---|
| DAVID HALEVY | 24STPB01963 |

(C)     A new loan to the Decedent, David Halevy and Sue Halevy, as trustees of the Halevy Family Trust dated September 6, 2010 ("**D&S Trust**"), Alan, Alan Gomperts and Sharon Gomperts, as trustees of the Gomperts and Halevy Family Trust ("**G&H Trust**") and Daniel in the principal amount of $2,575,000.00 ("**Personal Guarantors Loan**"), secured by the real property commonly known as 3538 Greenfield Avenue, Los Angeles, California, owned by G&H Trust, 133 S. Palm Drive, Beverly Hills, California, owned by D&S Trust, and 8561 Horner Street, Los Angeles, California, owned by Daniel. A true and correct cop of the Personal Guarantors Loan documents are collectively attached as **Exhibit 5** and incorporated by this reference.

Taking into account all payments, credits, interest, and charges, the balance due by the Decedent owed to Claimant Archway, as of the date of the Decedent's death June 3, 2023, is the following:

| | | |
|---|---|---|
| Loan Obligation: | $ | 14,517.141.08 |
| New Loan Obligations: | | |
| *Negev Guaranty* | | 119,062.50 |
| *SLA Continuing Guaranty* | | 2,452,687.50 |
| *Personal Guarantors Loan* | | 1,238,250.00 |
| TOTAL: | $ | **18,327,141.08** |

| Estate of | Case Number |
|---|---|
| DAVID HALEVY | 24STPB01963 |

**Attachment to
CREDITOR'S CLAIM (DE-172)**

**Copies of Documents In Support of Creditor's Claim**

# EXHIBIT  1

# EXHIBIT  1

# EXHIBIT  1

## CONTINUING GUARANTY

**ALAN GOMPERTS,** an individual, **DANIEL HALEVY,** an individual, and **DAVID HALEVY,** an individual ("*Guarantor*"), executed this Continuing Guaranty (this "*Guaranty*") on July __, 2021 (the "*Effective Date*") in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*").

### BACKGROUND RECITALS

A.    Lender and **BROADWAY AVENUE INVESTMENTS LLC,** a California limited liability company ("*Borrower*") have entered into the Loan Agreement (the "*Loan Agreement*"), dated as of the date hereof governing (among other things) the Loan in the amount of $16,942,500.00 (the "*Loan*").

B.    The Loan is secured in part by that certain deed of trust lien given by the Borrower to the Lender (the "*Security Instrument*"), and more particularly described in the Loan Agreement. The Security Instrument encumbers Borrower's interest in and to the "Property" described in the Security Instrument (the "*Property*").

C.    Lender would not have entered into the Loan Agreement or made the Loan to Borrower without Guarantor making and delivering this Guaranty.

Therefore, Guarantor (1) acknowledges the receipt and sufficiency of good and adequate consideration for making this Guaranty, and (2) agrees as follows:

1.    Definitions.  Capitalized terms not otherwise defined in this Guaranty will have the meanings set forth in the Loan Agreement.  Within this Guaranty, words of any gender include all other genders and words in the singular number include the plural, unless the context otherwise requires.  The following terms have the following meanings:

"*Bankruptcy Event*" means any of the following events:  (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding).  A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"*Conveyance Event*" means that (1) legal or equitable title to any part of, or any interest in, the Collateral is vested in any Person other than Borrower or Lender, or (2) Borrower creates or permits any lien (except for the lien for Taxes which are not delinquent), security interest or other encumbrance against or covering the Collateral.

"*Enforcement Costs*" means all reasonable attorneys' fees, legal expenses and other costs Lender incurs to collect or enforce the Guaranteed Obligations or the Loan Documents.

"*Guaranteed Obligations*" means all (a) 100% of the Indebtedness and Interest, and/or (b) the operating costs of the Property, and/or (c) Enforcement Costs, and/or (d) Recourse Amounts.

"*Indebtedness*" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"*Interest*" means all accrued and unpaid interest on the Principal Amount.

"*Loan Documents*" means the Loan Agreement, the Security Instrument, the Hazardous Materials Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"*Liquid Assets*" means unencumbered (a) cash on hand or on deposit (including certificates of deposit which mature in less than twelve months) in commercial banks operating in the United States, (b) readily marketable securities issued by the United States, and (c) readily marketable commercial paper rated A-1 by Standard & Poor's Corporation (or a similar rating by any similar organization that rates commercial paper).

"*Recourse Amounts*" any loss, damage, cost, expense, liability, claim or other obligation (including attorneys' fees and costs reasonably incurred), causes of action, suits, claims, demands and judgments of any nature or description whatsoever, which may be imposed upon, incurred by or awarded against Lender or any affiliate thereof as a result of, arising out of or in connection with the following:

(a)     misapplication or misappropriation of Rents, security deposits, or other income, issues, profits and revenues derived from the Property at any time an Event of Default by Borrower exists, provided that any prepaid rent paid more than 1 month in advance as of the date of an Event of Default hereunder by Borrower shall be considered to have been collected after the event of Borrower's default;

(b)     fraud or material misrepresentation of Borrower or Guarantor;

(c)     (i) misapplication or misappropriation of any insurance policies by reason of damages, loss or destruction to any portion of the Property or the Improvements thereon to the full extent of such misapplied or misappropriated proceeds, or (ii) the misapplication or misappropriation of proceeds or awards resulting from the condemnation or taking in lieu of condemnation of any portion of the Property, to the full extent of such misapplied or misappropriated proceeds or awards;

(d)     intentional physical waste of the Property or any portion thereof, and all costs, including reasonable attorney's fees, incurred by Lender to repair or remediate such intentional physical waste, to the full extent of the actual loss incurred by Lender as a result thereof;

(e)     any taxes, assessments or insurance premiums, to the extent not covered by amounts paid into escrow by Borrower to Lender, for which Borrower is liable under the Note, the Security Instrument or any other loan document executed in connection therewith, but only to the extent that Revenue from the Property is sufficient to pay such taxes, assessments or insurance premiums;

(f)     failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property;

(g)     loss arising under the Hazardous Materials Indemnity Agreement executed by Borrower in favor of Lender, or Borrower's breach of the hazardous substances covenants, warranties or representation provisions contained in the Security Instrument or other loan documents executed in connection with the Note and Security Instrument, which loss is not caused by Lender after Lender takes title to the Property;

(h)     loss by fire or casualty to the extent not compensated by insurance proceeds collected by Lender;

(i)     any loss resulting from any Guarantor (or any Person comprising any Guarantor), Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Security Instrument or any other Loan Document, seeking a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserting in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, but only if and to the extent that a court of competent jurisdiction determines that such claims were frivolous (i.e., without any merit) and in bad faith; and

(j)     all costs and fees, including without limitation, reasonable attorneys' fees incurred by Lender in the enforcement of subparagraphs (a) through (j) above.

Notwithstanding the foregoing, Recourse Events shall mean the full amount of the Indebtedness upon the occurrence of either of the following events (the "*Full Recourse Events*"):

(a)     a Bankruptcy Event;

(b)     Borrower fails to obtain Lender's prior consent to any subordinate financing secured by the Property; or

(c)     a Conveyance Event; or

(d)     Borrower fails to comply with the "single purpose entity/separateness" covenants set forth in Section 4.1(b) of the Loan Agreement beyond the expiration of all applicable notice cure periods. and such failure results in (or is cited as a factor by a court of competent jurisdiction) the substantive consolidation of Borrower with another Person; or

(e)     Borrower fails to comply with the cash management provisions set forth in Section 6.1 and Section 6.2 of the Loan Agreement beyond the expiration of all applicable notice cure periods.

"*Transfer Event*" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

2.    Inducement. Guarantor has an economic investment or interest in Borrower, and an interest in the success of the Property, and Guarantor will substantially benefit from Lender's agreement to make the Loan to Borrower.

3.    Guaranty. In order to induce Lender to make the Loan to Borrower, Guarantor absolutely, unconditionally and irrevocably guarantees and agrees to pay and perform the Guaranteed Obligations. Notwithstanding anything to the contrary in this Guaranty or any of the other Loan Documents, Guarantor will be liable for all of the Indebtedness and the Enforcement Costs if a Conveyance Event, or a Bankruptcy Event, occurs.

4.    Waivers.

(a)    Guarantor, with respect to the Guaranteed Obligations and the Indebtedness, waives: (i) **PRESENTMENT FOR PAYMENT**; (ii) **DEMAND**; (iii) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (iv) **NOTICE OF INTENTION TO ACCELERATE**; (v) **NOTICE OF ACCELERATION**; (vi) **NOTICE OF DISPOSITION OF COLLATERAL**; (vii) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (viii) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (ix) **PROTEST AND NOTICE OF PROTEST**; and (x) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(b)    Lender is not obligated to notify Guarantor of (i) Lender's acceptance of this Guaranty, (ii) any credit extended on the faith of this Guaranty, or (iii) Borrower's failure to pay or perform any Indebtedness which constitutes Guaranteed Obligations. Lender is not obligated to use diligence in preserving any Person's liability for the Indebtedness or the Guaranteed Obligations. Lender is not obligated to use diligence in bringing suit to enforce collection, or performance, of the Indebtedness or the Guaranteed Obligations.

(c)    Guarantor waives **ALL DEFENSES GIVEN OR REDUCTIONS IN THE GUARANTEED OBLIGATIONS AVAILABLE TO SURETIES OR GUARANTORS AT LAW OR IN EQUITY** other than the actual payment and performance of the Guaranteed Obligations, including **ALL DEFENSES BASED UPON QUESTIONS AS TO (i) THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THE INDEBTEDNESS OR THE GUARANTEED OBLIGATIONS, OR (ii) THE VALUE OF ANY COLLATERAL**. Guarantor is primarily liable under this Guaranty.

(d)    At any time, Lender may, in its sole discretion, without Guarantor's prior consent, and without impairing, modifying, releasing or otherwise affecting Guarantor's liability under this Guaranty:

(i)    alter, compromise, accelerate, renew, extend, or change the time or manner for the payment of, the Indebtedness;

(ii)    increase or reduce the rate of interest on the Indebtedness;

(iii)    take, surrender, exchange, withdraw, subordinate, alter, modify or eliminate security;

(iv)    (1) add, release, discharge, or (2) settle or compromise with, any Borrower Party or other Person liable for the Indebtedness or the Guaranteed Obligations;

(v)    make any change to the Loan Documents or the manner in which Lender does business with Borrower; or

4

(vi)    apply any moneys received from Borrower or any other source, or from any security or collateral, in the manner Lender determines, without being required to marshal securities or assets or to apply any part of the moneys or security to any particular part of the Guaranteed Obligations.

Lender is not required to retain, hold, protect, exercise due care with respect thereto, perfect security interests in or otherwise assure or safeguard any security for the Indebtedness or the Guaranteed Obligations; and Guarantor's obligations under this Guaranty and any other Loan Documents will not be affected by, and Guarantor will not have any recourse from, Lender's failure (x) to do any of the foregoing with respect to any security for the Indebtedness or the Guaranteed Obligations, or (y) to exercise or not exercise any right or remedy of Lender under the Loan Documents, at law or in equity.

5.    _Guaranty Absolute_.  Guarantor's liability under this Guaranty is absolute, and will not be modified, released or impaired, for any reason, including because:

(a)    any Person (including any Borrower Party) dies, or is or becomes incapacitated, disabled, dissolved or terminated;

(b)    Lender fails to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of any Borrower Party or another Person;

(c)    Lender cannot recover the Indebtedness from any Borrower Party or another Person for any reason, including any statute of limitations or Applicable Bankruptcy Law;

(d)    Any Borrower Party or another Person is entitled to any defense, setoff or counterclaim related to the Loan, the Indebtedness or the Guaranteed Obligations;

(e)    a Conveyance Event or a Transfer Event occurs;

(f)    Borrower Party (other than Guarantor) or another Person liable for the payment or performance of Indebtedness or the Guaranteed Obligations is released or discharged by operation of law or otherwise (other than a discharge resulting from the payment of the Indebtedness);

(g)    this Guaranty or any other Loan Document is modified, extended, amended, released or waived; or

(h)    Lender fails to give Guarantor notice of an Event of Default under any Loan Document.

6.    _Subordination_.  Until the Indebtedness is repaid in full (and including all interest accruing, after any Bankruptcy Event, on the Indebtedness):

(a)    Guarantor subordinates all rights to repayment of any current or future indebtedness from Borrower to Guarantor to Lender's prior right to receive or require payment in full of the Indebtedness.

(b)    Guarantor shall not accept any payment or satisfaction of any indebtedness of Borrower to Guarantor.

(c)    Guarantor shall not accept any security for any indebtedness of Borrower to Guarantor.

(d)    If Guarantor receives any payment, satisfaction or security for any indebtedness of Borrower to Guarantor, then Guarantor shall immediately deliver the payment, satisfaction or security to Lender. Lender will apply the payment, satisfaction or security as set forth in the Loan Agreement. Guarantor will hold any payment, satisfaction or security Guarantor receives in trust for Lender until the payment, satisfaction or security is delivered to Lender.

7.    _Waiver of Right of Subrogation_.  To the fullest extent permitted by Applicable Law, Guarantor waives all rights at law or in equity to seek subrogation, contribution, indemnification or any

5

other form of reimbursement or repayment from any Borrower Party or any other guarantor of, or any other party secondarily liable for, the payment or performance of the Indebtedness or the Guaranteed Obligations until the Indebtedness has been paid and performed in full. When the Indebtedness has been indefeasibly paid and fully performed, Guarantor will be subrogated to the rights of Lender against Borrower and any endorsers, sureties or other guarantors to the extent of the payments that Guarantor makes on the Guaranteed Obligations.

8.    No Usury. Lender and Guarantor intend that this Guaranty and the other Loan Documents strictly comply with applicable usury law. Therefore, Lender and Guarantor agree that: (i) none of the terms of this Guaranty or the other Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; and (ii) no Person (including any Borrower Party) will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness. If at any time the interest received for the Guaranteed Obligations exceeds the Maximum Rate, then Lender will, at its option, either refund to Guarantor the amount of the excess or credit the amount of the excess against the Guaranteed Obligations. Guarantor agrees that the Loan and the Guaranty are not usurious and agrees that if, at any time, Guarantor believes that the Loan or the Guaranty is usurious, it shall give Lender (a) notice of the condition and (b) 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

9.    Representations and Warranties. On the Effective Date, Guarantor represents to Lender that:

(a)    Guarantor (i) is solvent, (ii) is not bankrupt and (ii) has no outstanding liens, garnishments, bankruptcies or court actions which could cause Guarantor to become insolvent or bankrupt. No Bankruptcy Event has occurred.

(b)    Each Guarantor financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly presents the financial condition and the results of operations of each Guarantor on the date and for the period covered by the financial statements. All other reports, statements and other data that any Guarantor furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading. Since the date of the last financial statements each Guarantor delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) Guarantor's business, condition (financial or otherwise) or operations, or (b) Guarantor's ability to perform or satisfy, or Lender's ability to enforce, any of the Guaranteed Obligations. For the purposes of Subsection 9(a) and 9(b), "Guarantor" includes any joint ventures, managing member or general partner of Guarantor.

(c)    There are no suits or proceedings (including condemnation) pending, or to Guarantor's knowledge threatened, against or affecting any Guarantor, another Borrower Party or the Collateral, or involving the validity, enforceability or priority of this Guaranty or any of the Loan Documents.

(d)    If Guarantor is not a natural person, then Guarantor: (i) is duly organized, validly existing, and in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own its other assets and transact its present or proposed business.

(e)    Guarantor has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty, and has taken all necessary actions to authorize its execution, delivery and performance of the Guaranteed Obligations. Guarantor has duly executed and delivered this Guaranty, and each other Loan Document to which it is a party or under which

6

737 S Broadway – Guaranty

it is obligated. Each obligation under this Guaranty or any other Loan Document constitutes, Guarantor's legal, valid and binding obligation, enforceable in accordance with the Loan Document's terms, except to the extent enforcement of any Loan Document is subject to the effect of (i) Applicable Bankruptcy Law, or (ii) general principles of equity.

(f)  Guarantor's execution, delivery and performance of this Guaranty and the other Loan Documents, and compliance with the terms and provisions of this Guaranty and the other Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, or constitute a default under, the terms of any other instrument to which Guarantor is a party or by which Guarantor is bound or may be subject, or (iii) violate any term of Guarantor's certificate of formation or other documents and agreements governing Guarantor's existence, management or operation. Guarantor is not required to obtain any Person's consent to execute, deliver or perform this Guaranty or the other Loan Documents.

(g)  Guarantor is intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

10.  Covenants.  Guarantor absolutely and unconditionally covenants that:

(a)  Guarantor shall pay and perform the Guaranteed Obligations even if, for any reason, (i) Borrower does not pay or perform the Indebtedness or any other Borrower obligations under the Loan Documents, or (ii) the Indebtedness or the Guaranteed Obligations are disaffirmed or terminated (except for payment and performance in full).

(b)  Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower is (for any reason) liable for any portion of the Indebtedness or the Guaranteed Obligations.

(c)  Guarantor will at all times remain intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

(d)  Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower's organizational structure changes.

(e)  Notwithstanding any prior reduction or termination of this Guaranty, Guarantor will remain liable for, and (after Lender's demand) pay to Lender, the amount of any prior Indebtedness payment that Lender must (for any reason) pay to Borrower or any other Person.

(f)  Guarantor will not (i) benefit from, (ii) be able to direct the application of, or (iii) have any right to participate in, any Collateral.

(g)  Guarantor will remain obligated under this Guaranty for the Guaranteed Obligations even if Guarantor loses (for any reason) any right against (i) any Borrower Party or other Person, or (ii) the Collateral.

(h)  Lender is not required to pursue any remedies against any Person or the Collateral before demanding that Guarantor pay or perform the Guaranteed Obligations.

(i)  Lender may maintain an action on this Guaranty without joining any other Borrower Party or bringing a separate action against a Borrower Party.

(j)  Until all Indebtedness is indefeasibly repaid, Guarantor shall maintain (a) at least $2,000,000.00 of Liquid Assets (the "*Liquidity Requirement*"), and (b) a tangible net worth of at least $16,942,500.00 (the "*Net Worth Requirement*").  Guarantor will provide Lender with evidence (which may include a certificate), satisfactory to Lender in its discretion, establishing Guarantor's satisfaction of the Liquidity Requirement and the Net Worth Requirement within 60 days after the end of each calendar quarter.

7

737 S Broadway – Guaranty

11. <u>Financial Statements and Reports</u>. Guarantor shall deliver to Lender all financial statements, reports and certificates, if any, required under the Loan Agreement.

12. <u>Multiple Guarantors</u>. If there are more than one Guarantor, then this <u>Section 12</u> is in effect. Unless the context clearly indicates otherwise, all references to "*Guarantor*" mean either or any Guarantor.

(a) **Joint Liability**. Lender may sue any Guarantor, jointly or individually, without impairing Lender's rights against each Guarantor under this Guaranty. Lender may compromise with any Guarantor or any other Person for any sum Lender sees fit. Lender may release any Guarantor or any other Person from any liability for the Indebtedness or the Guaranteed Obligations without impairing Lender's right to demand and collect the balance of the Indebtedness or the Guaranteed Obligations from any Guarantor or other Person. No compromise or release will, except as specifically set forth in this Guaranty, impair Guarantors' rights amongst themselves.

(b) **Disputes**. Each Guarantor shall indemnify, defend and hold Lender harmless from and against any Claim Lender may suffer arising from any dispute between Guarantors, **INCLUDING THOSE CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM LENDER'S SOLE, COMPARATIVE OR CONTRIBUTORY NEGLIGENCE, OR STRICT LIABILITY,** unless a court of competent jurisdiction determines in a final non-appealable judgment that the Claim actual resulted from the intentional misconduct or gross negligence of Lender.

13. <u>Revival and Reinstatement</u>. This Guaranty remains in full force and effect during any Bankruptcy Event. Notwithstanding the full payment and performance of the Obligations and the Guaranteed Obligations, this Guaranty will be reinstated in full force and effect immediately upon the occurrence of any Bankruptcy Event. If any prior payment or performance of the Obligations or Guaranteed Obligations is rescinded or reduced, or Lender must otherwise restore or return any prior payment or performance of the Obligations or Guaranteed Obligations, then the Guaranteed Obligations will be reinstated to the extent of the payment or performance actually rescinded, reduced, restored or returned.

14. <u>Rights Cumulative</u>. Lender's rights under this Guaranty, at law and in equity are cumulative. Until the Indebtedness is paid and performed in full and this Guaranty is terminated, Lender may exercise, as many times and as often as Lender elects (in its discretion) any rights under this Guaranty, at law and in equity. This Guaranty does not diminish or discharge Lender's rights under any prior or future guaranty by Guarantor in favor of Lender.

15. <u>Notices</u>. Any notice or communication required or permitted under this Guaranty must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

| | |
|---|---|
| To Lender: | Archway Real Estate Income Fund I SPE I, LLC |
| | 16 N. Marengo Avenue, Suite 212 |
| | Pasadena, California 91101 |
| | Attention: Chuck Ng |
| | Phone: (310) 779-6505 |
| | Email: cng@oakhurstfunds.com |
| with a copy to: | Raines Feldman LLP |
| | 1800 Avenue of the Stars, 12th Floor |
| | Los Angeles, CA 90067 |
| | Attention: Joshua Mogin |
| | Phone: (310) 440-4100 |
| | Email: jmogin@raineslaw.com |
| To Guarantor: | Alan Gomperts |

8

737 S Broadway – Guaranty

42

264 S. Oakhurst Drive
Beverly Hills CA 90212
Phone: (310) 621-5350
Email: alangomperts@hotmail.com

Daniel Halevy
133 S. Palm Drive
Beverly Hills CA 90212
Phone: (310) 467-4703
Email: danhalevy@gmail.com

David Halevy
257 S. Linden Drive
Beverly Hills CA 90212
Phone: (310) 666-2885
Email: danhalevy@gmail.com

with a copy to

Feldman Berman Schwartz LLP
20750 Ventura Blvd., Ste. 201
Woodland Hills, CA 91364
 (818) 707-1465 ext. 3
Attention: Craig Berman
cberman@fbsllp.com

or to such other address as Lender or Guarantor may designate in writing and deliver in accordance with this Section. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this Section. Any notice or communication sent in accordance with this Section will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this Section. Guarantor consents to Lender recording any telephone communications between Lender and Guarantor.

16.      Applicable Law.  The Laws of the **STATE OF CALIFORNIA** (without giving effect to its principles of conflicts of law) and of the **UNITED STATES** will govern and control this Guaranty.  If any provision of this Guaranty or the application thereof to any person or circumstance, for any reason and to any extent, shall be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

17.      Consent to Forum.  **GUARANTOR IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS.  BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN SECTION 15 ABOVE.**

18.      Waiver of Jury Trial.  **GUARANTOR WAIVES ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.  GUARANTOR HAS BEEN ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

9

25

19.    <u>Counterparts</u>. The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument. All counterparts of each Loan Document must be construed together and will constitute one instrument.

20.    <u>Modification or Termination</u>. This Guaranty may only be amended, modified or terminated by a written instrument executed by Lender and Guarantor. Guarantor agrees that it will be bound by any written amendment or modification of the Loan Documents, with or without notice to Guarantor, and Guarantor's obligations under this Guaranty and the other Loan Documents will not be impaired because of any such amendment or modification.

21.    <u>Successors and Assigns; Unenforceability of Certain Provisions, Headings</u>. The terms of this Guaranty are binding on Guarantor and its heirs, devisees, representatives, successors and assigns and inure to the benefit of Lender and all of its transferees, credit participants, successors and assignees. The headings in this Guaranty are for convenience only and will not limit or otherwise affect any of the terms of this Guaranty. If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents. All remaining portions of the Loan Documents will remain enforceable and valid.

22.    <u>Damage Waiver</u>. Guarantor agrees that Lender will not be liable to Guarantor, any other Borrower Party or any other Person for any punitive, exemplary or consequential damages which may actually or allegedly arise from this Guaranty, the Loan, the other Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER.** The foregoing waiver does not limit or otherwise impair the terms of any other waiver or indemnity in the Loan Agreement.

23.    <u>Assignment</u>. Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents (including this Guaranty) and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan or this Guaranty, including credit information on Borrower Parties and any of their respective principals. If Lender makes any assignment or sells any interest in the Loan or this Guaranty, then Guarantor shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Guaranty as will facilitate Lender's sale or assignment, provided that no modification will materially add to Guarantor's obligations under this Guaranty or the other Loan Documents.

24.    <u>Imaging</u>. Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Guarantor waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

25.    <u>Time</u>. Time is of the essence for this Guaranty and the other Loan Documents.

26.    <u>California Provisions</u>. In addition to the waivers set forth elsewhere in this Guaranty:

(a)    Guarantor hereby waives marshaling of assets and liabilities, rights of offset, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any liability to which it applies or may apply, acceleration, presentment, demand for payment, protest, notice of non-payment, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and demands, collection suit or the taking of any other action by Lender.

(b)    Guarantor expressly waives any and all benefits, rights and/or defenses which might otherwise be available to Guarantor under the following sections of the California Civil Code: Section 2809 (the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal), Section 2810 (a surety is not liable if, for any reason other than the mere personal disability of the principal, there is no liability upon the part of

10

26

the principal at the time of execution of the contract, or the liability of the principal thereafter ceases), Section 2819 (a surety is exonerated if the creditor alters the original obligation of the principal without the consent of the surety), Section 2822 (a surety's right to have the principal designate the portion of any obligation to be satisfied by the surety in the event that the principal provides partial satisfaction of such obligation), Section 2845 (a surety is exonerated to the extent that the creditor fails to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue and which would lighten the surety's burden), Section 2846 (a surety may compel the principal to perform the obligation when due), Section 2847 (if a surety satisfies the principal obligation, or any part thereof, the principal is obligated to reimburse the surety for the amounts paid by the surety), Section 2850 (whenever the property of a surety is hypothecated with property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation), Section 2899 (where one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort to the property in a certain order, on the demand of any party interested) and Section 3433 (where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons).

(c)     Guarantor expressly agrees not to exercise or take advantage of any rights, benefits and/or defenses which might be available to Guarantor under the following California Civil Code Sections, unless and until the Guaranteed Obligations shall have been indefeasibly paid and satisfied in full:  Section 2839 (performance of the principal obligation, or an offer of such performance, duly made as provided in the Civil Code, exonerates a surety), Section 2848 (a surety, upon satisfaction of the obligation of the principal, is entitled to enforce remedies which the creditor then has against the principal and to pursue his co-sureties or other third parties after the surety has satisfied the underlying debt, or at least more than his share of it), and Section 2849 (a surety is entitled to the benefit of security held by the creditor for the performance of the principal obligation held by the creditor).

(d)     Guarantor waives any defense that Guarantor may have by reason of the failure of Lender to provide Guarantor with any material facts about Borrower, including any information respecting the financial condition of Borrower, Borrower's ability to perform the Loan obligations or the sufficiency of Lender's security.

(e)     Guarantor waives any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other Person, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons.

(f)     Guarantor waives all rights of indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.  Guarantor hereby waives the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of guarantors or sureties thereunder.

(g)     Guarantor waives all rights and defenses that Guarantor may have because the debtor's (Borrower's) debt is secured by real property.  This means, among other things:

11

(i)    The creditor (Lender) may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by the debtor.

(ii)    If the creditor forecloses on any real property collateral pledged by the debtor:  (A) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the creditor may collect from Guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the debtor.

(h)    This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the debtor's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the Code of Civil Procedure.  Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal (Borrower) by the operation of Section 580d of the Code of Civil Procedure or otherwise.  Any summary of statutory provisions is for convenience only, and Guarantor has read and is familiar with the entirety of such provisions.

27.    Entire Agreement.    The Loan Documents constitute the entire understanding and agreement between Borrower, Guarantor and Lender with respect to the transactions arising in connection with the Loan and this Guaranty.  The Loan Documents supersede all prior written or oral understandings and agreements between Borrower, Guarantor and Lender with respect to the Loan and this Guaranty.


[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK SIGNATURE PAGE FOLLOWS]

12

737 S Broadway – Guaranty
46

28

Guarantor has executed this Guaranty to be effective on the Effective Date.

**GUARANTOR:**

_____

**ALAN GOMPERTS**, an individual

_____

**DANIEL HALEVY**, an individual

_____

**DAVID HALEVY**, an individual

# EXHIBIT  2

# EXHIBIT  2

# EXHIBIT  2

## SETTLEMENT AND LOAN MODIFICATION AGREEMENT

This SETTLEMENT AND LOAN MODIFICATION AGREEMENT ("Agreement"), is dated as of April 19, 2023, by and among BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower"), ALAN GOMPERTS ("Alan"), an individual, DANIEL HALEVY ("Daniel"), an individual, and DAVID HALEVY ("David", an individual together with Alan and Daniel, collectively and individually hereinafter referred to as "Guarantor"), on the one hand, and ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), on the other hand, with respect to the following facts, matters and issues.  Borrower and Guarantor together when referred to with Lender shall be collectively hereinafter referred to as the "Parties."

## RECITALS

A.     Lender has heretofore made a loan (the "Broadway Loan") to Borrower in the original maximum principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100 Dollars ($16,942,500.00) evidenced by, among other things, (i) that certain Promissory Note dated July 21, 2021 (together with any and all amendments thereto or modifications thereof, the "Note"), in the original principal face amount of $16,942,500.00, executed by Borrower to and in favor of Lender, and (ii) that certain Loan Agreement dated July 21, 2021, by and between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Loan Agreement").

B.     As security for, among other things, the indebtedness and obligations under the Broadway Loan, Borrower, as trustor, executed and delivered to and in favor of Lender, as beneficiary, that certain  Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 23, 2021, and recorded on July 26, 2021, as Instrument No. 20211142009 in the Official Records of Los Angeles County, California (together with any and all amendments thereto or modifications thereof, the "Deed of Trust"), encumbering, without limitation, certain real property more particularly described in **Exhibit "A"** attached hereto and incorporated herein by this reference (as more particularly described therein, the "Property").

C.     Payment and performance of Borrower's indebtedness and obligations in connection with the Broadway Loan was and is guaranteed by Guarantor pursuant to a Continuing Guaranty executed by Guarantor and dated as of July 21, 2021 (the "Continuing Guaranty").

D.     Pursuant to the Deed of Trust, Borrower granted to and in favor of Lender a first priority security interest in and lien upon certain real and personal property described in the Deed of Trust (the "Deed of Trust Collateral"), to secure, without limitation, payment and performance of the indebtedness and obligations under and in connection with the Broadway Loan and the Note.  The Deed of Trust Collateral and any other collateral securing the indebtedness and obligations under the Broadway Loan shall be collectively referred to as the "Collateral."  Lender's security interest in the Collateral was and is perfected under applicable law.

E.     This Agreement, the Note, Loan Agreement, Deed of Trust, Continuing Guaranty, and all other agreements, instruments and other documents executed by Borrower or Guarantor

in connection with the Broadway Loan shall at times hereinafter be referred to collectively as the "Broadway Loan Documents." Any and all terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

F.    Lender alleges that Borrower and Guarantor defaulted under the terms of the Broadway Loan Documents by, among other things, failing to obtain a certificate of occupancy for the Property by January 21, 2022 and failing to pay the Loan off in full as of August 1, 2022, the maturity date (collectively hereinafter the "defaults").

G.    On September 28, 2022, Lender filed its Verified Complaint for Breach of Guaranty against Guarantor in the Los Angeles County Superior Court entitled *Archway Real Estate Income Fund I SPE I, LLC, Plaintiff v. Alan Gomperts, et al., Defendants* Case Number 22STCV31742 (the "Litigation").

H.    On August 30, 2022, Lender caused to be commenced non-judicial foreclosure proceedings through the filing of a notice of default ("NOD") as instrument no. 20220859022 in the Official Records of Los Angeles County, California. The NOD is still pending.

I.    The Parties now desire to modify the Broadway Loan Documents, resolve and settle the Litigation, and rescind the NOD, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.    Recitals.  The recitals are incorporated herein by this reference as are all exhibits attached hereto.  Borrower and Guarantor, and each of them, represent and warrant to Lender that the factual information recited above is true and correct.  Except as specified herein, all of the terms and conditions of the Broadway Loan Documents, and each of them, shall remain in full force and effect.  In the event of any conflict or inconsistency between the terms, conditions, and provisions of this Agreement and the Broadway Loan Documents, the terms, conditions, and provisions of this Agreement shall prevail.

2.    Reaffirmation.  This Agreement is, in part, a reaffirmation of the obligations and indebtedness of Borrower and Guarantor to Lender as evidenced by the Broadway Loan Documents.  Therefore, Borrower and Guarantor each represent, warrant, covenant, and agree, that except as specified herein, all of the terms and conditions of the Broadway Loan Documents are in full force and effect, without waiver or modification of any kind whatsoever, and are ratified and confirmed in all respects.

3.    Acknowledgments.

A.    Borrower and Guarantor, and each of them, acknowledge the validity, priority and extent of the Broadway Loan Documents and acknowledge that the following sums are owed to the Lender as of April 19, 2023:

| | | |
|---|---|---|
| (1) | Principal balance in the amount of | $16,942,500.00 |
| (2) | Non-default interest in the amount of | $1,171,385.63 |
| (3) | Default interest ("Default Interest") in the amount of | $1,656,129.46 |
| (4) | Late charges ("Late Charges") in the amount of | $0.00 |
| (5) | Legal and Trustee fees and costs ("Legal/Trustee Fees') in the amount of | $65,000.00 (FRBC)<br>$30,000.00 (TC)<br>$16,489.00 (Trustee) |
| (6) | GRAND TOTAL ("Amounts Owed") | $19,881,504.09 |

In addition, interest continues to accrue at the rate of $8,471.25 per day, inclusive of default interest (the "Per Diem").

B.    Borrower and Guarantor, and each of them, acknowledge and confirm that neither Borrower nor Guarantor has any valid offset or defense to the Amounts Owed, obligations, and liability under the Broadway Loan Documents.

4.    New Loans.

A.    Concurrently with the execution of this Agreement, Lender shall make three (3) new loans in the aggregate amount of $4,000,000.00 (collectively, "New Loans"), as follows:

(1)    A loan to _Negev Investments, LLC ("Negev") in the principal amount of One Million Three Hundred Thousand and No/100 Dollars ($1,300,000.00) ("Negev Loan"), secured by the real property commonly known as 12800 Foxdale Drive, Desert Hot Springs, California ("Foxdale Property") and guaranteed by David.  The guaranty shall be secured by his membership interest in Negev.  The documents and instruments evidencing the Negev Loan are identified in Exhibit "B-1" attached hereto;

(2)    A loan to SLA Investments, LLC ("SLA") in the principal amount of One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) ("SLA Loan"), secured by the real property commonly known as 1040 S. Los Angeles Street, Los Angeles, California ("Los Angeles Property") and guaranteed by David, Sue Halevy ("Sue"), Alan, Sharon Gomperts a/k/a Sharon Halevy ("Sharon") and Daniel.  The guaranty shall be secured by David, Sue, Alan, Sharon and Daniel's membership interest in SLA.  The documents and instruments evidencing the SLA Loan are identified in Exhibit "B-2" attached hereto; and

(3)    A loan to David, David Halevy and Sue Halevy, as trustees of the Halevy Family Trust dated September 6, 2010 ("D&S Trust"), Alan, Alan Gomperts and Sharon Gomperts, as trustees of the Gomperts and Halevy Family Trust ("G&H Trust") and Daniel in the principal amount of Two Million Five Hundred Seventy-Five Thousand and No/100 Dollars

($2,575,000.00) ("Guarantor Loan"), secured by the real property commonly known as 3538 Greenfield Avenue, Los Angeles, California, owned by G&H Trust, 133 S. Palm Drive, Beverly Hills, California, owned by D&S Trust, and 8561 Horner Street, Los Angeles, California, owned by Daniel.  The documents and instruments evidencing the Guarantor Loan are identified in Exhibit "B-3" attached hereto.

B.    The proceeds of the New Loans ("New Loans Proceeds") shall be disbursed and allocated as provided in the Negev Loan, SLA Loan and Guarantor Loan, as more particularly described in Exhibit "C" attached hereto, and shall be used for the creation of an interest reserve for the New Loan, payment of past due amounts owed by Broadway to Lender under the Broadway Loan Documents, creation of an interest reserve for the Broadway Loan and to pay certain fees and costs.  To the extent that the New Loans Proceeds are insufficient to make all payments or deposits required pursuant to this Agreement, the Negev Loan, SLA Loan and Guarantor Loan, or any of them, Guarantor shall be required to do so, from their own funds, concurrently with the Settlement Closing (as herein defined).

5.    Amendments to Broadway Loan.

Upon Settlement Closing:

A.    The Maturity Date under the Broadway Loan shall be extended to December 1, 2023, at which time the entire principal balance under the Broadway Loan plus all accrued and unpaid interest thereon shall be due and payable as provided under the Broadway Loan Documents. From and after the Settlement Closing, any and all references in the Note, Loan Agreement, and the other Broadway Loan Documents to a maturity date of "August 1, 2022" shall be replaced with "December 1, 2023."

B.    The obligations of Borrower to obtain the Certificate of Occupancy on the Property no later than January 21, 2022 pursuant to Section 5.1(a) of the Loan Agreement is hereby amended to be required as soon as is reasonably practicable in the best efforts of Borrower, but in any event no later than the Maturity Date.

6.    Interest Reserve Deposit.  Concurrently with the Settlement Closing, Guarantor shall deposit the sum of $892,874.03 (the "Interest Reserve Shortfall") into the Interest Reserve. The Interest Reserve Shortfall shall not bear interest.  Borrower continues to authorize Lender, on a monthly basis, to disburse from the Interest Reserve the amount of interest accrued and unpaid to Lender under the terms of Section 12(b) of the Loan Agreement without further authorization on the part of Borrower.  Such disbursements by Lender may be made by such means (including, as shall be satisfactory to Lender, in its sole and absolute discretion. Notwithstanding the Interest Reserve, Borrower remains liable and obligated to pay all accrued and unpaid interest when it is due and payable, in the event that the amounts in the Interest Reserve are insufficient to do so.

7.    Conditions Precedent to Settlement Closing.  The obligations of Lender hereunder are expressly conditioned upon the following having occurred, or Lender having received on or prior to April 19, 2023 ("Settlement Closing"), all of the following amounts, documents, and

instruments in form and content satisfactory to Lender, in its sole and absolute discretion, opinion, and judgment:

      A.     This Agreement, fully executed by Borrower and Guarantor;

      B.     The closing of the Negev Loan;

      C.     The closing of the SLA Loan;

      D.     The closing of the Guarantor Loan;

      E.     Payment of the Legal/Trustee Fees;

      F.     Payment and/or deposit of any additional monies required pursuant to Section 6, above;

      G.     At Borrower's expense, endorsements to Lender's existing policy of title insurance insuring the continuing priority of the lien of the Deed of Trust in a first priority position; and

      H.     A Memorandum of Modification to the Deed of Trust, fully executed by Borrower and notarized for recording purposes.

      8.     <u>Rescission of NOD; Dismissal of Action</u>.  Upon the Settlement Closing:

      A.     Lender will cause the NOD to be rescinded, subject to the right of Lender to cause to a new notice of default to be recorded in the event there is any default under this Agreement or any of the other Broadway Loan Documents subsequent to the Settlement Closing. Further, as long as there is no default under this Agreement or any of the other Broadway Loan Documents from and after the date of this Agreement, interest on the Broadway Loan shall accrue and be payable at the non-default rate of interest provided for in the Note. Furthermore, upon the Settlement Closing, Lender shall waive its right to collect the Default Interest and Late Charges.

      B.     Lender will cause to be filed with the Court a dismissal without prejudice of the Litigation, subject to the right of Lender to commence a new action or proceeding against Guarantor and any other parties, as determined by Lender, if there is a default under this Agreement or any of the other Broadway Loan Documents by which Guarantor is bound.

      9.     <u>Representations and Warranties of Borrower and Guarantor</u>.  Borrower and Guarantor hereby represent and warrant to Lender and covenant and agree with Lender as follows:

      A.     Borrower and Guarantor, and each of them, have full legal right, power and authority to enter into and perform this Agreement.  The execution and delivery of this Agreement by Borrower and Guarantor and the consummation by Borrower and Guarantor of the transactions contemplated hereby have been duly authorized by all necessary action by or on behalf of Borrower and Guarantor.  This Agreement is a valid and binding obligation of

Borrower and Guarantor, enforceable against Borrower and Guarantor in accordance with its terms.

B.    Neither the execution and delivery of this Agreement by Borrower and Guarantor, or either of them, nor the consummation by Borrower and Guarantor of the transactions contemplated hereby, conflicts with or constitutes a violation or a default under any law applicable to Borrower and Guarantor, or either of them, or any contract, commitment, agreement, arrangement or restriction of any kind to which Borrower or Guarantor is a party, by which Borrower or Guarantor is bound or to which any of Borrower's or Guarantor's property or assets is subject.

C.    There are no actions, suits or proceedings pending, or to the knowledge of Borrower or Guarantor, threatened against or affecting Borrower or Guarantor, in relation to its obligations to Lender or involving the validity and enforceability of this Agreement, or any of the other Broadway Loan Documents, as applicable, at law or in equity, or before or by any Governmental Agency, or which could have a material adverse effect on the financial condition, operations, properties, assets, liabilities or earnings of Borrower or Guarantor, or the ability of Borrower or Guarantor to perform their obligations to Lender.

D.    Borrower and Guarantor, and each of them, hereby reaffirm and confirm that the representations and warranties of Borrower and Guarantor, and each of them, contained in the Broadway Loan Documents are true, correct and complete in all material respects as of the date of this Agreement.

10.    <u>Revival of Obligation.</u>

A.    Borrower and Guarantor acknowledge and agree that in the event that the payment of money, this Agreement, or the grant of collateral should for any reason subsequently be declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then as to that which is repaid or restored pursuant to any such Voidable Transfer (including all costs, expenses and attorneys' fees of Lender related thereto, including, without limitation, relief from stay or similar proceedings), the liability of Borrower and Guarantor to Lender shall automatically be revived, reinstated and restored as though such Voidable Transfer had never been made to Lender.

B.    Nothing set forth herein is an admission that such Voidable Transfer has occurred.  Borrower and Guarantor expressly acknowledge that Lender may rely upon advice of counsel, and if so advised by counsel, may, in the exercise of Lender's sole opinion and judgment, settle, without defending, any action to void any alleged Voidable Transfer, and that upon such settlement, Borrower and Guarantor shall again be liable for any deficiency resulting from such settlement as provided in this Agreement.

11.    <u>Waiver of Certain Bankruptcy Rights.</u>

Borrower and Guarantor acknowledge and agree that but for Lender entering into this Agreement with Borrower and Guarantor, Lender would have continued to diligently pursue all of its rights and remedies under the Broadway Loan Documents, at law and in equity, against Borrower and Guarantor. As an additional inducement to and material consideration for Lender agreeing to the modifications and extension provided in this Agreement, Borrower and Guarantor agree that in the event a Bankruptcy or Judicial Action (as hereinafter defined in this Section 11) is commenced which subjects Lender to any stay in the exercise of Lender's rights and remedies under the Broadway Loan Documents with respect to the Collateral, including, but not limited to, the automatic stay imposed by Section 362 of the United States Bankruptcy Code (individually and collectively, "Stay"), then Borrower and Guarantor irrevocably consent and agree that such Stay shall automatically be lifted and released against Lender with respect to the Collateral, and Lender shall thereafter be entitled to exercise all of its rights and remedies under the Broadway Loan Documents with respect to the Collateral, subject, however, to the terms and conditions of this Agreement. Borrower and Guarantor acknowledge that each is knowingly, voluntarily, and intentionally waiving each of such party's rights to any Stay and agrees that the benefits provided to Borrower and Guarantor under the terms of this Agreement are valuable consideration for such waiver. As used in this Section 11, the term "Bankruptcy or Judicial Action" shall mean any voluntary or involuntary case filed by or against Borrower and Guarantor, or either of them, under the United States Bankruptcy Code, or any voluntary or involuntary petition in composition, readjustment, liquidation, or dissolution, or any state and federal bankruptcy law action filed by or against Borrower and Guarantor, or either of them, any action where Borrower and Guarantor, or either of them, are adjudicated as bankrupt or insolvent, any action for dissolution of Borrower and Guarantor, or either of them, or any action in furtherance of any of the foregoing, or any other action, case, or proceeding that has the effect of staying (or in which a stay is being obtained against) the enforcement by Lender of its rights and remedies with respect to the Collateral under the Broadway Loan Documents.

12.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Borrower and Guarantor and their respective successors, assigns, directors, officers, shareholders, partners, accountants, heirs, executors, administrators, trustees and trustees in bankruptcy.

13.    Release by Borrower and Guarantor.

A.    Borrower and Guarantor, on behalf of themselves, their respective successors and assigns, and each of them, do hereby forever relieve, release, acquit and discharge Lender and its predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower and Guarantor, or either of them, now own or hold or have at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing, in whole or in part, on or before the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or

in connection with the Recitals above, the Loan, the facts pertaining to this Agreement, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and Guarantor, or either of them, to Lender, or the lending arrangements between Lender and Borrower and Guarantor, all individually and collectively.

(1)    As to the matters released herein, Borrower and Guarantor expressly waive any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her, would have materially affected his or her settlement with the debtor or released party."

(2)    Borrower and Guarantor expressly waive and release any right or benefit which they have or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Borrower and Guarantor acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of Borrower and Guarantor, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

B.    Borrower and Guarantor are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released. Borrower and Guarantor shall indemnify, defend and hold Lender and each of the other Released Parties, and each of them, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

14.    <u>No Joint Venture, Management or Control</u>. Notwithstanding any provision of this Agreement and/or of the Broadway Loan Documents:

A.    Lender is not and shall not be construed to be a partner, joint venture, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower, Guarantor or any other Person;

B.     Lender shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of Borrower or Guarantor; and

C.     Borrower and Guarantor, or either of them, do not have any claims, causes of action or defenses to their obligations to Lender based on any allegations of management or control exercised by Lender. Borrower and Guarantor, and each of them acknowledge and agree that Lender does not manage or control them in any way.

15.     <u>No Further Commitments to Lend</u>.   Borrower and Guarantor agree and acknowledge that Lender will not and has no obligation to advance, provide or loan any further or additional monies or credit to Borrower and the obligation of Lender to advance any further sums to Borrower under the Broadway Loan Documents has been terminated thereunder. Borrower and Guarantor further agree and acknowledge that Lender will not and has no obligation to further extend the time for payment of any obligations owing to or arising in favor of Lender by Borrower and Guarantor, or either of them.

16.     <u>Miscellaneous</u>.

A.     Section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

B.     This Agreement may be executed in one or more counterparts but all of the counterparts shall constitute one agreement; provided, however, this Agreement shall not be effective and enforceable unless and until it is executed by all parties hereto.

C.     This Agreement and the other documents and instruments executed in connection therewith constitute the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

D.     This Agreement is not a novation, nor, except as expressly provided in this Agreement, is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers or rights set forth in the Broadway Loan Documents.  Nothing contained in this Agreement shall be deemed to constitute a waiver by Lender of any required performance by Borrower and Guarantor, or either of them, of any default heretofore or hereafter occurring under or in connection with the other Broadway Loan Documents.  In the event there is a conflict in any term, condition or provision of this Agreement, on the one hand, and the Loan Agreement or any of the other Broadway Loan Documents, on the other hand, the terms, conditions and provisions of this Agreement are to control.

E.     Borrower and Guarantor hereby further represent and warrant as follows:

(1)     Borrower and Guarantor have received, or have had the opportunity to receive, independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by Borrower and Guarantor, their attorneys reviewed this Agreement and discussed this Agreement with them and have made all desired changes;

**39**

(2)    Except as expressly stated in this Agreement, neither Lender nor any other person or entity has made any statement or representation to Borrower or Guarantor regarding facts relied upon by Borrower or Guarantor;

(3)    Borrower and Guarantor do not rely upon any statement, representation or promise of Lender or any other person or entity in executing this Agreement except as expressly stated in this Agreement;

(4)    The terms of this Agreement are contractual and not a mere recital;

(5)    This Agreement has been carefully read by, the contents hereof are known and understood by, and it is signed freely by Borrower; and

(6)    This Agreement and the releases contained herein are intended to be final and binding against Borrower and Guarantor, and Borrower and Guarantor acknowledge that Lender is expressly relying on the finality of this Agreement as a substantial, material factor inducing Lender's execution of this Agreement.

F.    This Agreement and any and all documents executed in connection herewith are entered into and made to be performed in Los Angeles County, California, and in the event that litigation is instituted in connection with this Agreement, and any and all documents executed in connection herewith, it shall be instituted in the Courts for Los Angeles County, California. This Agreement shall be construed under the laws of the State of California.

G.    Upon indefeasible payment and performance in full of the Broadway Loan Documents, Lender shall provide Borrower the Limited Release in the form of Exhibit "D" attached hereto.

H.    The waiver of any existing or future default by any party to this Agreement or of any of the terms of this Agreement shall not be deemed a waiver of any future default or term. No waiver of any other provisions hereof shall be deemed or constitute a waiver of any other provision, and no waiver of any type shall be binding unless evidenced by a writing signed by the party making waiver.

17.    JUDICIAL REFERENCE – The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Agreement and ANY MATTER RELATED THERETO, shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding. Notwithstanding the foregoing, the judicial reference provided herein shall not apply to the New Loans. ***By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.***

The parties below have initialed this section to further indicate their awareness and acceptance of each and every provision hereof.

_____          _____          _____
Borrower's Initials                    Alan's Initials                        Daniel's Initials

_____          _____          _____
David's Initials                       Guarantor's Initials                   Lender's Initials

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.

**BORROWER:**

BROADWAY AVENUE INVESTMENTS LLC.
a California limited liability company

By: _____
Name: Alan Gomperts
Its: Manager

**GUARANTOR:**

_____
ALAN GOMPERTS, an individual

_____
DANIEL HALEVY, an individual

_____
DAVID HALEVY, an individual, by Daniel Halevy as his attorney in fact

**LENDER:**
ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,
A Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signer

# EXHIBIT "A"
## LEGAL DESCRIPTION

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

## EXHIBIT "B-1"
## NEGEV LOAN

1. Loan Agreement
2. Promissory Note
3. Assignment of Leases and Rents
4. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Guaranty
6. Borrower's Closing Certificate
7. Borrower's Resolutions
8. Building Laws Indemnity Agreement
9. Hazardous Materials Indemnity Agreement
10. Undelivered Items Letter
11. Pledge and Security Agreement

## EXHIBIT "B-2"
## SLA LOAN

1. Promissory Note
2. Loan Agreement
3. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Assignment of Leases and Rents
5. Guaranty
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrowers Incumbency Certificate and Resolutions
9. Borrower's Closing Certificate
10. Undelivered Items letter
11. Pledge Agreement

# EXHIBIT "B-3"
# G&H LOAN

1. Promissory Note
2. Loan Agreement
3. Security Instrument (Greenfield) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Security Instrument (Horner Street) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Security Instrument (Palm Drive) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrower's Closing Certificate
9. Undelivered Items letter

# EXHIBIT "C"
## ALLOCATION OF NEW LOANS PROCEEDS

| SLA Loan | | | Negev Loan | | | Guarantor Loan | | |
|---|---|---|---|---|---|---|---|---|
| Sources | | | Sources | | | Sources | | |
| Loan | $ | 125,000.00 | Loan | | $ 1,300,000.00 | Loan | | $ 2,575,000.00 |
| Total Sources | $ | 125,000.00 | Total Sources | | $ 1,300,000.00 | Total Sources | | $ 2,575,000.00 |
| | | | | | | | | |
| Uses | | | Uses | | | Uses | | |
| Interest Reserve SLA Loan | $ | 6,927.08 | Interest Reserve Negev Loan | $ | 72,041.67 | Interest Reserve Guarantor Loan | $ | 142,697.92 |
| Per Diem SLA Loan (4/19-5/1) | $ | 395.83 | Per Diem Negev Loan (4/19-5/1) | $ | 4,116.67 | Per Diem Guarantor Loan (4/19-5/1) | $ | 8,154.17 |
| Back Pay Broadway (4/19) | $ | 36,605.80 | Back Pay Broadway (4/19) | $ | 380,700.33 | Back Pay Broadway (4/19) | $ | 754,079.50 |
| Per Diem Broadway Loan (4/19-5/1) | $ | 1,508.23 | Per Diem Broadway Loan (4/19-5/1) | $ | 15,685.62 | Per Diem Broadway Loan (4/19-5/1) | $ | 31,069.60 |
| 8-Month IR Broadway Loan | $ | 26,394.08 | 8-Month IR Broadway Loan | $ | 274,498.44 | 8-Month IR Broadway Loan | $ | 543,718.05 |
| Paydown Broadway Loan | $ | 53,168.97 | Paydown Broadway Loan | $ | 552,957.28 | Paydown Broadway Loan | $ | 1,095,280.76 |
| | | | | | | | | |
| Total Uses | $ | 125,000.00 | Total Uses | | $ 1,300,000.00 | Total Uses | | $ 2,575,000.00 |

## EXHIBIT "D"
## LIMITED RELEASE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), hereby releases:

a.      BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower") from all contractual liability and obligations under the Note and any of the other Loan Documents executed by Borrower in favor of Lender, except as otherwise provided in this Limited Release ("Release").

b.      ALAN GOMPERTS ("Alan"), DANIEL HALEVY ("Daniel") and DAVID HALEVY ("David," and together with Alan and Daniel, individually and collectively, "Guarantor") from all contractual liability and obligations under the Continuing Guaranty and any of the other Loan Documents executed by Guarantor in favor of Lender, except as otherwise provided in this Release.

1.      Notwithstanding the foregoing, the Release shall not apply to and hereby excludes Borrower's obligations and liability under (a) that certain Hazardous Materials Indemnity Agreement, dated July 21, 2021 by Borrower in favor of Lender, (b) Guarantor's obligations and liabilities under clause (g) of "Recourse Amounts" under Section 1 Definitions of the Continuing Guaranty, and (c) any other obligations, liability or indemnity contained in any Loan Document that survives repayment of the Note and any other obligations under the Loan Documents.

2.      Borrower and Guarantor acknowledge and agree that in the event that all or any part of any payment or credit that reduces or pays off the Note or any other obligation under the Loan Documents is declared by a court of competent jurisdiction  declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then this Release shall be null and void, and of no force and effect, unless and until the Note and any such obligations under the Loan Obligations are indefeasibly paid in full.

3.      Any capitalized term not expressly defined in this Release shall have the meaning ascribed to it in that certain Settlement and Loan Modification Agreement by and among Borrower, Guarantor and Lender, dated as of April __, 2023.

This Release is executed by the undersigned as of the ___ day of _____, 202_.

ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

# EXHIBIT  3

# EXHIBIT  3

# EXHIBIT  3

## CONTINUING GUARANTY

**DAVID HALEVY,** an individual ("*Guarantor*"), executed this Continuing Guaranty (this "*Guaranty*") on April 14, 2023 (the "*Effective Date*") in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*").

BACKGROUND RECITALS

A.      Lender and **NEGEV INVESTMENTS, LLC,** a California limited liability company ("*Borrower*") have entered into the Loan Agreement (the "*Loan Agreement*"), dated as of the date hereof governing (among other things) the Loan in the amount of $1,300,000.00 (the "*Loan*").

B.      The Loan is secured in part by that certain deed of trust lien given by the Borrower to the Lender (the "*Security Instrument*"), and more particularly described in the Loan Agreement. The Security Instrument encumbers Borrower's interest in and to the "Property" described in the Security Instrument (the "*Property*").

C.      Lender would not have entered into the Loan Agreement or made the Loan to Borrower without Guarantor making and delivering this Guaranty.

Therefore, Guarantor (1) acknowledges the receipt and sufficiency of good and adequate consideration for making this Guaranty, and (2) agrees as follows:

1.      Definitions.    Capitalized terms not otherwise defined in this Guaranty will have the meanings set forth in the Loan Agreement.  Within this Guaranty, words of any gender include all other genders and words in the singular number include the plural, unless the context otherwise requires.  The following terms have the following meanings:

"*Bankruptcy Event*" means any of the following events:  (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding).  A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"*Conveyance Event*" means that (1) legal or equitable title to any part of, or any interest in, the Collateral is vested in any Person other than Borrower or Lender, or (2) Borrower creates or permits any lien (except for the lien for Taxes which are not delinquent), security interest or other encumbrance against or covering the Collateral.

"*Enforcement Costs*" means all reasonable attorneys' fees, legal expenses and other costs Lender incurs to collect or enforce the Guaranteed Obligations or the Loan Documents.

1

"*Guaranteed Obligations*" means all (a) 100% of the Indebtedness and Interest, and/or (b) the operating costs of the Property, and/or (c) Enforcement Costs, and/or (d) Recourse Amounts.

"*Indebtedness*" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"*Interest*" means all accrued and unpaid interest on the Principal Amount.

"*Loan Documents*" means the Loan Agreement, the Security Instrument, the Hazardous Materials Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"*Liquid Assets*" means unencumbered (a) cash on hand or on deposit (including certificates of deposit which mature in less than twelve months) in commercial banks operating in the United States, (b) readily marketable securities issued by the United States, and (c) readily marketable commercial paper rated A-1 by Standard & Poor's Corporation (or a similar rating by any similar organization that rates commercial paper).

"*Recourse Amounts*" any loss, damage, cost, expense, liability, claim or other obligation (including attorneys' fees and costs reasonably incurred), causes of action, suits, claims, demands and judgments of any nature or description whatsoever, which may be imposed upon, incurred by or awarded against Lender or any affiliate thereof as a result of, arising out of or in connection with the following:

(a)     misapplication or misappropriation of Rents, security deposits, or other income, issues, profits and revenues derived from the Property at any time an Event of Default by Borrower exists, provided that any prepaid rent paid more than 1 month in advance as of the date of an Event of Default hereunder by Borrower shall be considered to have been collected after the event of Borrower's default;

(b)     fraud or material misrepresentation of Borrower or Guarantor;

(c)     (i) misapplication or misappropriation of any insurance policies by reason of damages, loss or destruction to any portion of the Property or the Improvements thereon to the full extent of such misapplied or misappropriated proceeds, or (ii) the misapplication or misappropriation of proceeds or awards resulting from the condemnation or taking in lieu of condemnation of any portion of the Property, to the full extent of such misapplied or misappropriated proceeds or awards;

(d)     intentional physical waste of the Property or any portion thereof, and all costs, including reasonable attorney's fees, incurred by Lender to repair or remediate such intentional physical waste, to the full extent of the actual loss incurred by Lender as a result thereof;

(e)     any taxes, assessments or insurance premiums, to the extent not covered by amounts paid into escrow by Borrower to Lender, for which Borrower is liable under the Note, the Security Instrument or any other loan document executed in connection therewith, but only to the extent that Revenue from the Property is sufficient to pay such taxes, assessments or insurance premiums;

(f)     failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property;

(g)     loss arising under the Hazardous Materials Indemnity Agreement executed by Borrower in favor of Lender, or Borrower's breach of the hazardous substances covenants, warranties or representation provisions contained in the Security Instrument or other loan documents executed in connection with the Note and Security Instrument, which loss is not caused by Lender after Lender takes title to the Property;

(h)     loss by fire or casualty to the extent not compensated by insurance proceeds collected by Lender;

(i)     any loss resulting from any Guarantor (or any Person comprising any Guarantor), Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Security Instrument or any other Loan Document, seeking a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserting in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, but only if and to the extent that a court of competent jurisdiction determines that such claims were frivolous (i.e., without any merit) and in bad faith; and

(j)     all costs and fees, including without limitation, reasonable attorneys' fees incurred by Lender in the enforcement of subparagraphs (a) through (j) above.

Notwithstanding the foregoing, Recourse Events shall mean the full amount of the Indebtedness upon the occurrence of either of the following events (the "***Full Recourse Events***"):

(a)     a Bankruptcy Event;

(b)     Borrower fails to obtain Lender's prior consent to any subordinate financing secured by the Property; or

(c)     a Conveyance Event; or

(d)     Borrower fails to comply with the "single purpose entity/separateness" covenants set forth in Section 4.1(b) of the Loan Agreement beyond the expiration of all applicable notice cure periods. and such failure results in (or is cited as a factor by a court of competent jurisdiction) the substantive consolidation of Borrower with another Person; or

(e)     Borrower fails to comply with the cash management provisions set forth in Section 6.1 and Section 6.2 of the Loan Agreement beyond the expiration of all applicable notice cure periods.

"***Transfer Event***" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

2.    <u>Inducement</u>.  Guarantor has an economic investment or interest in Borrower, and an interest in the success of the Property, and Guarantor will substantially benefit from Lender's agreement to make the Loan to Borrower.

3.    <u>Guaranty</u>.  In order to induce Lender to make the Loan to Borrower, Guarantor absolutely, unconditionally and irrevocably guarantees and agrees to pay and perform the Guaranteed Obligations. Notwithstanding anything to the contrary in this Guaranty or any of the other Loan Documents, Guarantor will be liable for all of the Indebtedness and the Enforcement Costs if a Conveyance Event, or a Bankruptcy Event, occurs.

4.    <u>Waivers</u>.

(a)    Guarantor, with respect to the Guaranteed Obligations and the Indebtedness, waives:  (i) **PRESENTMENT FOR PAYMENT**; (ii) **DEMAND**; (iii) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (iv) **NOTICE OF INTENTION TO ACCELERATE**; (v) **NOTICE OF ACCELERATION**; (vi) **NOTICE OF DISPOSITION OF COLLATERAL**; (vii) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (viii) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (ix) **PROTEST AND NOTICE OF PROTEST**; and (x) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(b)    Lender is not obligated to notify Guarantor of (i) Lender's acceptance of this Guaranty, (ii) any credit extended on the faith of this Guaranty, or (iii) Borrower's failure to pay or perform any Indebtedness which constitutes Guaranteed Obligations.  Lender is not obligated to use diligence in preserving any Person's liability for the Indebtedness or the Guaranteed Obligations.  Lender is not obligated to use diligence in bringing suit to enforce collection, or performance, of the Indebtedness or the Guaranteed Obligations.

(c)    Guarantor waives **<u>ALL DEFENSES GIVEN OR REDUCTIONS IN THE GUARANTEED OBLIGATIONS AVAILABLE TO SURETIES OR GUARANTORS AT LAW OR IN EQUITY</u>** other than the actual payment and performance of the Guaranteed Obligations, including **<u>ALL DEFENSES BASED UPON QUESTIONS AS TO (i) THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THE INDEBTEDNESS OR THE GUARANTEED OBLIGATIONS, OR (ii) THE VALUE OF ANY COLLATERAL</u>**. Guarantor is primarily liable under this Guaranty.

(d)    At any time, Lender may, in its sole discretion, without Guarantor's prior consent, and without impairing, modifying, releasing or otherwise affecting Guarantor's liability under this Guaranty:

(i)    alter, compromise, accelerate, renew, extend, or change the time or manner for the payment of, the Indebtedness;

(ii)    increase or reduce the rate of interest on the Indebtedness;

(iii)    take, surrender, exchange, withdraw, subordinate, alter, modify or eliminate security;

(iv)    (1) add, release, discharge, or (2) settle or compromise with, any Borrower Party or other Person liable for the Indebtedness or the Guaranteed Obligations;

(v)    make any change to the Loan Documents or the manner in which Lender does business with Borrower; or

4

(vi)     apply any moneys received from Borrower or any other source, or from any security or collateral, in the manner Lender determines, without being required to marshal securities or assets or to apply any part of the moneys or security to any particular part of the Guaranteed Obligations.

Lender is not required to retain, hold, protect, exercise due care with respect thereto, perfect security interests in or otherwise assure or safeguard any security for the Indebtedness or the Guaranteed Obligations; and Guarantor's obligations under this Guaranty and any other Loan Documents will not be affected by, and Guarantor will not have any recourse from, Lender's failure (x) to do any of the foregoing with respect to any security for the Indebtedness or the Guaranteed Obligations, or (y) to exercise or not exercise any right or remedy of Lender under the Loan Documents, at law or in equity.

5.     Guaranty Absolute.  Guarantor's liability under this Guaranty is absolute, and will not be modified, released or impaired, for any reason, including because:

(a)     any Person (including any Borrower Party) dies, or is or becomes incapacitated, disabled, dissolved or terminated;

(b)     Lender fails to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of any Borrower Party or another Person;

(c)     Lender cannot recover the Indebtedness from any Borrower Party or another Person for any reason, including any statute of limitations or Applicable Bankruptcy Law;

(d)     Any Borrower Party or another Person is entitled to any defense, setoff or counterclaim related to the Loan, the Indebtedness or the Guaranteed Obligations;

(e)     a Conveyance Event or a Transfer Event occurs;

(f)     Borrower Party (other than Guarantor) or another Person liable for the payment or performance of Indebtedness or the Guaranteed Obligations is released or discharged by operation of law or otherwise (other than a discharge resulting from the payment of the Indebtedness);

(g)     this Guaranty or any other Loan Document is modified, extended, amended, released or waived; or

(h)     Lender fails to give Guarantor notice of an Event of Default under any Loan Document.

6.     Subordination.  Until the Indebtedness is repaid in full (and including all interest accruing, after any Bankruptcy Event, on the Indebtedness):

(a)     Guarantor subordinates all rights to repayment of any current or future indebtedness from Borrower to Guarantor to Lender's prior right to receive or require payment in full of the Indebtedness.

(b)     Guarantor shall not accept any payment or satisfaction of any indebtedness of Borrower to Guarantor.

(c)     Guarantor shall not accept any security for any indebtedness of Borrower to Guarantor.

(d)     If Guarantor receives any payment, satisfaction or security for any indebtedness of Borrower to Guarantor, then Guarantor shall immediately deliver the payment, satisfaction or security to Lender.  Lender will apply the payment, satisfaction or security as set forth in the Loan Agreement.  Guarantor will hold any payment, satisfaction or security Guarantor receives in trust for Lender until the payment, satisfaction or security is delivered to Lender.

7.     Waiver of Right of Subrogation.  To the fullest extent permitted by Applicable Law, Guarantor waives all rights at law or in equity to seek subrogation, contribution, indemnification or any

5

other form of reimbursement or repayment from any Borrower Party or any other guarantor of, or any other party secondarily liable for, the payment or performance of the Indebtedness or the Guaranteed Obligations until the Indebtedness has been paid and performed in full.  When the Indebtedness has been indefeasibly paid and fully performed, Guarantor will be subrogated to the rights of Lender against Borrower and any endorsers, sureties or other guarantors to the extent of the payments that Guarantor makes on the Guaranteed Obligations.

8.        No Usury.  Lender and Guarantor intend that this Guaranty and the other Loan Documents strictly comply with applicable usury law.  Therefore, Lender and Guarantor agree that:  (i) none of the terms of this Guaranty or the other Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; and (ii) no Person (including any Borrower Party) will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate.  Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness.  If at any time the interest received for the Guaranteed Obligations exceeds the Maximum Rate, then Lender will, at its option, either refund to Guarantor the amount of the excess or credit the amount of the excess against the Guaranteed Obligations.  Guarantor agrees that the Loan and the Guaranty are not usurious and agrees that if, at any time, Guarantor believes that the Loan or the Guaranty is usurious, it shall give Lender (a) notice of the condition and (b) 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

9.        Representations and Warranties.  On the Effective Date, Guarantor represents to Lender that:

(a)        Guarantor (i) is solvent, (ii) is not bankrupt and (ii) has no outstanding liens, garnishments, bankruptcies or court actions which could cause Guarantor to become insolvent or bankrupt.  No Bankruptcy Event has occurred.

(b)        Each Guarantor financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly presents the financial condition and the results of operations of each Guarantor on the date and for the period covered by the financial statements.  All other reports, statements and other data that any Guarantor furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading.  Since the date of the last financial statements each Guarantor delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) Guarantor's business, condition (financial or otherwise) or operations, or (b) Guarantor's ability to perform or satisfy, or Lender's ability to enforce, any of the Guaranteed Obligations.  For the purposes of Subsection 9(a) and 9(b), "Guarantor" includes any joint ventures, managing member or general partner of Guarantor.

(c)        There are no suits or proceedings (including condemnation) pending, or to Guarantor's knowledge threatened, against or affecting any Guarantor, another Borrower Party or the Collateral, or involving the validity, enforceability or priority of this Guaranty or any of the Loan Documents.

(d)        If Guarantor is not a natural person, then Guarantor:  (i) is duly organized, validly existing, and in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own its other assets and transact its present or proposed business.

(e)        Guarantor has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty, and has taken all necessary actions to authorize its execution, delivery and performance of the Guaranteed Obligations.  Guarantor has duly executed and delivered this Guaranty, and each other Loan Document to which it is a party or under which

6

it is obligated.  Each obligation under this Guaranty or any other Loan Document constitutes, Guarantor's legal, valid and binding obligation, enforceable in accordance with the Loan Document's terms, except to the extent enforcement of any Loan Document is subject to the effect of (i) Applicable Bankruptcy Law, or (ii) general principles of equity.

(f)      Guarantor's execution, delivery and performance of this Guaranty and the other Loan Documents, and compliance with the terms and provisions of this Guaranty and the other Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, or constitute a default under, the terms of any other instrument to which Guarantor is a party or by which Guarantor is bound or may be subject, or (iii) violate any term of Guarantor's certificate of formation or other documents and agreements governing Guarantor's existence, management or operation.  Guarantor is not required to obtain any Person's consent to execute, deliver or perform this Guaranty or the other Loan Documents.

(g)      Guarantor is intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

10.    <u>Covenants</u>.  Guarantor absolutely and unconditionally covenants that:

(a)      Guarantor shall pay and perform the Guaranteed Obligations even if, for any reason, (i) Borrower does not pay or perform the Indebtedness or any other Borrower obligations under the Loan Documents, or (ii) the Indebtedness or the Guaranteed Obligations are disaffirmed or terminated (except for payment and performance in full).

(b)      Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower is (for any reason) liable for any portion of the Indebtedness or the Guaranteed Obligations.

(c)      Guarantor will at all times remain intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

(d)      Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower's organizational structure changes.

(e)      Notwithstanding any prior reduction or termination of this Guaranty, Guarantor will remain liable for, and (after Lender's demand) pay to Lender, the amount of any prior Indebtedness payment that Lender must (for any reason) pay to Borrower or any other Person.

(f)      Guarantor will not (i) benefit from, (ii) be able to direct the application of, or (iii) have any right to participate in, any Collateral.

(g)      Guarantor will remain obligated under this Guaranty for the Guaranteed Obligations even if Guarantor loses (for any reason) any right against (i) any Borrower Party or other Person, or (ii) the Collateral.

(h)      Lender is not required to pursue any remedies against any Person or the Collateral before demanding that Guarantor pay or perform the Guaranteed Obligations.

(i)      Lender may maintain an action on this Guaranty without joining any other Borrower Party or bringing a separate action against a Borrower Party.

(j)      Until all Indebtedness is indefeasibly repaid, Guarantor shall maintain (a) at least $2,000,000.00 of Liquid Assets (the "***Liquidity Requirement***"), and (b) a tangible net worth of at least $1,300,000.00 (the "***Net Worth Requirement***").  Guarantor will provide Lender with evidence (which may include a certificate), satisfactory to Lender in its discretion, establishing Guarantor's satisfaction of the Liquidity Requirement and the Net Worth Requirement within 60 days after the end of each calendar quarter.

11.   <u>Financial Statements and Reports</u>.   Guarantor shall deliver to Lender all financial statements, reports and certificates, if any, required under the Loan Agreement.

12.   <u>Multiple Guarantors</u>.   If there are more than one Guarantor, then this <u>Section 12</u> is in effect. Unless the context clearly indicates otherwise, all references to "*Guarantor*" mean either or any Guarantor.

(a)   **Joint Liability**.   Lender may sue any Guarantor, jointly or individually, without impairing Lender's rights against each Guarantor under this Guaranty.   Lender may compromise with any Guarantor or any other Person for any sum Lender sees fit.   Lender may release any Guarantor or any other Person from any liability for the Indebtedness or the Guaranteed Obligations without impairing Lender's right to demand and collect the balance of the Indebtedness or the Guaranteed Obligations from any Guarantor or other Person.   No compromise or release will, except as specifically set forth in this Guaranty, impair Guarantors' rights amongst themselves.

(b)   **Disputes**.   Each Guarantor shall indemnify, defend and hold Lender harmless from and against any Claim Lender may suffer arising from any dispute between Guarantors, **INCLUDING THOSE CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM LENDER'S SOLE, COMPARATIVE OR CONTRIBUTORY NEGLIGENCE, OR STRICT LIABILITY**, unless a court of competent jurisdiction determines in a final non-appealable judgment that the Claim actual resulted from the intentional misconduct or gross negligence of Lender.

13.   <u>Revival and Reinstatement</u>.   This Guaranty remains in full force and effect during any Bankruptcy Event.   Notwithstanding the full payment and performance of the Obligations and the Guaranteed Obligations, this Guaranty will be reinstated in full force and effect immediately upon the occurrence of any Bankruptcy Event.   If any prior payment or performance of the Obligations or Guaranteed Obligations is rescinded or reduced, or Lender must otherwise restore or return any prior payment or performance of the Obligations or Guaranteed Obligations, then the Guaranteed Obligations will be reinstated to the extent of the payment or performance actually rescinded, reduced, restored or returned.

14.   <u>Rights Cumulative</u>.   Lender's rights under this Guaranty, at law and in equity are cumulative.   Until the Indebtedness is paid and performed in full and this Guaranty is terminated, Lender may exercise, as many times and as often as Lender elects (in its discretion) any rights under this Guaranty, at law and in equity.   This Guaranty does not diminish or discharge Lender's rights under any prior or future guaranty by Guarantor in favor of Lender.

15.   <u>Notices</u>.   Any notice or communication required or permitted under this Guaranty must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

To Lender:          Archway Real Estate Income Fund I SPE I, LLC
                    1875 Century Park East. Suite #900
                    Los Angeles, CA 90067
                    Attention: Joshua Kohan
                    Phone: (310) 893-5277
                    Email: joshua@archwayfund.com

with a copy to:     Thompson Coburn LLP
                    10100 Santa Monica Blvd., Suite 500
                    Los Angeles, CA 90067
                    Attention: Joshua Mogin
                    Phone: (310) 282-2520
                    Email: jmogin@thompsoncoburn.com

8

|                    |                                        |
|--------------------|----------------------------------------|
| To Guarantor:      | David Halevy                           |
|                    | 257 S. Linden Drive                    |
|                    | Beverly Hills CA 90212                 |
|                    | Phone: (310) 666-2885                  |
|                    | Email: danhalevy@gmail.com             |
| with a copy to     | Locke Lord LLP                         |
|                    | 300 S. Grand Ave., Suite 2600          |
|                    | Los Angeles, CA 90071                  |
|                    | Attention: David S. Kupetz            |
|                    | Phone: (213) 687-6774                  |
|                    | Email: David.Kupetz@lockelord.com      |

or to such other address as Lender or Guarantor may designate in writing and deliver in accordance with this <u>Section</u>. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this <u>Section</u>. Any notice or communication sent in accordance with this <u>Section</u> will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this <u>Section</u>. Guarantor consents to Lender recording any telephone communications between Lender and Guarantor.

16.     <u>Applicable Law</u>.  The Laws of the **STATE OF CALIFORNIA** (without giving effect to its principles of conflicts of law) and of the **UNITED STATES** will govern and control this Guaranty.  If any provision of this Guaranty or the application thereof to any person or circumstance, for any reason and to any extent, shall be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

17.     <u>Consent to Forum</u>.  **GUARANTOR IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS.  BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN <u>SECTION 15</u> ABOVE.**

18.     <u>Waiver of Jury Trial</u>.  **GUARANTOR WAIVES ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.  GUARANTOR HAS BEEN ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

19.     <u>Counterparts</u>.  The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument.  All counterparts of each Loan Document must be construed together and will constitute one instrument.

20.     <u>Modification or Termination</u>.  This Guaranty may only be amended, modified or terminated by a written instrument executed by Lender and Guarantor.  Guarantor agrees that it will be bound by any written amendment or modification of the Loan Documents, with or without notice to Guarantor, and Guarantor's obligations under this Guaranty and the other Loan Documents will not be impaired because of any such amendment or modification.

21.     <u>Successors and Assigns; Unenforceability of Certain Provisions, Headings</u>.  The terms of this Guaranty are binding on Guarantor and its heirs, devisees, representatives, successors and assigns and

9

inure to the benefit of Lender and all of its transferees, credit participants, successors and assignees. The headings in this Guaranty are for convenience only and will not limit or otherwise affect any of the terms of this Guaranty. If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents. All remaining portions of the Loan Documents will remain enforceable and valid.

22. <u>Damage Waiver</u>. Guarantor agrees that Lender will not be liable to Guarantor, any other Borrower Party or any other Person for any punitive, exemplary or consequential damages which may actually or allegedly arise from this Guaranty, the Loan, the other Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**. The foregoing waiver does not limit or otherwise impair the terms of any other waiver or indemnity in the Loan Agreement.

23. <u>Assignment</u>. Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents (including this Guaranty) and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan or this Guaranty, including credit information on Borrower Parties and any of their respective principals. If Lender makes any assignment or sells any interest in the Loan or this Guaranty, then Guarantor shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Guaranty as will facilitate Lender's sale or assignment, provided that no modification will materially add to Guarantor's obligations under this Guaranty or the other Loan Documents.

24. <u>Imaging</u>. Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Guarantor waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

25. <u>Time</u>. Time is of the essence for this Guaranty and the other Loan Documents.

26. <u>California Provisions</u>. In addition to the waivers set forth elsewhere in this Guaranty:

(a) Guarantor hereby waives marshaling of assets and liabilities, rights of offset, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any liability to which it applies or may apply, acceleration, presentment, demand for payment, protest, notice of non-payment, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and demands, collection suit or the taking of any other action by Lender.

(b) Guarantor expressly waives any and all benefits, rights and/or defenses which might otherwise be available to Guarantor under the following sections of the California Civil Code: Section 2809 (the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal), Section 2810 (a surety is not liable if, for any reason other than the mere personal disability of the principal, there is no liability upon the part of the principal at the time of execution of the contract, or the liability of the principal thereafter ceases), Section 2819 (a surety is exonerated if the creditor alters the original obligation of the principal without the consent of the surety), Section 2822 (a surety's right to have the principal designate the portion of any obligation to be satisfied by the surety in the event that the principal provides partial satisfaction of such obligation), Section 2845 (a surety is exonerated to the extent that the creditor fails to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue and which would lighten the surety's burden), Section 2846 (a surety may compel the principal to perform the obligation when due), Section 2847 (if a surety satisfies the principal obligation, or any part thereof, the principal is obligated to reimburse the surety for the amounts paid by the surety), Section 2850 (whenever the property of a surety is hypothecated with property of the principal, the surety is entitled to have the property of the

10

principal first applied to the discharge of the obligation), Section 2899 (where one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort to the property in a certain order, on the demand of any party interested) and Section 3433 (where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons).

(c)     Guarantor expressly agrees not to exercise or take advantage of any rights, benefits and/or defenses which might be available to Guarantor under the following California Civil Code Sections, unless and until the Guaranteed Obligations shall have been indefeasibly paid and satisfied in full:  Section 2839 (performance of the principal obligation, or an offer of such performance, duly made as provided in the Civil Code, exonerates a surety), Section 2848 (a surety, upon satisfaction of the obligation of the principal, is entitled to enforce remedies which the creditor then has against the principal and to pursue his co-sureties or other third parties after the surety has satisfied the underlying debt, or at least more than his share of it), and Section 2849 (a surety is entitled to the benefit of security held by the creditor for the performance of the principal obligation held by the creditor).

(d)     Guarantor waives any defense that Guarantor may have by reason of the failure of Lender to provide Guarantor with any material facts about Borrower, including any information respecting the financial condition of Borrower, Borrower's ability to perform the Loan obligations or the sufficiency of Lender's security.

(e)     Guarantor waives any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other Person, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons.

(f)     Guarantor waives all rights of indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.  Guarantor hereby waives the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of guarantors or sureties thereunder.

(g)     Guarantor waives all rights and defenses that Guarantor may have because the debtor's (Borrower's) debt is secured by real property.  This means, among other things:

(i)     The creditor (Lender) may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by the debtor.

(ii)     If the creditor forecloses on any real property collateral pledged by the debtor:  (A) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the creditor may collect from Guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the debtor.

(h)     This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the debtor's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b,

11

580d or 726 of the Code of Civil Procedure.  Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal (Borrower) by the operation of Section 580d of the Code of Civil Procedure or otherwise.  Any summary of statutory provisions is for convenience only, and Guarantor has read and is familiar with the entirety of such provisions.

27.    <u>Entire Agreement</u>.    The Loan Documents constitute the entire understanding and agreement between Borrower, Guarantor and Lender with respect to the transactions arising in connection with the Loan and this Guaranty.  The Loan Documents supersede all prior written or oral understandings and agreements between Borrower, Guarantor and Lender with respect to the Loan and this Guaranty.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK SIGNATURE PAGE FOLLOWS]

12

Guarantor has executed this Guaranty to be effective on the Effective Date.

**GUARANTOR:**

_____

**DAVID HALEVY,** by Daniel Halevy as his attorney in fact

# EXHIBIT  4

# EXHIBIT  4

# EXHIBIT  4

## CONTINUING GUARANTY

**ALAN GOMPERTS,** an individual, **DANIEL HALEVY,** an individual, **DAVID HALEVY,** an individual**, and SUE HALEVY,** an individual (collectively "*Guarantor*"), executed this Continuing Guaranty (this "*Guaranty*") on April 14, 2023 (the "*Effective Date*") in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*").

BACKGROUND RECITALS

A.    Lender and **SLA INVESTMENTS, LLC,** a California limited liability company ("*Borrower*") have entered into the Loan Agreement (the "*Loan Agreement*"), dated as of the date hereof governing (among other things) the Loan in the amount of $125,000.00 (the "*Loan*").

B.    The Loan is secured in part by that certain deed of trust lien given by the Borrower to the Lender (the "*Security Instrument*"), and more particularly described in the Loan Agreement. The Security Instrument encumbers Borrower's interest in and to the "Property" described in the Security Instrument (the "*Property*").

C.    Lender would not have entered into the Loan Agreement or made the Loan to Borrower without Guarantor making and delivering this Guaranty.

Therefore, Guarantor (1) acknowledges the receipt and sufficiency of good and adequate consideration for making this Guaranty, and (2) agrees as follows:

1.    <u>Definitions</u>.  Capitalized terms not otherwise defined in this Guaranty will have the meanings set forth in the Loan Agreement.  Within this Guaranty, words of any gender include all other genders and words in the singular number include the plural, unless the context otherwise requires.  The following terms have the following meanings:

"*Bankruptcy Event*" means any of the following events:  (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding).  A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"*Conveyance Event*" means that (1) legal or equitable title to any part of, or any interest in, the Collateral is vested in any Person other than Borrower or Lender, or (2) Borrower creates or permits any lien (except for the lien for Taxes which are not delinquent), security interest or other encumbrance against or covering the Collateral.

"*Enforcement Costs*" means all reasonable attorneys' fees, legal expenses and other costs Lender incurs to collect or enforce the Guaranteed Obligations or the Loan Documents.

"***Guaranteed Obligations***" means all (a) 100% of the Indebtedness and Interest, and/or (b) the operating costs of the Property, and/or (c) Enforcement Costs, and/or (d) Recourse Amounts.

"***Indebtedness***" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"***Interest***" means all accrued and unpaid interest on the Principal Amount.

"***Loan Documents***" means the Loan Agreement, the Security Instrument, the Hazardous Materials Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"***Liquid Assets***" means unencumbered (a) cash on hand or on deposit (including certificates of deposit which mature in less than twelve months) in commercial banks operating in the United States, (b) readily marketable securities issued by the United States, and (c) readily marketable commercial paper rated A-1 by Standard & Poor's Corporation (or a similar rating by any similar organization that rates commercial paper).

"***Recourse Amounts***" any loss, damage, cost, expense, liability, claim or other obligation (including attorneys' fees and costs reasonably incurred), causes of action, suits, claims, demands and judgments of any nature or description whatsoever, which may be imposed upon, incurred by or awarded against Lender or any affiliate thereof as a result of, arising out of or in connection with the following:

(a)    misapplication or misappropriation of Rents, security deposits, or other income, issues, profits and revenues derived from the Property at any time an Event of Default by Borrower exists, provided that any prepaid rent paid more than 1 month in advance as of the date of an Event of Default hereunder by Borrower shall be considered to have been collected after the event of Borrower's default;

(b)    fraud or material misrepresentation of Borrower or Guarantor;

(c)    (i) misapplication or misappropriation of any insurance policies by reason of damages, loss or destruction to any portion of the Property or the Improvements thereon to the full extent of such misapplied or misappropriated proceeds, or (ii) the misapplication or misappropriation of proceeds or awards resulting from the condemnation or taking in lieu of condemnation of any portion of the Property, to the full extent of such misapplied or misappropriated proceeds or awards;

(d)    intentional physical waste of the Property or any portion thereof, and all costs, including reasonable attorney's fees, incurred by Lender to repair or remediate such intentional physical waste, to the full extent of the actual loss incurred by Lender as a result thereof;

(e)    any taxes, assessments or insurance premiums, to the extent not covered by amounts paid into escrow by Borrower to Lender, for which Borrower is liable under the Note, the Security Instrument or any other loan document executed in connection therewith, but only to the extent that Revenue from the Property is sufficient to pay such taxes, assessments or insurance premiums;

2

(f)     failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property;

(g)     loss arising under the Hazardous Materials Indemnity Agreement executed by Borrower in favor of Lender, or Borrower's breach of the hazardous substances covenants, warranties or representation provisions contained in the Security Instrument or other loan documents executed in connection with the Note and Security Instrument, which loss is not caused by Lender after Lender takes title to the Property;

(h)     loss by fire or casualty to the extent not compensated by insurance proceeds collected by Lender;

(i)     any loss resulting from any Guarantor (or any Person comprising any Guarantor), Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Security Instrument or any other Loan Document, seeking a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserting in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, but only if and to the extent that a court of competent jurisdiction determines that such claims were frivolous (i.e., without any merit) and in bad faith; and

(j)     all costs and fees, including without limitation, reasonable attorneys' fees incurred by Lender in the enforcement of subparagraphs (a) through (j) above.

Notwithstanding the foregoing, Recourse Events shall mean the full amount of the Indebtedness upon the occurrence of either of the following events (the "***Full Recourse Events***"):

(a)     a Bankruptcy Event;

(b)     Borrower fails to obtain Lender's prior consent to any subordinate financing secured by the Property; or

(c)     a Conveyance Event; or

(d)     Borrower fails to comply with the "single purpose entity/separateness" covenants set forth in Section 4.1(b) of the Loan Agreement beyond the expiration of all applicable notice cure periods. and such failure results in (or is cited as a factor by a court of competent jurisdiction) the substantive consolidation of Borrower with another Person; or

(e)     Borrower fails to comply with the cash management provisions set forth in Section 6.1 and Section 6.2 of the Loan Agreement beyond the expiration of all applicable notice cure periods.

"***Transfer Event***" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

2.    <u>Inducement</u>.  Guarantor has an economic investment or interest in Borrower, and an interest in the success of the Property, and Guarantor will substantially benefit from Lender's agreement to make the Loan to Borrower.

3.    <u>Guaranty</u>.  In order to induce Lender to make the Loan to Borrower, Guarantor absolutely, unconditionally and irrevocably guarantees and agrees to pay and perform the Guaranteed Obligations. Notwithstanding anything to the contrary in this Guaranty or any of the other Loan Documents, Guarantor will be liable for all of the Indebtedness and the Enforcement Costs if a Conveyance Event, or a Bankruptcy Event, occurs.

4.    <u>Waivers</u>.

(a)    Guarantor, with respect to the Guaranteed Obligations and the Indebtedness, waives: (i) **PRESENTMENT FOR PAYMENT**; (ii) **DEMAND**; (iii) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (iv) **NOTICE OF INTENTION TO ACCELERATE**; (v) **NOTICE OF ACCELERATION**; (vi) **NOTICE OF DISPOSITION OF COLLATERAL**; (vii) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (viii) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (ix) **PROTEST AND NOTICE OF PROTEST**; and (x) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(b)    Lender is not obligated to notify Guarantor of (i) Lender's acceptance of this Guaranty, (ii) any credit extended on the faith of this Guaranty, or (iii) Borrower's failure to pay or perform any Indebtedness which constitutes Guaranteed Obligations.  Lender is not obligated to use diligence in preserving any Person's liability for the Indebtedness or the Guaranteed Obligations.  Lender is not obligated to use diligence in bringing suit to enforce collection, or performance, of the Indebtedness or the Guaranteed Obligations.

(c)    Guarantor waives **<u>ALL DEFENSES GIVEN OR REDUCTIONS IN THE GUARANTEED OBLIGATIONS AVAILABLE TO SURETIES OR GUARANTORS AT LAW OR IN EQUITY</u>** other than the actual payment and performance of the Guaranteed Obligations, including **<u>ALL DEFENSES BASED UPON QUESTIONS AS TO (i) THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THE INDEBTEDNESS OR THE GUARANTEED OBLIGATIONS, OR (ii) THE VALUE OF ANY COLLATERAL</u>**. Guarantor is primarily liable under this Guaranty.

(d)    At any time, Lender may, in its sole discretion, without Guarantor's prior consent, and without impairing, modifying, releasing or otherwise affecting Guarantor's liability under this Guaranty:

(i)    alter, compromise, accelerate, renew, extend, or change the time or manner for the payment of, the Indebtedness;

(ii)    increase or reduce the rate of interest on the Indebtedness;

(iii)    take, surrender, exchange, withdraw, subordinate, alter, modify or eliminate security;

(iv)    (1) add, release, discharge, or (2) settle or compromise with, any Borrower Party or other Person liable for the Indebtedness or the Guaranteed Obligations;

(v)    make any change to the Loan Documents or the manner in which Lender does business with Borrower; or

(vi)      apply any moneys received from Borrower or any other source, or from any security or collateral, in the manner Lender determines, without being required to marshal securities or assets or to apply any part of the moneys or security to any particular part of the Guaranteed Obligations.

Lender is not required to retain, hold, protect, exercise due care with respect thereto, perfect security interests in or otherwise assure or safeguard any security for the Indebtedness or the Guaranteed Obligations; and Guarantor's obligations under this Guaranty and any other Loan Documents will not be affected by, and Guarantor will not have any recourse from, Lender's failure (x) to do any of the foregoing with respect to any security for the Indebtedness or the Guaranteed Obligations, or (y) to exercise or not exercise any right or remedy of Lender under the Loan Documents, at law or in equity.

5.      <u>Guaranty Absolute</u>.  Guarantor's liability under this Guaranty is absolute, and will not be modified, released or impaired, for any reason, including because:

(a)      any Person (including any Borrower Party) dies, or is or becomes incapacitated, disabled, dissolved or terminated;

(b)      Lender fails to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of any Borrower Party or another Person;

(c)      Lender cannot recover the Indebtedness from any Borrower Party or another Person for any reason, including any statute of limitations or Applicable Bankruptcy Law;

(d)      Any Borrower Party or another Person is entitled to any defense, setoff or counterclaim related to the Loan, the Indebtedness or the Guaranteed Obligations;

(e)      a Conveyance Event or a Transfer Event occurs;

(f)      Borrower Party (other than Guarantor) or another Person liable for the payment or performance of Indebtedness or the Guaranteed Obligations is released or discharged by operation of law or otherwise (other than a discharge resulting from the payment of the Indebtedness);

(g)      this Guaranty or any other Loan Document is modified, extended, amended, released or waived; or

(h)      Lender fails to give Guarantor notice of an Event of Default under any Loan Document.

6.      <u>Subordination</u>.  Until the Indebtedness is repaid in full (and including all interest accruing, after any Bankruptcy Event, on the Indebtedness):

(a)      Guarantor subordinates all rights to repayment of any current or future indebtedness from Borrower to Guarantor to Lender's prior right to receive or require payment in full of the Indebtedness.

(b)      Guarantor shall not accept any payment or satisfaction of any indebtedness of Borrower to Guarantor.

(c)      Guarantor shall not accept any security for any indebtedness of Borrower to Guarantor.

(d)      If Guarantor receives any payment, satisfaction or security for any indebtedness of Borrower to Guarantor, then Guarantor shall immediately deliver the payment, satisfaction or security to Lender.  Lender will apply the payment, satisfaction or security as set forth in the Loan Agreement.  Guarantor will hold any payment, satisfaction or security Guarantor receives in trust for Lender until the payment, satisfaction or security is delivered to Lender.

7.      <u>Waiver of Right of Subrogation</u>.  To the fullest extent permitted by Applicable Law, Guarantor waives all rights at law or in equity to seek subrogation, contribution, indemnification or any

other form of reimbursement or repayment from any Borrower Party or any other guarantor of, or any other party secondarily liable for, the payment or performance of the Indebtedness or the Guaranteed Obligations until the Indebtedness has been paid and performed in full. When the Indebtedness has been indefeasibly paid and fully performed, Guarantor will be subrogated to the rights of Lender against Borrower and any endorsers, sureties or other guarantors to the extent of the payments that Guarantor makes on the Guaranteed Obligations.

8.    <u>No Usury</u>. Lender and Guarantor intend that this Guaranty and the other Loan Documents strictly comply with applicable usury law. Therefore, Lender and Guarantor agree that: (i) none of the terms of this Guaranty or the other Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; and (ii) no Person (including any Borrower Party) will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness. If at any time the interest received for the Guaranteed Obligations exceeds the Maximum Rate, then Lender will, at its option, either refund to Guarantor the amount of the excess or credit the amount of the excess against the Guaranteed Obligations. Guarantor agrees that the Loan and the Guaranty are not usurious and agrees that if, at any time, Guarantor believes that the Loan or the Guaranty is usurious, it shall give Lender (a) notice of the condition and (b) 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

9.    <u>Representations and Warranties</u>. On the Effective Date, Guarantor represents to Lender that:

(a)    Guarantor (i) is solvent, (ii) is not bankrupt and (ii) has no outstanding liens, garnishments, bankruptcies or court actions which could cause Guarantor to become insolvent or bankrupt. No Bankruptcy Event has occurred.

(b)    Each Guarantor financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly presents the financial condition and the results of operations of each Guarantor on the date and for the period covered by the financial statements. All other reports, statements and other data that any Guarantor furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading. Since the date of the last financial statements each Guarantor delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) Guarantor's business, condition (financial or otherwise) or operations, or (b) Guarantor's ability to perform or satisfy, or Lender's ability to enforce, any of the Guaranteed Obligations. For the purposes of <u>Subsection 9(a)</u> and <u>9(b)</u>, "Guarantor" includes any joint ventures, managing member or general partner of Guarantor.

(c)    There are no suits or proceedings (including condemnation) pending, or to Guarantor's knowledge threatened, against or affecting any Guarantor, another Borrower Party or the Collateral, or involving the validity, enforceability or priority of this Guaranty or any of the Loan Documents.

(d)    If Guarantor is not a natural person, then Guarantor: (i) is duly organized, validly existing, and in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own its other assets and transact its present or proposed business.

(e)    Guarantor has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty, and has taken all necessary actions to authorize its execution, delivery and performance of the Guaranteed Obligations. Guarantor has duly executed and delivered this Guaranty, and each other Loan Document to which it is a party or under which

6

it is obligated. Each obligation under this Guaranty or any other Loan Document constitutes, Guarantor's legal, valid and binding obligation, enforceable in accordance with the Loan Document's terms, except to the extent enforcement of any Loan Document is subject to the effect of (i) Applicable Bankruptcy Law, or (ii) general principles of equity.

(f)     Guarantor's execution, delivery and performance of this Guaranty and the other Loan Documents, and compliance with the terms and provisions of this Guaranty and the other Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, or constitute a default under, the terms of any other instrument to which Guarantor is a party or by which Guarantor is bound or may be subject, or (iii) violate any term of Guarantor's certificate of formation or other documents and agreements governing Guarantor's existence, management or operation. Guarantor is not required to obtain any Person's consent to execute, deliver or perform this Guaranty or the other Loan Documents.

(g)     Guarantor is intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

10.     <u>Covenants</u>. Guarantor absolutely and unconditionally covenants that:

(a)     Guarantor shall pay and perform the Guaranteed Obligations even if, for any reason, (i) Borrower does not pay or perform the Indebtedness or any other Borrower obligations under the Loan Documents, or (ii) the Indebtedness or the Guaranteed Obligations are disaffirmed or terminated (except for payment and performance in full).

(b)     Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower is (for any reason) liable for any portion of the Indebtedness or the Guaranteed Obligations.

(c)     Guarantor will at all times remain intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

(d)     Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower's organizational structure changes.

(e)     Notwithstanding any prior reduction or termination of this Guaranty, Guarantor will remain liable for, and (after Lender's demand) pay to Lender, the amount of any prior Indebtedness payment that Lender must (for any reason) pay to Borrower or any other Person.

(f)     Guarantor will not (i) benefit from, (ii) be able to direct the application of, or (iii) have any right to participate in, any Collateral.

(g)     Guarantor will remain obligated under this Guaranty for the Guaranteed Obligations even if Guarantor loses (for any reason) any right against (i) any Borrower Party or other Person, or (ii) the Collateral.

(h)     Lender is not required to pursue any remedies against any Person or the Collateral before demanding that Guarantor pay or perform the Guaranteed Obligations.

(i)     Lender may maintain an action on this Guaranty without joining any other Borrower Party or bringing a separate action against a Borrower Party.

(j)     Until all Indebtedness is indefeasibly repaid, Guarantor shall maintain (a) at least $12,500.00 of Liquid Assets (the "***Liquidity Requirement***"), and (b) a tangible net worth of at least $125,000.00 (the "***Net Worth Requirement***").   Guarantor will provide Lender with evidence (which may include a certificate), satisfactory to Lender in its discretion, establishing Guarantor's satisfaction of the Liquidity Requirement and the Net Worth Requirement within 60 days after the end of each calendar quarter.

7

11.    <u>Financial Statements and Reports</u>.    Guarantor shall deliver to Lender all financial statements, reports and certificates, if any, required under the Loan Agreement.

12.    <u>Multiple Guarantors</u>.  If there are more than one Guarantor, then this <u>Section 12</u> is in effect. Unless the context clearly indicates otherwise, all references to "*Guarantor*" mean either or any Guarantor.

(a)    **Joint Liability**.  Lender may sue any Guarantor, jointly or individually, without impairing Lender's rights against each Guarantor under this Guaranty.  Lender may compromise with any Guarantor or any other Person for any sum Lender sees fit.  Lender may release any Guarantor or any other Person from any liability for the Indebtedness or the Guaranteed Obligations without impairing Lender's right to demand and collect the balance of the Indebtedness or the Guaranteed Obligations from any Guarantor or other Person.  No compromise or release will, except as specifically set forth in this Guaranty, impair Guarantors' rights amongst themselves.

(b)    **Disputes**. Each Guarantor shall indemnify, defend and hold Lender harmless from and against any Claim Lender may suffer arising from any dispute between Guarantors, **INCLUDING THOSE CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM LENDER'S SOLE, COMPARATIVE OR CONTRIBUTORY NEGLIGENCE, OR STRICT LIABILITY**, unless a court of competent jurisdiction determines in a final non-appealable judgment that the Claim actual resulted from the intentional misconduct or gross negligence of Lender.

13.    <u>Revival and Reinstatement</u>.  This Guaranty remains in full force and effect during any Bankruptcy Event.  Notwithstanding the full payment and performance of the Obligations and the Guaranteed Obligations, this Guaranty will be reinstated in full force and effect immediately upon the occurrence of any Bankruptcy Event.  If any prior payment or performance of the Obligations or Guaranteed Obligations is rescinded or reduced, or Lender must otherwise restore or return any prior payment or performance of the Obligations or Guaranteed Obligations, then the Guaranteed Obligations will be reinstated to the extent of the payment or performance actually rescinded, reduced, restored or returned.

14.    <u>Rights Cumulative</u>.  Lender's rights under this Guaranty, at law and in equity are cumulative.  Until the Indebtedness is paid and performed in full and this Guaranty is terminated, Lender may exercise, as many times and as often as Lender elects (in its discretion) any rights under this Guaranty, at law and in equity.  This Guaranty does not diminish or discharge Lender's rights under any prior or future guaranty by Guarantor in favor of Lender.

15.    <u>Notices</u>.  Any notice or communication required or permitted under this Guaranty must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

|  |  |
|---|---|
| To Lender: | Archway Real Estate Income Fund I SPE I, LLC |
|  | 1875 Century Park East. Suite #900 |
|  | Los Angeles, CA 90067 |
|  | Attention: Joshua Kohan |
|  | Phone: (310) 893-5277 |
|  | Email: joshua@archwayfund.com |
|  |  |
| with a copy to: | Thompson Coburn LLP |
|  | 10100 Santa Monica Blvd., Suite 500 |
|  | Los Angeles, CA 90067 |
|  | Attention: Joshua Mogin |
|  | Phone: (310) 282-2520 |
|  | Email: jmogin@thompsoncoburn.com |

|                 |                                           |
|-----------------|-------------------------------------------|
| To Guarantor:   | David Halevy/Sue Halevy                   |
|                 | 257 S. Linden Drive                       |
|                 | Beverly Hills CA 90212                    |
|                 | Phone: (310) 666-2885                     |
|                 | Email: danhalevy@gmail.com                |
|                 |                                           |
|                 | Alan Gomperts                             |
|                 | 264 S. Oakhurst Drive                     |
|                 | Beverly Hills CA 90212                    |
|                 | Phone: (310) 621-5350                     |
|                 | Email: alangomperts@hotmail.com           |
|                 |                                           |
| with a copy to  | Locke Lord LLP                            |
|                 | 300 S. Grand Ave., Suite 2600             |
|                 | Los Angeles, CA 90071                     |
|                 | Attention: David S. Kupetz               |
|                 | Phone: (213) 687-6774                     |
|                 | Email: David.Kupetz@lockelord.com         |

or to such other address as Lender or Guarantor may designate in writing and deliver in accordance with this Section. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this Section. Any notice or communication sent in accordance with this Section will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this Section. Guarantor consents to Lender recording any telephone communications between Lender and Guarantor.

16. <u>Applicable Law</u>. The Laws of the **STATE OF CALIFORNIA** (without giving effect to its principles of conflicts of law) and of the **UNITED STATES** will govern and control this Guaranty. If any provision of this Guaranty or the application thereof to any person or circumstance, for any reason and to any extent, shall be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

17. <u>Consent to Forum</u>. **GUARANTOR IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS. BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN <u>SECTION 15</u> ABOVE.**

18. <u>Waiver of Jury Trial</u>. **GUARANTOR WAIVES ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS. GUARANTOR HAS BEEN ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

19. <u>Counterparts</u>. The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument. All counterparts of each Loan Document must be construed together and will constitute one instrument.

20.    <u>Modification or Termination</u>.    This Guaranty may only be amended, modified or terminated by a written instrument executed by Lender and Guarantor.  Guarantor agrees that it will be bound by any written amendment or modification of the Loan Documents, with or without notice to Guarantor, and Guarantor's obligations under this Guaranty and the other Loan Documents will not be impaired because of any such amendment or modification.

21.    <u>Successors and Assigns; Unenforceability of Certain Provisions, Headings</u>.  The terms of this Guaranty are binding on Guarantor and its heirs, devisees, representatives, successors and assigns and inure to the benefit of Lender and all of its transferees, credit participants, successors and assignees.  The headings in this Guaranty are for convenience only and will not limit or otherwise affect any of the terms of this Guaranty.  If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents.  All remaining portions of the Loan Documents will remain enforceable and valid.

22.    <u>Damage Waiver</u>.  Guarantor agrees that Lender will not be liable to Guarantor, any other Borrower Party or any other Person for any punitive, exemplary or consequential damages which may actually or allegedly arise from this Guaranty, the Loan, the other Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**.  The foregoing waiver does not limit or otherwise impair the terms of any other waiver or indemnity in the Loan Agreement.

23.    <u>Assignment</u>.  Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents (including this Guaranty) and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan or this Guaranty, including credit information on Borrower Parties and any of their respective principals.  If Lender makes any assignment or sells any interest in the Loan or this Guaranty, then Guarantor shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Guaranty as will facilitate Lender's sale or assignment, provided that no modification will materially add to Guarantor's obligations under this Guaranty or the other Loan Documents.

24.    <u>Imaging</u>.  Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Guarantor waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

25.    <u>Time</u>.  Time is of the essence for this Guaranty and the other Loan Documents.

26.    <u>California Provisions</u>.  In addition to the waivers set forth elsewhere in this Guaranty:

(a)    Guarantor hereby waives marshaling of assets and liabilities, rights of offset, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any liability to which it applies or may apply, acceleration, presentment, demand for payment, protest, notice of non-payment, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and demands, collection suit or the taking of any other action by Lender.

(b)    Guarantor expressly waives any and all benefits, rights and/or defenses which might otherwise be available to Guarantor under the following sections of the California Civil Code:  Section 2809 (the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal), Section 2810 (a surety is not liable if, for any reason other than the mere personal disability of the principal, there is no liability upon the part of the principal at the time of execution of the contract, or the liability of the principal thereafter ceases), Section 2819 (a surety is exonerated if the creditor alters the original obligation of the principal without the consent of the surety), Section 2822 (a surety's right to have the principal

designate the portion of any obligation to be satisfied by the surety in the event that the principal provides partial satisfaction of such obligation), Section 2845 (a surety is exonerated to the extent that the creditor fails to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue and which would lighten the surety's burden), Section 2846 (a surety may compel the principal to perform the obligation when due), Section 2847 (if a surety satisfies the principal obligation, or any part thereof, the principal is obligated to reimburse the surety for the amounts paid by the surety), Section 2850 (whenever the property of a surety is hypothecated with property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation), Section 2899 (where one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort to the property in a certain order, on the demand of any party interested) and Section 3433 (where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons).

(c)     Guarantor expressly agrees not to exercise or take advantage of any rights, benefits and/or defenses which might be available to Guarantor under the following California Civil Code Sections, unless and until the Guaranteed Obligations shall have been indefeasibly paid and satisfied in full:  Section 2839 (performance of the principal obligation, or an offer of such performance, duly made as provided in the Civil Code, exonerates a surety), Section 2848 (a surety, upon satisfaction of the obligation of the principal, is entitled to enforce remedies which the creditor then has against the principal and to pursue his co-sureties or other third parties after the surety has satisfied the underlying debt, or at least more than his share of it), and Section 2849 (a surety is entitled to the benefit of security held by the creditor for the performance of the principal obligation held by the creditor).

(d)     Guarantor waives any defense that Guarantor may have by reason of the failure of Lender to provide Guarantor with any material facts about Borrower, including any information respecting the financial condition of Borrower, Borrower's ability to perform the Loan obligations or the sufficiency of Lender's security.

(e)     Guarantor waives any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other Person, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons.

(f)     Guarantor waives all rights of indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.  Guarantor hereby waives the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of guarantors or sureties thereunder.

(g)     Guarantor waives all rights and defenses that Guarantor may have because the debtor's (Borrower's) debt is secured by real property.  This means, among other things:

(i)     The creditor (Lender) may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by the debtor.

(ii)     If the creditor forecloses on any real property collateral pledged by the debtor:  (A) the amount of the debt may be reduced only by the price for which that

11

South Los Angeles– Guaranty

92

118

collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the creditor may collect from Guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the debtor.

(h)      This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the debtor's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the Code of Civil Procedure.  Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal (Borrower) by the operation of Section 580d of the Code of Civil Procedure or otherwise.  Any summary of statutory provisions is for convenience only, and Guarantor has read and is familiar with the entirety of such provisions.

27.      <u>Entire Agreement</u>.   The Loan Documents constitute the entire understanding and agreement between Borrower, Guarantor and Lender with respect to the transactions arising in connection with the Loan and this Guaranty.  The Loan Documents supersede all prior written or oral understandings and agreements between Borrower, Guarantor and Lender with respect to the Loan and this Guaranty.

[**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK SIGNATURE PAGE FOLLOWS**]

South Los Angeles– Guaranty

Guarantor has executed this Guaranty to be effective on the Effective Date.

**GUARANTOR:**

**DAVID HALEVY,** by Daniel Halevy as his attorney in fact

**SUE HALEVY,** an individual

**ALAN GOMPERTS,** an individual

**DANIEL HALEVY,** an individual

# EXHIBIT  5

# EXHIBIT  5

# EXHIBIT  5

**LOAN AGREEMENT**


By and Between


(i) **ALAN GOMPERTS**, and **SHARON HALEVY**, **as Trustees of The Gomperts and Halevy Family Trust**, (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010**, and (iii) **DANIEL HALEVY**, an individual


and


ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS .................................................................................................1
   1.1.  Defined Terms ...........................................................................................................1
   1.2.  Terms Generally; References and Titles....................................................................1

ARTICLE II. THE LOAN .....................................................................................................1
   2.1.  The Loan ....................................................................................................................1
       (a)  Interest ...........................................................................................................1
       (b)  Default Rate; Late Charge .............................................................................2
       (c)  Payment ........................................................................................................2
       (d)  Method and Place of Payment........................................................................2
       (e)  Prepayment ....................................................................................................3
       (f)  Additional Expenditures................................................................................3
       (g)  Additional Costs ............................................................................................3
       (h)  Lender's Determinations. ...............................................................................3
   2.2.  Security for the Loan .................................................................................................3
   2.3.  Origination Fee ..........................................................................................................3

ARTICLE III. REPRESENTATIONS......................................................................................3
   3.1.  Representations ..........................................................................................................3
       (a)  Status; Operational Authority........................................................................3
       (b)  Power; Transactional Authority; Enforceability ...........................................3
       (c)  No Violation; No Consent..............................................................................4
       (d)  Financial Matters...........................................................................................4
       (e)  Contemplated Actions....................................................................................4
       (f)  No Default ......................................................................................................4
       (g)  Trade Name ....................................................................................................4
       (h)  Litigation .......................................................................................................4
       (i)  Title and Authority; Permitted Encumbrances ..............................................4
       (j)  Taxes .............................................................................................................5
       (k)  Other Agreements; Defaults...........................................................................5
       (l)  Foreign Person...............................................................................................5
       (m) ERISA ...........................................................................................................5
       (n)  Executive Order 13224; OFAC .....................................................................5
       (o)  Purpose ..........................................................................................................5
       (p)  Investment Company Act ...............................................................................6
       (q)  No Financing Statement .................................................................................6
       (r)  Location of Collateral ....................................................................................6
       (s)  Compliance with Applicable Law .................................................................6
       (t)  Brokerage Commissions.................................................................................6
       (u)  Leases ............................................................................................................6
       (v)  Collateral .......................................................................................................6
       (w) Condition of Property.....................................................................................6
       (x)  Intentionally Omitted ....................................**Error! Bookmark not defined.**
       (y)  Condemnation ................................................................................................6
       (z)  Access............................................................................................................6

(aa) Forfeiture. ....................................................................................7
(bb) Solvency. .....................................................................................7
(cc) Full and Accurate Disclosure. ..........................................................7
(dd) Environmental ..............................................................................7

ARTICLE IV. COVENANTS AND AGREEMENTS OF BORROWER .......................8
  4.1.  Covenants and Agreements. ..........................................................8
        (a)  Change of Name, Identity or Structure ......................................8
        (b)  Single Purpose Entity/Separateness. .........................................8
        (c)  Indemnity; Fees and Expenses; Waivers ....................................8
        (d)  Books and Records ...............................................................9
        (e)  Financial Statements and other Reports ....................................10
        (f)  Compliance Certificate .........................................................10
        (g)  Estoppel Certificate .............................................................10
        (h)  Further Assurances ..............................................................11
        (i)  Location and Use of Collateral ................................................11
        (j)  Insurance Requirements .......................................................11
             (i)   Insurance. ..................................................................11
             (ii)  Form and Quality .........................................................13
             (iii) Assignment. ...............................................................13
             (iv)  Adjustments ..............................................................14
        (k)  Escrow ..............................................................................14
        (l)  Operation of Property ...........................................................15
        (m)  Repair and Maintenance .......................................................15
        (n)  Appraisal ..........................................................................15
        (o)  Casualty and Condemnation ..................................................15
        (p)  Title Insurance ...................................................................17
        (q)  Borrower's Funds. ...............................................................17
        (r)  Collateral ..........................................................................18

ARTICLE V. DEFAULTS AND REMEDIES ...................................................22
  5.1.  Event of Default .........................................................................22
        (a)  Monetary Obligations ...........................................................23
        (b)  Representations ...................................................................23
        (c)  Insolvency; Bankruptcy ........................................................23
        (d)  Third Party Matters .............................................................23
        (e)  Transfers; Liens; Debt ..........................................................23
        (f)  Death; Dissolution; Change in Ownership or Control ..................23
        (g)  Financial Reporting .............................................................23
        (h)  DSCR Test Default...............................................................23
        (i)  Lis Pendens. ......................................................................23
        (j)  Non-Monetary Obligations ....................................................23
  5.2.  Remedies ..................................................................................24

ARTICLE VI. CASH MANAGEMENT ......................................**Error! Bookmark not defined.**
  6.1.  Lockbox Deposit Account. ....................................**Error! Bookmark not defined.**
  6.2.  Cash Management Account. ...................................**Error! Bookmark not defined.**
  6.3.  Monthly Excess Cash Flow Impound. .....................**Error! Bookmark not defined.**

ARTICLE VII. RESERVE FUNDS ....................................................................................27
    7.1.  Security; Establishment of Funds. ..............................................................27
             (i)   Interest Reserve. ................................**Error! Bookmark not defined.**
             (ii)  Pledge and Disbursement of Funds.. ....................................................27

ARTICLE VIII. RESERVED. ....................................................**Error! Bookmark not defined.**

ARTICLE IX. GENERAL CONDITIONS ........................................................................28
    9.1.  Waiver...........................................................................................................28
    9.2.  Lender's Action or Inaction.........................................................................28
    9.3.  Lender's Rights ............................................................................................29
    9.4.  Third Party Rights .......................................................................................29
    9.5.  Satisfaction of Condition; Time ..................................................................29
    9.6.  Assignment; Loan Participations ................................................................29
    9.7.  Heirs, Successors and Assigns ....................................................................30
    9.8.  Exercise of Rights and Remedies ...............................................................30
    9.9.  Headings .....................................................................................................30
    9.10. Inconsistency...............................................................................................30
    9.11. Applicable Law ...........................................................................................30
    9.12. Forum; Service............................................................................................31
    9.13. Usury...........................................................................................................31
    9.14. Severability .................................................................................................31
    9.15. Counterparts ................................................................................................31
    9.16. Joint Liability ..............................................................................................31
    9.17. Modification or Termination........................................................................31
    9.18. Notice ..........................................................................................................31
    9.19. Signatures....................................................................................................32
    9.20. No Partnership .............................................................................................32
    9.21. Waiver of Jury Trial ....................................................................................32
    9.22. Consent of Lender; Approvals .....................................................................33
    9.23. Imaging .......................................................................................................33
    9.24. Entire Agreement ........................................................................................33
    9.25. Payoff Statement. ....................................................**Error! Bookmark not defined.**
    9.26. Damage Waiver ...........................................................................................33

## LOAN AGREEMENT

(i) **ALAN GOMPERTS**, and **SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust ("*G&H Trust*"**), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010 ("*D&S Trust*"),**, and (iii) **DANIEL HALEVY**, an individual ("***DH***") (G& H Trust, D&S Trust and DH are collectively, referred to herein as, "***Borrower***") and **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("***Lender***") for the mutual promises in the Loan Documents and other good and valuable consideration, enter into this Agreement on the Closing Date.

BACKGROUND RECITALS

A.      Borrower has requested that Lender make the Loan to Borrower in the amount of $2,575,000.00.

B.      Lender has agreed, subject to the terms of the Loan Documents, to make the Loan to Borrower.

C.      Borrower and Lender desire to enter into this Agreement to specify the terms and conditions of the Loan.

Borrower and Lender (1) acknowledge the receipt and sufficiency of the above-referenced consideration, and, (2) therefore, agree as follows:

ARTICLE I.
DEFINITIONS

1.1.      Defined Terms. Each capitalized term used in the Loan Documents has the meaning set forth in **Exhibit A** of this Agreement.

1.2.      Terms Generally; References and Titles. References in this Agreement to "Articles," "Sections," "Exhibits" or "Schedules" will be to the Articles, Sections, Exhibits or Schedules of this Agreement unless otherwise specifically provided. All Exhibits and Schedules attached to this Agreement are incorporated in, and are a part of, this Agreement for the purposes set forth in this Agreement. Any term defined in this Agreement may be used in the singular or plural. Words of any gender include all other genders. The terms "include," "includes," and "including" are followed by "without limitation". Except as otherwise specified or limited in this Agreement, a reference to any Person includes the successors and assigns of the Person. Unless otherwise specified all references "from" or "through" any date mean "from and including" or "through and including" the date. References to any statute or act include all related current regulations and all amendments and any successor statutes, acts and regulations. References to any statute or act, without additional reference, refer to federal statutes and acts of the United States. References to any agreement, instrument or document includes all schedules, exhibits, annexes and other attachments to the agreement, instrument or document.

ARTICLE II.
THE LOAN

2.1.      The Loan. Subject to the terms of this Agreement and in reliance on Borrower's representations and warranties in the Loan Documents, Lender agrees to lend, and Borrower agrees to borrow, the Loan. THEREFORE, FOR VALUE RECEIVED, Borrower promises to pay to the order of Lender the Principal Amount with fees, costs and interest as set forth in, and payable (in Dollars at Lender's Offices) pursuant to, this Agreement. The funding and closing of the Loan will take place in Lender's Offices or at such other place as Lender may designate.

(a)      Interest.

1

(i)    Subject to <u>Subsection 2.1(a)(ii)</u> below, the Principal Amount and Additional Costs bear interest at the Interest Rate.

(ii)    All interest accruing under the Loan Documents will be calculated on the basis of a 30/360 basis. Borrower shall make each payment which it owes under the Loan Documents on or before the Payment Deadline in immediately available Dollars without setoff, counterclaim or other deduction. If Lender receives any payment after the Payment Deadline, then the payment will be credited on the next following Business Day.

(b)    <u>Default Rate; Late Charge</u>.

(i)    Any time during an Event of Default Period, the Principal Amount, any Additional Costs, and all past due installments of interest will bear interest at the Default Rate.

(ii)    In addition to all other sums due under the Loan Documents, Borrower shall pay to Lender on demand the Late Charge upon all Past Due Indebtedness (other than the outstanding Principal Amount due on the Maturity Date). The Late Charge is not a penalty, but is intended to compensate Lender for the losses Lender incurs because of the delinquent payment. Borrower agrees that, considering all of the circumstances existing on the date this Agreement is executed, the Late Charge represents a reasonable estimate of the losses Lender will incur because of any late payment, and that proof of Lender's actual losses will be costly, inconvenient, impracticable and extremely difficult to fix. Lender does not waive the Event of Default resulting from a past due payment because Lender accepts a Late Charge.

(c)    <u>Payment</u>.

(i)    Borrower shall pay to Lender:

(A) interest on the Principal Amount, in arrears, on each Interest Payment Date computed at the Interest Rate, and

(B) on the Maturity Date, Borrower shall pay in full to Lender (1) the Principal Amount along with all unpaid, accrued interest, (2) the Exit Fee, and (3) all other Indebtedness.

(ii)    Except during an Event of Default Period, Lender will apply all Loan payments: (A) first, to any unpaid Claims arising out of the Loan; (B) second, to any unpaid Additional Costs; (C) third, to accrued but unpaid interest due under the Loan Documents; (D) fourth, to all other unpaid sums due under the Loan Documents, except for the Principal Amount; and (E) last, to the unpaid Principal Amount. During an Event of Default Period, Lender may apply all Loan payments in any order Lender elects in its sole discretion.

(iii)    Borrower may not send any payments to Lender with a Paid in Full Mark. If Borrower tenders a payment to Lender with a Paid in Full Mark, then Lender may accept the payment without losing any of Lender's rights under the Loan Documents, and Borrower will remain obligated to pay any further amounts owed to Lender under the Loan Documents.

(d)    <u>Method and Place of Payment</u>. Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 2:00 PM, Pacific time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or at such other place as Lender shall from time to time designate, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a

day which is not a Business Day, the due date thereof shall be the immediately preceding Business Day.

(e)    <u>Prepayment</u>. Borrower may prepay the Loan, in whole or in part, at any time without any Payment Premium.

(f)    <u>Additional Expenditures</u>. All sums Lender pays or expends pursuant to the Loan Documents in excess of the Maximum Principal Amount will be (i) an additional loan to Borrower, (ii) Indebtedness, and (iii) due and payable within 5 days of Lender's written demand to Borrower, together with interest at the Default Rate from the date of Lender's expenditure until Borrower repays the expenditure and interest to Lender. Notwithstanding anything to the contrary in the Loan Documents, Lender is not obligated to make any expenditures.

(g)    <u>Additional Costs</u>. Notwithstanding anything to the contrary in any of the Loan Documents, Borrower shall pay to Lender all Additional Costs within 5 days of Lender's written demand.

(h)    <u>Lender's Determinations</u>. All of Lender's determinations in this <u>Section 2.1(a)</u> are conclusive, absent manifest error.

2.2.    <u>Security for the Loan</u>. The Loan is secured by, among other things, the Security Instrument and is guaranteed by the Guaranty.

2.3.    <u>Origination Fee</u>.  On the Closing Date, Borrower shall pay the Loan Origination Fee to Lender.

2.4    <u>Payoff Statement</u>. Borrower will provide written notice to Lender specifying the proposed Business Day on which any payment of the Loan in full is to be made pursuant to hereof, which date shall be no earlier than 30 days after the date of such payoff notice. In the event Borrower wishes to set the payoff date at a date which is earlier than 30 days after the date of such payoff notice, Borrower shall be responsible for payment of 30 days interest regardless of the actual payoff date.


ARTICLE III.
<u>REPRESENTATIONS</u>

3.1.    <u>Representations</u>. On the Closing Date and, on each Compliance Certificate Delivery Date, Borrower represents to Lender that:

(a)    <u>Status; Operational Authority</u>. Each Borrower Party: (i) is duly organized, validly existing, in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own the Property and its other assets, and to transact its present and proposed business.

(b)    <u>Power; Transactional Authority; Enforceability</u>. Each Borrower Party has the requisite power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party, and has taken all necessary actions to authorize its execution, delivery and performance of the Loan Documents. Each Borrower Party has duly executed and delivered the Loan Documents.  The Loan Documents each Borrower Party executes or under which it is obligated constitute the Borrower Party's legal, valid and binding obligations, enforceable in accordance with the terms of the Loan Document, subject to (i) the effect of any

3

Applicable Bankruptcy Law, or (ii) general principles of equity.

(c)      No Violation; No Consent. Each Borrower Party's execution, delivery and performance of the Loan Documents, and compliance with the terms and provisions of the Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, the terms of any indenture, mortgage, deed of trust, agreement or other instrument to which the Borrower Party is a party or by which the Borrower Party or any of the Property or the Borrower Party's other assets is bound or may be subject, or (iii) violate any term of any Borrower Party's certificate of formation or other documents and agreements governing the Borrower Party's existence, management or operation. No Borrower Party is required to obtain the consent of any other party, including any Governmental Authority, in connection with the execution, delivery, performance, validity or enforceability of the Loan Documents.

(d)      Financial Matters. Each Borrower Party financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly present the financial condition and the results of operations of each Borrower Party on the date and for the period covered by the financial statements. All other reports, statements and other data that any Borrower Party furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading. Each Borrower Party (i) is solvent, (ii) is not bankrupt and (iii) has no outstanding liens, suits, garnishments, bankruptcies or court actions which may render the Borrower Party insolvent or bankrupt. Since the date of the last financial statements each Borrower Party delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) the Borrower Party's business, condition (financial or otherwise) or operations, or (b) the Borrower Party's ability to perform or satisfy, or Lender's ability to enforce, any of the Indebtedness.

(e)      Contemplated Actions. Neither Borrower nor any Borrower Party is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and neither Borrower nor any Borrower Party has knowledge of any Person contemplating the filing of any such petition against it.

(f)      No Default. No Event of Default exists.

(g)      Trade Name. Borrower does not do business under any trade name or other name with respect to the Property or otherwise.

(h)      Litigation. There are no suits or proceedings (including condemnation) pending or (to Borrower's knowledge, after reasonable inquiry) threatened against or affecting any Borrower Party or the Property (including a condemnation proceeding) or involving the validity, enforceability or priority of any of the Loan Documents. Borrower has not received notice from any Governmental Authority alleging that any Borrower Party or the Property is violating any Applicable Law.

(i)      Title and Authority; Permitted Encumbrances. Borrower is the lawful owner of good and marketable and indefeasible title to the Property free and clear from all liens, security interests and encumbrances, except the lien and security interest evidenced by the Security Instrument and the Permitted Encumbrances. Borrower has good right and authority to transfer and mortgage the Property and to grant a security interest in the Collateral. There are no mechanic's or materialmen's liens, or other claims that may constitute a lien on the Property other than claims for Real Estate Taxes which are not yet due or payable. There are no defaults under any of the Permitted Encumbrances. No Permitted Encumbrance has been modified unless approved by Lender in

4

writing.

(j)    Taxes. Each Borrower Party has filed all required Tax returns. Each Borrower Party has paid all Taxes for which it is obligated, other than those Taxes which (A) are not yet delinquent or (B) the appropriate Borrower Party is diligently, and in good faith, contesting and for which the Borrower Party has made adequate reserves acceptable to Lender. There are no unpaid or outstanding real estate or other taxes or assessments on or against the Property or any part thereof, except general real estate taxes not due or payable. The Property is comprised of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot. There are no pending or, to Borrower's best knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(k)    Other Agreements; Defaults. Neither Borrower nor any Borrower Party is a party to any agreement or instrument or subject to any court order, injunction, permit, or restriction which would result in a Material Adverse Change to the Property or the business, operations, or condition (financial or otherwise) of Borrower or any Borrower Party. Neither Borrower nor any Borrower Party is in violation of any agreement which violation could reasonably be expected to result in a Material Adverse Change to the Property, Borrower or any Borrower Party or Borrower's or any Borrower Party's business, properties, or assets, operations or condition, financial or otherwise.

(l)    Foreign Person. Borrower is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended, Sections 1445 and 7701 (i.e., Borrower is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder). Borrower's Taxpayer Identification Number is true and correct.

(m)    ERISA. (i) Borrower is not an "employee benefit plan" or a "governmental plan" within the meaning of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; (iii) Borrower's assets do not constitute "plan assets" under ERISA; and (iv) one or more of the following circumstances is true: (1) Equity interests in Borrower are publicly offered securities under ERISA or are securities issued by an investment company registered under the Investment Company Act of 1940; (2) Less than 25% of the value of any class of equity interests in Borrower is held by "benefit plan investors" within the meaning of ERISA; or (3) Borrower qualifies as an "operating company," a "venture capital operating company," or a "real estate operating company" within the meaning of ERISA. Borrower will deliver to Lender such certifications and other evidence periodically requested by Lender, in its sole discretion, to verify the representations in this Subsection.

(n)    Executive Order 13224; OFAC. No Borrower Party or any Person with which a Borrower Party is associated or affiliated is (i) referred to or described in Executive Order 13224 (Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, as amended) or (ii) subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. Borrower will not use any Loan proceeds in violation of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

(o)    Purpose. The Loan is solely for the purpose of carrying on or acquiring Borrower's business, and is not for personal, family, household or agricultural purposes. Borrower does not use any portion of the Property as Borrower's residence or business homestead and, therefore, no portion of the Property is exempt from forced sale under Applicable Bankruptcy Law or any other Applicable Law. Borrower will not use any Loan proceeds to purchase or carry "margin stock" within the meaning of Federal Reserve Regulation U (12 C.F.R. § 221 et seq., as amended).

5

(p)     Investment Company Act. No Borrower Party is (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(q)     No Financing Statement. There are no effective financing statements covering any of the Property, except for those financing statements filed in connection with the Loan.

(r)     Location of Collateral. All tangible Collateral is located on the Land located at (i) 3538 Greenfield Avenue, Los Angeles, CA 90034, (ii), 8561 Horner Street, Los Angeles, CA 90035 and (iii) 133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212.

(s)     Compliance with Applicable Law. Borrower and the Property comply with all Applicable Laws. Borrower has not received notice that it or the Property is violating Applicable Law. Borrower has obtained all requisite licenses, permits, franchises, qualifications, certificates of occupancy or other governmental authorizations to own, lease and operate the Property and carry on its business from all Governmental Authorities with jurisdiction over the Property.

(t)     Brokerage Commissions. Any brokerage commission due in connection with any Lease has been paid in full.

(u)     Leases.  As of the date hereof, there are no existing Leases for the Property.

(v)     Collateral. Borrower is the sole owner of, has good title to, and the right to assign, the Collateral. No Person (other than Borrower and Lender) has any right, title or interest in the Collateral. The Licenses and Contracts are (or will be when issued or entered into) in full force and effect and there are no defaults (or any events which with the passage of time or the giving of notice, would be a default) under the Licenses or Contracts. Borrower has not assigned, transferred, encumbered, created or permitted any lien upon or charge against the Collateral (except in favor of Lender).

(w)     Condition of Property. The Property has all necessary utility services required for Borrower's use of the Property. The Property has legal access to all streets, alleys and easements necessary to serve the Property, and all of the streets, alleys and easements use have been completed, dedicated and accepted by the appropriate Governmental Authority. The Property including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, (a) are in good condition, order and repair in all material respects; and (b) has no structural or other material defects or damages and no deferred maintenance, whether latent or otherwise.

(x)     Condemnation. No condemnation has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

(y)     Access. To the best of Borrower's knowledge, the Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities. To the best of Borrower's knowledge, all public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property, except to the extent such other property is subject to a perpetual easement for such utility benefiting the Property. To the best of Borrower's knowledge, all roads necessary for the full utilization of

6

the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

(z) <u>Forfeiture</u>. There has not been and shall never be committed by Borrower or to the Borrower's knowledge, any other person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

(aa) <u>Solvency</u>. After giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and, immediately following the making of the Loan, will be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured, and Borrower's assets, immediately following the making of the Loan, will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, or believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). No petition in bankruptcy has been filed against Borrower or any Borrower Party in the last seven years, and neither Borrower nor Borrower Party in the last seven years has ever made an assignment of its assets for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any Borrower Party is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and neither Borrower nor any Borrower Party has knowledge of any Person contemplating the filing of any such petition against it.

(bb) <u>Full and Accurate Disclosure</u>. No statement of fact made by or on behalf of Borrower or any Borrower Party in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements contained herein or therein, taken as a whole, not misleading. There is no fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, nor as far as Borrower can foresee, would result in a Material Adverse Change to, the Property or the business, operations or condition (financial or otherwise) of Borrower or any Borrower Party. All information supplied by Borrower regarding any other Collateral is accurate and complete in all material respects. All evidence of Borrower and Borrower Party's identity provided to Lender is genuine, and all related information is accurate.

(cc) <u>Environmental</u>.

(i) <u>Compliance</u>. Except as otherwise disclose in the Phase 1 environmental report delivered to Lender in connection herewith, Borrower (A) is in compliance with all applicable Environmental Laws, (B) has obtained all Environmental Approvals required to operate its business as presently conducted or as reasonably anticipated to be conducted, (C) has not received any written communication, whether from a Governmental Authority, citizens group, employee or otherwise, that alleges that Borrower has failed to comply with any Environmental Law, (D) no civil, criminal or administrative action, suit, claim, hearing, investigation or proceeding has been brought or been threatened against Borrower, nor have any settlements been reached by or with any parties or any liens imposed in

7

connection with Material of Environmental Concern or Environmental Laws, and to the best of Borrower's knowledge no circumstance exists that may prevent or interfere with Borrower's full compliance in the future with all applicable Environmental Laws.

(ii)    No Claim. There is no Environmental Claim pending or threatened against Borrower or the Property.

(iii)    No Violation. There are no past or present actions, activities, circumstances, conditions, events or incidents, including the release, emission, discharge or disposal of any Material of Environmental Concern that could form the basis of any Environmental Claims against Borrower or the Property.

(iv)    No Materials of Environmental Concern. (a) There are no on-site or off-site locations in which Borrower has stored, disposed or arranged for the disposal of Materials of Environmental Concern; (b) there are no underground storage tanks located on Property; (c) there is no asbestos in the Improvements and (d) no polychlorinated biphenyls (PCBs) are used or stored at the Property.

3.2.    Survival .  Borrower's representations and warranties hereunder shall survive until (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents

ARTICLE IV.
COVENANTS AND AGREEMENTS OF BORROWER

4.1.    Covenants and Agreements. Borrower covenants to Lender as follows:

(a)    Change of Name, Identity or Structure. Borrower shall not change its name, identity (including trade name) or its entity structure or governance without notifying Lender of any change in writing at least 30 days prior to the date of the change.

(b)    Single Purpose Entity/Separateness. Borrower represents, warrants and covenants to comply with the Single Purpose Entity Covenants set forth on Exhibit E attached hereto:

(c)    Indemnity; Fees and Expenses; Waivers. Borrower's obligations under this Section 4.1(c) shall survive (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents.

(i)    Borrower shall protect, defend, indemnify, reimburse and hold each Indemnified Party harmless from all Claims of every kind, known or unknown, foreseeable or unforeseeable, which may be imposed upon, asserted against or incurred or paid by an Indemnified Party at any time, arising out of or in any way connected with (A) the Loan, (B) the Property, (C) any Loan Document, (D) bodily injury, death, or property damage occurring in, upon or adjacent to the Property, through any cause whatsoever, (E) Indemnified Party's exercise of legal remedies under the Loan Documents, (F) any act performed or omitted to be performed by any Indemnified Party under any Loan Document, (G) any Borrower failure to perform its obligations under any Contract or License, (H) any Event of Default, (I) any Environmental Claim, or (J) any Borrower Party violation of Applicable Law, **INCLUDING ANY CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, OR STRICT LIABILITY, OF ANY INDEMNIFIED PARTY**, except to the extent a court of competent jurisdiction determines in a final, non-appealable judgment that the Claims actually arose from the

8

Indemnified Party's gross negligence, fraud, intentional or willful misconduct.

(ii)    If an Indemnified Party notifies Borrower of any Claims for which Borrower's indemnity in <u>Subsection (1)</u> above applies, Borrower shall, on behalf of the Indemnified Party, assume and conduct, with due diligence and in good faith, the investigation and defense of the Claims with counsel mutually selected by the Indemnified Party and Borrower. If both Borrower and an Indemnified Party are defendants to the Claims and the Indemnified Party has been advised in writing by counsel that there may be legal defenses available to it which are inconsistent with those available to Borrower, then the Indemnified Party may select separate counsel to participate in the investigation and defense of the Claims on its own behalf, and Borrower will pay or reimburse the Indemnified Party for all reasonable Attorneys' Fees incurred with respect to separate counsel.

(iii)    If an Indemnified Party notifies Borrower of any Claims for which Borrower's indemnity in <u>Subsection (1)</u> above applies and Borrower fails to comply with the terms of <u>Subsection (2)</u> above, within 15 days after being notified of the Claims, then (A) notwithstanding anything to the contrary in any of the Loan Documents, an Event of Default will immediately occur, and (B) the Indemnified Party may contest (or settle) the Claims at Borrower's expense using counsel selected by the Indemnified Party.

(iv)    Borrower shall pay, immediately upon Lender's demand, all fees (including appraisal fees, filing and recording fees, inspection fees, survey fees, taxes, brokerage fees and commissions, abstract fees, title policy fees, uniform commercial code search fees, escrow fees, and reasonable Attorneys' fees) and all other costs Lender or Borrower incurs in connection with (A) the Loan and the Loan Documents, (B) any Event of Default, (C) Lender's (1) exercise of remedies under the Loan Documents or (2) protection of the Property, or (D) any modification to the Loan Documents.

(v)    Borrower, with respect to the Indebtedness, waives: (A) **PRESENTMENT FOR PAYMENT**; (B) **DEMAND**; (C) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (D) **NOTICE OF INTENTION TO ACCELERATE**; (E) **NOTICE OF ACCELERATION**; (F) **NOTICE OF DISPOSITION OF COLLATERAL**; (G) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (H) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (I) **PROTEST AND NOTICE OF PROTEST**; and (J) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(vi)    If Lender appoints a substitute or successor Trustee, then Borrower waives any right to attack the validity, or require Lender to show proof of the authorization, of the appointment for any reason.

(vii)    Borrower further waives and releases the rights (A) of redemption, valuation, and appraisement of the Property or other Collateral, (B) to (i) marshaling of Borrower's assets (including the Property), (ii) the sale in inverse order of alienation, (iii) a homestead exemption concerning any of the Collateral, and (C) to any matter to defeat, reduce or affect the Lender's right under the terms of the Loan Documents to sell the Collateral or collect the full Indebtedness.

(d)    <u>Books and Records</u>. Borrower shall keep accurate books and records in accordance with the Approved Accounting Method. Lender and its representatives may, with at least 24-hour prior notice in writing, and during reasonable business hours, inspect and copy all of Borrower's books and records (including all contracts, statements, invoices, bills and claims for labor, materials and services supplied for the construction and operation of the improvements forming a part of the Property).

9

(e)     <u>Financial Statements and other Reports</u>. Borrower shall deliver to Lender the below statements and reports on or before the below delivery deadline. Borrower shall also deliver to Lender any other information, reports or certificates as and when reasonably requested by Lender.

| **Statement or Report** | **Frequency** | **Delivery Deadline** |
|---|---|---|
| Certified Borrower's balance sheet and income/operating statement | Annually | Within 30 days after each calendar year ends |
| Certified rent roll | Annually | Within 30 days after each calendar year ends |
| Copies of filed federal income tax returns of Borrower | Annually | The earlier of (i) 120 days after each calendar year ends or (ii) 10 days after filing |
| Copies of filed federal income tax returns of Guarantor | Annually | The earlier of (i) 120 days after each calendar year ends or (ii) 10 days after filing |
| Compliance Certificate | Monthly//Quarterly | Delivered along with Borrower's monthly/quarterly statements |

All statements and reports must be in scope and detail reasonably satisfactory to Lender. During any Event of Default Period, Lender may require that all statements and reports be prepared (and audited after the occurrence of an Event of Default at Borrower's cost and expense) by an independent certified public accountant, in a manner reasonably acceptable to Lender. Each rent roll and/or delinquency report must, with respect to each of the Leases, contain: (i) each Tenant's name and address; (ii) rental amount; (iii) square footage of the premises; (iv) security deposit; (v) commencement date; (vi) termination date; (vii) date through which rent is paid; and (viii) the occurrence of any default. . Borrower shall provide Lender with such additional financial, management, or other information regarding Borrower or the Property, as Lender may reasonably request. Upon Lender's request, Borrower shall deliver all items required by this <u>Subsection</u> in an electronic format or by electronic transmission reasonably acceptable to Lender.

Each financial statement shall be certified by any representative of Borrower or acceptable to Lender if such financial statement is delivered by Borrower. Each financial statement, report or other information required to be delivered or caused to be delivered by Borrower to Lender under this Agreement and required hereunder to be certified by the chief financial representative of Borrower shall also certify that: (i) all of the covenants set forth in this <u>Section 4.1(e)</u> are fully performed and (ii) the representations and warranties set forth in the this Agreement and in the other Loan Documents are and remain true, correct and complete in all material respects except as disclosed in writing in the certificate. If Borrower fails to provide to Lender the financial statements and other information specified herein within the respective time period specified, and if such failure continues for 5 days after notice from Lender, then Borrower shall pay to Lender a fee in the amount of $1,000.00. In the event such failure shall continue for 15 days after notice from Lender, it shall constitute an Event of Default hereunder.

(f)     <u>Compliance Certificate</u>. Borrower shall deliver a Compliance Certificate to Lender on or before the Compliance Certificate Due Date.

(g)     <u>Estoppel Certificate</u>. Borrower shall:

(i)     within 10 days after receiving Lender's request, deliver a certificate stating

10

(or explaining why the statement is false) (A) that the Loan Documents are valid and binding obligations of Borrower, (B) that the Loan Documents are enforceable against Borrower in accordance with their terms, (C) the Principal Amount, (D) that the Loan Documents have not been released, subordinated or modified, (E) the date of the last Loan payment, and (F) that Borrower is entitled to no offsets or defenses against enforcement of the Loan Documents; and

(ii)    within 10 days after receiving Lender's request, deliver a certificate from each requested Tenant, in form and substance acceptable to Lender, confirming the terms of the Tenant's Leases.

(h)    <u>Further Assurances</u>. Borrower shall, on Lender's request and at Borrower's cost: (i) promptly correct any defect concerning the Loan Documents, the Leases or the Collateral; (ii) execute, deliver and file any instrument, and do anything Lender reasonably determines to be necessary or desirable to carry out the purposes of the Loan Documents; (iii) take all necessary action to promptly protect the liens or the security interests under the Loan Documents against any Person other than Lender; (iv) take all actions reasonably necessary or desirable in Lender's determination to comply with the requirements or requests of any Governmental Authority; and (v) submit to Lender such additional information concerning the Collateral or the Contractors as Lender may reasonably request.

(i)    <u>Location and Use of Collateral</u>. All tangible Collateral will be used in the business of Borrower and shall remain in Borrower's control at all times at Borrower's risk of loss and shall be located on the Property. The Property shall not be used to sell, grow, produce, or distribute cannabis or for any service directly related to the sale, growth, production, or distribution of cannabis.

(j)    <u>Insurance Requirements</u>.

(i)    <u>Insurance</u>. Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(A)    comprehensive "All Risk" or "Special Form" insurance on the Improvements and the personal property (A) in an amount equal to one hundred percent (100%) of the "***Full Replacement Cost***," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations) with no waiver of depreciation, but the amount shall in no event be less than the outstanding Principal Amount; (B) containing an agreed amount endorsement with respect to the Improvements and personal property waiving all co-insurance provisions, or confirmation that co-insurance does not apply; and (C) providing for no deductible in excess of $25,000.00 for all such insurance coverage. In addition, Borrower shall obtain: (x) if any portion of the Improvements is currently, or at any time in the future, located in a Federally designated "special flood hazard area", flood hazard insurance in an amount equal to the outstanding Principal Amount or such other amount as Lender shall require; (y) earthquake insurance in amounts and form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity with a probable maximum loss (PML) exceeding twenty percent (20%), and (z) coastal windstorm insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in any coastal region, and if such windstorm coverage is excluded under the Special Form Coverage, provided that the insurance pursuant to clauses (x), (y) and (z) hereof shall be on terms consistent with the comprehensive "All Risk" or "Special Form" insurance policy required under this <u>Subsection (i)</u>;

11

(B)    commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverage against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (1) to be on the so-called "occurrence" form with a combined limit of not less than $2,000,000.00 in the aggregate and $1,000,000.00 per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (2) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (3) to cover at least the following hazards: (i) premises and operations; (ii) products and completed operations on an "if any" basis; (iii) independent contractors; (iv) blanket contractual liability for all legal contracts; and (v) contractual liability covering the indemnities contained in the Security Instrument to the extent the same is available;

(C)    rental loss and/or business income interruption insurance (1) with loss payable to Lender; (2) covering all risks required to be covered by the insurance provided for in subsection (A) above; for loss of Rents in an amount equal to one hundred percent (100%) of the projected gross income from operations for a period of twelve (12) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period. The amount of such loss of Rents or business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate from the Property for the succeeding twelve (12) month period. Notwithstanding anything to the contrary contained in this Agreement, all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied at Lender's sole discretion to (I) the Indebtedness, or (II) Operating Expenses approved by Lender in its sole discretion; *provided, however*, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Indebtedness, except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(D)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage forms do not otherwise apply, owner's and contractor's protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy

(E)    worker's compensation insurance with respect to any employees of Borrower, as required by any Governmental Authority or Applicable Laws;

(F)    comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(G)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of not less than $1,000,000.00;

(H)     umbrella or excess liability insurance in an amount not less than $5,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(I)     if the Property is or becomes a legal "non-conforming" use, ordinance or law coverage to compensate for the cost of demolition and rebuilding of the undamaged portion of the Property along with any increased cost of construction in amounts as requested by Lender;

(J)     the commercial property business income, general liability and umbrella or excess liability insurance required hereunder shall cover perils of terrorism and acts of terrorism and Borrower shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required hereunder at all times during the term of the Loan so long as Lender determines that either (I) prudent owners of real estate comparable to the Property are maintaining same or (II) prudent institutional lenders (including, without limitation, investment banks) to such owners are requiring that such owners maintain such insurance; and

(K)     upon 60 days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(ii)     <u>Form and Quality</u>. All insurance policies shall be endorsed in form and substance reasonably acceptable to Lender to name Lender as an additional insured, loss payee or mortgagee thereunder, as its interest may appear, with loss payable to Lender, without contribution, under a standard mortgagee clause. All such insurance policies and endorsements shall be fully paid for and contain such provisions and expiration dates and be in such form and issued by such insurance companies licensed to do business in the state in which the Property is located, with a rating of "A:X" or better as established by Best's Rating Guide. Each policy shall provide that such policy may not be canceled or materially changed except upon 30 days' prior written notice of intention of non-renewal, cancellation or material change to Lender and that no act or thing done by Borrower shall invalidate any policy as against Lender. Blanket policies shall be permitted only if (A) Lender receives appropriate endorsements and/or duplicate policies containing Lender's right to continue coverage on a pro rata pass-through basis and that coverage will not be affected by any loss on other properties covered by the policies and (B) the policy contains a sublimit equal to the replacement cost of the Property in an amount approved by Lender which is expressly allocated for the Property, and any such policy shall in all other respects comply with the requirements of this Section.  Borrower authorizes Lender to pay the premiums for such policies (the "***Insurance Premiums")*** from the Insurance Impound, if any, as the same become due and payable annually in advance. If Borrower fails to deposit funds into the Insurance Impound, if any, sufficient to permit Lender to pay the Insurance Premiums when due, Lender may obtain such insurance and pay the premium therefor and Borrower shall, on demand, reimburse Lender for all expenses incurred in connection therewith.

(iii)     <u>Assignment</u>. Borrower shall assign the policies or proofs of insurance to Lender, in such manner and form that Lender and its successors and assigns shall at all times have and hold the same as security for the payment of the Loan. If requested by

13

Lender, Borrower shall deliver copies of all original policies certified to Lender by the insurance company or authorized agent as being true copies, together with the endorsements required hereunder. If Borrower elects to obtain any insurance which is not required under this Agreement, all related insurance policies shall be endorsed in compliance with Section 4.1(j), and such additional insurance shall not be canceled without prior notice to Lender. From time to time upon Lender's request, Borrower shall identify to Lender all insurance maintained by Borrower with respect to the Property. The proceeds of insurance policies coming into the possession of Lender shall not be deemed trust funds, and Lender shall be entitled to apply such proceeds as herein provided.

(iv)    Adjustments. Borrower shall give immediate written notice of any loss to the insurance carrier and to Lender. Borrower irrevocably authorizes and empowers Lender, as attorney in fact for Borrower coupled with an interest, to notify any of Borrower's insurance carriers to add Lender as a loss payee, mortgagee insured or additional insured, as the case may be, to any policy maintained by Borrower that is required under this Agreement, and if Borrower fails to diligently do so, to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's reasonable expenses incurred in the collection of such proceeds. Nothing contained in this Section 4.1(j), however, shall require Lender to incur any expense or take any action hereunder

(k)    Escrow.  Borrower shall not be required to make monthly deposits into the Tax and Insurance Escrow Account for Taxes and Insurance Premiums provided that (i) no Event of Default has occurred and is continuing, (ii) the Property is covered by insurance as required in herein, (iii) Borrower has provided sufficient evidence to Lender that the Insurance Premiums have been paid on or before the date the Insurance Premiums are due, and (iv) Borrower has provided sufficient evidence to Lender that the Taxes have been paid on or before the date the Taxes are delinquent.  In the event the foregoing conditions are not satisfied, as additional security for the Indebtedness and Borrower's obligations under the Loan Documents, Borrower shall establish and maintain the Tax and Insurance Escrow Account. Contemporaneously with the establishment of the Tax and Insurance Escrow Account, Borrower will deposit into the Tax and Insurance Escrow Account a sum equal to all Real Estate Taxes and Insurance Premiums for the then current year, as Lender reasonably estimates. Thereafter, on each Interest Payment Date, Borrower shall pay to Lender, which Lender will deposit into the Tax and Insurance Escrow Account a sum of money equal to 1/12th of the annual charges for the Insurance Premiums and (ii) sum of money equal to 1/12th of the annual Taxes, which amounts shall be calculated as the necessary sufficient funds (as Lender reasonably estimates) to permit Lender to pay, at least 30 days prior to the due date, the next installments for Real Estate Taxes and Insurance Premiums. Borrower shall ensure that Lender receives, at least 30 days prior to the due date, all invoices for Real Estate Taxes and Insurance Premiums. So long as no Event of Default has occurred and Lender has received all invoices for Real Estate Taxes and Insurance Premiums, Lender shall pay (or will permit Borrower to make withdrawals from the Tax and Insurance Escrow Account to pay) all invoices for Real Estate Taxes and Insurance Premiums. Any excess amounts in the Tax and Insurance Escrow Account may, at Lender's option, be retained in the account for future use, applied to the Indebtedness or refunded to Borrower. Borrower shall immediately remit to Lender funds (as Lender determines and demands) sufficient to satisfy any deficiency in the Tax and Insurance Escrow Account. The Tax and Insurance Escrow Account is not, unless otherwise explicitly required by Applicable Law, an escrow or trust fund. The Tax and Insurance Escrow Account will not bear interest. The Tax and Insurance Escrow Account may be mingled with the general funds of Lender. Borrower grants to Lender a security interest in all funds deposited with Lender for the purpose of securing the Loan. If any time (i) the amount on deposit with Lender, together with amounts to be deposited by

14

Borrower before such Insurance Premiums are payable, is insufficient to pay such Insurance Premiums, or (ii) the amount on deposit with Lender, together with amounts to be deposited by Borrower before such Taxes are payable, is insufficient to pay such Taxes, Borrower shall deposit any deficiency with Lender after 10 days' written notice. Lender shall pay such Taxes when the amount on deposit with Lender is sufficient to pay such Taxes and Lender has received a bill for such Taxes. During an Event of Default Period, Lender may apply the Tax and Insurance Escrow Account funds to the Indebtedness as Lender determines.

(l)     Operation of Property. Borrower shall operate the Property in accordance with all Applicable Laws and in the same manner as is customary and usual in the operation of comparable commercial properties in the same metropolitan area as the Property. Borrower shall use the Property solely for commercial purposes. Borrower shall not use or allow the use of the Property in any manner which constitutes a public or private nuisance. Without obtaining Lender's prior written consent, Borrower shall: (i) use all commercially reasonable efforts to oppose any zoning reclassification of the Property, (ii) not seek, or acquiesce to, any zoning reclassification or variance for the Property; (iii) not impose any additional restrictive covenants or encumbrances upon the Property; (iv) not execute or file any subdivision plat affecting the Property; (v) not consent to any municipality's annexation of the Property to any municipality; (vi) not permit the Property to be operated as a cooperative or condominium; (vii) not permit any drilling or exploration for, or extraction, removal or production of, minerals from the surface of the Property; (viii) not permit any action or inaction which may reasonably be expected to diminish the value of the Property.

(m)     Repair and Maintenance. Borrower shall keep the Property in good order, repair, condition and appearance. Borrower shall promptly make all necessary repairs and replacements, to the Property. Borrower shall insure that the Property is not deteriorated, misused, abused or wasted. All replacements to the Property must be equal or better than the replaced Property was when it was new. Borrower may not, without Lender's prior written consent: (i) erect any new buildings or structures or other Improvements on the Property (other than Property repairs, restoration in connection with any casualty and/or improvements in connection with Leases); (ii) except for the foregoing repairs, remove any Property from the Land; or (iii) make any structural alteration or any other alteration to the Property involving an estimated expenditure of $25,000.00 or more. Lender (or its designee) may, at Borrower's expense, inspect or examine the Property during normal business hours and without unnecessarily interrupting the Tenants or the operations of the Property. Except during any Event of Default Period, Lender (or its designee) shall give Borrower 24 hours advanced notice (by any means and not subject to the terms of Section 8.18 below). Borrower shall assist Lender (and its designees) in completing any inspection. Borrower (or its designee) may accompany Lender (and its designee) during any inspection of the Property. If Lender's inspection reveals that repairs to the Property are necessary, then Borrower shall complete all repairs or other work to Lender's reasonable satisfaction within 90 days after Lender delivers written notice of the necessary repairs to Borrower.

(n)     Appraisal. At Borrower's expense, Lender may obtain from time to time an Appraisal. The costs for any Appraisal are Additional Costs. Notwithstanding anything to the contrary in the Loan Documents, Borrower will only be liable for the cost of one Appraisal after the occurrence of an Event of Default or in connection with the exercise of the First Option to Extend.

(o)     Casualty and Condemnation.

(i)     Borrower's Obligation. If any Damage or a Taking occurs, then Borrower shall promptly (A) notify Lender of the Damage and take all necessary steps to preserve the Collateral, (B) at Borrower's expense (1) diligently prosecute any Taking proceedings,

(2) consult and cooperate with Lender in handling the Taking proceedings, and (C) subject to Sections 4.1(o)(ii) – (iv) below and regardless of whether the Net Proceeds are, or Award is, sufficient, commence and diligently (but, unless Lender approves otherwise in writing, no later than 90 days after the Damage occurs) complete the Restoration. Borrower shall comply with Lender's reasonable requirements to preserve the Collateral. Borrower may not settle any Taking proceedings without Lender's prior written consent. Lender may (but is not obligated to) participate in all Taking proceedings. Borrower shall sign and deliver all instruments Lender reasonably requests in connection with Lender's participation in any Taking proceeding. All of Lender's reasonable costs in any Taking proceeding are Additional Costs.

(ii)    Lender's Rights. Borrower will remain liable for the Indebtedness outstanding after Lender applies any Net Proceeds or Award. Lender will not pay interest on any Net Proceeds or Award Lender holds. If Borrower receives any insurance proceeds for the Damage or an Award, then Borrower shall promptly deliver all of the proceeds or Award to Lender, without deduction. Notwithstanding anything in the Loan Documents, at law or in equity to the contrary, the Net Proceeds and Award will not be trust funds and Lender may dispose of the Net Proceeds or Award as permitted in the Loan Documents. Borrower assumes all risk of loss from any Damage or Taking.

a.    If any Damage occurs which is, at least partially, covered by insurance, then: (A) if Borrower does not promptly make an insurance claim for the Damage, then Lender may, but is not obligated to, make the insurance claim; (B) if Lender makes an insurance claim, then Borrower authorizes and empowers Lender to settle, adjust, or compromise the claim; (C) Borrower authorizes and directs the insurer to make any Damage payment directly to Lender; and (D) unless otherwise expressly set forth in Subsection (iii) below, Lender may apply the Net Proceeds in any order it determines.

b.    Borrower assigns all Awards to Lender. All Awards must be paid to Lender. Lender may (A) collect, receive, and give receipt for, any Award, (B) accept any Award in any amount without question, and (C) appeal any judgment, decree, or Award. Borrower shall sign and deliver all instruments Lender reasonably requests to evidence Borrower's assignments and authorizations in this Subsection.

(iii)    Application of Net Proceeds or Award. Except during an Event of Default Period, Lender shall make the Net Proceeds or the Award available to Borrower for Restoration if: (A) prior to beginning the Restoration, in Lender's determination, the Restoration is practical and will be completed (1) within a reasonable time and (2) at least 90 days prior to the Scheduled Maturity Date; (B) prior to beginning the Restoration, in Lender's determination, Borrower has sufficient business interruption insurance; (C) prior to beginning the Restoration, Borrower enters into Contracts acceptable to Lender for Restoration; (D) prior to the beginning and until completion of the Restoration, Borrower has deposited and continuously maintains all Additional Funds with Lender; and (E) prior to the beginning and until completion of the Restoration, in Lender's determination, once the Restoration is complete, the Debt Service Coverage Ratio will exceed 1.20:1.0. Lender may (as Lender determines in its sole discretion) apply against the Indebtedness any Net Proceeds or Award in excess of the Restoration costs.

(iv)    Disbursement of Net Proceeds or Award. If Net Proceeds or an Award are available for Restoration, then Lender shall, in its sole discretion, establish a disbursement procedure (including lien releases and title insurance) and periodically make the Award or Net Proceeds (and the Additional Funds, if any) available to Borrower (in installments).

16

South Los Angeles - Loan Agreement

(v)    <u>Effect on Indebtedness</u>. Prior to, during and after any Damage or Taking, Borrower must pay the Indebtedness and perform its obligations under the Loan Documents. Lender's receipt of Net Proceeds, Rent Loss Proceeds, Additional Funds or an Award does not reduce the Indebtedness until Lender actually applies Net Proceeds, Rent Loss Proceeds, Additional Funds or the Award to the Indebtedness.

(p)    <u>Title Insurance</u>. On or before the Closing Date, Borrower shall furnish to Lender, at Borrower's expense, the Loan Title Policy. If the Loan Title Policy becomes invalid, or the insurer becomes insolvent or is placed in receivership, then Borrower shall, within 30 days after Lender's demand, furnish to Lender, at Borrower's expense, a substitute Loan Title Policy**.**

(q)    <u>Borrower's Funds</u>. Borrower represents, warrants and covenants to Lender that:

(i)    It has taken, and shall continue to take until after the Loan is fully repaid, such measures as are required by law to verify that the funds invested in Borrower are derived (i) from transactions that do not violate U.S. law and, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under U.S. law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(ii)    To the best of its knowledge, neither Borrower, nor any Borrower Party, nor any holder of a direct interest in Borrower, nor any Person providing funds to Borrower (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; and (iii) has had any of its/his/her funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(iii)    Borrower shall make payments on the Loan using funds invested in Borrower, Revenues or insurance proceeds unless otherwise agreed to by Lender.

(iv)    As of the Closing Date and at all times during the term of the Loan, all Revenues are and will be derived from lawful business activities of Borrower, rent paid by Tenants of the Property or other permissible sources under U.S. law.

(v)    On the Maturity Date, Borrower will take reasonable steps to verify that funds used to repay the Loan in full (whether in connection with a refinancing, asset sale or otherwise) are from sources permissible under U.S. law and to the extent such funds originate outside the United States, permissible under the laws of the jurisdiction in which they originated.

(vi)    Borrower is and at all times shall be in compliance with the Office of Foreign Assets Control sanctions and regulations promulgated under the authority granted by the Trading with the Enemy Act ("**_TWEA_**"), 50 U.S.C. App. Section 1 et seq., and the International Emergency Economic Powers Act ("**_IEEPA_**"), 50 U.S.C. Section 1701 et seq., as the TWEA and the IEEPA may apply to Borrower's activities;

(vii)    Borrower is and at all times shall be in compliance with the Patriot Act and all rules and regulations promulgated under the Patriot Act applicable to Borrower; and

(viii)    Borrower (1) is not now, nor has ever been, under investigation by any Governmental Authority for, nor has been charged with or convicted for a crime under, 18 U.S.C. Sections 1956 or 1957 or any predicate offense thereunder, or a violation of the Bank Secrecy Act; (2) has never been assessed a civil penalty under any anti-money laundering laws or predicate offenses thereunder; (3) has not had any of its funds seized, frozen or forfeited in any action relating to any anti-money laundering laws or predicate offenses thereunder; (4) has taken such steps and implemented such policies as are reasonably necessary to ensure that Borrower is not promoting, facilitating or otherwise furthering, intentionally or unintentionally, the transfer, deposit or withdrawal of criminally derived property, or of money or monetary instruments which are (or which Borrower suspects or has reason to believe are) the proceeds of any illegal activity or which are intended to be used to promote or further any illegal activity; and (5) has taken such steps and implemented such policies as are reasonably necessary to ensure that Borrower is in compliance with all laws and regulations applicable to its business for the prevention of money laundering and with anti-terrorism laws and regulations, with respect both to the source of funds from its investors and from its operations, and that such steps include the development and implementation of an anti-money laundering compliance program within the meaning of Section 352 of the Patriot Act, to the extent Borrower is required to develop such a programs under the rules and regulations promulgated pursuant to Section 352 of the Patriot Act.

(r)    <u>Collateral</u>. Until the Maturity Date, Borrower:

(i)    shall faithfully perform each of its affirmative and negative obligations under the Additional Collateral and the Leases;

(ii)    shall promptly enforce against all Persons (other than Lender), including Tenants, the terms of the Additional Collateral and the Leases;

(iii)    except as otherwise permitted in <u>Section 4.1(t)</u> below, may not, without Lender's prior written approval, (A) waive, modify or amend any terms of the Additional Collateral or the Leases, (B) release or discharge any Person (including any Tenant) from its obligations under any of the Additional Collateral or the Leases, or (C) terminate any of the Licenses, Contracts or Leases;

(iv)    may not enter into any new Contracts without Lender's prior written approval; however, notwithstanding the foregoing, Borrower may, without Lender's approval, enter into, modify or amend (i) Contracts terminable upon 30 days' notice, and (ii) Contracts for tenant improvements in connection with Leases that are entered into in accordance with the terms of the Loan Documents;

(v)    except as otherwise permitted in <u>Section 4.1(t)</u> below or in the Security Instrument, may not enter into any new Leases without Lender's prior written approval;

(vi)    shall, unless Lender otherwise agrees in writing, assign to Lender any letter of credit securing any Tenant Lease obligations; and

(vii)    shall give Lender prompt notice of any actual or alleged default under the Additional Collateral or the Leases along with a copy of any written notice Borrower receives concerning the actual or alleged default.

(s)    <u>Covenants on Environmental Matters</u>.

(i)    Borrower shall (i) comply strictly and in all respects with applicable Environmental Laws; (ii) notify Lender immediately upon Borrower's discovery of any

18

spill, discharge, release or presence of any Material of Environmental Concern at, upon, under, within, contiguous to or otherwise affecting the Property; (iii) at Borrower's sole cost and expense, promptly remove such Materials of Environmental Concern and remediate the Property in full compliance with Environmental Laws or as reasonably required by Lender based upon the recommendations and specifications of an independent environmental consultant approved by Lender; and (iv) promptly forward to Lender copies of all orders, notices, permits, applications or other communications and reports in connection with any spill, discharge, release or the presence of any Material of Environmental Concern or any other matters relating to the Environmental Laws or any similar laws or regulations, as they may affect the Property or Borrower.

(ii)    Borrower shall not cause and shall use commercially reasonable efforts to prohibit any Tenant or other Person from (i) causing any spill, discharge or release, or the use, storage, generation, manufacture, installation, or disposal, of any Materials of Environmental Concern at, upon, under, within or about the Property or the transportation of any Materials of Environmental Concern to or from the Property (except for cleaning and other products used in connection with routine maintenance or repair of the Property in full compliance with Environmental Laws), (ii) installing any underground storage tanks at the Property, or (iii) conducting any activity that requires a permit or other authorization under Environmental Laws.

(iii)    Borrower shall provide to Lender, at Borrower's sole cost and expense, promptly upon the written request of Lender from time to time, a Site Assessment or, if required by Lender, an update to any existing Site Assessment for the Property, to assess the presence or absence of any Materials of Environmental Concern and the potential costs in connection with abatement, cleanup or removal of any Materials of Environmental Concern found on, under, at or within the Property. Borrower shall pay the cost of no more than one such Site Assessment or update for the Property in any 12-month period, unless Lender's request for a Site Assessment is based on a reasonable suspicion of Materials of Environmental Concern at or near the Property, a breach of representations hereunder, or an Event of Default, in which case any such Site Assessment or update shall be at Borrower's expense.

(iv)    As between Borrower and Lender, all risk of loss associated with non-compliance with Environmental Laws, or with the presence of any Material of Environmental Concern at, upon, within, contiguous to or otherwise affecting the Property, shall lie solely with Borrower. Accordingly, Borrower shall bear all risks and costs associated with any loss (including any loss in value attributable to Materials of Environmental Concern), damage or liability therefrom, including all costs of removal of Materials of Environmental Concern or other remediation required by Lender or by law. Borrower shall indemnify, defend and hold Lender and its directors, officers, employees and agents harmless from and against all actual loss, liabilities, damages, claims, costs and expenses (including reasonable costs of defense and consultant fees, investigation and laboratory fees, court costs, and other litigation expenses) arising or alleged to have arisen out of or associated, in any way, with (a) the non-compliance with Environmental Laws, (b) the existence of Materials of Environmental Concern in, on, or about the Property, (c) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to Materials of Environmental Concern, (d) any lawsuit brought or threatened, settlement reached, or government order relating to such Materials of Environmental Concern, (e) a breach of any representation, warranty or covenant contained in this Article 4, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, or (f) the imposition of any environmental lien

19

encumbering the Property; **INCLUDING, WITHOUT LIMITATION, LOSS, LIABILITY, DAMAGE, CLAIM, COST OR EXPENSE RESULTING OR ALLEGED TO HAVE RESULTED SOLELY FROM LENDER'S NEGLIGENCE OR STRICT LIABILITY**, but Borrower shall not be liable under such indemnification to the extent such liabilities result solely from Lender's gross negligence, willful misconduct or fraud as determined by a final non-appealable judgment of a court of competent jurisdiction; and provided, further, that Borrower also shall not be liable under such indemnification to the extent such liabilities result solely from Lender's or any other bona fide third party purchaser's acts or omissions as owner of the Property by foreclosure deed or deed in lieu of foreclosure (or other acquisition of title by Lender or such bona fide third party purchaser), or from any Materials of Environmental Concern that first come to be located at, upon, under, within, contiguous to or otherwise affecting the Property after the date that Borrower no longer owns the Property. Borrower's obligations under this Section 4.1 shall arise whether or not any Governmental Authority has taken or threatened any action in connection with the presence of any Material of Environmental Concern, and whether or not the existence of any such Material of Environmental Concern or potential liability on account thereof is disclosed in any Site Assessment and shall continue notwithstanding the repayment of the Loan or any transfer or sale of any right, title and interest in the Property (by foreclosure, deed in lieu of foreclosure or otherwise). Additionally, if any Materials of Environmental Concern affect or threaten to affect the Property, and provided Borrower has not taken action, Lender may (but shall not be obligated to) give such notices and take such actions as it deems necessary or advisable at the expense of Borrower in order to abate the discharge of any Materials of Environmental Concern or remove the Materials of Environmental Concern. Any amounts payable to Lender by reason of the application of this Section 4.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. The obligations and liabilities of Borrower under this Section 4.1 shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or delivery of a deed in lieu of foreclosure.

(v)    Lender's Right to Protect Collateral. If any discharge of Materials of Environmental Concern or the threat of a discharge of Material of Environmental Concern affecting the Property occurs, whether originating or emanating from the Property or any contiguous real estate and/or Borrower fails to comply with any Environmental Laws or related regulations, Lender may at its election, but without the obligation so to do, give such notices and/or cause such work to be performed at the Property and/or take any and all other actions as Lender shall deem necessary or advisable in order to abate the discharge of any Material of Environmental Concern, remove the Material of Environmental Concern or cure Borrower's noncompliance.

(vi)    Notwithstanding any provision hereunder or elsewhere in the Loan Documents, or any rights or remedies granted by the Loan Documents, Lender does not waive and expressly reserves all rights and benefits now or hereafter accruing to Lender under the "security interest" or "secured creditor" exception under applicable Environmental Laws, as the same may be amended. No action taken by Lender pursuant to the Environmental Indemnity Agreement or the Loan Documents shall be deemed or construed to be a waiver or relinquishment of any such rights or benefits under the "security interest" exception.

(t)    Leasing Matters.

20

(i)        ; Approval Rights.  Any Major Lease executed after the date hereof shall require the prior written consent of Lender, which consent shall not be unreasonably withheld.  Any modification to a Major Lease shall require the prior written consent of Lender, which consent shall not be unreasonably withheld All Leases and other rental arrangements shall in all respects be approved by Lender. All leases shall provide that (a) the lease is subordinate to the Security Instrument, (which may be subject to Lender agreement of non-disturbance), (b) the tenant shall attorn to Lender, and (c) any cancellation, surrender, or amendment of a Lease without the prior written consent of Lender shall be voidable by Lender.  Borrower shall hold all tenant security deposits in the manner required by Applicable Law. Within twenty (20) days after Lender's request, Borrower shall furnish to Lender a statement of all tenant security deposits, and copies of all leases not previously delivered to Lender, certified by Borrower as being true and correct. Notwithstanding anything contained in the Loan Documents, Borrower shall have the right to enter into Leases or amendments, renewals, expansions or modifications of any existing Leases without Lender's consent provided (i) the proposed Lease, renewal, modification, expansion is an arm's length transaction, on economic terms conforming to current market conditions, with a Tenant that is not an Affiliate

(ii)        Deemed Approval. For any Lease other than a Major Lease, whenever Lender's approval or consent, which approval or consent shall not be unreasonably withheld, conditioned or delayed, is required pursuant to the provisions of this Section 4.1(t), Lender shall use reasonable good faith efforts to respond in writing within 5 Business days after Lender's receipt of Borrower's written request and all required information and documentation relating thereto in which to approve or disapprove such matter. If Lender fails to respond in writing to such request within 5 Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST DEEMED APPROVED IF NO WRITTEN RESPONSE WITHIN 5 DAYS**", Lender shall be deemed to have approved or consented to such matter if Lender fails to respond in writing to such second written request before the expiration of such 5 day period.

(iii)       Covenants. Borrower shall (or shall cause Property Manager to):

(A)       perform the obligations which Borrower is required to perform under the Leases;

(B)       enforce the obligations to be performed by the Tenants under the Leases;

(C)       promptly furnish to Lender any notice of default or termination received by Borrower from any Tenant, and any notice of default or termination given by Borrower to any Tenant;

(D)       not collect any Rents for more than 30 days in advance of the time when the same shall become due, except for bona fide security deposits not in excess of an amount equal to 1 months' rent;

(E)       not enter into any ground lease of any part of the Property;

(F)       not further assign or encumber any Lease;

21

(G)    not, except with Lender's prior written consent, cancel or accept surrender or termination of any Lease;

(H)    not, except with Lender's prior written consent, modify, amend or terminate any Lease; and

(I)    assign to Lender any letter of credit evidencing a security deposit on such terms as may be required by Lender and shall deliver the original of such letter(s) of credit to Lender.

(u)    <u>Management Agreement</u>.  As of the date hereof, Borrower shall self-manage the Property. If Borrower employs an third party Property Manager, Borrower shall (i) cause Property Manager to manage the Property in accordance with the Management Agreement approved by Lender, (ii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Management Agreement, and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Property Manager under the Management Agreement. If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed. Borrower shall not (i) surrender, terminate, cancel, modify, renew or extend the Management Agreement, (ii) enter into any agreement relating to the management or operation of the Property with Property Manager or any other Person, (iii) consent to the assignment by the Property Manager of its interest under the Management Agreement, or (iv) waive or release any of its rights and remedies under the Management Agreement, in each case without the express consent of Lender. Lender shall have the right to require Borrower to hire or replace the Property Manager with (x) an Unaffiliated Qualified Manager selected by Borrower, or (y) another property manager chosen by Borrower and approved by Lender in its sole and absolute discretion, upon the occurrence of any one or more of the following events: (i) at any time following the occurrence of an Event of Default, (ii) if Property Manager shall be in material default under the Management Agreement beyond any applicable notice and cure period, (iii) if Property Manager shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, or (iv) if at any time the Property Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds.

(v)    <u>Control of Borrower</u>. There shall be no change in the day-to-day control and management of Borrower without the written consent of Lender.

4.2.    <u>Survival</u> .  Borrower's covenants hereunder shall survive until (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents.

ARTICLE V.
<u>DEFAULTS AND REMEDIES</u>

5.1.    <u>Event of Default</u>. The term "***Event of Default***" means that:

22

(a)    <u>Monetary Obligations</u>. Borrower fails to pay: (i) prior to the Maturity Date, any Indebtedness within **5 days** after it is due and payable; or (ii) all of the Indebtedness on the Maturity Date; or

(b)    <u>Representations</u>. Any representation, warranty, certificate or other statement (financial or otherwise) made or furnished by or on behalf of Borrower to Lender under this Agreement or any of the other Loan Documents, or as an inducement to Lender to enter into this Agreement and the other Loan Documents, shall be false, incorrect, incomplete or misleading in any respect when made or furnished; or

(c)    <u>Insolvency; Bankruptcy</u>. A Bankruptcy Event occurs; or

(d)    <u>Third Party Matters</u>. Any Borrower Party (i) is in default under any material agreement in excess of $50,000 (other than the Loan Documents), (ii) fails to pay any final money judgment in excess of $50,000 , (iii) becomes party to any proceeding, or (iv) fails to comply with any Applicable Laws, which may (in Lender's reasonable determination) materially and adversely impair (A) the Borrower Party's ability to perform its obligations under the Loan Documents, or (B) the value of, or Lender's rights in, the Collateral; or

(e)    <u>Transfers; Liens; Debt</u>. Without Lender's prior written consent (which Lender may withhold for any reason or condition upon any event or consideration, as Lender determines in its sole discretion), Borrower:

(i)    sells, leases (except as expressly permitted in the Loan Documents), exchanges, assigns, transfers, conveys or otherwise disposes of any part of, or any interest in, the Property or the Collateral, or legal or equitable title to any part of, or any interest in, the Property is vested in any Person other than Borrower or Lender by operation of law or otherwise, whether voluntary or involuntary. Notwithstanding anything to the contrary in this <u>Section5.1(e)</u> or elsewhere in the Loan Documents, a sale wherein all of Borrower's obligations are paid in full to Lender, shall not constitute an Event of Default; or

(ii)    creates or permits any (voluntary or involuntary) lien, whether statutory, constitutional or contractual (except for the lien for ad valorem taxes on the Collateral which are not delinquent), security interest or other encumbrance, conditional sale or other title retention document, against or covering any portion of the Collateral; or

(f)    <u>Death; Dissolution; Change in Ownership or Control</u>. (i) Guarantor dies or becomes legally incapacitated (unless, within 60 days of such event. Borrower provides Lender with a replacement Guarantor acceptable to Lender in its sole and reasonable discretion or the remaining Guarantors satisfy the nete worth and liquidity covenants set for in the Guaranty); or (ii) Borrower dissolves, liquidates, merges or consolidates any interest in Borrower is, voluntarily or involuntarily, assigned, encumbered, or otherwise transferred; or

(g)    <u>Financial Reporting</u>. Lender does not receive any item on the date it is due under Section 4.1(e); or

(h)    <u>Intentionally Omitted</u>.

(i)    <u>Lis Pendens.</u> A Notice of lis pendens affecting Property is filed, and such lis pendens is not lifted within 15 days of such filing; or

(j)    <u>Default Under Organizational Documents</u>. The occurrence of a default under any of the organizational documents of Borrower, which remains uncured beyond any applicable grace or cure periods available to Borrower; or

(k)    <u>Insurance</u>. Borrower's fails to maintain insurance as required under this Agreement; or

(l)    <u>Taxes</u>. Borrower's fails to pay Taxes as required under this Agreement; or

(m)    <u>Single Purpose Entity</u>. Borrower's fails to  maintain its status as a Single Purpose Entity; or

(n)    <u>Default Under Guaranty</u>. A material default occurs under the Guaranty and such default is not cured within any grace or cure periods provided therein; or

(o)    <u>Certificate of Occupancy</u>. Borrower fails to obtain a certificate of occupancy on or before the date which is 6 months from the Closing Date; or

(p)    <u>Cannabis Use</u>. The Property is used to sell, grow, produce, or distribute cannabis.

(q)    <u>Non-Monetary Obligations.</u> Any Borrower Party fails, on or before the expiration of the Grace Period, to timely perform any of its obligations in any Loan Document, other than those failures specifically governed by any other Subsection of this <u>Section 5.1</u>.

5.2.    <u>Remedies</u>.

(a)    <u>Pre-Event of Default</u>. Lender may file, appear in, or defend any Loan Matter. Unless otherwise provided herein, Lender may employ counsel (including in-house counsel) and incur any reasonable expenses, including Attorneys' Fees, in connection with any Loan Matter. If Lender incurs any expense in connection with any Loan Matter, Borrower shall have 10 days to pay such expenses upon written demand from Lender.  If Borrower fails to pay within such time, then the expenditure will bear interest at the Default Rate from the date incurred until the date on which Borrower fully repays the expenditure along with all accrued interest. The expenditure and all accrued interest are Indebtedness. Borrower shall immediately pay to Lender all amounts due under this <u>Subsection</u> upon Lender's demand.

(b)    <u>Post-Event of Default</u>. During any Event of Default Period:

(i)    Lender may declare all Indebtedness in its entirety to be immediately due and payable or exercise any right at law or in equity, or any remedy expressly provided in any of the Loan Documents, including foreclosing any liens or security interests;

(ii)    Lender may: (1) enforce all Additional Collateral terms and exercise all rights under the Additional Collateral; (2) enter into, terminate, renew or modify Contracts or Licenses, and make concessions to Governmental Authorities; and (3) exercise all proprietary rights in, and fully utilize, the Plans and Specifications.

(iii)    Contractors and Governmental Authorities may: (1) continue work under the Additional Collateral under the sole direction of Lender; and (2) permit Lender to retain and use the Additional Collateral for any purpose Lender deems appropriate. In furtherance of the foregoing, any Person may rely on an affidavit from any officer, agent or attorney of Lender confirming the Event of Default Period.

By exercising any rights under the Loan Documents, Lender does not (unless Lender expressly agrees in writing) become (i) a party to any of the Additional Collateral, or (ii) liable to any Person, **EVEN IF THE LIABILITY ACTUALLY OR ALLEGEDLY AROSE FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, OR STRICT LIABILITY OF LENDER**. Lender will only be liable for liabilities if a court of competent jurisdiction determines in a final, non-appealable judgment that the liability arose from

24

Lender's gross negligence, intentional misconduct or fraud.

Lender's rights under this <u>Section</u> are in addition to any other rights and remedies Lender may have under the Loan Documents, at law, in equity or otherwise. Lender may (but will not be obligated to) also:

(iv)    at Borrower's sole cost and expense, take whatever action Lender deems necessary or appropriate, including the use of legal proceedings, to (A) cause Borrower to vacate the Property, and (B) take possession of the Property;

(v)    at Borrower's sole cost and expense, employ security watchmen to protect the Property; or

(vi)    at Borrower's sole cost and expense, perform or cause to be performed any covenant or agreement of Borrower under any of the Loan Documents.

(c)    <u>Costs</u>. All sums Lender incurs in connection with exercising its rights under the Loan Documents will be (1) Additional Costs and will bear interest from the date on which Lender incurs the sum until the date on which the sum is repaid in full at the Default Rate, and (2) secured by the Loan Documents. In addition to Lender's rights under the Loan Documents, Lender will be automatically subrogated to all rights of the Person receiving any sum from Lender.


ARTICLE VI.
CROSS DEFAULT AND CROSS COLLATERALIZATION.

6.1.    <u>737 S Broadway</u>.  In addition to the obligations herein, Borrower shall also be subject to the payment and performance of all obligations secured by:

(a)    The 737 S Broadway Security Instrument made by 737 S Broadway Borrower made in connection the 737 S Broadway Loan, which 737 S Broadway Security Instrument secures a lien on the 737 S Broadway Property;

(b)    In addition to the obligations secured by the 737 S Broadway Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)    An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under 737 S Broadway Security Instrument and the 737 S Broadway Loan.

(d)    An Event of Default under the 737 S Broadway the Security Instrument or the 737 S Broadway Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)    Borrower waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the 737 S Broadway Security Instrument or the exercise of Borrower's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Borrower makes this waiver for itself, for all persons and entities claiming through or under Borrower and for persons and entities who may acquire a lien or security interest on all or any part of the 737 S Broadway Loan and Collateral described in the 737 S Broadway Security Instrument or herein.

6.2.    <u>South Los Angeles</u>.  In addition to the obligations herein, Borrower shall also be subject to the payment and performance of all obligations secured by:

25

(a)    The South Los Angeles Security Instrument made by South Los Angeles Borrower made in connection the South Los Angeles Loan, which South Los Angeles Security Instrument secures a lien on the South Los Angeles Property;

(b)    In addition to the obligations secured by the South Los Angeles Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)    An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under South Los Angeles Security Instrument and the South Los Angeles Loan.

(d)    An Event of Default under the South Los Angeles the Security Instrument or the South Los Angeles Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)    Borrower waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the South Los Angeles Security Instrument or the exercise of Borrower's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Borrower makes this waiver for itself, for all persons and entities claiming through or under Borrower and for persons and entities who may acquire a lien or security interest on all or any part of the South Los Angeles Loan and Collateral described in the South Los Angeles Security Instrument or herein..

6.3.    <u>Foxdale</u>.  In addition to the obligations herein, Borrower shall also be subject to the payment and performance of all obligations secured by:

(a)    The Foxdale Security Instrument made by Foxdale Borrower made in connection the Foxdale Loan, which Foxdale Security Instrument secures a lien on the Foxdale Property;

(b)    In addition to the obligations secured by the Foxdale Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)    An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under Foxdale Security Instrument and the Foxdale Loan.

(d)    An Event of Default under the Foxdale the Security Instrument or the Foxdale Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)    Borrower waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the Foxdale Security Instrument or the exercise of Borrower's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Borrower makes this waiver for itself, for all persons and entities claiming through or under Borrower and for persons and entities who may acquire a lien or security interest on all or any part of the Foxdale Loan and Collateral described in the Foxdale Security Instrument or herein.

6.4.    <u>Payoff</u>.  Notwithstanding anything to the contrary contained herein, Borrower shall not pay off this Loan while the 737 S Broadway Loan, the Greenfield PH Loan or the Foxdale Loan remain outstanding.

6.5.    <u>Substitution of Collateral</u>.  Notwithstanding anything to the contrary contained herein, Borrower may provide a substitute real property as collateral for release of one or more of the 737 S Broadway Property, the South Los Angeles Property or the Foxdale Property; provided; however any such the terms and conditions of any such substitution (including, but not limited the substitute property) must be approved by Lender in its sole and absolute discretion.  Borrower shall bear all costs and expenses in connection with any proposed or completed substitution.


## ARTICLE VII.
## RESERVE FUNDS

7.1.    <u>Security; Establishment of Funds.</u>

(a)    <u>Security</u>. The Loan shall be secured by the Security Instrument creating a first lien on the Property, the Assignment of Rents and the other Loan Documents.

(b)    <u>Establishment of Funds</u>. Borrower agrees to establish the certain reserves (the "***Funds***") with Lender, to be held by Lender as further security for the Loan.

7.2.    <u>Reserves.</u>

(a)    <u>Tax and Insurance Escrow Account.</u>

(i)    Borrower shall establish and maintain the Tax and Insurance Escrow Account pursuant to the terms and provisions of Section 4.1(k) herein.

(ii)    Borrower pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Tax and Insurance Escrow Account as additional security for the payment of the Loan. Lender shall make disbursements from the Tax and Insurance Escrow Account pursuant to the terms and provisions herein, but not more often than monthly. The Tax and Insurance Escrow Account shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its reasonable discretion. Tax and Insurance Escrow Account will not bear interest. Upon the occurrence of and during the continuance of an Event of Default, Lender may apply any sums then present in the Tax and Insurance Escrow Account to the payment of the Loan in any order in its reasonable discretion. Until expended or applied as above provided, the Tax and Insurance Escrow Account shall constitute additional security for the Loan. Lender shall have no obligation to release any of the Tax and Insurance Escrow Account while any Event of Default (or any event or condition which, with the giving of notice, the passage of time, or both, would constitute an Event of Default) exists or any Material Adverse Change has occurred in Borrower or the Property. All costs and expenses incurred by Lender in the disbursement of any of the Tax and Insurance Escrow Account shall be paid by Borrower promptly upon demand or, at Lender's sole discretion, deducted from the Tax and Insurance Escrow Account. On the Maturity Date or on the date the Loan is paid in full, the monies then remaining on deposit with Lender under this Section 7.2 shall, at Lender's option, be applied against the Indebtedness or if no Event of Default exists, returned to Borrower.

27

(b)    <u>Interest Reserve.</u>

(i)    On the Closing Date, a portion of the Loan equal to $142,697.92 shall be retained and not funded by Lender on the date hereof.  These monies shall be retained as an Interest Reserve to be held in an account controlled by Lender for the monthly payment of Debt Service on the Loan.  On each Interest Payment Date during the initial term of the Loan, Lender shall disburse and apply from the Interest Reserve an amount equal to the monthly Debt Service of the Loan.  If the funds on deposit in the Interest Reserve are insufficient to pay the monthly Debt Service on the Loan on the applicable Interest Payment Dates, Borrower shall replenish the Interest Reserve by depositing an amount necessary, as determined by Lender in its reasonable discretion, to bring the amount on deposit in the Interest Reserve to that which is sufficient to make the monthly Debt Service on the Loan for the applicable Interest Payment Dates.

(ii)    Borrower pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Interest Reserve as additional security for the payment of the Loan. The Interest Reserve shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its reasonable discretion. The Interest Reserve will not bear interest. Borrower shall pay interest on the entire amount in the Interest Reserve commencing on the Closing Date. Upon the occurrence of an Event of Default, Lender may apply any sums then present in the Interest Reserve to the payment of the Loan in any order in its reasonable discretion. Until expended or applied as above provided, the Interest Reserve shall constitute additional security for the Loan. Lender shall have no obligation to release any of the Interest Reserve while any Event of Default Period (or any event or condition which, with the giving of notice, the passage of time, or both, would constitute an Event of Default) exists or any Material Adverse Change has occurred in Borrower or the Property. All reasonable costs and expenses incurred by Lender in the disbursement of any of the Interest Reserve shall be paid by Borrower promptly upon demand or, at Lender's sole discretion, deducted from the Interest Reserve. On the Maturity Date or on the date the Loan is paid in full, the monies then remaining on deposit with Lender under this Section 7.2(b) shall, at Lender's option, be applied against the Indebtedness or if no Event of Default exists, returned to Borrower.

ARTICLE VIII.
<u>GENERAL CONDITIONS</u>

8.1.    <u>Waiver</u>. Lender may, without impairing its rights under the Loan Documents (a) waive or not enforce any term of the Loan Documents (b) release any part of the Collateral from the lien or security interest of the Loan Documents or (c) release any Person, directly or indirectly, liable for the Indebtedness or any covenant in the Loan Documents, without releasing the liability of any Person.

8.2.    <u>Lender's Action or Inaction</u>. The liens, security interest or other security rights of Lender in any Loan Document will not be impaired by any indulgence, moratorium or release that Lender may grant, including (a) any renewal, extension, increase or modification which Lender may grant with respect to any Indebtedness, (b) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant in respect of the Property, or any part thereof or any interest therein, or (c) any release or indulgence granted to any endorser, guarantor or surety of any Indebtedness. If Lender takes additional security, then Lender will not be deemed to have released or impaired Lender's liens, assignments, security interests or other rights in and to the Property or under the Loan Documents and Borrower's, Guarantor's and any other endorser's, guarantor's or other surety's liability will not be affected, and the rights of any permitted junior lienholder will not be improved, thereby. Lender may resort to any

28

Collateral (or to any other security now existing or hereafter given to secure payment of the Indebtedness) in such order as Lender deems best (in its sole discretion) without waiving any of the rights, benefits, liens or security interests evidenced by the Security Instrument.

8.3.    Lender's Rights. Lender may waive any Event of Default without waiving any other prior or subsequent Event of Default. Lender may remedy any Event of Default without waiving the Event of Default remedied. Lender's failure to exercise (in any period of time) any right, power or remedy after any Event of Default will not be a waiver of (i) any Event of Default or (ii) Lender's right to exercise any power or remedy at a later date. Lender's single or partial exercise of any right, power or remedy under the Loan Documents will not exhaust the same or preclude any other or further exercise thereof, and every such right, power or remedy under any of the Loan Documents may be exercised at any time and from time to time. Borrower will not be entitled to any additional notice or demand under the Loan Documents, unless specified therein, regardless of whether Lender has given Borrower any notice or made any demand on Borrower which was not expressly required under the terms of the Loan Documents. Lender may accept, on account only, any payment in an amount less than the amount then due on the Indebtedness without in any way affecting the existence of an Event of Default.

8.4.    Third Party Rights. No Person, other than Lender or Borrower is a beneficiary of the Loan Documents. Lender makes no representations and assumes no duties or obligations to any Person concerning the Improvements.

8.5.    Satisfaction of Condition; Time. Lender may freely establish to its satisfaction but based on what a reasonable person would determine under the circumstances) the existence (or nonexistence) of any fact actually or implicitly required to satisfy any condition of this Agreement. Time is of the essence for the Loan Documents.

8.6.    Assignment; Loan Participations.

(a)    Notwithstanding anything to the contrary in the Loan Documents, Borrower may not assign its rights under any of the Loan Documents without the written consent of Lender. Any Borrower assignment without Lender's written consent will (i) be an immediate Event of Default, (ii) relieve Lender from all further obligations under the Loan Documents, and (iii) at Lender's option, be null and void.

(b)    Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan, including credit information on Borrower Parties and any of their respective principals without the knowledge or consent of Borrower. If Lender makes any assignment or sells any interest in the Loan, then Borrower shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Agreement as will facilitate Lender's sale or assignment, provided that no modification will materially add to Borrower's obligations under the Loan Documents.

(c)    Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, or (ii) to sell participation interests in the Loan.  The transaction referred to in clauses (i) and (ii)) above shall hereinafter be referred to collectively as "***Secondary Market Transactions***".

(d)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace in connection with any Secondary Market Transactions, at Borrower's cost and expense, including, without limitation, to:

(i)    (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, sponsor and Property Manager, (B) provide updated budgets relating to the Property and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "*Updated Information*"), together, if customary, with appropriate verification of the Updated Information acceptable to Lender;

(ii)    provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents;

(iii)    at any time prior to a Secondary Market Transaction, execute such amendments to the Loan Documents as requested by Lender, in its discretion, to change the dates on which the monthly payment date and Maturity Date occur; provided that such change in Maturity Date shall only be with respect to the day of the month, and not the year or month, of such Maturity Date; and

(iv)    execute such amendments to the Loan Documents and Borrower organizational documents as may be reasonably requested by Lender or otherwise to effect the Secondary Market Transaction, including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure (any of the foregoing, a "*Loan Bifurcation*"); provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would change the interest rate, the stated maturity or the amortization of principal set forth in the Note, except in connection with a Loan Bifurcation which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note.

8.7.    <u>Heirs, Successors and Assigns</u>. The Loan Documents (i) are binding upon Borrower, and its heirs, devisees, representatives, successors and permitted assigns, including all of Borrower's successors-in-interest in and to all or any part of the Property, (ii) inure to the benefit of Trustee and Lender and their respective successors, substitutes and assigns, and (iii) will constitute covenants running with the Land. All references in this Agreement to Borrower, Trustee or Lender will include all of their heirs, devisees, representatives, successors, substitutes and permitted assigns.

8.8.    <u>Exercise of Rights and Remedies</u>. Lender may exercise each right and remedy under the Loan Documents, at law or in equity at any time and from time to time. All of Lender's rights and remedies under the Loan Document, at law or in equity are separate, distinct and cumulative. Lender's exercise of any right or remedy under the Loan Document, at law or in equity will not preclude Lender from later exercising any other right or remedy under the Loan Documents, at law or in equity.

8.9.    <u>Headings</u>. The headings of the sections and subsections of this Agreement are for convenience of reference only and will not affect the scope or meaning of the sections of this Agreement.

8.10.    <u>Inconsistency</u>. If there are any inconsistencies between this Agreement and the other Loan Documents, then this Agreement will control all inconsistencies, except those inconsistencies necessary to create or preserve a valid lien upon or security interest in the Collateral. The Security Instrument will control all inconsistencies among the Loan Documents concerning the creation, preservation, perfection and foreclosure of all liens upon or security interests in the Collateral.

8.11.    <u>Applicable Law</u>. The Loan Documents and the rights and obligations of Borrower, Trustee and Lender are in all respects governed by, and construed and enforced in accordance with the laws of the state of California (without giving effect to its principles of conflicts of law) and the law of the United

30

States applicable to transactions in the state of California, except for those terms of the Security Instrument pertaining to the creation, perfections, validity or foreclosure of the liens or security interests on the Property located within the state of California, which terms will be governed by, and construed and enforced in accordance with the laws of the state of California (without giving effect to its principles of conflicts of law).

8.12.  Forum; Service. **BORROWER IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, IN THE STATE OF CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS. BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN SECTION 8.18.**

8.13.  Usury. Lender and Borrower intend that the Loan Documents strictly comply with applicable usury law. Therefore, Lender and Borrower agree that: (i) none of the terms of the Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; (ii) no Borrower Party will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate; and (iii) this Section controls over all other provisions of the Loan Documents which may be in conflict with this Section. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness. If at any time the interest received for the Indebtedness exceeds the Maximum Rate, then Lender will, at its option, either refund to Borrower the amount of the excess or credit the amount of the excess against the Principal Amount. Borrower agrees that the Loan is not usurious and agrees that if, at any time, Borrower believes that the Loan is usurious, it shall give Lender (a) notice of the condition and (b) sixty 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

8.14.  Severability. If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents. All remaining portions of the Loan Documents will remain enforceable and valid.

8.15.  Counterparts. The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument. All counterparts of each Loan Document must be construed together and will constitute one instrument.

8.16.  Joint Liability. If more than one Person is included in the definition of "Borrower", then each Person included in the definition of "Borrower" will be jointly and severally liable for Borrower's obligations under this Agreement.

8.17.  Modification or Termination. The Loan Documents may only be amended, modified or terminated by a written instrument executed by Lender and each Borrower Party (who is a party to the Loan Document). Notwithstanding the foregoing, Borrower agrees that it will be bound by any written amendment or modification of the Loan Documents between Lender and any subsequent owner of the Collateral, with or without notice to Borrower, and Borrower's obligations under the Loan Documents will not be impaired because of any such amendment or modification. This Section does not permit Borrower to transfer any of the Collateral.

8.18.  Notice. Any notice or communication required or permitted under the Loan Documents must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

To Lender:  Archway Real Estate Income Fund I SPE I, LLC

31

1875 Century Park East. Suite #900
Los Angeles, CA 90067
Attention: Joshua Kohan
Phone: (310) 893-5277
Email: joshua@archwayfund.com

with a copy to:     Thompson Coburn LLP
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 282-2520
Email: jmogin@thompsoncoburn.com

To Indemnitor:     SLA Investments, LLC
257 S. Linden Drive
Beverly Hills CA 90212
Attnetion: David Halevy
Phone: (310) 666-2885
Email: danhalevy@gmail.com

with a copy to     Locke Lord LLP
300 S. Grand Ave., Suite 2600
Los Angeles, CA 90071
Attention: David S. Kupetz
Phone: (213) 687-6774
Email: David.Kupetz@lockelord.com

or to such other address as Lender or Borrower may designate in writing and deliver in accordance with this <u>Section</u>. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this <u>Section</u>. Any notice or communication sent in accordance with this <u>Section</u> will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this <u>Section</u>. Borrower consents to Lender recording any telephone communications between Lender and Borrower.

8.19. <u>Signatures</u>. The Loan Documents may be executed by Facsimile Signature and delivered by electronic means, including a PDF (or other format) attachment to an email or fax. Subject to Applicable Law, any Loan Documents executed by Facsimile Signature will have the same force and effect as a Loan Document containing an original signature and will be binding on all parties to the Loan Documents. Lender may require that any Loan Document with a Facsimile Signature be confirmed by an original signature. However, Lender's failure to request or Borrower's failure to deliver any original signature confirmation will not limit the effectiveness of any Loan Document executed by Facsimile Signature. In this <u>Section</u>, "***original signature***" means a manually signed document by a natural person, as opposed to an electronic signature, and "***Facsimile Signature***" means the signature of a natural person produced by mechanical means, printer or stamp.

8.20. <u>No Partnership</u>. Borrower and Lender are not partners or joint venturers with respect to the Property. Nothing in the Loan Documents is intended to create any partnership, joint venture or association between Borrower and Lender.

8.21. <u>Waiver of Jury Trial</u>. **BORROWER AND LENDER WAIVE ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH ANY OF THE LOAN DOCUMENTS. BORROWER AND LENDER HAVE BOTH BEEN**

32

**ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

8.22.    <u>Consent of Lender; Approvals</u>. Except as otherwise expressly provided in the Loan Documents, if Lender's approval, consent or judgment is required under any Loan Document, then Lender may, in its sole discretion, exercise its judgment in granting or denying its approval or consent regardless of the reasonableness of the request or Lender's judgment.

8.23.    <u>Imaging</u>. Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Borrower waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

8.24.    <u>Entire Agreement</u>. The Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Loan. The Loan Documents supersede all prior written or oral understandings and agreements between Borrower and Lender with respect to the Loan.

8.25.    <u>Damage Waiver</u>. Borrower (and any other Borrower Party, who now or hereafter executes a Loan Document) and Lender agree that neither party will be liable to the other party or any other Person for any punitive, exemplary, consequential or other special damages which may actually or allegedly arise from the Loan, the Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

33

Borrower and Lender have executed this Agreement to be effective on the Closing Date.

**BORROWER:**

_____

**ALAN GOMPERTS, Trustee of**
**The Gomperts and Halevy Family Trust**

_____

**SHARON HALEVY, Trustee of**
**The Gomperts and Halevy Family Trust**

_____

**DAVID HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010,**
**by Daniel Halevy as his attorney in fact**

_____

**SUE HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010**

_____

**DANIEL HALEVY**, an individual

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**LENDER:**

**ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signer

[END OF SIGNATURE PAGES]

## EXHIBIT A

## DEFINITION OF TERMS

"***737 S Broadway Borrower***" means **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company.

"***737 S Broadway Loan***" means that Loan made to 737 S Broadway Borrower in an amount equal to $16,9420,500.00.

"***737 S Broadway Loan Documents***" means the loan agreement, the 737 S Broadway Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the 737 S Broadway Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing 737 S Broadway Loan Documents.

"***737 S Broadway Property***" means the property located at 737 S. Broadway, Los Angeles, CA 90014.

"***737 S Broadway Security Instrument***" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by 737 S Broadway Borrower, in favor of the Trustee for the benefit of Lender concerning the 737 S Broadway Property.

"***Additional Collateral***" means, collectively, any (a) Licenses, (b) Contracts (c) Plans and Specifications, (d) Net Proceeds, (e) Rent Loss Proceeds, and (f) Additional Funds.

"***Additional Costs***" means (1) all costs, losses and expenses Lender (in its reasonable determination) incurs (at any time) from (i) making or maintaining the Loan, (ii) protecting the Collateral (to the extent permitted under the Loan Documents), or (iii) enforcing its remedies under the Loan Documents during an Event of Default Period, and (2) any reduction in any amount to which Lender is entitled under the Loan Documents. Additional Costs includes costs which (a) subject Lender to any tax, duty or other charge with respect to the Loan, or changes the basis of taxation of any amounts payable to Lender under the Loan (other than income, capital gain or other taxes imposed on the overall net income of Lender or or of its applicable lending office or in connection with any sale of the Loan by Lender by the jurisdiction in which Lender's principal office or such applicable lending office is located) or (b) impose or modify any reserve, special deposit or similar requirements relating to Lender. For purposes of this definition, the term "Lender," at Lender's option, includes Lender's present and future participants in the Loan.

"***Additional Funds***" means the difference, in Lender's reasonable determination from time to time, between (i) the cost to complete the Restoration and (ii) the Net Proceeds or Award, as the case may be.

"***Affiliate***" means (a) any corporation in which Borrower or any partner, shareholder, director, officer, member, or manager of Borrower directly or indirectly owns or controls more than 10% of the beneficial interest, (b) any partnership, joint venture or limited liability company in which Borrower or any partner, shareholder, director, officer, member, or manager of Borrower is a partner, joint venturer or member, (c) any trust in which Borrower or any partner, shareholder, director, officer, member or manager of Borrower is a trustee or beneficiary, (d) any Person which is directly or indirectly owned or controlled by Borrower or any partner, shareholder, director, officer, member or manager of Borrower, (e) any partner, shareholder, director, officer, member, manager or employee of Borrower, (f) any Person related by birth, adoption or marriage to any partner, shareholder, director, officer, member, manager, or employee of Borrower, or (g) any Borrower Party.

"***Agreement***" means this Loan Agreement as, from time to time, amended, modified or restated.

"***Anti-Money Laundering Laws***" means the Bank Secrecy Act of 1970, the US Patriot Act and all other laws and regulations applicable to the prevention of money laundering.

"***Applicable Bankruptcy Law***" means Title 11 of the United States Code, any regulation or rule promulgated thereunder or any other present or future insolvency, bankruptcy or similar law, including laws concerning assignments for the benefit of creditors, appointment of a receiver, trustee, custodian or liquidator, under the laws of the United States or the State of California.

"***Applicable Law***" means all Laws, covenants, conditions and restrictions (including private restrictive covenants) and other requirements relating to or affecting Borrower, Guarantor, Lender or the Property.

"***Appraisal***" means an MAI appraisal of the Property ordered by Lender, dated within 30 days of its use, and prepared by a licensed appraiser satisfactory to Lender.

"***Approved Accounting Method***" shall mean the cash or accrual basis of accounting including, without limitation, a calculation of net operating income and occupancy statistics for the Property, currently utilized by Borrower and certain of its Affiliates in the preparation of financial data heretofore delivered to Lender so long as the same is and remains in general use by significant segments of the United States accounting profession.

"***Attorneys' Fees***" means all reasonable fees, costs and expenses of attorneys (including allocated costs of in-house counsel), other professional consultants and experts.

"***Award***" means all condemnation awards, judgments, decrees, or proceeds of any sale in lieu of condemnation.

"***Bankruptcy Event***" means any of the following events: (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding). A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"***Borrower***" means (i) **ALAN GOMPERTS**, and **SHARON HALEVY**, **as Trustees of The Gomperts and Halevy Family Trust** ("***G&H Trust***"), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("***D&S Trust***"),, and (iii) **DANIEL HALEVY**, an individual ("***DH***").

"***Borrower Operating Account***" means an account specified to Lender by Borrower in writing from time to time as Borrower's operating account.

"***Borrower Party***" means, collectively, Borrower and Guarantor.

"***Business Day***" means each day of the week which is not a Saturday, Sunday or a holiday

recognized and observed by the Federal Reserve Board of Governors.

"***Casualty***" means if the Property shall be damaged or destroyed, in whole or in part, by fire or any other casualty.

"***Claims***" means any claim (including any Environmental Claim or any other claims arising under Environmental Laws), demands, liabilities, losses, damages, causes of action, judgments, penalties, fines, costs and expenses (including Attorneys' Fees, and of the investigation and defense of any claim, whether or not such claim is ultimately defeated, and the settlement of any claim or judgment including all value paid or given in settlement).

"***Closing Date***" means April 14, 2023.

"***Collateral***" means the Property and all of Borrower's other assets, whether now owned or hereafter acquired, including the Leases, and all proceeds from Borrower's assets.

"***Compliance Certificate***" means a certificate in the form set forth in **Exhibit C** of this Agreement and executed by David Halevy on behalf of Borrower in favor of Lender.

"***Compliance Certificate Delivery Date***" means each date on which (1) Borrower delivers a Compliance Certificate to Lender, and (2) if Borrower fails to deliver a Compliance Certificate to Lender, then the Compliance Certificate Due Date.

"***Compliance Certificate Due Date***" means the **15th** calendar day following the end of each calendar quarter. If the Compliance Certificate Due Date is on a day which is not also a Business Day, then the Compliance Certificate Due Date will be the next Business Day.

"***Condemnation***" means any threatened or instituted proceedings for the taking by eminent domain, or offer to purchase in lieu of a taking, of all or any portion of the Property including any change in any street (whether as to grade, access, or otherwise).

"***Contractors***" means, collectively, all parties with whom or to whom the Contracts have been made or are given.

"***Contracts***" means all contracts, subcontracts, agreements, site development agreements, service agreements, management agreements, warranties and purchase orders, together with any and all renewals, extensions and modifications thereof and all amendments, exhibits and addenda thereto, which have been or will be executed by or on behalf of Borrower, or which have been assigned to Borrower, in connection with the acquisition, use, operation or maintenance of the Property or the construction of improvements on the Property.

"***Control***" or "***controls***" means, with respect to Borrower, the power to direct the management and policies of Borrower, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; and the terms "***Controlling***" and "***Controlled***" have meanings correlating to the foregoing.

"***Damage***" means any damage to, loss, or destruction of the Property.

"***Debt***" means, for any Person, without duplication: (a) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or any of its assets is liable; (b) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person or any of its assets would be liable or subject, if such amounts were advanced under the credit facility; (c) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests; (d) all indebtedness guaranteed by such Person, directly or indirectly; (e) all obligations under leases that constitute capital leases for which such Person or any of its assets is liable or subject; and

Exhibit A
TO
Loan Agreement

(f) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person or any of its assets is liable or subject contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"*Debt Service*" means the amount of the outstanding principal balance of the Loan multiplied by the Interest Rate divided by 360 and multiplied by 30 ("*30/360 Basis*"). Interest for the full or partial calendar month at the beginning of the term of this Loan will be calculated on the basis of a 360-day year and the actual number of days elapsed. Interest for any partial calendar month at the end of the term of this Note will be calculated on the basis of a 360-day year and the actual number of days elapsed..

"*Debt Service Coverage Ratio*" means the ratio that Lender reasonably determines on the DSCR Testing Date of (i) Net Cash Flow, to (ii) Debt Service of the Loan for the prior twelve (12) month period.

"*Default Rate*" means a per annum rate of interest equal to the lesser of (i) 18.0% and (ii) the Maximum Rate.

"*Dollars*" and "*$*" means lawful money of the United States of America, which at the time of payment is legal tender for the payment of all public and private debts.

"*Environmental Indemnity Agreement*" means the Hazardous Materials Indemnity Agreement of even date herewith executed by Borrower in favor of Lender.

"*Environmental Approvals*" means any permit, license, approval, ruling, variance, exemption or other authorization required under applicable Environmental Laws.

"*Environmental Claim*" means, with respect to any Person, any notice, claim, demand or similar written communication by any other Person alleging potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, fines or penalties arising out of, based on or resulting from (a) the presence, or release into the environment, of any Material of Environmental Concern at any location, whether or not owned by such Person or (b) circumstances forming the basis of any violation, or alleged violation of any Environmental Law.

"*Environmental Laws*" means all federal, state and foreign laws and regulations relating to pollution or protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including laws and regulations relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use treatment, storage, disposal, transport or handling of Materials of Environmental Concern. The term "Environmental Laws" includes the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations, guidelines and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including Subtitle I relating to underground Storage Tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act. The term "Environmental Law" also includes any present and future federal, state and local laws, statutes, ordinances, rules, regulations, guidelines and the like, as well as common law, conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; requiring notification or disclosure of any releases of any Material of Environmental Concern or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or

interest in the Property; or imposing conditions or requirements in connection with permits or other authorization for lawful activity.

"***ERISA***" means, as amended, the Employee Retirement Income Security Act of 1974 and all rules, regulations and guidance promulgated thereunder.

"***Event of Default***" has the meaning set forth in Section 5.1.

"***Event of Default Period***" means the period beginning on the occurrence of an Event of Default and ending on the cure of the Event of Default.

"***Exit Fee***" means $0 payable to Lender.

"**Extraordinary Expenses**" means any extraordinary operating which are not budgeted operating costs and expenses, capital expenditures, or leasing costs (each as set forth in an approved budget).

"***Financing Statement***" means a Financing Statement naming Borrower, as debtor, and Lender, as secured party, perfecting the security interest in the Collateral.

"**Foxdale Borrower**" means Negev Investments, LLC, a California limited liability company.

"***Foxdale Loan***" means that Loan made to Foxdale Borrower in an amount equal to $1,300,000.00.

"**Foxdale Loan Documents**" means the loan agreement, the Foxdale Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Foxdale Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Foxdale Loan Documents.

"***Foxdale Property***" means the property located at property known as "The Sandpiper" and located at 12800 Foxdale Drive, Desert Hot Springs, CA 92240.

"***Foxdale Security Instrument***" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by Foxdale Borrower, in favor of the Trustee for the benefit of Lender concerning the Foxdale Property.

"**Funds**" means collectively, the definition set forth in Section 7.1, together with all reserve or impound accounts (including the Interest Reserve) as set forth in this Agreement.

"***GAAP***" means those generally accepted accounting principles and practices recognized from time-to-time by the Financial Accounting Standards Board (or any generally recognized successor). Borrower, Guarantor and all parties who must deliver any financial information to Lender under this Agreement or any other Loan Document must consistently apply the generally accepted accounting principles and practices recognized by the Financial Accounting Standards Board (or any generally recognized successor) to all statements and information delivered or provided, or otherwise made available, to Lender.

"***Governmental Authority***" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"***Grace Period***" means a period of either (i) 10 days after Lender delivers written notice to Borrower (the "**Initial Grace Period**") and demand for the performance of any default of any covenant, agreement, warranty or condition set forth in this Agreement, or (ii) if (A) Borrower immediately commences and diligently pursues the cure of such default and delivers (prior to the end of the Initial Grace Period) to Lender a written request for more time, and (B) Lender reasonably determines that (1) such default cannot be cured within the Initial Grace Period but can be cured within 10 days after the default, 30 days (for a

total of 40 days from the date Lender delivers written notice to Borrower of the default).

"***Guarantor***" means N/A.

"***Guaranty***" means the Continuing Guaranty of even date herewith made by Guarantor in favor of Lender relating to the Loan.

"***Improvements***" means all improvements now or hereafter located upon the Land.

"***Indebtedness***" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"***Indemnified Party***" means Lender, Trustee and the directors, officers, employees and agents of Lender and Trustee and any Person owned or controlled by, owning or controlling, or under common control or affiliated with Lender or Trustee.

"***Insurance Impound***" means the impound account Borrower establishes with Lender for the payment of all insurance on the Property as required under this Agreement.

"***Insurance Premiums***" means all costs for the insurance policies required under <u>Section 4.1(j)</u> above.

"***Interest Payment Date***" means the first (1st) day of each calendar month commencing on May 1, 2023, and ending on the earlier of (i) the date the Loan is repaid in full, and (ii) the Maturity Date.

"***Interest Period***" means a 1-month period commencing on the first day, and ending on the last day, of each calendar month.

"***Interest Rate***" means 9.50% per annum.

"***Interest Reserve***" means the funds deposited by Borrower with Lender for the payment of debt service.

"***Land***" means the land described in **Exhibit B** of this Agreement.

"***Late Charge***" means a product equal to 5.0% of the amount of any Past Due Indebtedness.

"***Law***" means any statute, law, regulation, ordinance, rule, treaty, judgment, order, decree, permit, concession, franchise, license, agreement or other governmental restriction, or binding judicial (or tribunal) decisions of the United States or any state or political subdivision thereof, or of any foreign country or any department, province or other political subdivision thereof. All references to Law include any amendment or modification to the Law, and all regulations, rulings, and other Laws promulgated under such Law.

"***Lease(s)***" means all rights, title, interests, estates, powers, privileges, options and other benefits of Borrower in, to and under the lease agreements which now or hereafter cover or affect all or any portion of the Property, together with all renewals, extensions, modifications, amendments, subleases and assignments of such lease agreements.

"***Lender***" means collectively, ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company, its successors and/or assigns.

"***Lender's Offices***" means 16 N. Marengo Avenue, Suite 212, Pasadena, California 91101, Attention: Chuck Ng, or any other place Lender designates from time to time.

"***Licenses***" means, collectively, all licenses, permits, approvals, certificates and agreements with or from all boards, agencies, departments, governmental or otherwise, relating directly or indirectly to the ownership, use, operation and maintenance of the Property, or the construction of the Improvements, whether heretofore or hereafter issued or executed.

"**Loan**" means the loan or loans Lender makes to Borrower pursuant to this Agreement (or the other Loan Documents) up to the Maximum Principal Amount.

"**Loan Documents**" means this Agreement, the Security Instrument, the Environmental Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"**Loan Matter**" means any action or proceeding which may affect the rights or duties of any Person under the Loan Documents.

"**Loan Origination Fee**" means $_____ payable to Lender, in consideration for Lender agreeing to make the Loan to Borrower.

"**Loan Title Policy**" means the title insurance policy (i) naming Lender as the insured, (ii) in the amount of the Maximum Principal Amount, (iii) in form (including endorsements), date and substance, and written by a title insurance underwriter, satisfactory to Lender, (iv) insuring a valid first lien upon the Property by virtue of the Security Instrument, and (v) containing no exceptions other than the preprinted exceptions and the Permitted Encumbrances.

"**Loan to Value Ratio**" means the percentage resulting from a fraction having (i) a numerator equal to the Principal Amount plus any unfunded amounts under the Loan and (ii) a denominator equal to the value of the Property, as determined by the most recent Appraisal, established as of the date on which the fraction is determined.

"**Major Lease**" means any Lease (i) which, either individually or when taken together with any other Lease with the same Tenant or its Affiliates, demises in equal to or in excess of 10% square feet in the Improvements or (b) made with a Tenant that is paying base rent in an amount equal to or exceeding 10% of the Total Revenue.

"**Material Action**" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have Borrower or any Borrower Party be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against Borrower or any Borrower Party, to file a petition seeking, or consent to, reorganization or relief with respect to Borrower or any Borrower Party under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for Borrower or any Borrower Party or a substantial part of its respective property, to make any assignment for the benefit of creditors of Borrower or any Borrower Party, the admission in writing by Borrower or any Borrower Party of such Person's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

"**Material Adverse Change**" or "**material adverse change**" means, in Lender's reasonable discretion, the business prospects, operations or financial condition of a Person or property has changed in a manner which would reasonably be expected to substantially and materially impair the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable Person from timely performing any of its material obligations under the Loan Documents.

"**Material of Environmental Concern**" means all chemicals, pollutants, contaminants, wastes, toxic substances, petroleum and petroleum products, and all other substances regulated by Environmental Laws (but excluding any cleaning or other products, materials or substances in concentrations and amounts used in the ordinary course of operating a similar business on similar property).

"***Maturity Date***" means the earlier to occur of (1) the Scheduled Maturity Date and (2) the date on which the entire Loan must be paid in full after acceleration pursuant to the terms of the Loan Documents.

"***Maximum Principal Amount***" means $2,575,000.00.

"***Maximum Rate***" means the maximum interest rate permitted under Applicable Law.

"***Net Cash Flow***" means Total Revenue less Operating Expenses.

"***Net Proceeds***" means the amount of all insurance proceeds Lender receives <u>less</u> all reasonable costs and expenses Lender incurs in connection with the collection and disbursement of the proceeds.

"***Note***" means the promissory note evidencing the Loan executed by Borrower in favor of Lender as of the date hereof.

"***Operating Expenses***" means shall equal the greater of (x) annual pro forma operating expenses or (y) the most recent quarter's operating expenses multiplied by four, as reasonably approved by the Lender. Operating expenses shall exclude depreciation, and be inclusive of adjustments for accrual of certain non-recurring expenses, annualized Insurance Premiums, Taxes and management fees (in the amount equal to the greater of (x) management fees actually paid, or (y) an imputed rate of 3% of Total Revenue, (b) Taxes and Insurance Premiums, (c) adjustments reflecting the accrual of certain non-recurring expenses, and (d) professional and partnership fees.

"***Paid in Full Mark***" means any payment Borrower tenders to Lender marked "*paid in full*," "*without recourse*," or any similar language.

"***Past Due Indebtedness***" means the sum of any Indebtedness which Borrower fails to pay to Lender within the earlier to occur of (i) 10 days after the date on which the Indebtedness is due (or such longer period as my be applicable hereunder), and (ii) the Maturity Date.

"***Payment Deadline***" means no later than 2:00 p.m. (Pacific time zone) on the date any payment is due and payable under this Agreement or the date any voluntary prepayment is made.

"***Permitted Encumbrances***" means the encumbrances, approved by Lender, set forth in Schedule B of the Loan Title Policy, except for the preprinted exceptions to title coverage.

"***Person***" means a natural person, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"***Plans and Specifications***" means, collectively, all plans, specifications, notes, drawings, approvals, certifications and similar work product (and all modifications thereof) relating to the Property, including all engineering plans, complete architectural plans, specifications and work drawings, Property costs and related information, site plans, proposed plat dedications and proposed development restrictions and conditions and all requisite building permits authorizing construction of the Improvements (and repairs, modifications and additions thereto).

"***Prepayment Date***" means the day on which Borrower (or any other Person) tenders any Indebtedness which is not then due and payable.

"***Prepayment Premium***" means $0.

"***Principal Amount***" means, at any point in time, that portion of the principal balance of the Loan which is unpaid.

"***Principal Payment Date***" means the earlier of (i) the date the Loan is repaid in full, and (ii) the Maturity Date.

EXHIBIT A
TO
LOAN AGREEMENT

"***Property***" means, collectively, the Land, the Improvements and the Additional Collateral.

"***Property Manager***" means any management company approved by Lender to manage the Property.

"***Property Management Agreement***" means the agreement between Borrower and Property Manager for the operation and management of the of the Property.

"***Qualifying Leases***" means all Leases in place, fully executed and in good standing for the Property with Tenant's is possession and paying rent.

"***Real Estate Taxes***" means all ad valorem taxes, assessments and charges (including ground rents, water and sewer rents, and all other recurring charge) which may create a lien against the Property.

"***Reimbursable Expenses***" means budgeted operating costs and expenses, capital expenditures, or leasing costs (each as set forth in an approved budget). The Reimbursable Expenses shall include management fees owed to the Property Manager but shall not include any administrative fees owed to Property Manager.

"***Rent***" means all of the rents, income, receipts, revenues, issues, profits and other sums of money that are now or at any time hereafter become due and payable to Borrower under the terms of any Lease or arising or issuing from or out of any Lease or from or out of the Property or any part thereof, including minimum rents, additional rents, percentage rents, deficiency rents and liquidated damages following default, payments in consideration for cancellation of a Lease, security deposits (whether cash, one or more letters of credit, bonds or other form of security), advance rents, all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by destruction or damage to the Property and all of Borrower's rights to recover monetary amounts from any lessee in bankruptcy including rights of recovery for use and occupancy and damage claims arising out of lease defaults, including rejection, disaffirmance, repudiation, and similar actions, under Applicable Bankruptcy Law and other statutes governing the rights of creditors, including the immediate and continuing right to collect and receive each and all of the foregoing.

"***Rent Loss Proceeds***" means the aggregate of any loss or business interruption insurance proceeds which the carrier acknowledges is payable to Lender.

"***Restoration***" means the restoration, replacement, and rebuilding of the Property as nearly as possible to its value and condition immediately prior to any Damage or Taking in accordance with Plans and Specifications Lender approves.

"***Security Instrument***" means, collectively

     (a)    that certain Deed of Trust Assignment of Lease and Rents, Security Agreement and Fixture Filing executed by G&H Trust for 3538 Greenfield Avenue, Los Angeles, CA 90034**,**

     (b)    that certain Deed of Trust Assignment of Lease and Rents, Security Agreement and Fixture Filing executed by D&S Trust 133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212

     (c)    that certain Deed of Trust Assignment of Lease and Rents, Security Agreement and Fixture Filing executed by DH for 8561 Horner Street, Los Angeles, CA 90035

"***Site Assessment***" means an environmental engineering report for the Property prepared by an engineer engaged by Borrower and approved by Lender, and in a manner satisfactory to Lender, based upon an investigation relating to and making appropriate inquiries concerning the existence of hazardous

EXHIBIT A
TO
LOAN AGREEMENT

materials on or about the Property, and the past or present discharge, disposal, release or escape of any such substances, all consistent with ASTM Standard E1527-05 (or any successor thereto published by ASTM) and good customary and commercial practice.

"*State*" means the state in which the Land is situated.

"*Scheduled Maturity Date*" means December 1, 2023.

"*South Los Angeles Borrower*" means SLA Investments LLC, a California limited liability company.

"*South Los Angeles Loan*" means that Loan made to South Los Angeles Borrower in an amount equal to $125,000.00.

"*South Los Angeles Loan Documents*" means the loan agreement, the South Los Angeles Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the South Los Angeles Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing South Los Angeles Loan Documents.

"*South Los Angeles Property*" means the property located at 1040 S Los Angeles Street, Los Angeles, CA 90015.

"*South Los Angeles Security Instrument*" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by South Los Angeles Borrower, in favor of the Trustee for the benefit of Lender concerning the South Los Angeles Property.

"*Taking*" means any threatened or instituted proceedings for the condemnation or taking by eminent domain, or offer to purchase in lieu of a taking, of all or any portion of the Property including any change in any street (whether as to grade, access, or otherwise).

"*Tax*" or "*Taxes*" means all (1) income, franchise, margin and other taxes, which now or in the future, may be assessed against a Borrower Party, (2) stamp or other taxes due with respect to the Loan Documents, (3) taxes and assessments, which now or in the future, are levied or assessed against the Collateral, (4) taxes (except for ordinary income taxes) and assessments, which now or in the future, are levied or assessed against Lender in any way related to the Indebtedness or the Loan Documents, and (5) all Real Estate Taxes.

"*Tax and Insurance Escrow Account*" means the impound account Borrower establishes with Lender for the payment of real estate taxes and assessments against and insurance on the Property.

"*Tax Impound*" means the impound account Borrower establishes with Lender for the payment of all Taxes on the Property as required under this Agreement.

"*Taxpayer Identification Number*" means _____.

"*Tenant*" means each occupant of any portion of the Land or Improvements under a Lease.

"*Testing Determination Date*" means the date which is the last day of the calendar quarter.

"*Total Revenues*" means, the most recent calendar quarter's revenues for operations pursuant to fully executed approved Leases in good standing and in full force and effect, multiplied by four. Total revenues shall include a reasonable market vacancy factor equal to the greater of (a) the actual vacancy rate at the Property, or (b) 5.0%. The term "Total Revenues" will not include rentals, revenues or income derived from a Lease concerning a Tenant which is not yet in possession of its respective premises and paying rent;

<u>provided that</u> for the calculation of Debt Service Coverage Ratio in connection with Interest Rate, Total Revenues will include rentals revenues or income derived from a Lease concerning a Tenant in possession of its respective premises and paying rent.

"***Transfer Event***" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

"***Trustee***" has the meaning set forth in the Security Instrument.

"***UCC***" means the Uniform Commercial Code of the State in effect from time to time or, if the creation, perfection and enforcement of any security interest herein granted is governed by the laws of a state other than the State, then, as to the matter in question, the Uniform Commercial Code in effect in that state from time to time.

"***Unaffiliated Qualified Manager***" means an unaffiliated property manager of the Property that (A) is a reputable, nationally or regionally recognized management company having at least five (5) years' experience in the management of similar type properties, (B) at the time of its engagement as property manager has leasable square footage of the same property type as the Property equal to the lesser of 100,000 leasable square feet and five (5) times the leasable square feet of the Property and (C) is not the subject of a bankruptcy or similar insolvency proceeding.

## EXHIBIT B

## LEGAL DESCRIPTION OF LAND

**3538 Greenfield Avenue, Los Angeles, CA 90034**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 195 OF TRACT NO. 10516, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 159, PAGES 18 TO 20 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.


**133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 1118 TRACT 6380, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 69 PAGES 11 TO 20 INCLUSIVE OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.



**8561 Horner Street, Los Angeles, CA 90035**


THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 192 OF TRACT NO. 7385, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 81 PAGES 72 AND 73 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

## EXHIBIT C

## COMPLIANCE CERTIFICATE

On April 14, 2023, (i) **ALAN GOMPERTS**, and **SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust** ("*G&H Trust*"), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** ("*D&S Trust*"),, and (iii) **DANIEL HALEVY**, an individual ("*DH*") (G& H Trust, D&S Trust and DH are collectively, referred to herein as, "*Borrower*") and **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("*Lender*") entered into a Loan Agreement (the "*Agreement*"). Borrower delivers this certificate (this "*Certificate*") to Lender in order to comply with the terms of the Agreement. Capitalized terms used, but not defined, in this Certificate have the meanings specified in the Agreement.

Borrower certifies to Lender that as of the Closing Date (as defined below):

(1)      No Event of Default exists;

(2)      The natural person executing this Certificate on Borrower's behalf (a) holds the title or position with Borrower required under the Agreement to execute this Certificate, (b) has been duly authorized to execute this Certificate on Borrower's behalf, and (c) has the capacity to duly execute, and make the certifications in, this Certificate; and

(3)      Borrower's calculations of the Debt Service Coverage Ratio are effective as of the most recent DSCR Testing Date and are set forth on **Schedule 1** to this Certificate.

_____
Date Borrower Executed this Certificate
(the "Closing Date")


**BORROWER:**


_____
**ALAN GOMPERTS**, **Trustee of**
**The Gomperts and Halevy Family Trust**


_____
**SHARON HALEVY**, **Trustee of**
**The Gomperts and Halevy Family Trust**


_____
**DAVID HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010**,
**by Daniel Halevy as his attorney in fact**


_____
**SUE HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010**


EXHIBIT C
TO
LOAN AGREEMENT

**Page 120 of 154**                                                                                   147

_____

**DANIEL HALEVY**, an individual

EXHIBIT C

TO

LOAN AGREEMENT

**Page 121 of 154**

148

## EXHIBIT D

## CONDITIONS PRECEDENT

Each of the following conditions must be satisfied, at Borrower's cost and to Lender's satisfaction (in Lender's sole discretion), before this Agreement is effective.

1. <u>Documents</u>. Lender has received:

   a.  fully executed originals of each Loan Document;

   b.  legal opinions from each Borrower Party's counsel;

   c.  the Loan Title Policy;

   d.  an Appraisal establishing a Loan to Value Ratio less than or equal to 70%;

   e.  immediately available funds from Borrower sufficient to reimburse Lender for all costs (including attorneys' fees) Lender incurred to underwrite, document and close the Loan;

   f.  evidence that all Borrower Parties have all insurance policies required under the Loan Documents; and

   g.  all reports, including environmental assessments, Lender desires;

2. <u>Default</u>. On the day on which Lender receives the last satisfactory document under <u>paragraph 1</u> above:

   a.  no Event of Default exists; and

   b.  no event exists that after delivery of notice or passage of time will become an Event of Default.

## EXHIBIT E

### Single Purpose Entity Covenants

(d)    <u>Single Purpose Entity/Separateness</u>. Borrower represents, warrants and covenants as follows:

(i)    <u>Limited Purpose</u>. The sole purpose conducted or promoted by Borrower is to engage in the following activities:

(1)    to acquire, own, hold, lease, operate, manage, maintain, develop and improve the Property (or an undivided interest therein) and to contract for the operation, maintenance, management and development of the Property. Borrower has not owned, does not own, and will not own any asset or property other than (A) the Property, and (B) incidental personal property necessary for the ownership or operation of the Property;

(2)    to enter into and perform its obligations under the Loan Documents;

(3)    to sell, transfer, service, convey, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with the Property to the extent permitted under the Loan Documents; and

(4)    to engage in any lawful act or activity and to exercise any powers permitted that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.

(ii)    <u>Limitations on Debt, Actions</u>. Notwithstanding anything to the contrary in the Loan Documents or in any other document governing the formation, management or operation of Borrower, Borrower shall not:

(1)    guarantee any obligation of any Person, including any Affiliate, or become obligated for the debts of any other Person or hold out its credit as being available to pay the obligations of any other Person;

(2)    engage, directly or indirectly, in any business other than as required or permitted to be performed under this Section;

(3)    incur, create or assume any Debt other than (A) the Loan and (B) unsecured trade payables incurred in the ordinary course of its business that are related to the ownership and operation of the Property, and which shall (1) not exceed 2% of the outstanding balance of the Loan, (2) not be evidenced by a note, and (3) be paid within 60 days;

(4)    make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that Borrower may invest in those investments permitted under the Loan Documents;

(5)    to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, sale or other transfer of any of its assets outside the ordinary course of Borrower's business;

(6)    buy or hold evidence of indebtedness issued by any other Person (other than cash or investment-grade securities);

(7)    form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other) or own any equity interest in any other entity;

(8)    own any asset or property other than the Property (or an undivided interest therein) and incidental personal property necessary for the ownership or operation of the Property; or

(9)    take any Material Action without the unanimous written approval of all partners of Borrower.

(iii)  <u>Separateness Covenants</u>. In order to maintain its status as a separate entity and to avoid any confusion or potential consolidation with any Affiliate, Borrower represents and warrants that in the conduct of its operations since its organization it has observed, and covenants that it will continue to observe, the following covenants:

(1)    maintain books and records and bank accounts separate from those of any other Person;

(2)    maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets;

(3)    comply with all organizational formalities necessary to maintain its separate existence;

(4)    hold itself out to creditors and the public as a legal entity separate and distinct from any other entity;

(5)    maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other Person and not have its assets listed on any financial statement of any other Person; except that Borrower's assets may be included in a consolidated financial statement of its Affiliate so long as appropriate notation is made on such consolidated financial statements to indicate the separateness of Borrower from such Affiliate and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person;

(6)    prepare and file its own tax returns separate from those of any Person to the extent required by applicable law, and pay any taxes required to be paid by applicable law;

(7)    allocate and charge fairly and reasonably any common employee or overhead shared with Affiliates;

(8)    not enter into any transaction with Affiliates except on an arm's-length basis on terms which are intrinsically fair and no less favorable than would

be available for unaffiliated third parties, and pursuant to written, enforceable agreements;

(9)    conduct business in its own name, and use separate stationery, invoices and checks;

(10)    not commingle its assets or funds with those of any other Person;

(11)    not assume, guarantee or pay the debts or obligations of any other Person;

(12)    correct any known misunderstanding as to its separate identity;

(13)    not permit any Affiliate to guarantee or pay its obligations (other than limited guarantees and indemnities set forth in the Loan Documents);

(14)    not make loans or advances to any other Person;

(15)    pay its liabilities and expenses out of and to the extent of its own funds; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower;

(16)    maintain a sufficient number of employees in light of its contemplated business purpose and pay the salaries of its own employees, if any, only from its own funds; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower;

(17)    maintain adequate capital in light of its contemplated business purpose, transactions and liabilities; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower; and

(18)    cause the managers, officers, employees, agents and other representatives of Borrower to act at all times with respect to Borrower consistently and in furtherance of the foregoing and in the best interests of Borrower.

SCHEDULE 1

TO

LOAN AGREEMENT



**This page is part of your document - DO NOT DISCARD**



## 20230259824



**Pages:
0027**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**04/24/23 AT 08:00AM**

| | |
|---|---:|
| FEES: | 170.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 395.00 |



**L E A D S H E E T**



**202304240110008**

**00023380271**



**014033488**

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

30097266C-D2
154


FOR REFERENCE ONLY 2023025982

RECORDING REQUESTED BY
Fidelity National Title Company

AND WHEN RECORDED MAIL TO:

Thompson Coburn LL
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attn: Joshua Morgan

300972060.D2

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS
## SECURITY AGREEMENT AND FIXTURE FILING

RECORDING REQUESTED BY
Fidelity National Title Company

**AND WHEN RECORDED MAIL TO:**

Thompson Coburn LL
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attn: Joshua Morgan

3009724660.D2

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS
## SECURITY AGREEMENT AND FIXTURE FILING

RECORDING REQUESTED BY
FIDELITY NATIONAL TITLE

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Thompson Coburn LLP
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 282-2520
Email: jmogin@thompsoncoburn.com

3009724C-D2

APN: 4331-018-029

*(space above this line for recorder's use only)*

**DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010**, as grantor
(Trustor)

to

**FIDELITY NATIONAL TITLE**, as trustee
(Trustee)

for the benefit of

**ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, as beneficiary

(collectively, Lender)

### DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

Dated:          April 14, 2023

Address:      133 South Palm Dr, Apt 0005
Beverly Hills, CA 90212

THIS INSTRUMENT IS TO BE INDEXED AS BOTH A DEED OF TRUST AND A FIXTURE FILING FILED AS A FINANCING STATEMENT.

THIS INSTRUMENT CONSTITUTES A FIXTURE FILING UNDER SECTION 9502 OF THE CALIFORNIA COMMERCIAL CODE.  TO THE EXTENT THE GOODS ARE FIXTURES UNDER THE LAWS OF THE STATE OF CALIFORNIA, THE FIXTURES ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY LOCATED IN RIVERSIDE COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED ON <u>EXHIBIT A</u> ATTACHED TO THIS SECURITY INSTRUMENT.

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

This Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing is executed as of April 14, 2023, by **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** (*"Trustor"*) to **FIDELITY NATIONAL TITLE** (*"Trustee"*), for the benefit of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company, as beneficiary (*"Lender"*).

This Security Instrument is made in connection with that certain Loan Agreement (the *"Loan Agreement"*), between (i i) **ALAN GOMPERTS**, and **SHARON HALEVY, as Trustees of The Gomperts and Halevy Family Trust** (*"G&H Trust"*), (ii) **DAVID HALEVY** and **SUE HALEVY, as Trustees of the Halevy Family Trust dated September 8, 2010** (*"D&S Trust"*),, and (iii) **DANIEL HALEVY**, an individual (*"DH"*) (G& H Trust, D&S Trust and DH are collectively, referred to herein as, *"Borrower"*) and Lender, and the Promissory Note (the *"Note"*) described in the Loan Agreement, in the original principal amount of $2,575,000.00 in evidence of the loan (the *"Loan"*) made by Lender to Borrower..

## W I T N E S S E T H:

In order to secure payment of the Indebtedness and performance of Borrower's obligations under the Loan Documents, Trustor hereby irrevocably grants, bargains, sells and conveys to Trustee IN TRUST, WITH POWER OF SALE, the following property and rights, whether now owned or held or hereafter acquired and Trustor further grants to Trustee a first priority security interest in the Property.

### GRANTING CLAUSE ONE

All of Trustor's right, title and interest in and to the Land.

### GRANTING CLAUSE TWO

All of Trustor's right, title and interest in and to the Additional Land.

### GRANTING CLAUSE THREE

All of Trustor's right, title and interest in and to the Improvements.

### GRANTING CLAUSE FOUR

All easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, oil, gas and mineral rights, air rights and development rights, zoning rights, tax credits or benefits and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever in any way now or hereafter belonging, relating or pertaining to the Real Property or any part thereof and the reversion and reversions, remainder and remainders and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land or any part thereof to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy, property, possession, claim and demand whatsoever, both in law and in equity, of Trustor in, of and to the Real Property and every part and parcel thereof, with the appurtenances thereto.

### GRANTING CLAUSE FIVE

All right, title and interest in and to the Equipment and the right, title and interest of Trustor in and to any of the Equipment which may be subject to any Security Agreements (as defined in the Uniform

Commercial Code) superior, inferior or pari passu in lien to the lien of this Security Instrument. In connection with Equipment which is leased to Trustor or which is subject to a lien or security interest which is superior to the lien of this Security Instrument, this Security Instrument shall also cover all right, title and interest of each Trustor in and to all deposits and the benefit of all payments now or hereafter made with respect to such Equipment.

### GRANTING CLAUSE SIX

All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property or any part thereof, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of said right), or for a change of grade or for any other injury to or decrease in the value of the Real Property.

### GRANTING CLAUSE SEVEN

All leases and subleases (including, without limitation, all guarantees thereof) and other agreements affecting the use, enjoyment and/or occupancy of the Real Property or any part thereof, now or hereafter entered into (including any use or occupancy arrangements created pursuant to Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property) and all income, rents, issues, profits, revenues and proceeds including, but not limited to, all oil and gas or other mineral royalties and bonuses from the Real Property (including any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property and all claims as a creditor in connection with any of the foregoing) and all proceeds from the sale, cancellation, surrender or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Indebtedness.

### GRANTING CLAUSE EIGHT

All proceeds of and any unearned premiums on any insurance policies covering the Real Property or any part thereof including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Real Property or any part thereof.

### GRANTING CLAUSE NINE

All tax refunds, including interest thereon, tax credits and tax abatements and the right to receive or benefit from the same, which may be payable or available with respect to the Real Property.

### GRANTING CLAUSE TEN

The right, in the name of and on behalf of Trustor, to appear in and defend any action or proceeding brought with respect to the Real Property or any part thereof and to commence any action or proceeding to protect the interest of Lender in the Real Property or any part thereof and all awards and/or judgments received by Trustor from any source whatsoever.

## GRANTING CLAUSE ELEVEN

All cash on hand, bank accounts, accounts receivable, security deposits, utility or other deposits, intangibles, contract rights, interests, estates or other claims, both in law and in equity, which Trustor now has or may hereafter acquire in the Real Property or any part thereof.

## GRANTING CLAUSE TWELVE

All rights which Trustor now has or may hereafter acquire to be indemnified and/or held harmless from any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) relating to the Real Property or any part thereof.

## GRANTING CLAUSE THIRTEEN

All plans and specifications, maps, surveys, studies, reports, contracts, subcontracts, service contracts, management contracts, franchise agreements and other agreements, franchises, trade names, trademarks, symbols, service marks, approvals, consents, permits, special permits, licenses and rights, whether governmental or otherwise, respecting the use, occupation, development, construction and/or operation of the Real Property or any part thereof or the activities conducted thereon or therein, or otherwise pertaining to the Real Property or any part thereof.

## GRANTING CLAUSE FOURTEEN

All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

WITH RESPECT to any portion of the Property which is not real estate under the laws of the State of California, Trustor hereby grants, bargains, sells and conveys the same to Lender for the purposes set forth hereunder and the references above to Trustee shall be deemed to be to Lender with respect to such portion of the Property and Lender shall be vested with all rights, power and authority granted hereunder or by law to Trustee with respect thereto.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Trustee and its successors and assigns for the benefit of Lender and the successors and assigns of Lender forever.

IN TRUST, WITH POWER OF SALE, to secure the payment to Lender of the Indebtedness at the time and in the manner provided for its payment in the Note and in this Security Instrument;

PROVIDED, HOWEVER, these presents are upon the express condition, if Trustor shall well and truly pay to Lender the Indebtedness at the time and in the manner provided in the Note and this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void;

AND Trustor represents and warrants to and covenants and agrees with Lender and Trustee as follows:

Trustor warrants to Trustee for the benefit of Lender, and agrees to defend title to the Property against the claims of any Person or Governmental Authority, subject to the Permitted Encumbrances. This Security Instrument will have no further force or effect on the Termination Date. Trustee on behalf of

Lender will (unless otherwise required by Applicable Law) release this Security Instrument within 30 days after the Termination Date, at Trustor's expense.

Trustor acknowledges receiving good and valuable consideration, including the Indebtedness, to execute and deliver this Security Instrument.

AND Trustor represents and warrants to and covenants and agrees with Lender and Trustee as follows:

## ARTICLE I.
## Definitions and Loan Documents

1.1    <u>Loan Documents</u>.  All representations, covenants and other terms (including those terms that apply to all Loan Documents) of the other Loan Documents are, by reference, fully incorporated in this Security Instrument.  All covenants in the Loan Documents are covenants running with the Land.

1.2    <u>Definitions</u>.  Capitalized terms not otherwise defined below will have the meanings set forth in the Loan Agreement.  Each of the below capitalized terms has the following meaning:

"*737 S Broadway Borrower*" means **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company.

"*737 S Broadway Loan*" means that Loan made to 737 S Broadway Borrower in an amount equal to $16,9420,500.00.

"*737 S Broadway Loan Documents*" means the loan agreement, the 737 S Broadway Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the 737 S Broadway Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing 737 S Broadway Loan Documents.

"*737 S Broadway Property*" means the property located at 737 S. Broadway, Los Angeles, CA 90014.

"*737 S Broadway Security Instrument*" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by 737 S Broadway Borrower, in favor of the Trustee for the benefit of Lender concerning the 737 S Broadway Property.

"*Additional Land*" means all additional lands, estates and development rights hereafter acquired by Trustor for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental Deed of Trust or otherwise, be expressly made subject to the lien thereof.

"*Collateral*" means the Property and all of Trustor's other assets, whether now owned or hereafter acquired, including the Leases, and all proceeds from Trustor's assets.

"*Equipment*" means all machinery, equipment, fixtures, goods which are or are to become fixtures, furnishings, inventory and other property of every kind and nature whatsoever owned by Trustor or in which Trustor has or shall have an interest (to the extent of such interest) now or hereafter located upon the Real Property or appurtenant thereto and usable in connection with the present or future operation and occupancy of the Real Property and all building equipment, materials and supplies of any nature whatsoever owned by Trustor or in which Trustor has or shall have an interest (to the extent of such interest) now or hereafter located upon the Real Property or appurtenant thereto or usable in connection with the present or future operation and occupancy of the Real Property, including but not limited to all heating, ventilating, air conditioning, plumbing, lighting, communications and elevator machinery, equipment and fixtures.

"*Foreclosure Statute*" has the meaning set forth in <u>Section 4.2</u> below.

"*Foxdale Borrower*" means Negev Investments, LLC, a California limited liability company.

"*Foxdale Loan*" means that Loan made to Foxdale Borrower in an amount equal to $1,300,000.00.

"*Foxdale Loan Documents*" means the loan agreement, the Foxdale Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Foxdale Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Foxdale Loan Documents.

"*Foxdale Property*" means the property located at property known as "The Sandpiper" and located at 12800 Foxdale Drive, Desert Hot Springs, CA 92240.

"*Foxdale Security Instrument*" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by Foxdale Borrower, in favor of the Trustee for the benefit of Lender concerning the Foxdale Property.

"*South Los Angeles Borrower*" means SLA Investments LLC, a California limited liability company.

"*South Los Angeles Loan*" means that Loan made to South Los Angeles Borrower in an amount equal to $125,000.00.

"*South Los Angeles Loan Documents*" means the loan agreement, the South Los Angeles Security Instrument, the environmental indemnity agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the South Los Angeles Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing South Los Angeles Loan Documents.

"*South Los Angeles Property*" means the property located at 1040 S Los Angeles Street, Los Angeles, CA 90015.

"*South Los Angeles Security Instrument*" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by South Los Angeles Borrower, in favor of the Trustee for the benefit of Lender concerning the South Los Angeles Property.

"*Improvements*" means any and all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located on the Land or any part thereof.

"*Land*" the real property or properties described on *Exhibit A* attached hereto.

"*Loan Agreement*" means the Loan Agreement, dated as of the date hereof, between Lender and Borrower.

"*Payment Notice*" means Lender's notice to Tenant of an Event of Default Period.

"*Personal Property*" means all (i) Awards, (ii) Leases, (iii) all of Trustor's accounts (as defined in the UCC), goods (as defined in the UCC), fixtures, accessions (as defined in the UCC), general intangibles (as defined in the UCC), chattel paper (as defined in the UCC), investment property (as defined in the UCC) and deposits accounts (as defined in the UCC) (including any accounts opened in connection with cash management), which are ever situated on, derived from or used in connection with the Property, (iv) Additional Collateral, (v) all insurance policies covering the Property, the other Personal Property and the liability of any Trustor, Trustee or Lender, and all insurance proceeds from any of the policies, (vi) amounts deposited in the Tax and Insurance Escrow Account, and (vii) all proceeds of the Personal Property described in (i) – (vi).

"*Property*" means the Real Property and the Personal Property.

"*Real Property*" means, collectively, (i) the Land (as legally described in *Exhibit A* annexed to this Security Instrument), (ii) the Improvements, (iii) Leases, Rents and Awards, (iv) all fixtures, accessions and appurtenances to the Land or Improvements, (v) all easements and rights of way now or hereafter benefiting the Land, (vi) all of Trustor's interest in any lands adjoining the Land, (vii) all water and all of Trustor's water rights benefiting the Land, and (viii) all rights, estates and privileges appurtenant or incident to the foregoing.

"*Security Instrument*" means this Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, as amended, modified, restated and extended.

"*Termination Date*" means day on which Trustor fully pays the Indebtedness and performance all of Trustor's obligations under the Loan Documents.

"*Transferee*" means any Person, including Lender, who takes title to any Collateral after a Transfer Event.

"*Trustee*" means Fidelity National Title, and the successors and substitutes Lender designates.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code of the State of California, as amended.

1.3     Terms Generally; References and Titles.     References in this Security Instrument to "Articles," "Sections," "Exhibits" or "Schedules" will be to the Articles, Sections, Exhibits or Schedules of this Agreement unless otherwise specifically provided. All Exhibits and Schedules annexed to this Security Instrument are incorporated in, and are a part of, this Security Instrument for the purposes set forth in this Security Instrument. Any term defined in this Security Instrument may be used in the singular or plural. Words of any gender include all other genders. The terms "include," "includes," and "including" are followed by "without limitation". Except as otherwise specified or limited in this Security Instrument, a reference to any Person includes the successors and assigns of the Person. Unless otherwise specified all references "from" or "through" any date mean "from and including" or "through and including" the date. References to any statute or act include all related current regulations and all amendments and any successor statutes, acts and regulations. References to any statute or act, without additional reference, refer to federal statutes and acts of the United States. References to any agreement, instrument or document includes all schedules, exhibits, annexes and other attachments to the agreement, instrument or document.

1.4     Prepayment Premium.     Unless Lender specifically waives the Prepayment Premium (as defined in the Loan Agreement) in any purported payoff statement, the Prepayment Premium is due and payable as provided in the Loan Agreement.

## ARTICLE II.
## Assignment of Leases and Rents

2.1     Assignment.     For the Indebtedness and other good and valuable consideration, Trustor absolutely and unconditionally assigns and transfers to Lender (a) the Leases, (b) the Rents, and (c) any and all guaranties of payment of the Rent. Trustor does hereby absolutely and unconditionally assign to Lender its right, title and interest in all current and future Leases and Rents and all proceeds from the sale, cancellation, surrender or other disposition of the Leases, it being intended by Trustor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment to Lender shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise to impose any obligation upon Lender. Trustor agrees to execute and deliver to Lender such additional instruments in form and substance satisfactory to Lender, as may hereafter be requested by Lender to further evidence and confirm such assignment. Nevertheless, subject to the terms of this Section 2.1, Lender grants to Trustor a revocable license to operate and manage the Property and to collect the Rents. Trustor shall hold the Rents, or a

portion thereof sufficient to discharge all current sums due on the Indebtedness, in trust for the benefit of Lender for use in the payment of such sums. During an Event of Default Period, the license granted to Trustor herein shall be automatically revoked and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Property. Lender is hereby granted and assigned by Trustor the right, at its option, upon the revocation of the license granted herein to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license herein granted may be applied toward payment of the Indebtedness in such priority and proportion as Lender in its reasonable discretion shall deem proper. It is further the intent of Trustor and Lender that the Rents hereby absolutely assigned are no longer, during the term of this Security Instrument, property of Trustor or property of any estate of Trustor as defined in Section 541 of the Bankruptcy Code and shall not constitute collateral, cash or otherwise, of Trustor.

2.2     Application of Rent.

(a)        Each Tenant may, until Lender delivers a Payment Notice, pay Rent directly to Trustor (or its designee). Trustor shall hold all Rent it (or its designee) receives in trust for the benefit of Lender and the Loan. Unless Lender otherwise agrees, Trustor must first only use the Rent to satisfy obligations arising under the Loan Documents, including payment of all Real Estate Taxes, insurance premiums, maintenance and repair costs, for the Property.

(b)        After a Tenant receives a Payment Notice, Tenant shall pay directly to Lender all Rent thereafter accruing. Tenant is relieved of its obligations to pay Trustor under any Lease to the extent of all Rent Tenant pays to Lender.

(c)        Lender may use any Rent it receives for (in the priority and amounts as Lender determines in its discretion): (i) (1) the expenses to operate, maintain and manage the Property, and (2) the expenses incident to taking and retaining possession of the Property and collecting Rent; and (ii) the Indebtedness. The assignment in Section 2.1 above does not reduce the Indebtedness unless Lender actually receives Rent and applies it to the Indebtedness.

(d)        Lender may, at its option and without impairing its rights under the assignment in this Section 2.1, release any Rent Lender receives to Trustor.

(e)        As between Trustor, Lender and any other Person, except a Tenant who has not received a Payment Notice, the assignment in Section 2.1 above is absolute, unconditional and presently effective. Lender's delivery of a Payment Notice is solely for the benefit and protection of each Tenant and does not otherwise benefit or affect Trustor or any Person claiming through or under Trustor.

(f)        Lender is not required to institute legal proceedings to enforce the terms of this Section.

2.3     No Third Party Beneficiary. The assignment in Section 2.1 above is not made for the benefit of any Person other than Lender.

2.4     Release and Termination. The assignment in Section 2.1 above terminates upon Lender's release of this Security Instrument.

ARTICLE III.
**Leases**

3.1     Intentionally Omitted.

3.2     Approval. Except as set forth below and in the Loan Agreement, no Lease (including any Lease amendments) will be effective unless approved by Lender.

3.3     Terms. Notwithstanding the terms of any Lease made on or after the Closing Date, each Lease is subordinate to this Security Instrument and each Tenant shall, if Lender elects, execute an instrument (in form and substance acceptable to Lender in its sole discretion) subordinating the Tenant's

leasehold interest to Lender's liens and security interests.  Unless Lender specifically agrees in writing, no Leases may impose obligations upon Lender or any Transferee prior to or following a Transfer Event.

3.4    <u>Lender's Preapproval</u>.  Notwithstanding <u>Section 3.2</u> above and subject to <u>Sections</u> **Error! Reference source not found.** and <u>3.3</u> above, Trustor may enter into and modify, but not terminate, Leases (except ground or master Leases) that:

(a)        are with Tenants who are not affiliated with Trustor;

(b)        do not grant Tenant's more than 1 month of free rent for each year of the lease or renewal term or any reduced Rents, except as permitted pursuant to clause (d) hereof;

(c)        do not afford Tenants any termination rights;

(d)        are an arm's length transaction on economic terms conforming to current market conditions;

(e)        have a market rental rate; and

(f)        do not contain any rights of first refusal or options to purchase.

ARTICLE IV.
<u>Remedies</u>

4.1    <u>Possession</u>.  During an Event of Default Period, Lender may (a) enter upon and take possession of the Property and (b) exercise, without Trustor's interference, any rights which Trustor has with respect to the managing, possessing, operating, leasing, protecting or preserving the Property.  If Lender rents any of the Property, Lender will do so for the account of Trustor, and Lender may deduct from the Rents all expenses and liabilities Lender incurs in collecting the Rents and in managing, operating, maintaining, protecting or preserving the Property.  Lender may apply any remaining Rents to the Indebtedness in any manner Lender chooses.  All costs, expenses and liabilities Lender incurs in collecting the Rents and in managing, operating, maintaining, protecting or preserving the Property, which exceed the Rents Lender actually collects from Tenants will be Additional Costs.  If Lender elects to take possession of the Property, then Trustor will quietly surrender possession of the Property.  If Trustor fails to quietly surrender possession of the Property, then Lender may invoke all legal remedies to dispossess Trustor.

4.2    <u>Foreclosure</u>.  Trustor grants Trustee on behalf of Lender a power of sale.  During an Event of Default Period, Trustee, if Lender directs, on behalf of Lender may exercise the power of sale and foreclose the liens and security interests created by this Security Instrument in any manner provided at law or in equity (as amended, replaced or re-codified, the "***Foreclosure Statute***").  If the Foreclosure Statute is no longer in force or effect, then, in addition to Lender's other rights at law or in equity, Lender may foreclose pursuant to the rules set forth in the last effective Foreclosure Statute.  In addition to the power of sale and non-judicial foreclosure rights granted to Trustee on behalf of Lender, if Trustee on behalf of Lender desires, then Trustee on behalf of Lender may file suit on the Indebtedness and for the foreclosure of the liens and security interests created by this Security Instrument.

4.3    <u>Receiver</u>.  In addition to all other remedies in the Loan Documents, at law or in equity, during an Event of Default Period, (a) without notice to any Trustor Party, (b) whether or not Trustor is solvent, (c) whether or not a Trustor Party commits fraud or mismanages the Property, (d) even if the Property is sufficient to repay the Indebtedness, or (e) without filing any proceeding other than a proceeding seeking the appointment of a receiver, Lender will be entitled to the appointment of a receiver or receivers for the Property and the Rents.  Trustor irrevocably consents to the appointment of a receiver and waives all defenses to any Lender application for a receiver.  During a receivership for the Property, Trustor irrevocably consents to (i) Lender commencing any additional proceeding to enforce any other right or remedy under the Loan Documents, at law or in equity, and (ii) Trustee on behalf of Lender conducting a non-judicial sale of the Collateral pursuant to the Foreclosure Statute.  Any money Lender advances in

connection with a receivership will be Additional Costs. This *Section* is an express condition upon which the Loan is made.

4.4    Proceeds of Sale. The proceeds of any Trustee's or receiver's sale of the Property in foreclosure of the liens evidenced by this Security Instrument will be:

**FIRST**, applied to the payment of all costs of the sale, and a reasonable fee, to Trustee acting under Section 4.2 above; **SECOND**, applied to the Indebtedness, in the order Lender elects, until the Indebtedness is paid in full; and **THIRD**, the remainder, if any, paid to any Person (including Trustor) as required by Applicable Law.

4.5    Lender as Purchaser. Lender may purchase the Property at any foreclosure sale. In connection with any foreclosure sale, Lender may credit bid in an amount up to the Indebtedness then owed to Lender.

4.6    Uniform Commercial Code. During an Event of Default Period, Lender may exercise its rights of enforcement with respect to the Collateral under the UCC. In addition to or in substitution for Lender's UCC rights and remedies:

(a)    Lender may enter upon the Property to take possession of, assemble and collect the Collateral or to render it unusable, subject to the rights of any Tenants;

(b)    Lender may require Trustor to assemble the Collateral and make it available at the Property or any place Lender designates which is mutually convenient to allow Lender to take possession or dispose of the Collateral;

(c)    Lender may mail written notice to Trustor as provided in the Loan Agreement ten (10) days prior to the date of any sale of the Collateral, and such notice will constitute reasonable notice under the UCC;

(d)    Lender need not take possession of the Collateral prior to any Transfer Event; and

(e)    prior to applying Transfer Event proceeds to the Indebtedness, Lender may apply the proceeds to the reasonable expenses (including Lender's legal expenses and reasonable attorneys' fees, including allocated in-house counsel expenses) incurred to collect the Indebtedness, enforce the Loan Documents or to take possession of, hold or prepare the Collateral for transfer.

4.7    Delivery of Possession After Foreclosure. Immediately after a Transfer Event, Trustor and any Person claiming any Collateral interest by, through or under Trustor, who is occupying or using the Property or other Collateral, will become the tenant or lessee of the Transferee. Subject to the terms of the applicable Lease and to any non-disturbance and attornment agreement between Lender and a Tenant, the post-Transfer Event tenancy will be a tenancy at will, terminable at the will of either Transferee or the tenant, at a daily fair market rental. If a Tenant fails to surrender possession of the Collateral to Transferee after Transferee's demand, then Transferee may institute and maintain an action for forcible entry and detainer of the Property.

ARTICLE V.<br>
<strong><u>Miscellaneous</u></strong>

5.1    Successor Trustee. Lender may remove Trustee, or Trustee may resign, at any time with or without cause. If Trustee dies, resigns or is removed, then Lender may, in writing, appoint a successor or substitute trustee. Lender may exercise its right to remove any Trustee or appoint any number of successor or substitute trustees as often as Lender desires until the Termination Date. Lender may appoint a single or multiple substitute trustees to act instead of the original trustee. If multiple substitute trustees are appointed, then each may act alone without the other substitute trustees. Immediately after a successor or substitute trustee is appointed, (i) all of the Trustee's estate in and title to the Collateral vests in the

successor or substitute trustee(s), (ii) the successor or substitute trustee(s) will succeed to all rights, powers, privileges and immunities conferred upon Trustee, and (iii) the prior Trustee(s) shall assign, transfer and deliver to the successor or substitute Trustee(s) all of the Collateral the prior Trustee holds. Upon the written request of Lender or of the successor or substitute Trustee(s), the prior Trustee shall execute and deliver an instrument transferring to the successor or substitute Trustee(s) all of the estate in and title to the Collateral.

5.2    Authorization to File Financing Statement. Trustor authorizes Lender to file in any jurisdiction a reproduction of this Security Instrument or financing statements covering the Collateral. If Lender desires, Lender may describe the Collateral in any financing statement as "*all assets*" of Trustor or words of similar effect.

5.3    Fixture Filing. This Security Instrument is a financing statement filed as a fixture filing. For purposes of this Security Instrument being a financing statement: Trustor is the debtor, Lender is the secured party, and the collateral is the Personal Property, including fixtures.

5.4    Dealing with Successor. If Trustor no longer owns the Collateral, then Lender may, without notice to Trustor, deal with Trustor's successor in interest concerning this Security Instrument and the Indebtedness in the same manner as with Trustor, without in any way vitiating or discharging Trustor's liability under the Loan Documents or for the Indebtedness. Notwithstanding the foregoing, Lender does not consent to any transfer of the Collateral, except as expressly set forth in the Loan Documents or as Lender hereafter agrees in writing.

5.5    Subrogation. If Loan proceeds pay indebtedness secured by any outstanding lien, security interest or prior encumbrance against the Collateral, then Lender has advanced the proceeds at Trustor's request and Lender is subrogated to all rights, security interests and liens held by the holder of the outstanding liens, security interests or encumbrances, irrespective of whether the liens, security interests or encumbrances are released. However, the terms and provisions of the Loan Documents will govern the rights and remedies of Lender and supersede the terms, provisions, rights and remedies under and pursuant to the instruments creating the original lien, security interest or encumbrance.

5.6    Application of Indebtedness. If this Security Instrument or any of the Collateral cannot lawfully secure any of the Indebtedness or if the liens or security interests created by this Security Instrument are invalid or unenforceable as to any of the Indebtedness or any of the Collateral, then all payments made on the Indebtedness will be applied first to all of the Indebtedness which is not secured by this Security Instrument or the Collateral.

5.7    Agents. Lender or Trustee may appoint one or more Persons as agent to perform any act necessary or incidental to any sale of the Collateral, in the name and on behalf of Lender or Trustee.

5.8    Transfer Recitals. All statements of fact in any instrument evidencing a Transfer Event concerning (i) nonpayment of the Indebtedness, (ii) any Event of Default, (iii) acceleration of the Indebtedness, or (iv) any other matter, are prima facie evidence of the truth of the recited fact.

5.9    Notices. Any notice required or permitted to be given under this Security Instrument shall be in writing and either (a) shall be mailed by certified mail, postage prepaid, return receipt requested, or (b) sent by overnight air courier service, or (c) personally delivered to a representative of the receiving party, or (d) sent by facsimile or email. All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

To Lender:        Archway Real Estate Income Fund I SPE I, LLC
                  1875 Century Park East. Suite #900
                  Los Angeles, CA 90067
                  Attention: Joshua Kohan
                  Phone: (310) 893-5277

Email: joshua@archwayfund.com

with a copy to:   Thompson Coburn LLP
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 282-2520
Email: jmogin@thompsoncoburn.com

To Trustor:   c/o David Halevy
257 S. Linden Drive
Beverly Hills CA 90212
Phone: (310) 666-2885
Email: danhalevy@gmail.com

with a copy to   Locke Lord LLP
300 S. Grand Ave., Suite 2600
Los Angeles, CA 90071
Attention: David S. Kupetz
Phone: (213) 687-6774
Email: David.Kupetz@lockelord.com

Trustee:   Fidelity National Title
555 S. Flower Street, Suite 4420
Los Angeles, CA 90071
Attention: JB Jennings
Phone: (213) 452-7100
Email: JB.Jennings@fnf.com

Any notice so addressed and sent by United States mail or overnight courier shall be deemed to be given on the earliest of (1) when actually delivered, (2) on the first Business Day after deposit with an overnight air courier service, or (3) on the third Business Day after deposit in the United States mail, postage prepaid, in each case to the address of the intended addressee. Any notice so delivered in person shall be deemed to be given when receipted for by, or actually received by, Lender or Indemnitor, as the case may be. Notices transmitted by facsimile or email shall be deemed received on the date of transmission, provided that a confirming copy of such notice is also sent by mail, overnight courier or personal delivery, as provided above. Either party may designate a change of address by written notice to the other by giving at least ten (10) days prior written notice of such change of address.

## ARTICLE VI.
## **Concerning the Trustee**

6.1  <u>Trustee's Fees</u>.  Trustor shall pay all costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

6.2    <u>Substitute Trustee</u>. Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction. Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for willful negligence or misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof. Lender may remove Trustee at any time or from time to time and select a successor trustee by filing the appropriate instrument in the office where this Security Instrument is recorded. Trustor hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, with full power of substitution to file, execute and record any document required to appoint such substitute trustee. In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever, Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender. The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise. Trustor agrees to the foregoing for itself, its successors and assigns.

6.3    <u>Power of Sale</u>.

(a)    Upon the occurrence of an Event of Default, Trustee, or the agent or successor of Trustee, at the request of Lender, shall sell or offer for sale the Property in such portions, order and parcels as Lender may determine with or without having first taken possession of same, to the highest bidder for cash at one or more public auctions in accordance with the terms and provisions of the law of the State in which the Property is located. Such sale shall be made at the area within the courthouse of the county in which the Property (or any portion thereof to be sold) is situated (whether the parts or parcels thereof, if any, in different counties are contiguous or not, and without the necessity of having any Personal Property hereby secured present at such sale) which is designated by the applicable court of such County as the area in which public sales are to take place, or, if no such area is designated, at the area at the courthouse designated in the notice of sale as the area in which the sale will take place, on such day and at such times as permitted under applicable law of the State where the Property is located, after advertising the time, place and terms of sale and that portion of the Property in accordance with such law, and after having served written or printed notice of the proposed sale by certified mail on each Trustor obligated to pay the Note and other secured indebtedness secured by this Security Instrument according to the records of Lender in accordance with applicable law. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

(b)    At any such public sale, Trustee may execute and deliver in the name of Trustor to the purchaser a conveyance of the Property or any part of the Property in fee simple. In the event of any sale under this Security Instrument by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Property may be sold in its entirety or in separate parcels and in such manner or order as Lender in its sole discretion may elect, and if Lender so elects, Trustee may sell the Personal Property covered by this Security Instrument at one or more separate sales in any manner permitted by the Uniform Commercial Code of the State in which the Property is located, and one or more exercises of the powers herein granted shall not extinguish or exhaust such powers, until all the Property is sold or the Note and other secured indebtedness is paid in full. If the Note and other secured indebtedness is now or hereafter further secured by any chattel mortgages, pledges, contracts or guaranty, assignments of lease, or other security instruments, Lender at its option may exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as Lender may determine.

(c)     Upon any foreclosure sale or sales of all or any portion of the Property under the power herein granted, Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the Indebtedness as a credit to the purchase price.

(d)     In the event of a foreclosure or a sale of all or any portion of the Property under the power herein granted, the proceeds of said sale shall be applied, in whatever order Lender in its sole discretion may decide, to the expenses of such sale and of all proceedings in connection therewith (including, without limitation, attorneys' fees and expenses), to fees and expenses of Trustee (including, without limitation, Trustee's attorneys' fees and expenses), to insurance premiums, liens, assessments, taxes and charges (including, without limitation, utility charges advanced by Lender), to payment of the outstanding principal balance of the Indebtedness, and to the accrued interest on all of the foregoing; and the remainder, if any, shall be paid to Trustor, or to the person or entity lawfully entitled thereto.

(e)     In case Trustee shall have proceeded to enforce any right or remedy under this Security Instrument by foreclosure, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Lender, then in every case, Trustor, Lender and Trustee shall be restored to their former positions and the rights, powers and remedies of Lender and Trustee herein provided or arising, or existing otherwise as herein set forth shall continue as if no such proceeding had been taken.

6.4     <u>Acceptance by Trustee</u>.  Trustee accepts the Property when this Security Instrument, duly executed and acknowledged, becomes a public record as provided by law.  Trustee shall not be obligated to perform any act required hereunder unless the performance of such act is requested in writing and Trustee is reasonably indemnified against loss, cost, liability and expense.

6.5     <u>Acts of Trustee</u>.  From time to time, upon written request of Lender and without affecting the liability of any person for payment of any indebtedness or performance of the obligations secured hereby, Trustee may, without liability therefor and without notice reconvey all or any part of the Property; consent to the making of any map or plat thereof; join in granting any easement thereon; join in any declaration of covenants and restrictions; or join in any extension agreement or any agreement subordinating the lien or charge hereof.  Trustee may from time to time apply in any court of competent jurisdiction for aid and direction in the execution of the trust hereunder and the enforcement of the rights and remedies available hereunder, and Trustee may obtain orders or decrees directing or confirming or approving acts in the execution of said trust and the enforcement of said remedies.  Trustee has no obligation to notify any party of any pending sale or any action or proceeding unless held or commenced and maintained by Trustee under this Security Instrument.

6.6     <u>No Liability of Trustee</u>.  The Trustee shall not be liable for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except due to the Trustee's gross negligence, breach of agreement, fraud or willful misconduct.  The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by them hereunder, believed by the Trustee in good faith to be genuine.  All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law or under the Loan Documents), and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder.

6.7     <u>Trustee Powers</u>.  Trustee may exercise any of its powers through appointment of attorney-in-fact or agents.  Trustee may select and employ legal counsel at the expense of Trustor.

6.8     <u>Priority</u>.  All amounts advanced by either of Lender or Trustee hereunder shall be secured by this Security Instrument with priority dating back to the date of the grant of this Security Instrument.

6.9    <u>Ratification</u>. Trustor hereby ratifies and confirms every act that Trustee and its successors may lawfully do at the Property by virtue of powers granted to Trustee hereunder.

## ARTICLE VII.
## State Law Provisions

7.1    <u>Conflicts</u>. This <u>Article VII</u> will control any conflict between the terms of this <u>Article VII</u> and the other provisions of this Security Instrument and the other Loan Documents.

7.2    <u>Full Reconveyance</u>. Upon written request of Lender stating that all sums secured hereby have been paid, upon surrender to Trustee of the Note and the original or a certified copy of this Security Instrument for cancellation and retention, and upon payment of its fees, Trustee shall fully reconvey, without warranty, the entire remaining Property then held hereunder. The recitals in such reconveyance of any matters of facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

7.3    <u>Dwellings</u>. No portion of the proceeds of the Loan shall be used by Trustor to finance the purchase or construction of real property containing four (4) or fewer residential units or on which four (4) or fewer residential units are to be constructed. No portion of the Property is or will be a "dwelling" within the meaning of Section 10240.1 or Section 10240.2 of the California Business and Professions Code.

7.4    <u>Civil Code</u>. Trustor represents, warrants and acknowledges that the Loan is not subject to the provisions of Chapter 3, Title IV, Part 4, Division Third of the Civil Code of the State of California (Civil Code Sections 1912 et seq.) other than Section 1916.1 thereof.

7.5    <u>Indemnity; Expenses</u>. Trustor will pay or reimburse the Trustee and the Lender for all reasonable attorneys' fees, costs and expenses incurred by either of them in any suit, action, legal proceeding or dispute of any kind in which either of them is made a party or appears as party plaintiff or defendant, affecting the Indebtedness, this Security Instrument or the interest created herein, or the Property, or any appeal thereof, including, but not limited to, activities related to enforcement of the remedies of Lender, activities related to protection of Lender's collateral, any foreclosure action or exercise of the power of sale, any condemnation action involving the Property or any action to protect the security hereof, any bankruptcy or other insolvency proceeding commenced by or against Trustor, and any such amounts paid or incurred by the Trustee or the Lender shall be added to the Indebtedness and shall be secured by this Security Instrument. The agreements of this subsection shall expressly survive in perpetuity satisfaction of this Security Instrument and repayment of the Indebtedness, any release, reconveyance, discharge of foreclosure of this Security Instrument, conveyance by deed in lieu of foreclosure, sale, and any subsequent transfer by trustee's conveyance of the Property. Notwithstanding the forgoing, Trustor shall have no liability under this Section for any fees, costs or expenses arising solely from the gross negligence, fraud, or willful misconduct of Lender.

7.6    <u>Supplemental Environmental Provisions</u>. In the event that any portion of the Property is determined to be "environmentally impaired" (as "environmentally impaired" is defined in California Code of Civil Procedure Section 726.5(e)(3)) or to be an "affected parcel" (as "affected parcel" is defined in California Code of Civil Procedure Section 726.5(e)(1)), then, without otherwise limiting or in any way affecting Lender's or Trustee's rights and remedies under this Security Instrument, Lender may elect to exercise its right under California Code of Civil Procedure Section 726.5(a) to (i) waive its lien on such environmentally impaired or affected portion of the Property, and (ii) exercise the rights and remedies of an unsecured creditor, including reduction of its claim against Trustor to judgment and any other rights and remedies permitted by law. Lender shall have the right under Section 7.1 of this Security Instrument to allocate amounts recovered on the Indebtedness first to those portions thereof other than damages and other

amounts recoverable under California Code of Civil Procedure Section 736, and thereafter to damages and other amounts recoverable under said Section.

7.7     Foreclosure By Power of Sale.

(i)     Should Lender elect to foreclose by exercise of the power of sale herein contained, Lender shall deliver to Trustee a written declaration of default and demand for sale, and shall deposit with Trustee this Security Instrument and the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

(a)     Upon receipt of notice from Lender, Trustee shall cause to be recorded, published and delivered to Trustor such notice of default and election to sell as is then required by law. Trustee shall, without demand on Trustor, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale having been given as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole, or in separate lots or parcels or items and in such order as Lender may direct Trustee so to do, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matter or fact shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Trustor, Trustee or Lender, may purchase at such sale, and Trustor hereby covenants to warrant and defend the title of such purchaser or purchasers.

(b)     Subject to applicable law, Trustee may postpone the sale of all or any portion of the Property by public announcement at the time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

7.8     Separate Sales. The Property may be sold in one or more parcels and in such manner and order as Lender, in its sole discretion, may direct Trustee so to do. A sale of less than the whole of the Property or any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein, and subsequent sales may be made hereunder until all obligations secured hereby have been satisfied, or the entire Property sold, without defect or irregularity.

7.9     Release of and Resort to Collateral. Lender may release, regardless of consideration and without the necessity for any notice to a consent by the holder of any subordinate lien on the Property, any part of the Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interests created in or evidenced by the Loan Documents or their stature as a first and prior lien and security interest in and to the Property. For payment of the Indebtedness, Lender may resort to any other security in such order and manner as Lender may elect.

7.10     Waiver of Redemption, Notice and Marshalling of Assets. To the fullest extent permitted by law, Trustor hereby irrevocably and unconditionally waives and releases (i) all benefit that might accrue to Trustor by virtue of any present or future statute of limitations or law or judicial decision exempting the Property from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment, (ii) all notices of any Event of Default or of Trustee's election to exercise or his actual exercise of any right, remedy or recourse provided for under the Loan Documents, and (iii) any right to a marshalling of assets or a sale in inverse order of alienation.

7.11     Discontinuance of Proceedings. If Lender shall have proceeded to invoke any right, remedy or recourse permitted under the Loan Documents and shall thereafter elect to discontinue or abandon it for any reason, Lender shall have the unqualified right to do so and, in such an event, Trustor

and Lender shall be restored to their former positions with respect to the Indebtedness, the Loan Documents, the Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if the right, remedy or recourse had never been invoked, but no such discontinuance or abandonment shall waive any Event of Default which may then exist or the right of Lender thereafter to exercise any right, remedy or recourse under the Loan Documents for such Event of Default.

7.12    No Mortgagee in Possession.  Neither the enforcement of any of the remedies under this Security Instrument nor any other remedies afforded to Lender under the Loan Documents, at law or in equity, shall cause Lender or Trustee to be deemed or construed to be a mortgagee in possession of the Property, to obligate Lender or Trustee to lease the Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.

7.13    Concerning the Trustee.  With the approval of Lender, Trustee shall have the right to take any and all of the following actions:  (i) to select, employ and consult with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution and interpretation of the Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his or her agents or attorneys, (iii) to select and employ, in and about the execution of his or her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee (and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence, bad faith, fraud or willful misconduct), and (iv) any and all other lawful action that Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property.  Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting any action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine.  Trustee shall be entitled to reimbursement for expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.  Trustor will, from time to time, pay the compensation due to Trustee hereunder and reimburse Trustee for, and save and hold Trustee harmless against, any and all liability and expenses which may be incurred by Trustee in the performance of Trustee's duties.

7.14    Retention of Money.  All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, and shall be segregated from any other moneys of Trustee.

7.15    Successor Trustees.  Trustee may resign by the giving of notice of such resignation in writing to Lender.  If Trustee shall die, resign or become disqualified from acting in the execution of this trust, or if, for any reason, Lender, in Lender's sole discretion and with or without cause, shall prefer to appoint a substitute trustee or multiple substitute trustees, or successive substitute trustees or successive multiple substitute trustees, to act instead of the aforenamed Trustee, Lender shall have full power to appoint a substitute trustee (or, if preferred, multiple substitute trustees) in succession who shall succeed (and if multiple substitute trustees are appointed, each of such multiple substitute trustees shall succeed) to all the estates, rights, powers and duties of the aforenamed Trustee.  Such appointment may be executed by any authorized agent of Lender, and if such Lender be a corporation and such appointment be executed on its behalf by any officer of such corporation, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any

superior officer of the corporation. Trustor hereby ratifies and confirms any and all acts which the aforenamed Trustee, or his or her successor or successors in this trust, shall do lawfully by virtue hereof. If multiple substitute trustees are appointed, each of such multiple substitute trustees shall be empowered and authorized to act alone without the necessity of the joinder of the other multiple substitute trustees, whenever any action or undertaking of such substitute trustees is requested or required under or pursuant to this Security Instrument or applicable law. Any prior election to act jointly or severally shall not prevent either or both of such multiple substitute Trustees from subsequently executing, jointly or severally, any or all of the provisions hereof.

7.16    Perfection of Appointment. Should any deed, conveyance, or instrument of any nature be required from Trustor by any Trustee or substitute Trustee to more fully and certainly vest in and confirm to Trustee or substitute Trustee such estates, rights, powers, and duties, then, upon request by Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Trustor.

7.17    Succession Instruments. Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its, his or her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in such Trustee's place.

7.18    No Representation by Trustee or Lender. By accepting or approving anything required to be observed, performed, or fulfilled or to be given to Trustee or Lender pursuant to the Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, neither Trustee nor Lender shall be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or affirmation with respect thereto by Trustee or Lender.

7.19    Border Zone. To Trustor's knowledge, Trustor represents to Lender that, as of the date hereof, the Property has not been designated as "border zone property" under the provisions of California Health and Safety Code, Sections 25220 et. seq. and there has been no occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be designated as Border Zone Property.

## ARTICLE VIII.
## Cross Default And Cross Collateralization.

8.1    737 S Broadway. In addition to the obligations herein, Trustor shall also be subject to the payment and performance of all obligations secured by:

(a)    The 737 S Broadway Security Instrument made by 737 S Broadway Borrower made in connection the 737 S Broadway Loan, which 737 S Broadway Security Instrument secures a lien on the 737 S Broadway Property;

(b)    In addition to the obligations secured by the 737 S Broadway Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)    An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under 737 S Broadway Security Instrument and the 737 S Broadway Loan.

(d)    An Event of Default under the 737 S Broadway the Security Instrument or the 737 S Broadway Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)    Trustor waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the 737 S Broadway Security Instrument or the exercise of Trustor's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Trustor makes this waiver for itself, for all persons and entities claiming through or under Trustor and for persons and entities who may acquire a lien or security interest on all or any part of the 737 S Broadway Loan and Collateral described in the 737 S Broadway Security Instrument or herein.

8.2    <u>South Los Angeles</u>.  In addition to the obligations herein, Trustor shall also be subject to the payment and performance of all obligations secured by:

(a)    The South Los Angeles Security Instrument made by South Los Angeles Borrower made in connection the South Los Angeles Loan, which South Los Angeles Security Instrument secures a lien on the South Los Angeles Property;

(b)    In addition to the obligations secured by the South Los Angeles Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)    An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under South Los Angeles Security Instrument and the South Los Angeles Loan.

(d)    An Event of Default under the South Los Angeles the Security Instrument or the South Los Angeles Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)    Trustor waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the South Los Angeles Security Instrument or the exercise of Trustor's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Trustor makes this waiver for itself, for all persons and entities claiming through or under Trustor and for persons and entities who may acquire a lien or security interest on all or any part of the South Los Angeles Loan and Collateral described in the South Los Angeles Security Instrument or herein.

8.3    <u>Foxdale</u>.  In addition to the obligations herein, Trustor shall also be subject to the payment and performance of all obligations secured by:

(a)    The Foxdale Security Instrument made by Foxdale Borrower made in connection the Foxdale Loan, which Foxdale Security Instrument secures a lien on the Foxdale Property;

(b)    In addition to the obligations secured by the Foxdale Security Instrument shall also secure the payment and performance of all obligations secured by this Loan.

(c)      An Event of Default under the Note, the Security Instrument or any of the other Loan Documents shall constitute an Event of Default under Foxdale Security Instrument and the Foxdale Loan.

(d)      An Event of Default under the Foxdale the Security Instrument or the Foxdale Loan shall constitute an Event of Default under this Security Instrument and the Loan.

(e)      Trustor waives all rights to have all or part of the Collateral described herein and the Land marshalled upon any foreclosure of the Foxdale Security Instrument or the exercise of Trustor's rights and remedies hereunder.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of the Land and Collateral described in either or both of said security instruments as a whole or in separate parcels, in any order that Lender may designate.  Trustor makes this waiver for itself, for all persons and entities claiming through or under Trustor and for persons and entities who may acquire a lien or security interest on all or any part of the Foxdale Loan and Collateral described in the Foxdale Security Instrument or herein.

8.4      Payoff.  Notwithstanding anything to the contrary contained herein, Trustor shall not pay off the this Loan while the 737 S Broadway Loan, the Greenfield PH Loan or the Foxdale Loan remain outstanding.

ARTICLE IX.
**Additional Security**

9.1      Additional Security – Obligations Secured by Additional Mortgages.  In addition to the obligations secured by this Security Instrument and described as obligations herein, this Security Instrument shall also secure the payment and performance of all obligations secured by that certain Deeds of Trust, Security Agreement and Fixture Filing made by Borrower, as Borrower, for the benefit of Lender, its successors and assigns forever, as beneficiary, dated as of the date hereof (collectively ,the "***Additional Security Instrument***") with respect to the properties more commonly known as the addresses set forth on the Property Schedule attached as Exhibit B under "***Additional Properties*.**"

9.2      Secured Payment and Performance.  In addition to the obligations secured by the Additional Security Instrument, the Additional Security Instrument shall also secure the payment and performance of all obligations secured by this Security Instrument.

9.3      Cross Default.  An Event of Default under any of the Additional Security Instrument, as defined therein, shall, at Lender's option, constitute an Event of Default under this Security Instrument. An Event of Default under this Security Instrument shall, at Lender's option, constitute an Event of Default under the Additional Security Instrument.

9.4      Waiver of Marshalling.  Trustor waives all rights to have all or part of the Property described in this Security Instrument and/or the Additional Security Instrument marshalled upon any foreclosure of this Security Instrument or any foreclosure of the Additional Security Instrument.  Lender shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of, the Property described in any of said Additional Security Instruments as a whole or in separate parcels, in any order that Lender may designate.  Trustor makes this waiver for itself, for all persons and entities claiming through or under Trustor and for persons and entities who may acquire a lien or security interest on all or any part of the Property described in either of said Additional Security Instrument, or on any interest therein.

9.5      Additional Representations and Warranties of Trustor.

(a)    Trustor represents and warrants that the lien of the Additional Security Instrument is a first lien on each of the properties described therein and covered thereby and that the provisions of this Security Instrument will not cause intervening liens to become prior to the lien of any of the Additional Security Instrument.  If any intervening lien exists or hereafter arises, Trustor shall cause the same to be released or subordinated to the lien of the Additional Security Instrument, without limiting any other right or remedy available to Lender.

(b)    Trustor further warrants that Trustor has no legal or equitable claim against any Trustor named in the Additional Security Instrument which would be prior to the lien of the Additional Security Instrument, or which would entitle Trustor to a judgment entitling Trustor to an equitable lien on all or any portion of that property prior in lien to the Additional Security Instrument.

(c)    Except as supplemented and/or modified by this Security Instrument, all of the terms, covenants and conditions of the Additional Security Instrument and the other loan documents executed in connection therewith shall remain in full force and effect.

(d)    Trustor and Lender acknowledge and agree that: this Security Instrument shall constitute a lien or charge upon only that property described herein as the "***Property***;" and the Additional Security Instrument shall constitute liens or charges upon only that property described therein as the "***Property***."

9.6    <u>Release</u>. This Security Instrument shall not be released until all the entire Loan in paid in full.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Trustor has executed this Security Instrument on the date of the below acknowledgement, but to be effective on the Closing Date.

**TRUSTOR:**

_____
**DAVID HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010,**
**by Daniel Halevy as his attorney in fact**

_____
**SUE HALEVY, Trustee of**
**the Halevy Family Trust dated September 8, 2010**

SIGNATURE/NOTARY PAGE
TO
SECURITY INSTRUMENT

ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF *LOS ANGELES*

On *APRIL 17*___, 20*23*, before me, *ALAN KABAKER*___ (a notary public),
personally appeared ___*DANIEL X/X LEVY*___, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

ALAN KABAKER
COMM. # 2307449
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. OCT. 28, 2023

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF *LOS ANGELES*

On *APRIL 17*___, 20*23*, before me, *ALAN KABAKER*___ (a notary public),
personally appeared *SUE HALEVY*___, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

ALAN KABAKER
COMM. # 2307449
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. OCT. 28, 2023

SIGNATURE/NOTARY PAGE
TO
SECURITY INSTRUMENT

## EXHIBIT A

LEGAL DESCRIPTION OF LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 1118 TRACT 6380, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 69 PAGES 11 TO 20 INCLUSIVE OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXHIBIT A
TO
SECURITY INSTRUMENT

## EXHIBIT B

## PROPERTY

133 South Palm Dr, Apt 0005, Beverly Hills, CA 90212

## ADDITIONAL PROPERTIES

3538 Greenfield Avenue, Los Angeles, CA,

8561 Horner Street, Los Angeles, CA 90035

EXHIBIT B
TO
SECURITY INSTRUMENT

# EXHIBIT 2

| ESTATE OF *(Name)*:  DAVID HALEVY                DECEDENT | CASE NUMBER:  24STPB01963 |

### FACTS SUPPORTING THE CREDITOR'S CLAIM
[X] See attachment *(if space is insufficient)*

| Date of item | Item and supporting facts | Amount claimed |
|---|---|---|
| | LOAN OBLIGATION: | |
| 07/21/2021 | Principal funding                $ 16,942,500.00 | |
| | - Less all payments and credits (from 07/21/2021-06/02/2023) | |
| | + Plus all interest and charges (from 07/21/2021-06/02/2023) | |
| | Subtotal: | 14,517,141.08 |
| | NEW LOAN OBLIGATIONS: | |
| 04/14/2023 | Principal funding                $ 4,000,000.00 | |
| | - Less all payments and credits (from 04/14/2023-06/02/2023) | |
| | + Plus all interest and charges (from 04/14/2023-06/02/2023) | |
| | Negev Guaranty subtotal: | 119,062.50 |
| | SLA Continuing Guaranty subtotal: | 2,452,687.50 |
| | Personal Guarantors Loan subtotal: | 1,238,250.00 |
| | (SEE ATTACHMENT) | |
| | **TOTAL:** | $ 18,327,141.08 |

**PROOF OF** [X] **MAILING** [ ] **PERSONAL DELIVERY   TO PERSONAL REPRESENTATIVE**
*(Be sure to mail or take the original to the court clerk's office for filing)*

1. I am the creditor or a person acting on behalf of the creditor. At the time of mailing or delivery I was at least 18 years of age.
2. My residence or business address is *(specify)*:
   300 Corporate Pointe, Suite 320, Culver City, CA 90230
3. I mailed or personally delivered a copy of this *Creditor's Claim* to the personal representative as follows *(check either a or b below)*:
   a. [X] **Mail.** I am a resident of or employed in the county where the mailing occurred.
      (1) I enclosed a copy in an envelope AND
         (a) [ ] **deposited** the sealed envelope with the United States Postal Service with the postage fully prepaid.
         (b) [X] **placed** the envelope for collection and mailing on the date and at the place shown in items below following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.
      (2) The envelope was addressed and mailed first-class as follows:
         (a) Name of personal representative served: Daniel Halevy
         (b) Address on envelope: 8561 Horner St., Los Angeles, CA 90035
            COPY: David Soffer, Soffer Law Group, 345 N. Maple Dr #386, Beverly Hills, CA 90210
         (c) Date of mailing: May 30, 2024
         (d) Place of mailing *(city and state)*: Culver City, California
   b. [ ] **Personal delivery.** I personally delivered a copy of the claim to the personal representative as follows:
      (1) Name of personal representative served:
      (2) Address where delivered:

      (3) Date delivered:
      (4) Time delivered:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: May 30 , 2023

. . . . . .   Adam L. Streltzer   . . . . . . . .
(TYPE OR PRINT NAME OF CLAIMANT)                          ▶          *(signature)*          (SIGNATURE OF CLAIMANT)



# EXHIBIT 3

**LOAN AGREEMENT**


By and Between


BROADWAY AVENUE INVESTMENTS LLC


and


ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC

## TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ...................................................................................................1
   1.1.  Defined Terms ...........................................................................................................1
   1.2.  Terms Generally; References and Titles...................................................................1

ARTICLE II. THE LOAN ......................................................................................................1
   2.1.  The Loan ...................................................................................................................1
      (a)  Interest ............................................................................................................1
      (b)  Default Rate; Late Charge ..............................................................................2
      (c)  Payment .........................................................................................................2
      (d)  Method and Place of Payment.........................................................................2
      (e)  Prepayment ....................................................................................................2
      (f)  Additional Expenditures..................................................................................3
      (g)  Additional Costs .............................................................................................3
      (h)  Lender's Determinations. ................................................................................3
   2.2.  Security for the Loan ................................................................................................3
   2.3.  Origination Fee .........................................................................................................3

ARTICLE III. REPRESENTATIONS.....................................................................................3
   3.1.  Representations ........................................................................................................3
      (a)  Status; Operational Authority.........................................................................3
      (b)  Power; Transactional Authority; Enforceability ............................................3
      (c)  No Violation; No Consent...............................................................................3
      (d)  Financial Matters............................................................................................4
      (e)  Contemplated Actions.....................................................................................4
      (f)  No Default ......................................................................................................4
      (g)  Trade Name ....................................................................................................4
      (h)  Litigation .......................................................................................................4
      (i)  Title and Authority; Permitted Encumbrances...............................................4
      (j)  Taxes .............................................................................................................4
      (k)  Other Agreements; Defaults............................................................................5
      (l)  Foreign Person...............................................................................................5
      (m) ERISA ...........................................................................................................5
      (n)  Executive Order 13224; OFAC.......................................................................5
      (o)  Purpose ..........................................................................................................5
      (p)  Investment Company Act ................................................................................5
      (q)  No Financing Statement ..................................................................................6
      (r)  Location of Collateral.....................................................................................6
      (s)  Compliance with Applicable Law ...................................................................6
      (t)  Brokerage Commissions.................................................................................6
      (u)  Leases ............................................................................................................6
      (v)  Collateral .......................................................................................................6
      (w) Condition of Property.....................................................................................6
      (x)  Intentionally Omitted ...................................**Error! Bookmark not defined.**
      (y)  Condemnation ................................................................................................6
      (z)  Access.............................................................................................................6

(aa) Forfeiture. ..................................................................................7
(bb) Solvency. ...................................................................................7
(cc) Full and Accurate Disclosure. ....................................................7
(dd) Environmental ...........................................................................7

ARTICLE IV. COVENANTS AND AGREEMENTS OF BORROWER ......................8
  4.1.  Covenants and Agreements. ......................................................................8
    (a)  Change of Name, Identity or Structure ...................................8
    (b)  Single Purpose Entity/Separateness. .......................................8
    (c)  Indemnity; Fees and Expenses; Waivers ...............................8
    (d)  Books and Records ..................................................................9
    (e)  Financial Statements and other Reports ..................................9
    (f)  Compliance Certificate ..........................................................10
    (g)  Estoppel Certificate ...............................................................10
    (h)  Further Assurances .................................................................11
    (i)  Location and Use of Collateral ...............................................11
    (j)  Insurance Requirements .........................................................11
      (i)  Insurance. ...................................................................11
      (ii)  Form and Quality. .....................................................13
      (iii)  Assignment. ..............................................................13
      (iv)  Adjustments ..............................................................14
    (k)  Escrow ....................................................................................14
    (l)  Operation of Property .............................................................15
    (m)  Repair and Maintenance .........................................................15
    (n)  Appraisal .................................................................................15
    (o)  Casualty and Condemnation ...................................................15
    (p)  Title Insurance ........................................................................17
    (q)  Borrower's Funds. ..................................................................17
    (r)  Collateral ................................................................................18

ARTICLE V. DEFAULTS AND REMEDIES ............................................................22
  5.1.  Event of Default .......................................................................................22
    (a)  Monetary Obligations .............................................................23
    (b)  Representations .......................................................................23
    (c)  Insolvency; Bankruptcy ..........................................................23
    (d)  Third Party Matters .................................................................23
    (e)  Transfers; Liens; Debt ............................................................23
    (f)  Death; Dissolution; Change in Ownership or Control ...........23
    (g)  Financial Reporting ................................................................23
    (h)  DSCR Test Default ................................................................23
    (i)  Lis Pendens. ...........................................................................23
    (j)  Non-Monetary Obligations ....................................................23
  5.2.  Remedies ..................................................................................................24

ARTICLE VI. CASH MANAGEMENT .....................................................................25
  6.1.  Lockbox Deposit Account. .......................................**Error! Bookmark not defined.**
  6.2.  Cash Management Account. .....................................**Error! Bookmark not defined.**
  6.3.  Monthly Excess Cash Flow Impound. ......................**Error! Bookmark not defined.**

ARTICLE VII. RESERVE FUNDS .................................................................................25
   7.1.   Security; Establishment of Funds. ................................................................25
          (i)   Interest Reserve. ...............................**Error! Bookmark not defined.**
          (ii)  Pledge and Disbursement of Funds.. ..................................................25

ARTICLE VIII. RESERVED. .....................................................**Error! Bookmark not defined.**

ARTICLE IX. GENERAL CONDITIONS ................................................................27
   9.1.   Waiver ...........................................................................................................27
   9.2.   Lender's Action or Inaction......................................................................27
   9.3.   Lender's Rights ..........................................................................................27
   9.4.   Third Party Rights......................................................................................27
   9.5.   Satisfaction of Condition; Time ..............................................................27
   9.6.   Assignment; Loan Participations ............................................................27
   9.7.   Heirs, Successors and Assigns .................................................................28
   9.8.   Exercise of Rights and Remedies ............................................................29
   9.9.   Headings ......................................................................................................29
   9.10. Inconsistency...............................................................................................29
   9.11. Applicable Law ...........................................................................................29
   9.12. Forum; Service ............................................................................................29
   9.13. Usury............................................................................................................29
   9.14. Severability .................................................................................................29
   9.15. Counterparts ...............................................................................................29
   9.16. Joint Liability .............................................................................................30
   9.17. Modification or Termination....................................................................30
   9.18. Notice ...........................................................................................................30
   9.19. Signatures....................................................................................................30
   9.20. No Partnership ...........................................................................................31
   9.21. Waiver of Jury Trial...................................................................................31
   9.22. Consent of Lender; Approvals ...............................................................31
   9.23. Imaging .......................................................................................................31
   9.24. Entire Agreement ......................................................................................31
   9.25. Payoff Statement. ....................................................**Error! Bookmark not defined.**
   9.26. Damage Waiver .........................................................................................31

## LOAN AGREEMENT

**BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("***Borrower***") and **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("***Lender***") for the mutual promises in the Loan Documents and other good and valuable consideration, enter into this Agreement on the Closing Date.

BACKGROUND RECITALS

A.     Borrower has requested that Lender make the Loan to Borrower in the amount of $16,942,500.00.

B.     Lender has agreed, subject to the terms of the Loan Documents, to make the Loan to Borrower.

C.     Borrower and Lender desire to enter into this Agreement to specify the terms and conditions of the Loan.

Borrower and Lender (1) acknowledge the receipt and sufficiency of the above-referenced consideration, and, (2) therefore, agree as follows:

ARTICLE I.
DEFINITIONS

1.1.     Defined Terms. Each capitalized term used in the Loan Documents has the meaning set forth in **Exhibit A** of this Agreement.

1.2.     Terms Generally; References and Titles. References in this Agreement to "Articles," "Sections," "Exhibits" or "Schedules" will be to the Articles, Sections, Exhibits or Schedules of this Agreement unless otherwise specifically provided. All Exhibits and Schedules attached to this Agreement are incorporated in, and are a part of, this Agreement for the purposes set forth in this Agreement. Any term defined in this Agreement may be used in the singular or plural. Words of any gender include all other genders. The terms "include," "includes," and "including" are followed by "without limitation". Except as otherwise specified or limited in this Agreement, a reference to any Person includes the successors and assigns of the Person. Unless otherwise specified all references "from" or "through" any date mean "from and including" or "through and including" the date. References to any statute or act include all related current regulations and all amendments and any successor statutes, acts and regulations. References to any statute or act, without additional reference, refer to federal statutes and acts of the United States. References to any agreement, instrument or document includes all schedules, exhibits, annexes and other attachments to the agreement, instrument or document.

ARTICLE II.
THE LOAN

2.1.     The Loan. Subject to the terms of this Agreement and in reliance on Borrower's representations and warranties in the Loan Documents, Lender agrees to lend, and Borrower agrees to borrow, the Loan. THEREFORE, FOR VALUE RECEIVED, Borrower promises to pay to the order of Lender the Principal Amount with fees, costs and interest as set forth in, and payable (in Dollars at Lender's Offices) pursuant to, this Agreement. The funding and closing of the Loan will take place in Lender's Offices or at such other place as Lender may designate.

(a)     Interest.

(i)     Subject to Subsection 2.1(a)(ii) below, the Principal Amount and Additional Costs bear interest at the Interest Rate.

(ii)    All interest accruing under the Loan Documents will be calculated on the basis of a 30/360 basis. Borrower shall make each payment which it owes under the Loan Documents on or before the Payment Deadline in immediately available Dollars without setoff, counterclaim or other deduction. If Lender receives any payment after the Payment Deadline, then the payment will be credited on the next following Business Day.

(b)    Default Rate; Late Charge.

(i)    Any time during an Event of Default Period, the Principal Amount, any Additional Costs, and all past due installments of interest will bear interest at the Default Rate.

(ii)    In addition to all other sums due under the Loan Documents, Borrower shall pay to Lender on demand the Late Charge upon all Past Due Indebtedness (other than the outstanding Principal Amount due on the Maturity Date). The Late Charge is not a penalty, but is intended to compensate Lender for the losses Lender incurs because of the delinquent payment. Borrower agrees that, considering all of the circumstances existing on the date this Agreement is executed, the Late Charge represents a reasonable estimate of the losses Lender will incur because of any late payment, and that proof of Lender's actual losses will be costly, inconvenient, impracticable and extremely difficult to fix. Lender does not waive the Event of Default resulting from a past due payment because Lender accepts a Late Charge.

(c)    Payment.

(i)    Borrower shall pay to Lender:

(A) interest on the Principal Amount, in arrears, on each Interest Payment Date computed at the Interest Rate, and

(B) on the Maturity Date, Borrower shall pay in full to Lender (1) the Principal Amount along with all unpaid, accrued interest, (2) the Exit Fee, and (3) all other Indebtedness.

(ii)    Except during an Event of Default Period, Lender will apply all Loan payments: (A) first, to any unpaid Claims arising out of the Loan; (B) second, to any unpaid Additional Costs; (C) third, to accrued but unpaid interest due under the Loan Documents; (D) fourth, to all other unpaid sums due under the Loan Documents, except for the Principal Amount; and (E) last, to the unpaid Principal Amount. During an Event of Default Period, Lender may apply all Loan payments in any order Lender elects in its sole discretion.

(iii)    Borrower may not send any payments to Lender with a Paid in Full Mark. If Borrower tenders a payment to Lender with a Paid in Full Mark, then Lender may accept the payment without losing any of Lender's rights under the Loan Documents, and Borrower will remain obligated to pay any further amounts owed to Lender under the Loan Documents.

(d)    Method and Place of Payment. Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 2:00 PM, Pacific time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or at such other place as Lender shall from time to time designate, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the immediately preceding Business Day.

(e)    Prepayment. Borrower may prepay the Loan, in whole or in part, at any time

without any Payment Premium.

(f)    <u>Additional Expenditures</u>. All sums Lender pays or expends pursuant to the Loan Documents in excess of the Maximum Principal Amount will be (i) an additional loan to Borrower, (ii) Indebtedness, and (iii) due and payable within 5 days of Lender's written demand to Borrower, together with interest at the Default Rate from the date of Lender's expenditure until Borrower repays the expenditure and interest to Lender. Notwithstanding anything to the contrary in the Loan Documents, Lender is not obligated to make any expenditures.

(g)    <u>Additional Costs</u>. Notwithstanding anything to the contrary in any of the Loan Documents, Borrower shall pay to Lender all Additional Costs within 5 days of Lender's written demand.

(h)    <u>Lender's Determinations</u>. All of Lender's determinations in this <u>Section 2.1(a)</u> are conclusive, absent manifest error.

2.2.    <u>Security for the Loan</u>. The Loan is secured by, among other things, the Security Instrument and is guaranteed by the Guaranty.

2.3.    <u>Origination Fee</u>.  On the Closing Date, Borrower shall pay the Loan Origination Fee to Lender.

2.4    <u>Payoff Statement</u>. Borrower will provide written notice to Lender specifying the proposed Business Day on which any payment of the Loan in full is to be made pursuant to hereof, which date shall be no earlier than 30 days after the date of such payoff notice. In the event Borrower wishes to set the payoff date at a date which is earlier than 30 days after the date of such payoff notice, Borrower shall be responsible for payment of 30 days interest regardless of the actual payoff date.

ARTICLE III.
<u>REPRESENTATIONS</u>

3.1.    <u>Representations</u>. On the Closing Date and, on each Compliance Certificate Delivery Date, Borrower represents to Lender that:

(a)    <u>Status; Operational Authority</u>. Each Borrower Party: (i) is duly organized, validly existing, in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own the Property and its other assets, and to transact its present and proposed business.

(b)    <u>Power; Transactional Authority; Enforceability</u>. Each Borrower Party has the requisite power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party, and has taken all necessary actions to authorize its execution, delivery and performance of the Loan Documents. Each Borrower Party has duly executed and delivered the Loan Documents.  The Loan Documents each Borrower Party executes or under which it is obligated constitute the Borrower Party's legal, valid and binding obligations, enforceable in accordance with the terms of the Loan Document, subject to (i) the effect of any Applicable Bankruptcy Law, or (ii) general principles of equity.

(c)    <u>No Violation; No Consent</u>. Each Borrower Party's execution, delivery and performance of the Loan Documents, and compliance with the terms and provisions of the Loan

3

Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, the terms of any indenture, mortgage, deed of trust, agreement or other instrument to which the Borrower Party is a party or by which the Borrower Party or any of the Property or the Borrower Party's other assets is bound or may be subject, or (iii) violate any term of any Borrower Party's certificate of formation or other documents and agreements governing the Borrower Party's existence, management or operation. No Borrower Party is required to obtain the consent of any other party, including any Governmental Authority, in connection with the execution, delivery, performance, validity or enforceability of the Loan Documents.

(d)     <u>Financial Matters</u>. Each Borrower Party financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly present the financial condition and the results of operations of each Borrower Party on the date and for the period covered by the financial statements. All other reports, statements and other data that any Borrower Party furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading. Each Borrower Party (i) is solvent, (ii) is not bankrupt and (iii) has no outstanding liens, suits, garnishments, bankruptcies or court actions which may render the Borrower Party insolvent or bankrupt. Since the date of the last financial statements each Borrower Party delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) the Borrower Party's business, condition (financial or otherwise) or operations, or (b) the Borrower Party's ability to perform or satisfy, or Lender's ability to enforce, any of the Indebtedness.

(e)     <u>Contemplated Actions</u>. Neither Borrower nor any Borrower Party is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and neither Borrower nor any Borrower Party has knowledge of any Person contemplating the filing of any such petition against it.

(f)     <u>No Default</u>. No Event of Default exists.

(g)     <u>Trade Name</u>. Borrower does not do business under any trade name or other name with respect to the Property or otherwise.

(h)     <u>Litigation</u>. There are no suits or proceedings (including condemnation) pending or (to Borrower's knowledge, after reasonable inquiry) threatened against or affecting any Borrower Party or the Property (including a condemnation proceeding) or involving the validity, enforceability or priority of any of the Loan Documents. Borrower has not received notice from any Governmental Authority alleging that any Borrower Party or the Property is violating any Applicable Law.

(i)     <u>Title and Authority; Permitted Encumbrances</u>. Borrower is the lawful owner of good and marketable and indefeasible title to the Property free and clear from all liens, security interests and encumbrances, except the lien and security interest evidenced by the Security Instrument and the Permitted Encumbrances. Borrower has good right and authority to transfer and mortgage the Property and to grant a security interest in the Collateral. There are no mechanic's or materialmen's liens, or other claims that may constitute a lien on the Property other than claims for Real Estate Taxes which are not yet due or payable. There are no defaults under any of the Permitted Encumbrances. No Permitted Encumbrance has been modified unless approved by Lender in writing.

(j)     <u>Taxes</u>. Each Borrower Party has filed all required Tax returns. Each Borrower Party has paid all Taxes for which it is obligated, other than those Taxes which (A) are not yet

4

delinquent or (B) the appropriate Borrower Party is diligently, and in good faith, contesting and for which the Borrower Party has made adequate reserves acceptable to Lender. There are no unpaid or outstanding real estate or other taxes or assessments on or against the Property or any part thereof, except general real estate taxes not due or payable. The Property is comprised of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot. There are no pending or, to Borrower's best knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(k)     Other Agreements; Defaults. Neither Borrower nor any Borrower Party is a party to any agreement or instrument or subject to any court order, injunction, permit, or restriction which would result in a Material Adverse Change to the Property or the business, operations, or condition (financial or otherwise) of Borrower or any Borrower Party. Neither Borrower nor any Borrower Party is in violation of any agreement which violation could reasonably be expected to result in a Material Adverse Change to the Property, Borrower or any Borrower Party or Borrower's or any Borrower Party's business, properties, or assets, operations or condition, financial or otherwise.

(l)     Foreign Person. Borrower is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended, Sections 1445 and 7701 (i.e., Borrower is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder). Borrower's Taxpayer Identification Number is true and correct.

(m)     ERISA. (i) Borrower is not an "employee benefit plan" or a "governmental plan" within the meaning of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; (iii) Borrower's assets do not constitute "plan assets" under ERISA; and (iv) one or more of the following circumstances is true: (1) Equity interests in Borrower are publicly offered securities under ERISA or are securities issued by an investment company registered under the Investment Company Act of 1940; (2) Less than 25% of the value of any class of equity interests in Borrower is held by "benefit plan investors" within the meaning of ERISA; or (3) Borrower qualifies as an "operating company," a "venture capital operating company," or a "real estate operating company" within the meaning of ERISA. Borrower will deliver to Lender such certifications and other evidence periodically requested by Lender, in its sole discretion, to verify the representations in this Subsection.

(n)     Executive Order 13224; OFAC. No Borrower Party or any Person with which a Borrower Party is associated or affiliated is (i) referred to or described in Executive Order 13224 (Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, as amended) or (ii) subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. Borrower will not use any Loan proceeds in violation of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

(o)     Purpose. The Loan is solely for the purpose of carrying on or acquiring Borrower's business, and is not for personal, family, household or agricultural purposes. Borrower does not use any portion of the Property as Borrower's residence or business homestead and, therefore, no portion of the Property is exempt from forced sale under Applicable Bankruptcy Law or any other Applicable Law. Borrower will not use any Loan proceeds to purchase or carry "margin stock" within the meaning of Federal Reserve Regulation U (12 C.F.R. § 221 et seq., as amended).

(p)     Investment Company Act. No Borrower Party is (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a

"holding company" or an "affiliate" of either a "holding company" or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(q)      No Financing Statement. There are no effective financing statements covering any of the Property, except for those financing statements filed in connection with the Loan.

(r)      Location of Collateral. All tangible Collateral is located on the Land located at 737 S. Broadway, Los Angeles, CA 90014.

(s)      Compliance with Applicable Law. Borrower and the Property comply with all Applicable Laws. Borrower has not received notice that it or the Property is violating Applicable Law. Borrower has obtained all requisite licenses, permits, franchises, qualifications, certificates of occupancy or other governmental authorizations to own, lease and operate the Property and carry on its business from all Governmental Authorities with jurisdiction over the Property.

(t)      Brokerage Commissions. Any brokerage commission due in connection with any Lease has been paid in full.

(u)      Leases.  As of the date hereof, there are no existing Leases for the Property.

(v)      Collateral. Borrower is the sole owner of, has good title to, and the right to assign, the Collateral. No Person (other than Borrower and Lender) has any right, title or interest in the Collateral. The Licenses and Contracts are (or will be when issued or entered into) in full force and effect and there are no defaults (or any events which with the passage of time or the giving of notice, would be a default) under the Licenses or Contracts. Borrower has not assigned, transferred, encumbered, created or permitted any lien upon or charge against the Collateral (except in favor of Lender).

(w)      Condition of Property. The Property has all necessary utility services required for Borrower's use of the Property. The Property has legal access to all streets, alleys and easements necessary to serve the Property, and all of the streets, alleys and easements use have been completed, dedicated and accepted by the appropriate Governmental Authority. The Property including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, (a) are in good condition, order and repair in all material respects; and (b) has no structural or other material defects or damages and no deferred maintenance, whether latent or otherwise.

(x)      Condemnation. No condemnation has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

(y)      Access. To the best of Borrower's knowledge, the Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities. To the best of Borrower's knowledge, all public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property, except to the extent such other property is subject to a perpetual easement for such utility benefiting the Property. To the best of Borrower's knowledge, all roads necessary for the full utilization of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

(z)  <u>Forfeiture</u>. There has not been and shall never be committed by Borrower or to the Borrower's knowledge, any other person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

(aa)  <u>Solvency</u>. After giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and, immediately following the making of the Loan, will be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured, and Borrower's assets, immediately following the making of the Loan, will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, or believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). No petition in bankruptcy has been filed against Borrower or any Borrower Party in the last seven years, and neither Borrower nor Borrower Party in the last seven years has ever made an assignment of its assets for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any Borrower Party is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and neither Borrower nor any Borrower Party has knowledge of any Person contemplating the filing of any such petition against it.

(bb)  <u>Full and Accurate Disclosure</u>. No statement of fact made by or on behalf of Borrower or any Borrower Party in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements contained herein or therein, taken as a whole, not misleading. There is no fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, nor as far as Borrower can foresee, would result in a Material Adverse Change to, the Property or the business, operations or condition (financial or otherwise) of Borrower or any Borrower Party. All information supplied by Borrower regarding any other Collateral is accurate and complete in all material respects. All evidence of Borrower and Borrower Party's identity provided to Lender is genuine, and all related information is accurate.

(cc)  <u>Environmental</u>.

(i)  <u>Compliance</u>. Except as otherwise disclose in the Phase 1 environmental report delivered to Lender in connection herewith, Borrower (A) is in compliance with all applicable Environmental Laws, (B) has obtained all Environmental Approvals required to operate its business as presently conducted or as reasonably anticipated to be conducted, (C) has not received any written communication, whether from a Governmental Authority, citizens group, employee or otherwise, that alleges that Borrower has failed to comply with any Environmental Law, (D) no civil, criminal or administrative action, suit, claim, hearing, investigation or proceeding has been brought or been threatened against Borrower, nor have any settlements been reached by or with any parties or any liens imposed in connection with Material of Environmental Concern or Environmental Laws, and to the best of Borrower's knowledge no circumstance exists that may prevent or interfere with Borrower's full compliance in the future with all applicable Environmental Laws.

(ii)    <u>No Claim</u>. There is no Environmental Claim pending or threatened against Borrower or the Property.

(iii)    <u>No Violation</u>. There are no past or present actions, activities, circumstances, conditions, events or incidents, including the release, emission, discharge or disposal of any Material of Environmental Concern that could form the basis of any Environmental Claims against Borrower or the Property.

(iv)    <u>No Materials of Environmental Concern</u>. (a) There are no on-site or off-site locations in which Borrower has stored, disposed or arranged for the disposal of Materials of Environmental Concern; (b) there are no underground storage tanks located on Property; (c) there is no asbestos in the Improvements and (d) no polychlorinated biphenyls (PCBs) are used or stored at the Property.

3.2.    <u>Survival</u> .  Borrower's representations and warranties hereunder shall survive until (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents


ARTICLE IV.
<u>COVENANTS AND AGREEMENTS OF BORROWER</u>

4.1.    <u>Covenants and Agreements</u>. Borrower covenants to Lender as follows:

(a)    <u>Change of Name, Identity or Structure</u>. Borrower shall not change its name, identity (including trade name) or its entity structure or governance without notifying Lender of any change in writing at least 30 days prior to the date of the change.

(b)    <u>Single Purpose Entity/Separateness</u>. Borrower represents, warrants and covenants to comply with the Single Purpose Entity Covenants set forth on <u>Exhibit E</u> attached hereto:

(c)    <u>Indemnity; Fees and Expenses; Waivers</u>. Borrower's obligations under this <u>Section 4.1(c)</u> shall survive (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents.

(i)    Borrower shall protect, defend, indemnify, reimburse and hold each Indemnified Party harmless from all Claims of every kind, known or unknown, foreseeable or unforeseeable, which may be imposed upon, asserted against or incurred or paid by an Indemnified Party at any time, arising out of or in any way connected with (A) the Loan, (B) the Property, (C) any Loan Document, (D) bodily injury, death, or property damage occurring in, upon or adjacent to the Property, through any cause whatsoever, (E) Indemnified Party's exercise of legal remedies under the Loan Documents, (F) any act performed or omitted to be performed by any Indemnified Party under any Loan Document, (G) any Borrower failure to perform its obligations under any Contract or License, (H) any Event of Default, (I) any Environmental Claim, or (J) any Borrower Party violation of Applicable Law, **INCLUDING ANY CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, OR STRICT LIABILITY, OF ANY INDEMNIFIED PARTY**, except to the extent a court of competent jurisdiction determines in a final, non-appealable judgment that the Claims actually arose from the Indemnified Party's gross negligence, fraud, intentional or willful misconduct.

(ii)    If an Indemnified Party notifies Borrower of any Claims for which Borrower's indemnity in <u>Subsection (1)</u> above applies, Borrower shall, on behalf of the

8

Indemnified Party, assume and conduct, with due diligence and in good faith, the investigation and defense of the Claims with counsel mutually selected by the Indemnified Party and Borrower. If both Borrower and an Indemnified Party are defendants to the Claims and the Indemnified Party has been advised in writing by counsel that there may be legal defenses available to it which are inconsistent with those available to Borrower, then the Indemnified Party may select separate counsel to participate in the investigation and defense of the Claims on its own behalf, and Borrower will pay or reimburse the Indemnified Party for all reasonable Attorneys' Fees incurred with respect to separate counsel.

(iii)      If an Indemnified Party notifies Borrower of any Claims for which Borrower's indemnity in Subsection (1) above applies and Borrower fails to comply with the terms of Subsection (2) above, within 15 days after being notified of the Claims, then (A) notwithstanding anything to the contrary in any of the Loan Documents, an Event of Default will immediately occur, and (B) the Indemnified Party may contest (or settle) the Claims at Borrower's expense using counsel selected by the Indemnified Party.

(iv)      Borrower shall pay, immediately upon Lender's demand, all fees (including appraisal fees, filing and recording fees, inspection fees, survey fees, taxes, brokerage fees and commissions, abstract fees, title policy fees, uniform commercial code search fees, escrow fees, and reasonable Attorneys' fees) and all other costs Lender or Borrower incurs in connection with (A) the Loan and the Loan Documents, (B) any Event of Default, (C) Lender's (1) exercise of remedies under the Loan Documents or (2) protection of the Property, or (D) any modification to the Loan Documents.

(v)      Borrower, with respect to the Indebtedness, waives: (A) **PRESENTMENT FOR PAYMENT**; (B) **DEMAND**; (C) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (D) **NOTICE OF INTENTION TO ACCELERATE**; (E) **NOTICE OF ACCELERATION**; (F) **NOTICE OF DISPOSITION OF COLLATERAL**; (G) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (H) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (I) **PROTEST AND NOTICE OF PROTEST**; and (J) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(vi)      If Lender appoints a substitute or successor Trustee, then Borrower waives any right to attack the validity, or require Lender to show proof of the authorization, of the appointment for any reason.

(vii)      Borrower further waives and releases the rights (A) of redemption, valuation, and appraisement of the Property or other Collateral, (B) to (i) marshaling of Borrower's assets (including the Property), (ii) the sale in inverse order of alienation, (iii) a homestead exemption concerning any of the Collateral, and (C) to any matter to defeat, reduce or affect the Lender's right under the terms of the Loan Documents to sell the Collateral or collect the full Indebtedness.

(d)      Books and Records. Borrower shall keep accurate books and records in accordance with the Approved Accounting Method. Lender and its representatives may, with at least 24-hour prior notice in writing, and during reasonable business hours, inspect and copy all of Borrower's books and records (including all contracts, statements, invoices, bills and claims for labor, materials and services supplied for the construction and operation of the improvements forming a part of the Property).

(e)      Financial Statements and other Reports. Borrower shall deliver to Lender the below statements and reports on or before the below delivery deadline. Borrower shall also deliver

9

to Lender any other information, reports or certificates as and when reasonably requested by Lender.

| **Statement or Report** | **Frequency** | **Delivery Deadline** |
|---|---|---|
| Certified Borrower's balance sheet and income/operating statement | Annually | Within 30 days after each calendar year ends |
| Certified rent roll | Annually | Within 30 days after each calendar year ends |
| Copies of filed federal income tax returns of Borrower | Annually | The earlier of (i) 120 days after each calendar year ends or (ii) 10 days after filing |
| Copies of filed federal income tax returns of Guarantor | Annually | The earlier of (i) 120 days after each calendar year ends or (ii) 10 days after filing |
| Compliance Certificate | Monthly//Quarterly | Delivered along with Borrower's monthly/quarterly statements |

All statements and reports must be in scope and detail reasonably satisfactory to Lender. During any Event of Default Period, Lender may require that all statements and reports be prepared (and audited after the occurrence of an Event of Default at Borrower's cost and expense) by an independent certified public accountant, in a manner reasonably acceptable to Lender. Each rent roll and/or delinquency report must, with respect to each of the Leases, contain: (i) each Tenant's name and address; (ii) rental amount; (iii) square footage of the premises; (iv) security deposit; (v) commencement date; (vi) termination date; (vii) date through which rent is paid; and (viii) the occurrence of any default. . Borrower shall provide Lender with such additional financial, management, or other information regarding Borrower or the Property, as Lender may reasonably request. Upon Lender's request, Borrower shall deliver all items required by this Subsection in an electronic format or by electronic transmission reasonably acceptable to Lender.

Each financial statement shall be certified by any representative of Borrower or acceptable to Lender if such financial statement is delivered by Borrower. Each financial statement, report or other information required to be delivered or caused to be delivered by Borrower to Lender under this Agreement and required hereunder to be certified by the chief financial representative of Borrower shall also certify that: (i) all of the covenants set forth in this Section 4.1(e) are fully performed and (ii) the representations and warranties set forth in the this Agreement and in the other Loan Documents are and remain true, correct and complete in all material respects except as disclosed in writing in the certificate. If Borrower fails to provide to Lender the financial statements and other information specified herein within the respective time period specified, and if such failure continues for 5 days after notice from Lender, then Borrower shall pay to Lender a fee in the amount of $1,000.00. In the event such failure shall continue for 15 days after notice from Lender, it shall constitute an Event of Default hereunder.

(f)     Compliance Certificate. Borrower shall deliver a Compliance Certificate to Lender on or before the Compliance Certificate Due Date.

(g)     Estoppel Certificate. Borrower shall:

(i)     within 10 days after receiving Lender's request, deliver a certificate stating (or explaining why the statement is false) (A) that the Loan Documents are valid and binding obligations of Borrower, (B) that the Loan Documents are enforceable against

10

Borrower in accordance with their terms, (C) the Principal Amount, (D) that the Loan Documents have not been released, subordinated or modified, (E) the date of the last Loan payment, and (F) that Borrower is entitled to no offsets or defenses against enforcement of the Loan Documents; and

(ii)    within 10 days after receiving Lender's request, deliver a certificate from each requested Tenant, in form and substance acceptable to Lender, confirming the terms of the Tenant's Leases.

(h)    <u>Further Assurances</u>. Borrower shall, on Lender's request and at Borrower's cost: (i) promptly correct any defect concerning the Loan Documents, the Leases or the Collateral; (ii) execute, deliver and file any instrument, and do anything Lender reasonably determines to be necessary or desirable to carry out the purposes of the Loan Documents; (iii) take all necessary action to promptly protect the liens or the security interests under the Loan Documents against any Person other than Lender; (iv) take all actions reasonably necessary or desirable in Lender's determination to comply with the requirements or requests of any Governmental Authority; and (v) submit to Lender such additional information concerning the Collateral or the Contractors as Lender may reasonably request.

(i)    <u>Location and Use of Collateral</u>. All tangible Collateral will be used in the business of Borrower and shall remain in Borrower's control at all times at Borrower's risk of loss and shall be located on the Property. The Property shall not be used to sell, grow, produce, or distribute cannabis or for any service directly related to the sale, growth, production, or distribution of cannabis.

(j)    <u>Insurance Requirements</u>.

(i)    <u>Insurance</u>. Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(A)    comprehensive "All Risk" or "Special Form" insurance on the Improvements and the personal property (A) in an amount equal to one hundred percent (100%) of the "***Full Replacement Cost***," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations) with no waiver of depreciation, but the amount shall in no event be less than the outstanding Principal Amount; (B) containing an agreed amount endorsement with respect to the Improvements and personal property waiving all co-insurance provisions, or confirmation that co-insurance does not apply; and (C) providing for no deductible in excess of $25,000.00 for all such insurance coverage. In addition, Borrower shall obtain: (x) if any portion of the Improvements is currently, or at any time in the future, located in a Federally designated "special flood hazard area", flood hazard insurance in an amount equal to the outstanding Principal Amount or such other amount as Lender shall require; (y) earthquake insurance in amounts and form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity with a probable maximum loss (PML) exceeding twenty percent (20%), and (z) coastal windstorm insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in any coastal region, and if such windstorm coverage is excluded under the Special Form Coverage, provided that the insurance pursuant to clauses (x), (y) and (z) hereof shall be on terms consistent with the comprehensive "All Risk" or "Special Form" insurance policy required under this <u>Subsection (i)</u>;

(B)      commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverage against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (1) to be on the so-called "occurrence" form with a combined limit of not less than $2,000,000.00 in the aggregate and $1,000,000.00 per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (2) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (3) to cover at least the following hazards: (i) premises and operations; (ii) products and completed operations on an "if any" basis; (iii) independent contractors; (iv) blanket contractual liability for all legal contracts; and (v) contractual liability covering the indemnities contained in the Security Instrument to the extent the same is available;

(C)      rental loss and/or business income interruption insurance (1) with loss payable to Lender; (2) covering all risks required to be covered by the insurance provided for in subsection (A) above; for loss of Rents in an amount equal to one hundred percent (100%) of the projected gross income from operations for a period of twelve (12) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period. The amount of such loss of Rents or business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate from the Property for the succeeding twelve (12) month period. Notwithstanding anything to the contrary contained in this Agreement, all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied at Lender's sole discretion to (I) the Indebtedness, or (II) Operating Expenses approved by Lender in its sole discretion; *provided, however*, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Indebtedness, except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(D)      at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage forms do not otherwise apply, owner's and contractor's protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy

(E)      worker's compensation insurance with respect to any employees of Borrower, as required by any Governmental Authority or Applicable Laws;

(F)      comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(G)      motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of not less than $1,000,000.00;

(H)    umbrella or excess liability insurance in an amount not less than $5,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(I)    if the Property is or becomes a legal "non-conforming" use, ordinance or law coverage to compensate for the cost of demolition and rebuilding of the undamaged portion of the Property along with any increased cost of construction in amounts as requested by Lender;

(J)    the commercial property business income, general liability and umbrella or excess liability insurance required hereunder shall cover perils of terrorism and acts of terrorism and Borrower shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required hereunder at all times during the term of the Loan so long as Lender determines that either (I) prudent owners of real estate comparable to the Property are maintaining same or (II) prudent institutional lenders (including, without limitation, investment banks) to such owners are requiring that such owners maintain such insurance; and

(K)    upon 60 days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(ii)    <u>Form and Quality</u>. All insurance policies shall be endorsed in form and substance reasonably acceptable to Lender to name Lender as an additional insured, loss payee or mortgagee thereunder, as its interest may appear, with loss payable to Lender, without contribution, under a standard mortgagee clause. All such insurance policies and endorsements shall be fully paid for and contain such provisions and expiration dates and be in such form and issued by such insurance companies licensed to do business in the state in which the Property is located, with a rating of "A:X" or better as established by Best's Rating Guide. Each policy shall provide that such policy may not be canceled or materially changed except upon 30 days' prior written notice of intention of non-renewal, cancellation or material change to Lender and that no act or thing done by Borrower shall invalidate any policy as against Lender. Blanket policies shall be permitted only if (A) Lender receives appropriate endorsements and/or duplicate policies containing Lender's right to continue coverage on a pro rata pass-through basis and that coverage will not be affected by any loss on other properties covered by the policies and (B) the policy contains a sublimit equal to the replacement cost of the Property in an amount approved by Lender which is expressly allocated for the Property, and any such policy shall in all other respects comply with the requirements of this Section.  Borrower authorizes Lender to pay the premiums for such policies (the "***Insurance Premiums")*** from the Insurance Impound, if any, as the same become due and payable annually in advance. If Borrower fails to deposit funds into the Insurance Impound, if any, sufficient to permit Lender to pay the Insurance Premiums when due, Lender may obtain such insurance and pay the premium therefor and Borrower shall, on demand, reimburse Lender for all expenses incurred in connection therewith.

(iii)    <u>Assignment</u>. Borrower shall assign the policies or proofs of insurance to Lender, in such manner and form that Lender and its successors and assigns shall at all times have and hold the same as security for the payment of the Loan. If requested by

13

Lender, Borrower shall deliver copies of all original policies certified to Lender by the insurance company or authorized agent as being true copies, together with the endorsements required hereunder. If Borrower elects to obtain any insurance which is not required under this Agreement, all related insurance policies shall be endorsed in compliance with Section 4.1(j), and such additional insurance shall not be canceled without prior notice to Lender. From time to time upon Lender's request, Borrower shall identify to Lender all insurance maintained by Borrower with respect to the Property. The proceeds of insurance policies coming into the possession of Lender shall not be deemed trust funds, and Lender shall be entitled to apply such proceeds as herein provided.

(iv)    Adjustments. Borrower shall give immediate written notice of any loss to the insurance carrier and to Lender. Borrower irrevocably authorizes and empowers Lender, as attorney in fact for Borrower coupled with an interest, to notify any of Borrower's insurance carriers to add Lender as a loss payee, mortgagee insured or additional insured, as the case may be, to any policy maintained by Borrower that is required under this Agreement, and if Borrower fails to diligently do so, to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's reasonable expenses incurred in the collection of such proceeds. Nothing contained in this Section 4.1(j), however, shall require Lender to incur any expense or take any action hereunder

(k)    Escrow.  Borrower shall not be required to make monthly deposits into the Tax and Insurance Escrow Account for Taxes and Insurance Premiums provided that (i) no Event of Default has occurred and is continuing, (ii) the Property is covered by insurance as required in herein, (iii) Borrower has provided sufficient evidence to Lender that the Insurance Premiums have been paid on or before the date the Insurance Premiums are due, and (iv) Borrower has provided sufficient evidence to Lender that the Taxes have been paid on or before the date the Taxes are delinquent.  In the event the foregoing conditions are not satisfied, as additional security for the Indebtedness and Borrower's obligations under the Loan Documents, Borrower shall establish and maintain the Tax and Insurance Escrow Account. Contemporaneously with the establishment of the Tax and Insurance Escrow Account, Borrower will deposit into the Tax and Insurance Escrow Account a sum equal to all Real Estate Taxes and Insurance Premiums for the then current year, as Lender reasonably estimates. Thereafter, on each Interest Payment Date, Borrower shall pay to Lender, which Lender will deposit into the Tax and Insurance Escrow Account a sum of money equal to 1/12th of the annual charges for the Insurance Premiums and (ii) sum of money equal to 1/12th of the annual Taxes, which amounts shall be calculated as the necessary sufficient funds (as Lender reasonably estimates) to permit Lender to pay, at least 30 days prior to the due date, the next installments for Real Estate Taxes and Insurance Premiums. Borrower shall ensure that Lender receives, at least 30 days prior to the due date, all invoices for Real Estate Taxes and Insurance Premiums. So long as no Event of Default has occurred and Lender has received all invoices for Real Estate Taxes and Insurance Premiums, Lender shall pay (or will permit Borrower to make withdrawals from the Tax and Insurance Escrow Account to pay) all invoices for Real Estate Taxes and Insurance Premiums. Any excess amounts in the Tax and Insurance Escrow Account may, at Lender's option, be retained in the account for future use, applied to the Indebtedness or refunded to Borrower. Borrower shall immediately remit to Lender funds (as Lender determines and demands) sufficient to satisfy any deficiency in the Tax and Insurance Escrow Account. The Tax and Insurance Escrow Account is not, unless otherwise explicitly required by Applicable Law, an escrow or trust fund. The Tax and Insurance Escrow Account will not bear interest. The Tax and Insurance Escrow Account may be mingled with the general funds of Lender. Borrower grants to Lender a security interest in all funds deposited with Lender for the purpose of securing the Loan. If any time (i) the amount on deposit with Lender, together with amounts to be deposited by

14

737 S Broadway - Loan Agreement

Borrower before such Insurance Premiums are payable, is insufficient to pay such Insurance Premiums, or (ii) the amount on deposit with Lender, together with amounts to be deposited by Borrower before such Taxes are payable, is insufficient to pay such Taxes, Borrower shall deposit any deficiency with Lender after 10 days' written notice. Lender shall pay such Taxes when the amount on deposit with Lender is sufficient to pay such Taxes and Lender has received a bill for such Taxes. During an Event of Default Period, Lender may apply the Tax and Insurance Escrow Account funds to the Indebtedness as Lender determines.

(l)    Operation of Property. Borrower shall operate the Property in accordance with all Applicable Laws and in the same manner as is customary and usual in the operation of comparable commercial properties in the same metropolitan area as the Property. Borrower shall use the Property solely for commercial purposes. Borrower shall not use or allow the use of the Property in any manner which constitutes a public or private nuisance. Without obtaining Lender's prior written consent, Borrower shall: (i) use all commercially reasonable efforts to oppose any zoning reclassification of the Property, (ii) not seek, or acquiesce to, any zoning reclassification or variance for the Property; (iii) not impose any additional restrictive covenants or encumbrances upon the Property; (iv) not execute or file any subdivision plat affecting the Property; (v) not consent to any municipality's annexation of the Property to any municipality; (vi) not permit the Property to be operated as a cooperative or condominium; (vii) not permit any drilling or exploration for, or extraction, removal or production of, minerals from the surface of the Property; (viii) not permit any action or inaction which may reasonably be expected to diminish the value of the Property.

(m)    Repair and Maintenance. Borrower shall keep the Property in good order, repair, condition and appearance. Borrower shall promptly make all necessary repairs and replacements, to the Property. Borrower shall insure that the Property is not deteriorated, misused, abused or wasted. All replacements to the Property must be equal or better than the replaced Property was when it was new. Borrower may not, without Lender's prior written consent: (i) erect any new buildings or structures or other Improvements on the Property (other than Property repairs, restoration in connection with any casualty and/or improvements in connection with Leases); (ii) except for the foregoing repairs, remove any Property from the Land; or (iii) make any structural alteration or any other alteration to the Property involving an estimated expenditure of $25,000.00 or more. Lender (or its designee) may, at Borrower's expense, inspect or examine the Property during normal business hours and without unnecessarily interrupting the Tenants or the operations of the Property. Except during any Event of Default Period, Lender (or its designee) shall give Borrower 24 hours advanced notice (by any means and not subject to the terms of Section 8.18 below). Borrower shall assist Lender (and its designees) in completing any inspection. Borrower (or its designee) may accompany Lender (and its designee) during any inspection of the Property. If Lender's inspection reveals that repairs to the Property are necessary, then Borrower shall complete all repairs or other work to Lender's reasonable satisfaction within 90 days after Lender delivers written notice of the necessary repairs to Borrower.

(n)    Appraisal. At Borrower's expense, Lender may obtain from time to time an Appraisal. The costs for any Appraisal are Additional Costs. Notwithstanding anything to the contrary in the Loan Documents, Borrower will only be liable for the cost of one Appraisal after the occurrence of an Event of Default or in connection with the exercise of the First Option to Extend.

(o)    Casualty and Condemnation.

(i)    Borrower's Obligation. If any Damage or a Taking occurs, then Borrower shall promptly (A) notify Lender of the Damage and take all necessary steps to preserve the Collateral, (B) at Borrower's expense (1) diligently prosecute any Taking proceedings,

(2) consult and cooperate with Lender in handling the Taking proceedings, and (C) subject to <u>Sections 4.1(o)(ii) – (iv)</u> below and regardless of whether the Net Proceeds are, or Award is, sufficient, commence and diligently (but, unless Lender approves otherwise in writing, no later than 90 days after the Damage occurs) complete the Restoration. Borrower shall comply with Lender's reasonable requirements to preserve the Collateral. Borrower may not settle any Taking proceedings without Lender's prior written consent.  Lender may (but is not obligated to) participate in all Taking proceedings. Borrower shall sign and deliver all instruments Lender reasonably requests in connection with Lender's participation in any Taking proceeding. All of Lender's reasonable costs in any Taking proceeding are Additional Costs.

(ii)     <u>Lender's Rights</u>. Borrower will remain liable for the Indebtedness outstanding after Lender applies any Net Proceeds or Award. Lender will not pay interest on any Net Proceeds or Award Lender holds. If Borrower receives any insurance proceeds for the Damage or an Award, then Borrower shall promptly deliver all of the proceeds or Award to Lender, without deduction. Notwithstanding anything in the Loan Documents, at law or in equity to the contrary, the Net Proceeds and Award will not be trust funds and Lender may dispose of the Net Proceeds or Award as permitted in the Loan Documents. Borrower assumes all risk of loss from any Damage or Taking.

a.     If any Damage occurs which is, at least partially, covered by insurance, then: (A) if Borrower does not promptly make an insurance claim for the Damage, then Lender may, but is not obligated to, make the insurance claim; (B) if Lender makes an insurance claim, then Borrower authorizes and empowers Lender to settle, adjust, or compromise the claim; (C) Borrower authorizes and directs the insurer to make any Damage payment directly to Lender; and (D) unless otherwise expressly set forth in <u>Subsection (iii)</u> below, Lender may apply the Net Proceeds in any order it determines.

b.     Borrower assigns all Awards to Lender. All Awards must be paid to Lender. Lender may (A) collect, receive, and give receipt for, any Award, (B) accept any Award in any amount without question, and (C) appeal any judgment, decree, or Award. Borrower shall sign and deliver all instruments Lender reasonably requests to evidence Borrower's assignments and authorizations in this <u>Subsection</u>.

(iii)     <u>Application of Net Proceeds or Award</u>. Except during an Event of Default Period, Lender shall make the Net Proceeds or the Award available to Borrower for Restoration if: (A) prior to beginning the Restoration, in Lender's determination, the Restoration is practical and will be completed (1) within a reasonable time and (2) at least 90 days prior to the Scheduled Maturity Date; (B) prior to beginning the Restoration, in Lender's determination, Borrower has sufficient business interruption insurance; (C) prior to beginning the Restoration, Borrower enters into Contracts acceptable to Lender for Restoration; (D) prior to the beginning and until completion of the Restoration, Borrower has deposited and continuously maintains all Additional Funds with Lender; and (E) prior to the beginning and until completion of the Restoration, in Lender's determination, once the Restoration is complete, the Debt Service Coverage Ratio will exceed 1.20:1.0. Lender may (as Lender determines in its sole discretion) apply against the Indebtedness any Net Proceeds or Award in excess of the Restoration costs.

(iv)     <u>Disbursement of Net Proceeds or Award</u>. If Net Proceeds or an Award are available for Restoration, then Lender shall, in its sole discretion, establish a disbursement procedure (including lien releases and title insurance) and periodically make the Award or Net Proceeds (and the Additional Funds, if any) available to Borrower (in installments).

(v)    Effect on Indebtedness. Prior to, during and after any Damage or Taking, Borrower must pay the Indebtedness and perform its obligations under the Loan Documents. Lender's receipt of Net Proceeds, Rent Loss Proceeds, Additional Funds or an Award does not reduce the Indebtedness until Lender actually applies Net Proceeds, Rent Loss Proceeds, Additional Funds or the Award to the Indebtedness.

(p)    Title Insurance. On or before the Closing Date, Borrower shall furnish to Lender, at Borrower's expense, the Loan Title Policy. If the Loan Title Policy becomes invalid, or the insurer becomes insolvent or is placed in receivership, then Borrower shall, within 30 days after Lender's demand, furnish to Lender, at Borrower's expense, a substitute Loan Title Policy.

(q)    Borrower's Funds. Borrower represents, warrants and covenants to Lender that:

(i)    It has taken, and shall continue to take until after the Loan is fully repaid, such measures as are required by law to verify that the funds invested in Borrower are derived (i) from transactions that do not violate U.S. law and, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under U.S. law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(ii)    To the best of its knowledge, neither Borrower, nor any Borrower Party, nor any holder of a direct interest in Borrower, nor any Person providing funds to Borrower (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; and (iii) has had any of its/his/her funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(iii)    Borrower shall make payments on the Loan using funds invested in Borrower, Revenues or insurance proceeds unless otherwise agreed to by Lender.

(iv)    As of the Closing Date and at all times during the term of the Loan, all Revenues are and will be derived from lawful business activities of Borrower, rent paid by Tenants of the Property or other permissible sources under U.S. law.

(v)    On the Maturity Date, Borrower will take reasonable steps to verify that funds used to repay the Loan in full (whether in connection with a refinancing, asset sale or otherwise) are from sources permissible under U.S. law and to the extent such funds originate outside the United States, permissible under the laws of the jurisdiction in which they originated.

(vi)    Borrower is and at all times shall be in compliance with the Office of Foreign Assets Control sanctions and regulations promulgated under the authority granted by the Trading with the Enemy Act ("**_TWEA_**"), 50 U.S.C. App. Section 1 et seq., and the International Emergency Economic Powers Act ("**_IEEPA_**"), 50 U.S.C. Section 1701 et seq., as the TWEA and the IEEPA may apply to Borrower's activities;

(vii)    Borrower is and at all times shall be in compliance with the Patriot Act and all rules and regulations promulgated under the Patriot Act applicable to Borrower; and

(viii)    Borrower (1) is not now, nor has ever been, under investigation by any Governmental Authority for, nor has been charged with or convicted for a crime under, 18 U.S.C. Sections 1956 or 1957 or any predicate offense thereunder, or a violation of the Bank Secrecy Act; (2) has never been assessed a civil penalty under any anti-money laundering laws or predicate offenses thereunder; (3) has not had any of its funds seized, frozen or forfeited in any action relating to any anti-money laundering laws or predicate offenses thereunder; (4) has taken such steps and implemented such policies as are reasonably necessary to ensure that Borrower is not promoting, facilitating or otherwise furthering, intentionally or unintentionally, the transfer, deposit or withdrawal of criminally derived property, or of money or monetary instruments which are (or which Borrower suspects or has reason to believe are) the proceeds of any illegal activity or which are intended to be used to promote or further any illegal activity; and (5) has taken such steps and implemented such policies as are reasonably necessary to ensure that Borrower is in compliance with all laws and regulations applicable to its business for the prevention of money laundering and with anti-terrorism laws and regulations, with respect both to the source of funds from its investors and from its operations, and that such steps include the development and implementation of an anti-money laundering compliance program within the meaning of Section 352 of the Patriot Act, to the extent Borrower is required to develop such a programs under the rules and regulations promulgated pursuant to Section 352 of the Patriot Act.

(r)    <u>Collateral</u>. Until the Maturity Date, Borrower:

(i)    shall faithfully perform each of its affirmative and negative obligations under the Additional Collateral and the Leases;

(ii)    shall promptly enforce against all Persons (other than Lender), including Tenants, the terms of the Additional Collateral and the Leases;

(iii)    except as otherwise permitted in <u>Section 4.1(t)</u> below, may not, without Lender's prior written approval, (A) waive, modify or amend any terms of the Additional Collateral or the Leases, (B) release or discharge any Person (including any Tenant) from its obligations under any of the Additional Collateral or the Leases, or (C) terminate any of the Licenses, Contracts or Leases;

(iv)    may not enter into any new Contracts without Lender's prior written approval; however, notwithstanding the foregoing, Borrower may, without Lender's approval, enter into, modify or amend (i) Contracts terminable upon 30 days' notice, and (ii) Contracts for tenant improvements in connection with Leases that are entered into in accordance with the terms of the Loan Documents;

(v)    except as otherwise permitted in <u>Section 4.1(t)</u> below or in the Security Instrument, may not enter into any new Leases without Lender's prior written approval;

(vi)    shall, unless Lender otherwise agrees in writing, assign to Lender any letter of credit securing any Tenant Lease obligations; and

(vii)    shall give Lender prompt notice of any actual or alleged default under the Additional Collateral or the Leases along with a copy of any written notice Borrower receives concerning the actual or alleged default.

(s)    <u>Covenants on Environmental Matters</u>.

(i)    Borrower shall (i) comply strictly and in all respects with applicable Environmental Laws; (ii) notify Lender immediately upon Borrower's discovery of any

18

spill, discharge, release or presence of any Material of Environmental Concern at, upon, under, within, contiguous to or otherwise affecting the Property; (iii) at Borrower's sole cost and expense, promptly remove such Materials of Environmental Concern and remediate the Property in full compliance with Environmental Laws or as reasonably required by Lender based upon the recommendations and specifications of an independent environmental consultant approved by Lender; and (iv) promptly forward to Lender copies of all orders, notices, permits, applications or other communications and reports in connection with any spill, discharge, release or the presence of any Material of Environmental Concern or any other matters relating to the Environmental Laws or any similar laws or regulations, as they may affect the Property or Borrower.

(ii)      Borrower shall not cause and shall use commercially reasonable efforts to prohibit any Tenant or other Person from (i) causing any spill, discharge or release, or the use, storage, generation, manufacture, installation, or disposal, of any Materials of Environmental Concern at, upon, under, within or about the Property or the transportation of any Materials of Environmental Concern to or from the Property (except for cleaning and other products used in connection with routine maintenance or repair of the Property in full compliance with Environmental Laws), (ii) installing any underground storage tanks at the Property, or (iii) conducting any activity that requires a permit or other authorization under Environmental Laws.

(iii)      Borrower shall provide to Lender, at Borrower's sole cost and expense, promptly upon the written request of Lender from time to time, a Site Assessment or, if required by Lender, an update to any existing Site Assessment for the Property, to assess the presence or absence of any Materials of Environmental Concern and the potential costs in connection with abatement, cleanup or removal of any Materials of Environmental Concern found on, under, at or within the Property. Borrower shall pay the cost of no more than one such Site Assessment or update for the Property in any 12-month period, unless Lender's request for a Site Assessment is based on a reasonable suspicion of Materials of Environmental Concern at or near the Property, a breach of representations hereunder, or an Event of Default, in which case any such Site Assessment or update shall be at Borrower's expense.

(iv)      As between Borrower and Lender, all risk of loss associated with non-compliance with Environmental Laws, or with the presence of any Material of Environmental Concern at, upon, within, contiguous to or otherwise affecting the Property, shall lie solely with Borrower. Accordingly, Borrower shall bear all risks and costs associated with any loss (including any loss in value attributable to Materials of Environmental Concern), damage or liability therefrom, including all costs of removal of Materials of Environmental Concern or other remediation required by Lender or by law. Borrower shall indemnify, defend and hold Lender and its directors, officers, employees and agents harmless from and against all actual loss, liabilities, damages, claims, costs and expenses (including reasonable costs of defense and consultant fees, investigation and laboratory fees, court costs, and other litigation expenses) arising or alleged to have arisen out of or associated, in any way, with (a) the non-compliance with Environmental Laws, (b) the existence of Materials of Environmental Concern in, on, or about the Property, (c) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to Materials of Environmental Concern, (d) any lawsuit brought or threatened, settlement reached, or government order relating to such Materials of Environmental Concern, (e) a breach of any representation, warranty or covenant contained in this Article 4, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, or (f) the imposition of any environmental lien

encumbering the Property; **INCLUDING, WITHOUT LIMITATION, LOSS, LIABILITY, DAMAGE, CLAIM, COST OR EXPENSE RESULTING OR ALLEGED TO HAVE RESULTED SOLELY FROM LENDER'S NEGLIGENCE OR STRICT LIABILITY**, but Borrower shall not be liable under such indemnification to the extent such liabilities result solely from Lender's gross negligence, willful misconduct or fraud as determined by a final non-appealable judgment of a court of competent jurisdiction; and provided, further, that Borrower also shall not be liable under such indemnification to the extent such liabilities result solely from Lender's or any other bona fide third party purchaser's acts or omissions as owner of the Property by foreclosure deed or deed in lieu of foreclosure (or other acquisition of title by Lender or such bona fide third party purchaser), or from any Materials of Environmental Concern that first come to be located at, upon, under, within, contiguous to or otherwise affecting the Property after the date that Borrower no longer owns the Property. Borrower's obligations under this Section 4.1 shall arise whether or not any Governmental Authority has taken or threatened any action in connection with the presence of any Material of Environmental Concern, and whether or not the existence of any such Material of Environmental Concern or potential liability on account thereof is disclosed in any Site Assessment and shall continue notwithstanding the repayment of the Loan or any transfer or sale of any right, title and interest in the Property (by foreclosure, deed in lieu of foreclosure or otherwise). Additionally, if any Materials of Environmental Concern affect or threaten to affect the Property, and provided Borrower has not taken action, Lender may (but shall not be obligated to) give such notices and take such actions as it deems necessary or advisable at the expense of Borrower in order to abate the discharge of any Materials of Environmental Concern or remove the Materials of Environmental Concern. Any amounts payable to Lender by reason of the application of this Section 4.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. The obligations and liabilities of Borrower under this Section 4.1 shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or delivery of a deed in lieu of foreclosure.

(v)     Lender's Right to Protect Collateral. If any discharge of Materials of Environmental Concern or the threat of a discharge of Material of Environmental Concern affecting the Property occurs, whether originating or emanating from the Property or any contiguous real estate and/or Borrower fails to comply with any Environmental Laws or related regulations, Lender may at its election, but without the obligation so to do, give such notices and/or cause such work to be performed at the Property and/or take any and all other actions as Lender shall deem necessary or advisable in order to abate the discharge of any Material of Environmental Concern, remove the Material of Environmental Concern or cure Borrower's noncompliance.

(vi)     Notwithstanding any provision hereunder or elsewhere in the Loan Documents, or any rights or remedies granted by the Loan Documents, Lender does not waive and expressly reserves all rights and benefits now or hereafter accruing to Lender under the "security interest" or "secured creditor" exception under applicable Environmental Laws, as the same may be amended. No action taken by Lender pursuant to the Environmental Indemnity Agreement or the Loan Documents shall be deemed or construed to be a waiver or relinquishment of any such rights or benefits under the "security interest" exception.

(t)     Leasing Matters.

(i)    ; Approval Rights.  Any Major Lease executed after the date hereof shall require the prior written consent of Lender, which consent shall not be unreasonably withheld.  Any modification to a Major Lease shall require the prior written consent of Lender, which consent shall not be unreasonably withheld All Leases and other rental arrangements shall in all respects be approved by Lender. All leases shall provide that (a) the lease is subordinate to the Security Instrument, (which may be subject to Lender agreement of non-disturbance), (b) the tenant shall attorn to Lender, and (c) any cancellation, surrender, or amendment of a Lease without the prior written consent of Lender shall be voidable by Lender.  Borrower shall hold all tenant security deposits in the manner required by Applicable Law. Within twenty (20) days after Lender's request, Borrower shall furnish to Lender a statement of all tenant security deposits, and copies of all leases not previously delivered to Lender, certified by Borrower as being true and correct. Notwithstanding anything contained in the Loan Documents, Borrower shall have the right to enter into Leases or amendments, renewals, expansions or modifications of any existing Leases without Lender's consent provided (i) the proposed Lease, renewal, modification, expansion is an arm's length transaction, on economic terms conforming to current market conditions, with a Tenant that is not an Affiliate

(ii)    Deemed Approval. For any Lease other than a Major Lease, whenever Lender's approval or consent, which approval or consent shall not be unreasonably withheld, conditioned or delayed, is required pursuant to the provisions of this Section 4.1(t), Lender shall use reasonable good faith efforts to respond in writing within 5 Business days after Lender's receipt of Borrower's written request and all required information and documentation relating thereto in which to approve or disapprove such matter. If Lender fails to respond in writing to such request within 5 Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST DEEMED APPROVED IF NO WRITTEN RESPONSE WITHIN 5 DAYS**", Lender shall be deemed to have approved or consented to such matter if Lender fails to respond in writing to such second written request before the expiration of such 5 day period.

(iii)    Covenants. Borrower shall (or shall cause Property Manager to):

(A)    perform the obligations which Borrower is required to perform under the Leases;

(B)    enforce the obligations to be performed by the Tenants under the Leases;

(C)    promptly furnish to Lender any notice of default or termination received by Borrower from any Tenant, and any notice of default or termination given by Borrower to any Tenant;

(D)    not collect any Rents for more than 30 days in advance of the time when the same shall become due, except for bona fide security deposits not in excess of an amount equal to 1 months' rent;

(E)    not enter into any ground lease of any part of the Property;

(F)    not further assign or encumber any Lease;

21

(G)    not, except with Lender's prior written consent, cancel or accept surrender or termination of any Lease;

(H)    not, except with Lender's prior written consent, modify, amend or terminate any Lease; and

(I)    assign to Lender any letter of credit evidencing a security deposit on such terms as may be required by Lender and shall deliver the original of such letter(s) of credit to Lender.

(u)    <u>Management Agreement</u>.  As of the date hereof, Borrower shall self-manage the Property. If Borrower employs an third party Property Manager, Borrower shall (i) cause Property Manager to manage the Property in accordance with the Management Agreement approved by Lender, (ii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Management Agreement, and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Property Manager under the Management Agreement. If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed. Borrower shall not (i) surrender, terminate, cancel, modify, renew or extend the Management Agreement, (ii) enter into any agreement relating to the management or operation of the Property with Property Manager or any other Person, (iii) consent to the assignment by the Property Manager of its interest under the Management Agreement, or (iv) waive or release any of its rights and remedies under the Management Agreement, in each case without the express consent of Lender. Lender shall have the right to require Borrower to hire or replace the Property Manager with (x) an Unaffiliated Qualified Manager selected by Borrower, or (y) another property manager chosen by Borrower and approved by Lender in its sole and absolute discretion, upon the occurrence of any one or more of the following events: (i) at any time following the occurrence of an Event of Default, (ii) if Property Manager shall be in material default under the Management Agreement beyond any applicable notice and cure period, (iii) if Property Manager shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, or (iv) if at any time the Property Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds.

(v)    <u>Control of Borrower</u>. There shall be no change in the day-to-day control and management of Borrower without the written consent of Lender.

4.2.    <u>Survival</u> .  Borrower's covenants hereunder shall survive until (1) payment in full of all Indebtedness, (2) maturity of the Loan and (3) termination of this Agreement and the other Loan Documents.

ARTICLE V.
<u>DEFAULTS AND REMEDIES</u>

5.1.    <u>Event of Default</u>. The term "**_Event of Default_**" means that:

22

(a)      Monetary Obligations. Borrower fails to pay: (i) prior to the Maturity Date, any Indebtedness within **5 days** after it is due and payable; or (ii) all of the Indebtedness on the Maturity Date; or

(b)      Representations. Any representation, warranty, certificate or other statement (financial or otherwise) made or furnished by or on behalf of Borrower to Lender under this Agreement or any of the other Loan Documents, or as an inducement to Lender to enter into this Agreement and the other Loan Documents, shall be false, incorrect, incomplete or misleading in any respect when made or furnished; or

(c)      Insolvency; Bankruptcy. A Bankruptcy Event occurs; or

(d)      Third Party Matters. Any Borrower Party (i) is in default under any material agreement in excess of $50,000 (other than the Loan Documents), (ii) fails to pay any final money judgment in excess of $50,000 , (iii) becomes party to any proceeding, or (iv) fails to comply with any Applicable Laws, which may (in Lender's reasonable determination) materially and adversely impair (A) the Borrower Party's ability to perform its obligations under the Loan Documents, or (B) the value of, or Lender's rights in, the Collateral; or

(e)      Transfers; Liens; Debt. Without Lender's prior written consent (which Lender may withhold for any reason or condition upon any event or consideration, as Lender determines in its sole discretion), Borrower:

(i)      sells, leases (except as expressly permitted in the Loan Documents), exchanges, assigns, transfers, conveys or otherwise disposes of any part of, or any interest in, the Property or the Collateral, or legal or equitable title to any part of, or any interest in, the Property is vested in any Person other than Borrower or Lender by operation of law or otherwise, whether voluntary or involuntary. Notwithstanding anything to the contrary in this Section5.1(e) or elsewhere in the Loan Documents, a sale wherein all of Borrower's obligations are paid in full to Lender, shall not constitute an Event of Default; or

(ii)      creates or permits any (voluntary or involuntary) lien, whether statutory, constitutional or contractual (except for the lien for ad valorem taxes on the Collateral which are not delinquent), security interest or other encumbrance, conditional sale or other title retention document, against or covering any portion of the Collateral; or

(f)      Death; Dissolution; Change in Ownership or Control. (i) Guarantor dies or becomes legally incapacitated (unless, within 60 days of such event. Borrower provides Lender with a replacement Guarantor acceptable to Lender in its sole and reasonable discretion or the remaining Guarantors satisfy the nete worth and liquidity covenants set for in the Guaranty); or (ii) Borrower dissolves, liquidates, merges or consolidates any interest in Borrower is, voluntarily or involuntarily, assigned, encumbered, or otherwise transferred; or

(g)      Financial Reporting. Lender does not receive any item on the date it is due under Section 4.1(e); or

(h)      Intentionally Omitted.

(i)      Lis Pendens. A Notice of lis pendens affecting Property is filed, and such lis pendens is not lifted within 15 days of such filing; or

(j)      Default Under Organizational Documents. The occurrence of a default under any of the organizational documents of Borrower, which remains uncured beyond any applicable grace or cure periods available to Borrower; or

(k)      Insurance. Borrower's fails to maintain insurance as required under this Agreement; or

(l)      Taxes. Borrower's fails to pay Taxes as required under this Agreement; or

(m)      Single Purpose Entity. Borrower's fails to maintain its status as a Single Purpose Entity; or

(n)      Default Under Guaranty. A material default occurs under the Guaranty and such default is not cured within any grace or cure periods provided therein; or

(o)      Certificate of Occupancy. Borrower fails to obtain a certificate of occupancy on or before the date which is 6 months from the Closing Date; or

(p)      Cannabis Use. The Property is used to sell, grow, produce, or distribute cannabis.

(q)      Non-Monetary Obligations. Any Borrower Party fails, on or before the expiration of the Grace Period, to timely perform any of its obligations in any Loan Document, other than those failures specifically governed by any other Subsection of this Section 5.1.

5.2.    Remedies.

(a)      Pre-Event of Default. Lender may file, appear in, or defend any Loan Matter. Unless otherwise provided herein, Lender may employ counsel (including in-house counsel) and incur any reasonable expenses, including Attorneys' Fees, in connection with any Loan Matter. If Lender incurs any expense in connection with any Loan Matter, Borrower shall have 10 days to pay such expenses upon written demand from Lender.  If Borrower fails to pay within such time, then the expenditure will bear interest at the Default Rate from the date incurred until the date on which Borrower fully repays the expenditure along with all accrued interest. The expenditure and all accrued interest are Indebtedness. Borrower shall immediately pay to Lender all amounts due under this Subsection upon Lender's demand.

(b)      Post-Event of Default. During any Event of Default Period:

(i)   Lender may declare all Indebtedness in its entirety to be immediately due and payable or exercise any right at law or in equity, or any remedy expressly provided in any of the Loan Documents, including foreclosing any liens or security interests;

(ii)   Lender may: (1) enforce all Additional Collateral terms and exercise all rights under the Additional Collateral; (2) enter into, terminate, renew or modify Contracts or Licenses, and make concessions to Governmental Authorities; and (3) exercise all proprietary rights in, and fully utilize, the Plans and Specifications.

(iii)   Contractors and Governmental Authorities may: (1) continue work under the Additional Collateral under the sole direction of Lender; and (2) permit Lender to retain and use the Additional Collateral for any purpose Lender deems appropriate. In furtherance of the foregoing, any Person may rely on an affidavit from any officer, agent or attorney of Lender confirming the Event of Default Period.

By exercising any rights under the Loan Documents, Lender does not (unless Lender expressly agrees in writing) become (i) a party to any of the Additional Collateral, or (ii) liable to any Person, **EVEN IF THE LIABILITY ACTUALLY OR ALLEGEDLY AROSE FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, OR STRICT LIABILITY OF LENDER**. Lender will only be liable for liabilities if a court of competent jurisdiction determines in a final, non-appealable judgment that the liability arose from

24

Lender's gross negligence, intentional misconduct or fraud.

Lender's rights under this <u>Section</u> are in addition to any other rights and remedies Lender may have under the Loan Documents, at law, in equity or otherwise. Lender may (but will not be obligated to) also:

     (iv)     at Borrower's sole cost and expense, take whatever action Lender deems necessary or appropriate, including the use of legal proceedings, to (A) cause Borrower to vacate the Property, and (B) take possession of the Property;

     (v)     at Borrower's sole cost and expense, employ security watchmen to protect the Property; or

     (vi)     at Borrower's sole cost and expense, perform or cause to be performed any covenant or agreement of Borrower under any of the Loan Documents.

     (c)     <u>Costs</u>. All sums Lender incurs in connection with exercising its rights under the Loan Documents will be (1) Additional Costs and will bear interest from the date on which Lender incurs the sum until the date on which the sum is repaid in full at the Default Rate, and (2) secured by the Loan Documents. In addition to Lender's rights under the Loan Documents, Lender will be automatically subrogated to all rights of the Person receiving any sum from Lender.

ARTICLE VI.
<u>INTENTIONALLY OMITTED</u>

ARTICLE VII.
<u>RESERVE FUNDS</u>

7.1.    <u>Security; Establishment of Funds.</u>

     (a)     <u>Security</u>. The Loan shall be secured by the Security Instrument creating a first lien on the Property, the Assignment of Rents and the other Loan Documents.

     (b)     <u>Establishment of Funds</u>. Borrower agrees to establish the certain reserves (the "***Funds***") with Lender, to be held by Lender as further security for the Loan.

7.2.    <u>Reserves.</u>

     (a)     <u>Tax and Insurance Escrow Account.</u>

     (i)     Borrower shall establish and maintain the Tax and Insurance Escrow Account pursuant to the terms and provisions of Section 4.1(k) herein.

     (ii)     Borrower pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Tax and Insurance Escrow Account as additional security for the payment of the Loan. Lender shall make disbursements from the Tax and Insurance Escrow Account pursuant to the terms and provisions herein, but not more often than monthly. The Tax and Insurance Escrow Account shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its reasonable discretion. Tax and Insurance Escrow Account will not bear interest. Upon the occurrence of and during the continuance of an Event of Default, Lender may apply any sums then present in the Tax and Insurance Escrow Account to the payment of the Loan in any order in its reasonable discretion. Until expended or applied as above provided, the Tax and Insurance Escrow Account shall constitute additional security for the Loan. Lender shall have no obligation to release any of the Tax and Insurance Escrow Account

25

while any Event of Default (or any event or condition which, with the giving of notice, the passage of time, or both, would constitute an Event of Default) exists or any Material Adverse Change has occurred in Borrower or the Property. All costs and expenses incurred by Lender in the disbursement of any of the Tax and Insurance Escrow Account shall be paid by Borrower promptly upon demand or, at Lender's sole discretion, deducted from the Tax and Insurance Escrow Account. On the Maturity Date or on the date the Loan is paid in full, the monies then remaining on deposit with Lender under this Section 7.2 shall, at Lender's option, be applied against the Indebtedness or if no Event of Default exists, returned to Borrower.

(b)    <u>Interest Reserve.</u>

    (i)    On the Closing Date, a portion of the Loan equal to $1,609,537.50 shall be retained and not funded by Lender on the date hereof.  These monies shall be retained as an Interest Reserve to be held in an account controlled by Lender for the monthly payment of Debt Service on the Loan.  On each Interest Payment Date during the initial term of the Loan, Lender shall disburse and apply from the Interest Reserve an amount equal to the monthly Debt Service of the Loan.  If the funds on deposit in the Interest Reserve are insufficient to pay the monthly Debt Service on the Loan on the applicable Interest Payment Dates, Borrower shall replenish the Interest Reserve by depositing an amount necessary, as determined by Lender in its reasonable discretion, to bring the amount on deposit in the Interest Reserve to that which is sufficient to make the monthly Debt Service on the Loan for the applicable Interest Payment Dates.

    (ii)    Borrower pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Interest Reserve as additional security for the payment of the Loan. The Interest Reserve shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its reasonable discretion. The Interest Reserve will not bear interest. Borrower shall pay interest on the entire amount in the Interest Reserve commencing on the Closing Date. Upon the occurrence of an Event of Default, Lender may apply any sums then present in the Interest Reserve to the payment of the Loan in any order in its reasonable discretion. Until expended or applied as above provided, the Interest Reserve shall constitute additional security for the Loan. Lender shall have no obligation to release any of the Interest Reserve while any Event of Default Period (or any event or condition which, with the giving of notice, the passage of time, or both, would constitute an Event of Default) exists or any Material Adverse Change has occurred in Borrower or the Property. All reasonable costs and expenses incurred by Lender in the disbursement of any of the Interest Reserve shall be paid by Borrower promptly upon demand or, at Lender's sole discretion, deducted from the Interest Reserve. On the Maturity Date or on the date the Loan is paid in full, the monies then remaining on deposit with Lender under this Section 7.2(b) shall, at Lender's option, be applied against the Indebtedness or if no Event of Default exists, returned to Borrower.

    (iii)    Notwithstanding anything to the contrary contained herein, in the event Borrower fails to obtain a certificate of occupancy for the Property on or before the date which is 6 months from the Closing Date, then on the subsequent Interest Payment Date, Lender shall cease to apply funds from the Interest Reserve to pay the monthly Debt Service, and Borrower shall be responsible for payment of monthly debt service on each subsequent Interest Payment Date.

## ARTICLE VIII.
## GENERAL CONDITIONS

8.1.    <u>Waiver</u>. Lender may, without impairing its rights under the Loan Documents (a) waive or not enforce any term of the Loan Documents (b) release any part of the Collateral from the lien or security interest of the Loan Documents or (c) release any Person, directly or indirectly, liable for the Indebtedness or any covenant in the Loan Documents, without releasing the liability of any Person.

8.2.    <u>Lender's Action or Inaction</u>. The liens, security interest or other security rights of Lender in any Loan Document will not be impaired by any indulgence, moratorium or release that Lender may grant, including (a) any renewal, extension, increase or modification which Lender may grant with respect to any Indebtedness, (b) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant in respect of the Property, or any part thereof or any interest therein, or (c) any release or indulgence granted to any endorser, guarantor or surety of any Indebtedness. If Lender takes additional security, then Lender will not be deemed to have released or impaired Lender's liens, assignments, security interests or other rights in and to the Property or under the Loan Documents and Borrower's, Guarantor's and any other endorser's, guarantor's or other surety's liability will not be affected, and the rights of any permitted junior lienholder will not be improved, thereby. Lender may resort to any Collateral (or to any other security now existing or hereafter given to secure payment of the Indebtedness) in such order as Lender deems best (in its sole discretion) without waiving any of the rights, benefits, liens or security interests evidenced by the Security Instrument.

8.3.    <u>Lender's Rights</u>. Lender may waive any Event of Default without waiving any other prior or subsequent Event of Default. Lender may remedy any Event of Default without waiving the Event of Default remedied. Lender's failure to exercise (in any period of time) any right, power or remedy after any Event of Default will not be a waiver of (i) any Event of Default or (ii) Lender's right to exercise any power or remedy at a later date. Lender's single or partial exercise of any right, power or remedy under the Loan Documents will not exhaust the same or preclude any other or further exercise thereof, and every such right, power or remedy under any of the Loan Documents may be exercised at any time and from time to time. Borrower will not be entitled to any additional notice or demand under the Loan Documents, unless specified therein, regardless of whether Lender has given Borrower any notice or made any demand on Borrower which was not expressly required under the terms of the Loan Documents. Lender may accept, on account only, any payment in an amount less than the amount then due on the Indebtedness without in any way affecting the existence of an Event of Default.

8.4.    <u>Third Party Rights</u>. No Person, other than Lender or Borrower is a beneficiary of the Loan Documents. Lender makes no representations and assumes no duties or obligations to any Person concerning the Improvements.

8.5.    <u>Satisfaction of Condition; Time</u>. Lender may freely establish to its satisfaction but based on what a reasonable person would determine under the circumstances) the existence (or nonexistence) of any fact actually or implicitly required to satisfy any condition of this Agreement. Time is of the essence for the Loan Documents.

8.6.    <u>Assignment; Loan Participations</u>.

(a)    Notwithstanding anything to the contrary in the Loan Documents, Borrower may not assign its rights under any of the Loan Documents without the written consent of Lender. Any Borrower assignment without Lender's written consent will (i) be an immediate Event of Default, (ii) relieve Lender from all further obligations under the Loan Documents, and (iii) at Lender's option, be null and void.

(b)    Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents and disseminate to any purchaser, assignee or prospective purchaser or

27

assignee any information Lender has pertaining to the Loan, including credit information on Borrower Parties and any of their respective principals without the knowledge or consent of Borrower. If Lender makes any assignment or sells any interest in the Loan, then Borrower shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Agreement as will facilitate Lender's sale or assignment, provided that no modification will materially add to Borrower's obligations under the Loan Documents.

(c)    Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, or (ii) to sell participation interests in the Loan.  The transaction referred to in clauses (i) and (ii)) above shall hereinafter be referred to collectively as "***Secondary Market Transactions***".

(d)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace in connection with any Secondary Market Transactions, at Borrower's cost and expense, including, without limitation, to:

(i)    (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, sponsor and Property Manager, (B) provide updated budgets relating to the Property and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "***Updated Information***"), together, if customary, with appropriate verification of the Updated Information acceptable to Lender;

(ii)    provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents;

(iii)    at any time prior to a Secondary Market Transaction, execute such amendments to the Loan Documents as requested by Lender, in its discretion, to change the dates on which the monthly payment date and Maturity Date occur; provided that such change in Maturity Date shall only be with respect to the day of the month, and not the year or month, of such Maturity Date; and

(iv)    execute such amendments to the Loan Documents and Borrower organizational documents as may be reasonably requested by Lender or otherwise to effect the Secondary Market Transaction, including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure (any of the foregoing, a "***Loan Bifurcation***"); provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would change the interest rate, the stated maturity or the amortization of principal set forth in the Note, except in connection with a Loan Bifurcation which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note.

8.7.    Heirs, Successors and Assigns. The Loan Documents (i) are binding upon Borrower, and its heirs, devisees, representatives, successors and permitted assigns, including all of Borrower's successors-in-interest in and to all or any part of the Property, (ii) inure to the benefit of Trustee and Lender and their respective successors, substitutes and assigns, and (iii) will constitute covenants running with the Land. All references in this Agreement to Borrower, Trustee or Lender will include all of their heirs, devisees, representatives, successors, substitutes and permitted assigns.

28

8.8.    Exercise of Rights and Remedies. Lender may exercise each right and remedy under the Loan Documents, at law or in equity at any time and from time to time. All of Lender's rights and remedies under the Loan Document, at law or in equity are separate, distinct and cumulative. Lender's exercise of any right or remedy under the Loan Document, at law or in equity will not preclude Lender from later exercising any other right or remedy under the Loan Documents, at law or in equity.

8.9.    Headings. The headings of the sections and subsections of this Agreement are for convenience of reference only and will not affect the scope or meaning of the sections of this Agreement.

8.10.    Inconsistency. If there are any inconsistencies between this Agreement and the other Loan Documents, then this Agreement will control all inconsistencies, except those inconsistencies necessary to create or preserve a valid lien upon or security interest in the Collateral. The Security Instrument will control all inconsistencies among the Loan Documents concerning the creation, preservation, perfection and foreclosure of all liens upon or security interests in the Collateral.

8.11.    Applicable Law. The Loan Documents and the rights and obligations of Borrower, Trustee and Lender are in all respects governed by, and construed and enforced in accordance with the laws of the state of California (without giving effect to its principles of conflicts of law) and the law of the United States applicable to transactions in the state of California, except for those terms of the Security Instrument pertaining to the creation, perfections, validity or foreclosure of the liens or security interests on the Property located within the state of California, which terms will be governed by, and construed and enforced in accordance with the laws of the state of California (without giving effect to its principles of conflicts of law).

8.12.    Forum; Service. **BORROWER IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, IN THE STATE OF CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS. BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN SECTION 8.18.**

8.13.    Usury. Lender and Borrower intend that the Loan Documents strictly comply with applicable usury law. Therefore, Lender and Borrower agree that: (i) none of the terms of the Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; (ii) no Borrower Party will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate; and (iii) this Section controls over all other provisions of the Loan Documents which may be in conflict with this Section. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness. If at any time the interest received for the Indebtedness exceeds the Maximum Rate, then Lender will, at its option, either refund to Borrower the amount of the excess or credit the amount of the excess against the Principal Amount. Borrower agrees that the Loan is not usurious and agrees that if, at any time, Borrower believes that the Loan is usurious, it shall give Lender (a) notice of the condition and (b) sixty 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

8.14.    Severability. If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents. All remaining portions of the Loan Documents will remain enforceable and valid.

8.15.    Counterparts. The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument. All counterparts of each Loan Document must be construed together and will constitute one instrument.

29

8.16.  <u>Joint Liability</u>. If more than one Person is included in the definition of "Borrower", then each Person included in the definition of "Borrower" will be jointly and severally liable for Borrower's obligations under this Agreement.

8.17.  <u>Modification or Termination</u>. The Loan Documents may only be amended, modified or terminated by a written instrument executed by Lender and each Borrower Party (who is a party to the Loan Document). Notwithstanding the foregoing, Borrower agrees that it will be bound by any written amendment or modification of the Loan Documents between Lender and any subsequent owner of the Collateral, with or without notice to Borrower, and Borrower's obligations under the Loan Documents will not be impaired because of any such amendment or modification. This <u>Section</u> does not permit Borrower to transfer any of the Collateral.

8.18.  <u>Notice</u>. Any notice or communication required or permitted under the Loan Documents must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

| To Lender: | Archway Real Estate Income Fund I SPE I, LLC |
| | 16 N. Marengo Avenue, Suite 212 |
| | Pasadena, California 91101 |
| | Attention: Chuck Ng |
| | Phone: (310) 779-6505 |
| | Email: cng@oakhurstfunds.com |
| | |
| with a copy to: | Raines Feldman LLP |
| | 1800 Avenue of the Stars, 12th Floor |
| | Los Angeles, CA 90067 |
| | Phone: (310) 440-4100 |
| | Attention: Joshua Mogin |
| | Email: jmogin@raineslaw.com |
| | |
| To Borrower: | Broadway Avenue Investments LLC |
| | 264 S. Oakhurst Drive |
| | Beverly Hills CA 90212 |
| | Attention: Alan Gomperts |
| | Phone: (310) 621-5350 |
| | Email: alangomperts@hotmail.com |
| | |
| with a copy to | Feldman Berman Schwartz LLP |
| | 20750 Ventura Blvd., Ste. 201 |
| | Woodland Hills, CA 91364 |
| | (818) 707-1465 ext. 3 |
| | Attention: Craig Berman |
| | cberman@fbsllp.com |

or to such other address as Lender or Borrower may designate in writing and deliver in accordance with this <u>Section</u>. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this <u>Section</u>. Any notice or communication sent in accordance with this <u>Section</u> will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this <u>Section</u>. Borrower consents to Lender recording any telephone communications between Lender and Borrower.

8.19.  <u>Signatures</u>. The Loan Documents may be executed by Facsimile Signature and delivered

by electronic means, including a PDF (or other format) attachment to an email or fax. Subject to Applicable Law, any Loan Documents executed by Facsimile Signature will have the same force and effect as a Loan Document containing an original signature and will be binding on all parties to the Loan Documents. Lender may require that any Loan Document with a Facsimile Signature be confirmed by an original signature. However, Lender's failure to request or Borrower's failure to deliver any original signature confirmation will not limit the effectiveness of any Loan Document executed by Facsimile Signature. In this <u>Section</u>, "***original signature***" means a manually signed document by a natural person, as opposed to an electronic signature, and "***Facsimile Signature***" means the signature of a natural person produced by mechanical means, printer or stamp.

8.20.    <u>No Partnership</u>. Borrower and Lender are not partners or joint venturers with respect to the Property. Nothing in the Loan Documents is intended to create any partnership, joint venture or association between Borrower and Lender.

8.21.    <u>Waiver of Jury Trial</u>. **BORROWER AND LENDER WAIVE ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH ANY OF THE LOAN DOCUMENTS. BORROWER AND LENDER HAVE BOTH BEEN ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

8.22.    <u>Consent of Lender; Approvals</u>. Except as otherwise expressly provided in the Loan Documents, if Lender's approval, consent or judgment is required under any Loan Document, then Lender may, in its sole discretion, exercise its judgment in granting or denying its approval or consent regardless of the reasonableness of the request or Lender's judgment.

8.23.    <u>Imaging</u>. Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Borrower waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

8.24.    <u>Entire Agreement</u>. The Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Loan. The Loan Documents supersede all prior written or oral understandings and agreements between Borrower and Lender with respect to the Loan.

8.25.    <u>Damage Waiver</u>. Borrower (and any other Borrower Party, who now or hereafter executes a Loan Document) and Lender agree that neither party will be liable to the other party or any other Person for any punitive, exemplary, consequential or other special damages which may actually or allegedly arise from the Loan, the Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Borrower and Lender have executed this Agreement to be effective on the Closing Date.

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By: _____
Name: Alan Gomperts
Title: Manager

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**LENDER:**

**ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name:   Bobby Khorshidi
Title:   Authorized Signatory

[END OF SIGNATURE PAGES]

## EXHIBIT A

## DEFINITION OF TERMS

"*Additional Collateral*" means, collectively, any (a) Licenses, (b) Contracts (c) Plans and Specifications, (d) Net Proceeds, (e) Rent Loss Proceeds, and (f) Additional Funds.

"*Additional Costs*" means (1) all costs, losses and expenses Lender (in its reasonable determination) incurs (at any time) from (i) making or maintaining the Loan, (ii) protecting the Collateral (to the extent permitted under the Loan Documents), or (iii) enforcing its remedies under the Loan Documents during an Event of Default Period, and (2) any reduction in any amount to which Lender is entitled under the Loan Documents. Additional Costs includes costs which (a) subject Lender to any tax, duty or other charge with respect to the Loan, or changes the basis of taxation of any amounts payable to Lender under the Loan (other than income, capital gain or other taxes imposed on the overall net income of Lender or of its applicable lending office or in connection with any sale of the Loan by Lender by the jurisdiction in which Lender's principal office or such applicable lending office is located) or (b) impose or modify any reserve, special deposit or similar requirements relating to Lender. For purposes of this definition, the term "Lender," at Lender's option, includes Lender's present and future participants in the Loan.

"*Additional Funds*" means the difference, in Lender's reasonable determination from time to time, between (i) the cost to complete the Restoration and (ii) the Net Proceeds or Award, as the case may be.

"*Affiliate*" means (a) any corporation in which Borrower or any partner, shareholder, director, officer, member, or manager of Borrower directly or indirectly owns or controls more than 10% of the beneficial interest, (b) any partnership, joint venture or limited liability company in which Borrower or any partner, shareholder, director, officer, member, or manager of Borrower is a partner, joint venturer or member, (c) any trust in which Borrower or any partner, shareholder, director, officer, member or manager of Borrower is a trustee or beneficiary, (d) any Person which is directly or indirectly owned or controlled by Borrower or any partner, shareholder, director, officer, member or manager of Borrower, (e) any partner, shareholder, director, officer, member, manager or employee of Borrower, (f) any Person related by birth, adoption or marriage to any partner, shareholder, director, officer, member, manager, or employee of Borrower, or (g) any Borrower Party.

"*Agreement*" means this Loan Agreement as, from time to time, amended, modified or restated.

"*Anti-Money Laundering Laws*" means the Bank Secrecy Act of 1970, the US Patriot Act and all other laws and regulations applicable to the prevention of money laundering.

"*Applicable Bankruptcy Law*" means Title 11 of the United States Code, any regulation or rule promulgated thereunder or any other present or future insolvency, bankruptcy or similar law, including laws concerning assignments for the benefit of creditors, appointment of a receiver, trustee, custodian or liquidator, under the laws of the United States or the State of California.

"*Applicable Law*" means all Laws, covenants, conditions and restrictions (including private restrictive covenants) and other requirements relating to or affecting Borrower, Guarantor, Lender or the Property.

"*Appraisal*" means an MAI appraisal of the Property ordered by Lender, dated within 30 days of its use, and prepared by a licensed appraiser satisfactory to Lender.

"*Approved Accounting Method*" shall mean the cash or accrual basis of accounting including, without limitation, a calculation of net operating income and occupancy statistics for the Property, currently utilized by Borrower and certain of its Affiliates in the preparation of financial data heretofore delivered to

Lender so long as the same is and remains in general use by significant segments of the United States accounting profession.

"***Attorneys' Fees***" means all reasonable fees, costs and expenses of attorneys (including allocated costs of in-house counsel), other professional consultants and experts.

"***Award***" means all condemnation awards, judgments, decrees, or proceeds of any sale in lieu of condemnation.

"***Bankruptcy Event***" means any of the following events: (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding). A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"***Borrower***" means **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company, its successors and permitted assigns.

"***Borrower Operating Account***" means an account specified to Lender by Borrower in writing from time to time as Borrower's operating account.

"***Borrower Party***" means, collectively, Borrower and Guarantor.

"***Business Day***" means each day of the week which is not a Saturday, Sunday or a holiday recognized and observed by the Federal Reserve Board of Governors.

"***Casualty***" means if the Property shall be damaged or destroyed, in whole or in part, by fire or any other casualty.

"***Claims***" means any claim (including any Environmental Claim or any other claims arising under Environmental Laws), demands, liabilities, losses, damages, causes of action, judgments, penalties, fines, costs and expenses (including Attorneys' Fees, and of the investigation and defense of any claim, whether or not such claim is ultimately defeated, and the settlement of any claim or judgment including all value paid or given in settlement).

"***Closing Date***" means July 21, 2021.

"***Collateral***" means the Property and all of Borrower's other assets, whether now owned or hereafter acquired, including the Leases, and all proceeds from Borrower's assets.

"***Compliance Certificate***" means a certificate in the form set forth in **Exhibit C** of this Agreement and executed by Alan Gomperts on behalf of Borrower in favor of Lender.

"***Compliance Certificate Delivery Date***" means each date on which (1) Borrower delivers a

Compliance Certificate to Lender, and (2) if Borrower fails to deliver a Compliance Certificate to Lender, then the Compliance Certificate Due Date.

"***Compliance Certificate Due Date***" means the **15**[th] calendar day following the end of each calendar quarter. If the Compliance Certificate Due Date is on a day which is not also a Business Day, then the Compliance Certificate Due Date will be the next Business Day.

"***Condemnation***" means any threatened or instituted proceedings for the taking by eminent domain, or offer to purchase in lieu of a taking, of all or any portion of the Property including any change in any street (whether as to grade, access, or otherwise).

"***Contractors***" means, collectively, all parties with whom or to whom the Contracts have been made or are given.

"***Contracts***" means all contracts, subcontracts, agreements, site development agreements, service agreements, management agreements, warranties and purchase orders, together with any and all renewals, extensions and modifications thereof and all amendments, exhibits and addenda thereto, which have been or will be executed by or on behalf of Borrower, or which have been assigned to Borrower, in connection with the acquisition, use, operation or maintenance of the Property or the construction of improvements on the Property.

"***Control***" or "***controls***" means, with respect to Borrower, the power to direct the management and policies of Borrower, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; and the terms "***Controlling***" and "***Controlled***" have meanings correlating to the foregoing.

"***Damage***" means any damage to, loss, or destruction of the Property.

"***Debt***" means, for any Person, without duplication: (a) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or any of its assets is liable; (b) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person or any of its assets would be liable or subject, if such amounts were advanced under the credit facility; (c) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests; (d) all indebtedness guaranteed by such Person, directly or indirectly; (e) all obligations under leases that constitute capital leases for which such Person or any of its assets is liable or subject; and (f) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person or any of its assets is liable or subject contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"***Debt Service***" means the amount of the outstanding principal balance of the Loan multiplied by the Interest Rate divided by 360 and multiplied by 30 ("***30/360 Basis***"). Interest for the full or partial calendar month at the beginning of the term of this Loan will be calculated on the basis of a 360-day year and the actual number of days elapsed. Interest for any partial calendar month at the end of the term of this Note will be calculated on the basis of a 360-day year and the actual number of days elapsed..

"***Debt Service Coverage Ratio***" means the ratio that Lender reasonably determines on the DSCR Testing Date of (i) Net Cash Flow, to (ii) Debt Service of the Loan for the prior twelve (12) month period.

"***Default Rate***" means a per annum rate of interest equal to the lesser of (i) 18.0% and (ii) the Maximum Rate.

"***Dollars***" and "***$***" means lawful money of the United States of America, which at the time of payment is legal tender for the payment of all public and private debts.

"*Environmental Indemnity Agreement*" means the Hazardous Materials Indemnity Agreement of even date herewith executed by Borrower in favor of Lender.

"*Environmental Approvals*" means any permit, license, approval, ruling, variance, exemption or other authorization required under applicable Environmental Laws.

"*Environmental Claim*" means, with respect to any Person, any notice, claim, demand or similar written communication by any other Person alleging potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, fines or penalties arising out of, based on or resulting from (a) the presence, or release into the environment, of any Material of Environmental Concern at any location, whether or not owned by such Person or (b) circumstances forming the basis of any violation, or alleged violation of any Environmental Law.

"*Environmental Laws*" means all federal, state and foreign laws and regulations relating to pollution or protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including laws and regulations relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use treatment, storage, disposal, transport or handling of Materials of Environmental Concern. The term "Environmental Laws" includes the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations, guidelines and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including Subtitle I relating to underground Storage Tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act. The term "Environmental Law" also includes any present and future federal, state and local laws, statutes, ordinances, rules, regulations, guidelines and the like, as well as common law, conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; requiring notification or disclosure of any releases of any Material of Environmental Concern or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in the Property; or imposing conditions or requirements in connection with permits or other authorization for lawful activity.

"*ERISA*" means, as amended, the Employee Retirement Income Security Act of 1974 and all rules, regulations and guidance promulgated thereunder.

"*Event of Default*" has the meaning set forth in Section 5.1.

"*Event of Default Period*" means the period beginning on the occurrence of an Event of Default and ending on the cure of the Event of Default.

"*Exit Fee*" means $0 payable to Lender.

"*Extraordinary Expenses*" means any extraordinary operating which are not budgeted operating costs and expenses, capital expenditures, or leasing costs (each as set forth in an approved budget).

"*Financing Statement*" means a Financing Statement naming Borrower, as debtor, and Lender, as secured party, perfecting the security interest in the Collateral.

"*Funds*" means collectively, the definition set forth in Section 7.1, together with all reserve or impound accounts (including the Interest Reserve) as set forth in this Agreement.

"***GAAP***" means those generally accepted accounting principles and practices recognized from time-to-time by the Financial Accounting Standards Board (or any generally recognized successor). Borrower, Guarantor and all parties who must deliver any financial information to Lender under this Agreement or any other Loan Document must consistently apply the generally accepted accounting principles and practices recognized by the Financial Accounting Standards Board (or any generally recognized successor) to all statements and information delivered or provided, or otherwise made available, to Lender.

"***Governmental Authority***" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"***Grace Period***" means a period of either (i) 10 days after Lender delivers written notice to Borrower (the "***Initial Grace Period***") and demand for the performance of any default of any covenant, agreement, warranty or condition set forth in this Agreement, or (ii) if (A) Borrower immediately commences and diligently pursues the cure of such default and delivers (prior to the end of the Initial Grace Period) to Lender a written request for more time, and (B) Lender reasonably determines that (1) such default cannot be cured within the Initial Grace Period but can be cured within 10 days after the default, 30 days (for a total of 40 days from the date Lender delivers written notice to Borrower of the default).

"***Guarantor***" means, COLLECTIVELY, **ALAN GOMPERTS,** an individual, **DANIEL HALEVY,** an individual, and **DAVID HALEVY,** an individual.

"***Guaranty***" means the Continuing Guaranty of even date herewith made by Guarantor in favor of Lender relating to the Loan.

"***Improvements***" means all improvements now or hereafter located upon the Land.

"***Indebtedness***" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"***Indemnified Party***" means Lender, Trustee and the directors, officers, employees and agents of Lender and Trustee and any Person owned or controlled by, owning or controlling, or under common control or affiliated with Lender or Trustee.

"***Insurance Impound***" means the impound account Borrower establishes with Lender for the payment of all insurance on the Property as required under this Agreement.

"***Insurance Premiums***" means all costs for the insurance policies required under Section 4.1(j) above.

"***Interest Payment Date***" means the first (1st) day of each calendar month commencing on September 1, 2021, and ending on the earlier of (i) the date the Loan is repaid in full, and (ii) the Maturity Date.

"***Interest Period***" means a 1-month period commencing on the first day, and ending on the last day, of each calendar month.

"***Interest Rate***" means 9.50% per annum.

"***Interest Reserve***" means the funds deposited by Borrower with Lender for the payment of debt service.

"***Land***" means the land described in **Exhibit B** of this Agreement.

"***Late Charge***" means a product equal to 5.0% of the amount of any Past Due Indebtedness.

"***Law***" means any statute, law, regulation, ordinance, rule, treaty, judgment, order, decree, permit, concession, franchise, license, agreement or other governmental restriction, or binding judicial (or tribunal) decisions of the United States or any state or political subdivision thereof, or of any foreign country or any department, province or other political subdivision thereof. All references to Law include any amendment or modification to the Law, and all regulations, rulings, and other Laws promulgated under such Law.

"***Lease(s)***" means all rights, title, interests, estates, powers, privileges, options and other benefits of Borrower in, to and under the lease agreements which now or hereafter cover or affect all or any portion of the Property, together with all renewals, extensions, modifications, amendments, subleases and assignments of such lease agreements.

"***Lender***" means collectively, ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company, its successors and/or assigns.

"***Lender's Offices***" means 16 N. Marengo Avenue, Suite 212, Pasadena, California 91101, Attention: Chuck Ng, or any other place Lender designates from time to time.

"***Licenses***" means, collectively, all licenses, permits, approvals, certificates and agreements with or from all boards, agencies, departments, governmental or otherwise, relating directly or indirectly to the ownership, use, operation and maintenance of the Property, or the construction of the Improvements, whether heretofore or hereafter issued or executed.

"***Loan***" means the loan or loans Lender makes to Borrower pursuant to this Agreement (or the other Loan Documents) up to the Maximum Principal Amount.

"***Loan Documents***" means this Agreement, the Security Instrument, the Environmental Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"***Loan Matter***" means any action or proceeding which may affect the rights or duties of any Person under the Loan Documents.

"***Loan Origination Fee***" means $338,850.00 payable to Lender, in consideration for Lender agreeing to make the Loan to Borrower.

"***Loan Title Policy***" means the title insurance policy (i) naming Lender as the insured, (ii) in the amount of the Maximum Principal Amount, (iii) in form (including endorsements), date and substance, and written by a title insurance underwriter, satisfactory to Lender, (iv) insuring a valid first lien upon the Property by virtue of the Security Instrument, and (v) containing no exceptions other than the preprinted exceptions and the Permitted Encumbrances.

"***Loan to Value Ratio***" means the percentage resulting from a fraction having (i) a numerator equal to the Principal Amount plus any unfunded amounts under the Loan and (ii) a denominator equal to the value of the Property, as determined by the most recent Appraisal, established as of the date on which the fraction is determined.

"***Major Lease***" means any Lease (i) which, either individually or when taken together with any other Lease with the same Tenant or its Affiliates, demises in equal to or in excess of 10% square feet in the Improvements or (b) made with a Tenant that is paying base rent in an amount equal to or exceeding 10% of the Total Revenue.

"***Material Action***" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have Borrower or any Borrower Party be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency

proceedings against Borrower or any Borrower Party, to file a petition seeking, or consent to, reorganization or relief with respect to Borrower or any Borrower Party under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for Borrower or any Borrower Party or a substantial part of its respective property, to make any assignment for the benefit of creditors of Borrower or any Borrower Party, the admission in writing by Borrower or any Borrower Party of such Person's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

"*Material Adverse Change*" or "*material adverse change*" means, in Lender's reasonable discretion, the business prospects, operations or financial condition of a Person or property has changed in a manner which would reasonably be expected to substantially and materially impair the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable Person from timely performing any of its material obligations under the Loan Documents.

"*Material of Environmental Concern*" means all chemicals, pollutants, contaminants, wastes, toxic substances, petroleum and petroleum products, and all other substances regulated by Environmental Laws (but excluding any cleaning or other products, materials or substances in concentrations and amounts used in the ordinary course of operating a similar business on similar property).

"*Maturity Date*" means the earlier to occur of (1) the Scheduled Maturity Date and (2) the date on which the entire Loan must be paid in full after acceleration pursuant to the terms of the Loan Documents.

"*Maximum Principal Amount"* means $16,942,500.00.

"*Maximum Rate*" means the maximum interest rate permitted under Applicable Law.

"*Net Cash Flow*" means Total Revenue less Operating Expenses.

"*Net Proceeds*" means the amount of all insurance proceeds Lender receives <u>less</u> all reasonable costs and expenses Lender incurs in connection with the collection and disbursement of the proceeds.

"*Note*" means the promissory note evidencing the Loan executed by Borrower in favor of Lender as of the date hereof.

"*Operating Expenses*" means shall equal the greater of (x) annual pro forma operating expenses or (y) the most recent quarter's operating expenses multiplied by four, as reasonably approved by the Lender. Operating expenses shall exclude depreciation, and be inclusive of adjustments for accrual of certain non-recurring expenses, annualized Insurance Premiums, Taxes and management fees (in the amount equal to the greater of (x) management fees actually paid, or (y) an imputed rate of 3% of Total Revenue, (b) Taxes and Insurance Premiums, (c) adjustments reflecting the accrual of certain non-recurring expenses, and (d) professional and partnership fees.

"*Paid in Full Mark*" means any payment Borrower tenders to Lender marked "*paid in full*," "*without recourse*," or any similar language.

"*Past Due Indebtedness*" means the sum of any Indebtedness which Borrower fails to pay to Lender within the earlier to occur of (i) 10 days after the date on which the Indebtedness is due (or such longer period as my be applicable hereunder), and (ii) the Maturity Date.

"*Payment Deadline*" means no later than 2:00 p.m. (Pacific time zone) on the date any payment is due and payable under this Agreement or the date any voluntary prepayment is made.

"*Permitted Encumbrances*" means the encumbrances, approved by Lender, set forth in Schedule

B of the Loan Title Policy, except for the preprinted exceptions to title coverage.

"***Person***" means a natural person, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"***Plans and Specifications***" means, collectively, all plans, specifications, notes, drawings, approvals, certifications and similar work product (and all modifications thereof) relating to the Property, including all engineering plans, complete architectural plans, specifications and work drawings, Property costs and related information, site plans, proposed plat dedications and proposed development restrictions and conditions and all requisite building permits authorizing construction of the Improvements (and repairs, modifications and additions thereto).

"***Prepayment Date***" means the day on which Borrower (or any other Person) tenders any Indebtedness which is not then due and payable.

"***Prepayment Premium***" means $0.

"***Principal Amount***" means, at any point in time, that portion of the principal balance of the Loan which is unpaid.

"***Principal Payment Date***" means the earlier of (i) the date the Loan is repaid in full, and (ii) the Maturity Date.

"***Property***" means, collectively, the Land, the Improvements and the Additional Collateral.

"***Property Manager***" means any management company approved by Lender to manage the Property.

"***Property Management Agreement***" means the agreement between Borrower and Property Manager for the operation and management of the of the Property.

"***Qualifying Leases***" means all Leases in place, fully executed and in good standing for the Property with Tenant's is possession and paying rent.

"***Real Estate Taxes***" means all ad valorem taxes, assessments and charges (including ground rents, water and sewer rents, and all other recurring charge) which may create a lien against the Property.

"***Reimbursable Expenses***" means budgeted operating costs and expenses, capital expenditures, or leasing costs (each as set forth in an approved budget). The Reimbursable Expenses shall include management fees owed to the Property Manager but shall not include any administrative fees owed to Property Manager.

"***Rent***" means all of the rents, income, receipts, revenues, issues, profits and other sums of money that are now or at any time hereafter become due and payable to Borrower under the terms of any Lease or arising or issuing from or out of any Lease or from or out of the Property or any part thereof, including minimum rents, additional rents, percentage rents, deficiency rents and liquidated damages following default, payments in consideration for cancellation of a Lease, security deposits (whether cash, one or more letters of credit, bonds or other form of security), advance rents, all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by destruction or damage to the Property and all of Borrower's rights to recover monetary amounts from any lessee in bankruptcy including rights of recovery for use and occupancy and damage claims arising out of lease defaults, including rejection, disaffirmance, repudiation, and similar actions, under Applicable Bankruptcy Law and other statutes governing the rights of creditors, including the immediate and continuing right to collect and receive each and all of the foregoing.

"**Rent Loss Proceeds**" means the aggregate of any loss or business interruption insurance proceeds which the carrier acknowledges is payable to Lender.

"**Restoration**" means the restoration, replacement, and rebuilding of the Property as nearly as possible to its value and condition immediately prior to any Damage or Taking in accordance with Plans and Specifications Lender approves.

"**Security Instrument**" means each deed of trust, mortgage, assignment of leases and rents, security agreement and fixture filing executed by Borrower, Guarantor or any other Person, in favor of the Trustee for the benefit of Lender concerning the Property.

"**Site Assessment**" means an environmental engineering report for the Property prepared by an engineer engaged by Borrower and approved by Lender, and in a manner satisfactory to Lender, based upon an investigation relating to and making appropriate inquiries concerning the existence of hazardous materials on or about the Property, and the past or present discharge, disposal, release or escape of any such substances, all consistent with ASTM Standard E1527-05 (or any successor thereto published by ASTM) and good customary and commercial practice.

"**State**" means the state in which the Land is situated.

"**Scheduled Maturity Date**" means August 1, 2022.

"**Taking**" means any threatened or instituted proceedings for the condemnation or taking by eminent domain, or offer to purchase in lieu of a taking, of all or any portion of the Property including any change in any street (whether as to grade, access, or otherwise).

"**Tax**" or "**Taxes**" means all (1) income, franchise, margin and other taxes, which now or in the future, may be assessed against a Borrower Party, (2) stamp or other taxes due with respect to the Loan Documents, (3) taxes and assessments, which now or in the future, are levied or assessed against the Collateral, (4) taxes (except for ordinary income taxes) and assessments, which now or in the future, are levied or assessed against Lender in any way related to the Indebtedness or the Loan Documents, and (5) all Real Estate Taxes.

"**Tax and Insurance Escrow Account**" means the impound account Borrower establishes with Lender for the payment of real estate taxes and assessments against and insurance on the Property.

"**Tax Impound**" means the impound account Borrower establishes with Lender for the payment of all Taxes on the Property as required under this Agreement.

"**Taxpayer Identification Number**" means _____.

"**Tenant**" means each occupant of any portion of the Land or Improvements under a Lease.

"**Testing Determination Date**" means the date which is the last day of the calendar quarter.

"**Total Revenues**" means, the most recent calendar quarter's revenues for operations pursuant to fully executed approved Leases in good standing and in full force and effect, multiplied by four. Total revenues shall include a reasonable market vacancy factor equal to the greater of (a) the actual vacancy rate at the Property, or (b) 5.0%. The term "Total Revenues" will not include rentals, revenues or income derived from a Lease concerning a Tenant which is not yet in possession of its respective premises and paying rent; provided that for the calculation of Debt Service Coverage Ratio in connection with Interest Rate, Total Revenues will include rentals revenues or income derived from a Lease concerning a Tenant in possession of its respective premises and paying rent.

"**Transfer Event**" means the conveyance of any Collateral to Lender or another Person through a

foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

"***Trustee***" has the meaning set forth in the Security Instrument.

"***UCC***" means the Uniform Commercial Code of the State in effect from time to time or, if the creation, perfection and enforcement of any security interest herein granted is governed by the laws of a state other than the State, then, as to the matter in question, the Uniform Commercial Code in effect in that state from time to time.

"***Unaffiliated Qualified Manager***" means an unaffiliated property manager of the Property that (A) is a reputable, nationally or regionally recognized management company having at least five (5) years' experience in the management of similar type properties, (B) at the time of its engagement as property manager has leasable square footage of the same property type as the Property equal to the lesser of 100,000 leasable square feet and five (5) times the leasable square feet of the Property and (C) is not the subject of a bankruptcy or similar insolvency proceeding.

## EXHIBIT B

## LEGAL DESCRIPTION OF LAND

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

## EXHIBIT C

## COMPLIANCE CERTIFICATE

On July ___, 2021, **BROADWAY AVENUE INVESTMENTS LLC,** a California limited liability company ("*Borrower*") and **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*") entered into a Loan Agreement (the "*Agreement*"). Borrower delivers this certificate (this "*Certificate*") to Lender in order to comply with the terms of the Agreement. Capitalized terms used, but not defined, in this Certificate have the meanings specified in the Agreement.

Borrower certifies to Lender that as of the Closing Date (as defined below):

(1)     No Event of Default exists;

(2)     The natural person executing this Certificate on Borrower's behalf (a) holds the title or position with Borrower required under the Agreement to execute this Certificate, (b) has been duly authorized to execute this Certificate on Borrower's behalf, and (c) has the capacity to duly execute, and make the certifications in, this Certificate; and

(3)     Borrower's calculations of the Debt Service Coverage Ratio are effective as of the most recent DSCR Testing Date and are set forth on **Schedule 1** to this Certificate.

---

Date Borrower Executed this Certificate
(the "Closing Date")

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By: _____
Name: Alan Gompers
Title: Manager

EXHIBIT C
TO
LOAN AGREEMENT

233

## EXHIBIT D

## CONDITIONS PRECEDENT

Each of the following conditions must be satisfied, at Borrower's cost and to Lender's satisfaction (in Lender's sole discretion), before this Agreement is effective.

1. Documents. Lender has received:

    a.   fully executed originals of each Loan Document;

    b.   legal opinions from each Borrower Party's counsel;

    c.   the Loan Title Policy;

    d.   an Appraisal establishing a Loan to Value Ratio less than or equal to 65%;

    e.   immediately available funds from Borrower sufficient to reimburse Lender for all costs (including attorneys' fees) Lender incurred to underwrite, document and close the Loan;

    f.   evidence that all Borrower Parties have all insurance policies required under the Loan Documents; and

    g.   all reports, including environmental assessments, Lender desires;

2. Default. On the day on which Lender receives the last satisfactory document under paragraph 1 above:

    a.   no Event of Default exists; and

    b.   no event exists that after delivery of notice or passage of time will become an Event of Default.

<u>**EXHIBIT E**</u>

<u>Single Purpose Entity Covenants</u>

(a)    <u>Single Purpose Entity/Separateness</u>. Borrower represents, warrants and covenants as follows:

(i)  <u>Limited Purpose</u>. The sole purpose conducted or promoted by Borrower is to engage in the following activities:

(1)    to acquire, own, hold, lease, operate, manage, maintain, develop and improve the Property (or an undivided interest therein) and to contract for the operation, maintenance, management and development of the Property. Borrower has not owned, does not own, and will not own any asset or property other than (A) the Property, and (B) incidental personal property necessary for the ownership or operation of the Property;

(2)    to enter into and perform its obligations under the Loan Documents;

(3)    to sell, transfer, service, convey, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with the Property to the extent permitted under the Loan Documents; and

(4)    to engage in any lawful act or activity and to exercise any powers permitted that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.

(ii)  <u>Limitations on Debt, Actions</u>. Notwithstanding anything to the contrary in the Loan Documents or in any other document governing the formation, management or operation of Borrower, Borrower shall not:

(1)    guarantee any obligation of any Person, including any Affiliate, or become obligated for the debts of any other Person or hold out its credit as being available to pay the obligations of any other Person;

(2)    engage, directly or indirectly, in any business other than as required or permitted to be performed under this Section;

(3)    incur, create or assume any Debt other than (A) the Loan and (B) unsecured trade payables incurred in the ordinary course of its business that are related to the ownership and operation of the Property, and which shall (1) not exceed 2% of the outstanding balance of the Loan, (2) not be evidenced by a note, and (3) be paid within 60 days;

(4)    make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that Borrower may invest in those investments permitted under the Loan Documents;

(5)    to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, sale or other transfer of any of its assets outside the ordinary course of Borrower's business;

E<small>XHIBIT</small> E

<small>TO</small>

L<small>OAN</small> A<small>GREEMENT</small>

(6)      buy or hold evidence of indebtedness issued by any other Person (other than cash or investment-grade securities);

(7)      form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other) or own any equity interest in any other entity;

(8)      own any asset or property other than the Property (or an undivided interest therein) and incidental personal property necessary for the ownership or operation of the Property; or

(9)      take any Material Action without the unanimous written approval of all partners of Borrower.

(iii) <u>Separateness Covenants</u>. In order to maintain its status as a separate entity and to avoid any confusion or potential consolidation with any Affiliate, Borrower represents and warrants that in the conduct of its operations since its organization it has observed, and covenants that it will continue to observe, the following covenants:

(1)      maintain books and records and bank accounts separate from those of any other Person;

(2)      maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets;

(3)      comply with all organizational formalities necessary to maintain its separate existence;

(4)      hold itself out to creditors and the public as a legal entity separate and distinct from any other entity;

(5)      maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other Person and not have its assets listed on any financial statement of any other Person; except that Borrower's assets may be included in a consolidated financial statement of its Affiliate so long as appropriate notation is made on such consolidated financial statements to indicate the separateness of Borrower from such Affiliate and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person;

(6)      prepare and file its own tax returns separate from those of any Person to the extent required by applicable law, and pay any taxes required to be paid by applicable law;

(7)      allocate and charge fairly and reasonably any common employee or overhead shared with Affiliates;

(8)      not enter into any transaction with Affiliates except on an arm's-length basis on terms which are intrinsically fair and no less favorable than would

be available for unaffiliated third parties, and pursuant to written, enforceable agreements;

(9)    conduct business in its own name, and use separate stationery, invoices and checks;

(10)    not commingle its assets or funds with those of any other Person;

(11)    not assume, guarantee or pay the debts or obligations of any other Person;

(12)    correct any known misunderstanding as to its separate identity;

(13)    not permit any Affiliate to guarantee or pay its obligations (other than limited guarantees and indemnities set forth in the Loan Documents);

(14)    not make loans or advances to any other Person;

(15)    pay its liabilities and expenses out of and to the extent of its own funds; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower;

(16)    maintain a sufficient number of employees in light of its contemplated business purpose and pay the salaries of its own employees, if any, only from its own funds; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower;

(17)    maintain adequate capital in light of its contemplated business purpose, transactions and liabilities; provided, however, that the foregoing shall not require any equity owner to make any additional capital contributions to Borrower; and

(18)    cause the managers, officers, employees, agents and other representatives of Borrower to act at all times with respect to Borrower consistently and in furtherance of the foregoing and in the best interests of Borrower.

SCHEDULE 1
TO
LOAN AGREEMENT

# PROMISSORY NOTE

$16,942,500.00                                                          As of July 21, 2021

FOR VALUE RECEIVED, **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*"), promises and agrees to pay to the order of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), in lawful money of the United States of America, the principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100  Dollars ($16,942,500.00) (the "*Loan*"), or so much thereof as may be advanced and outstanding under the Loan Agreement of even date herewith between Borrower and Lender (the "*Loan Agreement*"), with interest on the unpaid principal sum owing thereunder at the rate or rates or in the amounts computed in accordance with the Loan Agreement, together with all other amounts due Lender under the Loan Agreement, all payable in the manner and at the time or times provided in the Loan Agreement. Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Loan Agreement.

If not sooner due and payable in accordance with the Loan Agreement, Borrower shall pay to Lender all amounts due and unpaid under the Loan Agreement dated as of the date hereof, or on any earlier Maturity Date as set forth in the Loan Agreement. Unless otherwise specified in writing by Lender, all payments hereunder shall be paid to Lender at its office located at 16 N. Marengo Avenue, Suite 212, Pasadena, California 91101, Attention: Chuck Ng. Lender reserves the right to require any payment on this Note, whether such payment is a regular installment, prepayment or final payment, to be by wired federal funds or other immediately available funds.

Borrower, co-makers, sureties, endorsers and guarantors, and each of them, expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith, ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWER, except as otherwise provided in the Loan Agreement or other Loan Documents; such parties are and shall be jointly, severally, directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder or in connection with any right, lien, interest or property at any and all times had or existing as security for any amount called for hereunder.

This Promissory Note ("*Note*") evidences a portion of the advances made, interest due and all amounts otherwise owed to Lender under the Loan Agreement. This Note is executed in conjunction with the Loan Agreement and is secured by the liens and security interests created under the Loan Documents (including those arising under the Security Instrument). Reference is made to the Loan Agreement for provisions relating to repayment of the indebtedness evidenced by this Note, including mandatory repayment, acceleration following default, late charges, default rate of interest, limitations on interest, and restrictions on prepayment.

Lender reserves the right, at Lender's sole expense, exercisable in Lender's sole discretion and without notice to Borrower or any other person, to sell participations, to assign its interest or both, in all or any part of this Note or this debt or the debt evidenced hereby.

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents.  Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be

construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Loan, or on acceleration of the maturity of the Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation.  Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Loan without the payment of the Prepayment Premium (or, if the Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Loan.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Loan.

**WAIVER OF TRIAL BY JURY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**THIS WRITTEN NOTE ALONG WITH THE LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Note shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of laws principles.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

EXECUTED as of the date first written above.

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By
Name: Alan Gomperts
Title: Manager

<u>**CONTINUING GUARANTY**</u>

**ALAN GOMPERTS**, an individual, **DANIEL HALEVY**, an individual, and **DAVID HALEVY**, an individual ("*Guarantor*"), executed this Continuing Guaranty (this "*Guaranty*") on July __, 2021 (the "*Effective Date*") in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("*Lender*").

BACKGROUND RECITALS

A.     Lender and **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*") have entered into the Loan Agreement (the "*Loan Agreement*"), dated as of the date hereof governing (among other things) the Loan in the amount of $16,942,500.00 (the "*Loan*").

B.     The Loan is secured in part by that certain deed of trust lien given by the Borrower to the Lender (the "*Security Instrument*"), and more particularly described in the Loan Agreement. The Security Instrument encumbers Borrower's interest in and to the "Property" described in the Security Instrument (the "*Property*").

C.     Lender would not have entered into the Loan Agreement or made the Loan to Borrower without Guarantor making and delivering this Guaranty.

Therefore, Guarantor (1) acknowledges the receipt and sufficiency of good and adequate consideration for making this Guaranty, and (2) agrees as follows:

1.     Definitions.  Capitalized terms not otherwise defined in this Guaranty will have the meanings set forth in the Loan Agreement.  Within this Guaranty, words of any gender include all other genders and words in the singular number include the plural, unless the context otherwise requires.  The following terms have the following meanings:

"*Bankruptcy Event*" means any of the following events:  (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding).  A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"*Conveyance Event*" means that (1) legal or equitable title to any part of, or any interest in, the Collateral is vested in any Person other than Borrower or Lender, or (2) Borrower creates or permits any lien (except for the lien for Taxes which are not delinquent), security interest or other encumbrance against or covering the Collateral.

"*Enforcement Costs*" means all reasonable attorneys' fees, legal expenses and other costs Lender incurs to collect or enforce the Guaranteed Obligations or the Loan Documents.

1

"*Guaranteed Obligations*" means all (a) 100% of the Indebtedness and Interest, and/or (b) the operating costs of the Property, and/or (c) Enforcement Costs, and/or (d) Recourse Amounts.

"*Indebtedness*" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"*Interest*" means all accrued and unpaid interest on the Principal Amount.

"*Loan Documents*" means the Loan Agreement, the Security Instrument, the Hazardous Materials Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"*Liquid Assets*" means unencumbered (a) cash on hand or on deposit (including certificates of deposit which mature in less than twelve months) in commercial banks operating in the United States, (b) readily marketable securities issued by the United States, and (c) readily marketable commercial paper rated A-1 by Standard & Poor's Corporation (or a similar rating by any similar organization that rates commercial paper).

"*Recourse Amounts*" any loss, damage, cost, expense, liability, claim or other obligation (including attorneys' fees and costs reasonably incurred), causes of action, suits, claims, demands and judgments of any nature or description whatsoever, which may be imposed upon, incurred by or awarded against Lender or any affiliate thereof as a result of, arising out of or in connection with the following:

(a)     misapplication or misappropriation of Rents, security deposits, or other income, issues, profits and revenues derived from the Property at any time an Event of Default by Borrower exists, provided that any prepaid rent paid more than 1 month in advance as of the date of an Event of Default hereunder by Borrower shall be considered to have been collected after the event of Borrower's default;

(b)     fraud or material misrepresentation of Borrower or Guarantor;

(c)     (i) misapplication or misappropriation of any insurance policies by reason of damages, loss or destruction to any portion of the Property or the Improvements thereon to the full extent of such misapplied or misappropriated proceeds, or (ii) the misapplication or misappropriation of proceeds or awards resulting from the condemnation or taking in lieu of condemnation of any portion of the Property, to the full extent of such misapplied or misappropriated proceeds or awards;

(d)     intentional physical waste of the Property or any portion thereof, and all costs, including reasonable attorney's fees, incurred by Lender to repair or remediate such intentional physical waste, to the full extent of the actual loss incurred by Lender as a result thereof;

(e)     any taxes, assessments or insurance premiums, to the extent not covered by amounts paid into escrow by Borrower to Lender, for which Borrower is liable under the Note, the Security Instrument or any other loan document executed in connection therewith, but only to the extent that Revenue from the Property is sufficient to pay such taxes, assessments or insurance premiums;

(f)     failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property;

(g)     loss arising under the Hazardous Materials Indemnity Agreement executed by Borrower in favor of Lender, or Borrower's breach of the hazardous substances covenants, warranties or representation provisions contained in the Security Instrument or other loan documents executed in connection with the Note and Security Instrument, which loss is not caused by Lender after Lender takes title to the Property;

(h)     loss by fire or casualty to the extent not compensated by insurance proceeds collected by Lender;

(i)     any loss resulting from any Guarantor (or any Person comprising any Guarantor), Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Security Instrument or any other Loan Document, seeking a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserting in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, but only if and to the extent that a court of competent jurisdiction determines that such claims were frivolous (i.e., without any merit) and in bad faith; and

(j)     all costs and fees, including without limitation, reasonable attorneys' fees incurred by Lender in the enforcement of subparagraphs (a) through (j) above.

Notwithstanding the foregoing, Recourse Events shall mean the full amount of the Indebtedness upon the occurrence of either of the following events (the "***Full Recourse Events***"):

(a)     a Bankruptcy Event;

(b)     Borrower fails to obtain Lender's prior consent to any subordinate financing secured by the Property; or

(c)     a Conveyance Event; or

(d)     Borrower fails to comply with the "single purpose entity/separateness" covenants set forth in Section 4.1(b) of the Loan Agreement beyond the expiration of all applicable notice cure periods. and such failure results in (or is cited as a factor by a court of competent jurisdiction) the substantive consolidation of Borrower with another Person; or

(e)     Borrower fails to comply with the cash management provisions set forth in Section 6.1 and Section 6.2 of the Loan Agreement beyond the expiration of all applicable notice cure periods.

"*Transfer Event*" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

2.　　Inducement. Guarantor has an economic investment or interest in Borrower, and an interest in the success of the Property, and Guarantor will substantially benefit from Lender's agreement to make the Loan to Borrower.

3.　　Guaranty. In order to induce Lender to make the Loan to Borrower, Guarantor absolutely, unconditionally and irrevocably guarantees and agrees to pay and perform the Guaranteed Obligations. Notwithstanding anything to the contrary in this Guaranty or any of the other Loan Documents, Guarantor will be liable for all of the Indebtedness and the Enforcement Costs if a Conveyance Event, or a Bankruptcy Event, occurs.

4.　　Waivers.

(a)　　Guarantor, with respect to the Guaranteed Obligations and the Indebtedness, waives: (i) **PRESENTMENT FOR PAYMENT**; (ii) **DEMAND**; (iii) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (iv) **NOTICE OF INTENTION TO ACCELERATE**; (v) **NOTICE OF ACCELERATION**; (vi) **NOTICE OF DISPOSITION OF COLLATERAL**; (vii) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (viii) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (ix) **PROTEST AND NOTICE OF PROTEST**; and (x) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(b)　　Lender is not obligated to notify Guarantor of (i) Lender's acceptance of this Guaranty, (ii) any credit extended on the faith of this Guaranty, or (iii) Borrower's failure to pay or perform any Indebtedness which constitutes Guaranteed Obligations. Lender is not obligated to use diligence in preserving any Person's liability for the Indebtedness or the Guaranteed Obligations. Lender is not obligated to use diligence in bringing suit to enforce collection, or performance, of the Indebtedness or the Guaranteed Obligations.

(c)　　Guarantor waives **ALL DEFENSES GIVEN OR REDUCTIONS IN THE GUARANTEED OBLIGATIONS AVAILABLE TO SURETIES OR GUARANTORS AT LAW OR IN EQUITY** other than the actual payment and performance of the Guaranteed Obligations, including **ALL DEFENSES BASED UPON QUESTIONS AS TO (i) THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THE INDEBTEDNESS OR THE GUARANTEED OBLIGATIONS, OR (ii) THE VALUE OF ANY COLLATERAL**. Guarantor is primarily liable under this Guaranty.

(d)　　At any time, Lender may, in its sole discretion, without Guarantor's prior consent, and without impairing, modifying, releasing or otherwise affecting Guarantor's liability under this Guaranty:

(i)　　alter, compromise, accelerate, renew, extend, or change the time or manner for the payment of, the Indebtedness;

(ii)　　increase or reduce the rate of interest on the Indebtedness;

(iii)　　take, surrender, exchange, withdraw, subordinate, alter, modify or eliminate security;

(iv)　　(1) add, release, discharge, or (2) settle or compromise with, any Borrower Party or other Person liable for the Indebtedness or the Guaranteed Obligations;

(v)　　make any change to the Loan Documents or the manner in which Lender does business with Borrower; or

(vi)      apply any moneys received from Borrower or any other source, or from any security or collateral, in the manner Lender determines, without being required to marshal securities or assets or to apply any part of the moneys or security to any particular part of the Guaranteed Obligations.

Lender is not required to retain, hold, protect, exercise due care with respect thereto, perfect security interests in or otherwise assure or safeguard any security for the Indebtedness or the Guaranteed Obligations; and Guarantor's obligations under this Guaranty and any other Loan Documents will not be affected by, and Guarantor will not have any recourse from, Lender's failure (x) to do any of the foregoing with respect to any security for the Indebtedness or the Guaranteed Obligations, or (y) to exercise or not exercise any right or remedy of Lender under the Loan Documents, at law or in equity.

5.      Guaranty Absolute.  Guarantor's liability under this Guaranty is absolute, and will not be modified, released or impaired, for any reason, including because:

(a)      any Person (including any Borrower Party) dies, or is or becomes incapacitated, disabled, dissolved or terminated;

(b)      Lender fails to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of any Borrower Party or another Person;

(c)      Lender cannot recover the Indebtedness from any Borrower Party or another Person for any reason, including any statute of limitations or Applicable Bankruptcy Law;

(d)      Any Borrower Party or another Person is entitled to any defense, setoff or counterclaim related to the Loan, the Indebtedness or the Guaranteed Obligations;

(e)      a Conveyance Event or a Transfer Event occurs;

(f)      Borrower Party (other than Guarantor) or another Person liable for the payment or performance of Indebtedness or the Guaranteed Obligations is released or discharged by operation of law or otherwise (other than a discharge resulting from the payment of the Indebtedness);

(g)      this Guaranty or any other Loan Document is modified, extended, amended, released or waived; or

(h)      Lender fails to give Guarantor notice of an Event of Default under any Loan Document.

6.      Subordination.  Until the Indebtedness is repaid in full (and including all interest accruing, after any Bankruptcy Event, on the Indebtedness):

(a)      Guarantor subordinates all rights to repayment of any current or future indebtedness from Borrower to Guarantor to Lender's prior right to receive or require payment in full of the Indebtedness.

(b)      Guarantor shall not accept any payment or satisfaction of any indebtedness of Borrower to Guarantor.

(c)      Guarantor shall not accept any security for any indebtedness of Borrower to Guarantor.

(d)      If Guarantor receives any payment, satisfaction or security for any indebtedness of Borrower to Guarantor, then Guarantor shall immediately deliver the payment, satisfaction or security to Lender.  Lender will apply the payment, satisfaction or security as set forth in the Loan Agreement.  Guarantor will hold any payment, satisfaction or security Guarantor receives in trust for Lender until the payment, satisfaction or security is delivered to Lender.

7.      Waiver of Right of Subrogation.  To the fullest extent permitted by Applicable Law, Guarantor waives all rights at law or in equity to seek subrogation, contribution, indemnification or any

other form of reimbursement or repayment from any Borrower Party or any other guarantor of, or any other party secondarily liable for, the payment or performance of the Indebtedness or the Guaranteed Obligations until the Indebtedness has been paid and performed in full. When the Indebtedness has been indefeasibly paid and fully performed, Guarantor will be subrogated to the rights of Lender against Borrower and any endorsers, sureties or other guarantors to the extent of the payments that Guarantor makes on the Guaranteed Obligations.

8.    No Usury. Lender and Guarantor intend that this Guaranty and the other Loan Documents strictly comply with applicable usury law. Therefore, Lender and Guarantor agree that: (i) none of the terms of this Guaranty or the other Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; and (ii) no Person (including any Borrower Party) will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness. If at any time the interest received for the Guaranteed Obligations exceeds the Maximum Rate, then Lender will, at its option, either refund to Guarantor the amount of the excess or credit the amount of the excess against the Guaranteed Obligations. Guarantor agrees that the Loan and the Guaranty are not usurious and agrees that if, at any time, Guarantor believes that the Loan or the Guaranty is usurious, it shall give Lender (a) notice of the condition and (b) 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

9.    Representations and Warranties. On the Effective Date, Guarantor represents to Lender that:

(a)    Guarantor (i) is solvent, (ii) is not bankrupt and (ii) has no outstanding liens, garnishments, bankruptcies or court actions which could cause Guarantor to become insolvent or bankrupt. No Bankruptcy Event has occurred.

(b)    Each Guarantor financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly presents the financial condition and the results of operations of each Guarantor on the date and for the period covered by the financial statements. All other reports, statements and other data that any Guarantor furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading. Since the date of the last financial statements each Guarantor delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) Guarantor's business, condition (financial or otherwise) or operations, or (b) Guarantor's ability to perform or satisfy, or Lender's ability to enforce, any of the Guaranteed Obligations. For the purposes of Subsection 9(a) and 9(b), "Guarantor" includes any joint ventures, managing member or general partner of Guarantor.

(c)    There are no suits or proceedings (including condemnation) pending, or to Guarantor's knowledge threatened, against or affecting any Guarantor, another Borrower Party or the Collateral, or involving the validity, enforceability or priority of this Guaranty or any of the Loan Documents.

(d)    If Guarantor is not a natural person, then Guarantor: (i) is duly organized, validly existing, and in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own its other assets and transact its present or proposed business.

(e)    Guarantor has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty, and has taken all necessary actions to authorize its execution, delivery and performance of the Guaranteed Obligations. Guarantor has duly executed and delivered this Guaranty, and each other Loan Document to which it is a party or under which

it is obligated. Each obligation under this Guaranty or any other Loan Document constitutes, Guarantor's legal, valid and binding obligation, enforceable in accordance with the Loan Document's terms, except to the extent enforcement of any Loan Document is subject to the effect of (i) Applicable Bankruptcy Law, or (ii) general principles of equity.

(f)    Guarantor's execution, delivery and performance of this Guaranty and the other Loan Documents, and compliance with the terms and provisions of this Guaranty and the other Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, or constitute a default under, the terms of any other instrument to which Guarantor is a party or by which Guarantor is bound or may be subject, or (iii) violate any term of Guarantor's certificate of formation or other documents and agreements governing Guarantor's existence, management or operation. Guarantor is not required to obtain any Person's consent to execute, deliver or perform this Guaranty or the other Loan Documents.

(g)    Guarantor is intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

10.    Covenants. Guarantor absolutely and unconditionally covenants that:

(a)    Guarantor shall pay and perform the Guaranteed Obligations even if, for any reason, (i) Borrower does not pay or perform the Indebtedness or any other Borrower obligations under the Loan Documents, or (ii) the Indebtedness or the Guaranteed Obligations are disaffirmed or terminated (except for payment and performance in full).

(b)    Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower is (for any reason) liable for any portion of the Indebtedness or the Guaranteed Obligations.

(c)    Guarantor will at all times remain intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

(d)    Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower's organizational structure changes.

(e)    Notwithstanding any prior reduction or termination of this Guaranty, Guarantor will remain liable for, and (after Lender's demand) pay to Lender, the amount of any prior Indebtedness payment that Lender must (for any reason) pay to Borrower or any other Person.

(f)    Guarantor will not (i) benefit from, (ii) be able to direct the application of, or (iii) have any right to participate in, any Collateral.

(g)    Guarantor will remain obligated under this Guaranty for the Guaranteed Obligations even if Guarantor loses (for any reason) any right against (i) any Borrower Party or other Person, or (ii) the Collateral.

(h)    Lender is not required to pursue any remedies against any Person or the Collateral before demanding that Guarantor pay or perform the Guaranteed Obligations.

(i)    Lender may maintain an action on this Guaranty without joining any other Borrower Party or bringing a separate action against a Borrower Party.

(j)    Until all Indebtedness is indefeasibly repaid, Guarantor shall maintain (a) at least $2,000,000.00 of Liquid Assets (the "*Liquidity Requirement*"), and (b) a tangible net worth of at least $16,942,500.00 (the "*Net Worth Requirement*"). Guarantor will provide Lender with evidence (which may include a certificate), satisfactory to Lender in its discretion, establishing Guarantor's satisfaction of the Liquidity Requirement and the Net Worth Requirement within 60 days after the end of each calendar quarter.

7

11.     <u>Financial Statements and Reports</u>.   Guarantor shall deliver to Lender all financial statements, reports and certificates, if any, required under the Loan Agreement.

12.     <u>Multiple Guarantors</u>.  If there are more than one Guarantor, then this <u>Section 12</u> is in effect. Unless the context clearly indicates otherwise, all references to "*Guarantor*" mean either or any Guarantor.

(a)     **Joint Liability**.  Lender may sue any Guarantor, jointly or individually, without impairing Lender's rights against each Guarantor under this Guaranty.  Lender may compromise with any Guarantor or any other Person for any sum Lender sees fit.  Lender may release any Guarantor or any other Person from any liability for the Indebtedness or the Guaranteed Obligations without impairing Lender's right to demand and collect the balance of the Indebtedness or the Guaranteed Obligations from any Guarantor or other Person.  No compromise or release will, except as specifically set forth in this Guaranty, impair Guarantors' rights amongst themselves.

(b)     **Disputes**.  Each Guarantor shall indemnify, defend and hold Lender harmless from and against any Claim Lender may suffer arising from any dispute between Guarantors, **INCLUDING THOSE CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM LENDER'S SOLE, COMPARATIVE OR CONTRIBUTORY NEGLIGENCE, OR STRICT LIABILITY,** unless a court of competent jurisdiction determines in a final non-appealable judgment that the Claim actual resulted from the intentional misconduct or gross negligence of Lender.

13.     <u>Revival and Reinstatement</u>.  This Guaranty remains in full force and effect during any Bankruptcy Event.  Notwithstanding the full payment and performance of the Obligations and the Guaranteed Obligations, this Guaranty will be reinstated in full force and effect immediately upon the occurrence of any Bankruptcy Event.  If any prior payment or performance of the Obligations or Guaranteed Obligations is rescinded or reduced, or Lender must otherwise restore or return any prior payment or performance of the Obligations or Guaranteed Obligations, then the Guaranteed Obligations will be reinstated to the extent of the payment or performance actually rescinded, reduced, restored or returned.

14.     <u>Rights Cumulative</u>.  Lender's rights under this Guaranty, at law and in equity are cumulative.  Until the Indebtedness is paid and performed in full and this Guaranty is terminated, Lender may exercise, as many times and as often as Lender elects (in its discretion) any rights under this Guaranty, at law and in equity.  This Guaranty does not diminish or discharge Lender's rights under any prior or future guaranty by Guarantor in favor of Lender.

15.     <u>Notices</u>.  Any notice or communication required or permitted under this Guaranty must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

To Lender:              Archway Real Estate Income Fund I SPE I, LLC
                        16 N. Marengo Avenue, Suite 212
                        Pasadena, California 91101
                        Attention: Chuck Ng
                        Phone: (310) 779-6505
                        Email: cng@oakhurstfunds.com

with a copy to:         Raines Feldman LLP
                        1800 Avenue of the Stars, 12th Floor
                        Los Angeles, CA 90067
                        Attention: Joshua Mogin
                        Phone: (310) 440-4100
                        Email: jmogin@raineslaw.com

To Guarantor:           Alan Gomperts

8

264 S. Oakhurst Drive
Beverly Hills CA 90212
Phone: (310) 621-5350
Email: alangomperts@hotmail.com

Daniel Halevy
133 S. Palm Drive
Beverly Hills CA 90212
Phone: (310) 467-4703
Email: danhalevy@gmail.com

David Halevy
257 S. Linden Drive
Beverly Hills CA 90212
Phone: (310) 666-2885
Email: danhalevy@gmail.com

with a copy to       Feldman Berman Schwartz LLP
20750 Ventura Blvd., Ste. 201
Woodland Hills, CA 91364
(818) 707-1465 ext. 3
Attention: Craig Berman
cberman@fbsllp.com

or to such other address as Lender or Guarantor may designate in writing and deliver in accordance with this Section. Any change of address will be effective on the 5ᵗʰ Business Day after notice is given pursuant to the terms of this Section. Any notice or communication sent in accordance with this Section will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this Section. Guarantor consents to Lender recording any telephone communications between Lender and Guarantor.

16.     Applicable Law. The Laws of the **STATE OF CALIFORNIA** (without giving effect to its principles of conflicts of law) and of the **UNITED STATES** will govern and control this Guaranty. If any provision of this Guaranty or the application thereof to any person or circumstance, for any reason and to any extent, shall be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

17.     Consent to Forum. **GUARANTOR IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS. BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN SECTION 15 ABOVE.**

18.     Waiver of Jury Trial. **GUARANTOR WAIVES ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS. GUARANTOR HAS BEEN ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

9

19. <u>Counterparts</u>. The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument. All counterparts of each Loan Document must be construed together and will constitute one instrument.

20. <u>Modification or Termination</u>. This Guaranty may only be amended, modified or terminated by a written instrument executed by Lender and Guarantor. Guarantor agrees that it will be bound by any written amendment or modification of the Loan Documents, with or without notice to Guarantor, and Guarantor's obligations under this Guaranty and the other Loan Documents will not be impaired because of any such amendment or modification.

21. <u>Successors and Assigns; Unenforceability of Certain Provisions, Headings</u>. The terms of this Guaranty are binding on Guarantor and its heirs, devisees, representatives, successors and assigns and inure to the benefit of Lender and all of its transferees, credit participants, successors and assignees. The headings in this Guaranty are for convenience only and will not limit or otherwise affect any of the terms of this Guaranty. If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents. All remaining portions of the Loan Documents will remain enforceable and valid.

22. <u>Damage Waiver</u>. Guarantor agrees that Lender will not be liable to Guarantor, any other Borrower Party or any other Person for any punitive, exemplary or consequential damages which may actually or allegedly arise from this Guaranty, the Loan, the other Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**. The foregoing waiver does not limit or otherwise impair the terms of any other waiver or indemnity in the Loan Agreement.

23. <u>Assignment</u>. Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents (including this Guaranty) and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan or this Guaranty, including credit information on Borrower Parties and any of their respective principals. If Lender makes any assignment or sells any interest in the Loan or this Guaranty, then Guarantor shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Guaranty as will facilitate Lender's sale or assignment, provided that no modification will materially add to Guarantor's obligations under this Guaranty or the other Loan Documents.

24. <u>Imaging</u>. Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Guarantor waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

25. <u>Time</u>. Time is of the essence for this Guaranty and the other Loan Documents.

26. <u>California Provisions</u>. In addition to the waivers set forth elsewhere in this Guaranty:

(a) Guarantor hereby waives marshaling of assets and liabilities, rights of offset, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any liability to which it applies or may apply, acceleration, presentment, demand for payment, protest, notice of non-payment, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and demands, collection suit or the taking of any other action by Lender.

(b) Guarantor expressly waives any and all benefits, rights and/or defenses which might otherwise be available to Guarantor under the following sections of the California Civil Code: Section 2809 (the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal), Section 2810 (a surety is not liable if, for any reason other than the mere personal disability of the principal, there is no liability upon the part of

the principal at the time of execution of the contract, or the liability of the principal thereafter ceases), Section 2819 (a surety is exonerated if the creditor alters the original obligation of the principal without the consent of the surety), Section 2822 (a surety's right to have the principal designate the portion of any obligation to be satisfied by the surety in the event that the principal provides partial satisfaction of such obligation), Section 2845 (a surety is exonerated to the extent that the creditor fails to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue and which would lighten the surety's burden), Section 2846 (a surety may compel the principal to perform the obligation when due), Section 2847 (if a surety satisfies the principal obligation, or any part thereof, the principal is obligated to reimburse the surety for the amounts paid by the surety), Section 2850 (whenever the property of a surety is hypothecated with property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation), Section 2899 (where one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort to the property in a certain order, on the demand of any party interested) and Section 3433 (where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons).

(c)      Guarantor expressly agrees not to exercise or take advantage of any rights, benefits and/or defenses which might be available to Guarantor under the following California Civil Code Sections, unless and until the Guaranteed Obligations shall have been indefeasibly paid and satisfied in full:  Section 2839 (performance of the principal obligation, or an offer of such performance, duly made as provided in the Civil Code, exonerates a surety), Section 2848 (a surety, upon satisfaction of the obligation of the principal, is entitled to enforce remedies which the creditor then has against the principal and to pursue his co-sureties or other third parties after the surety has satisfied the underlying debt, or at least more than his share of it), and Section 2849 (a surety is entitled to the benefit of security held by the creditor for the performance of the principal obligation held by the creditor).

(d)      Guarantor waives any defense that Guarantor may have by reason of the failure of Lender to provide Guarantor with any material facts about Borrower, including any information respecting the financial condition of Borrower, Borrower's ability to perform the Loan obligations or the sufficiency of Lender's security.

(e)      Guarantor waives any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other Person, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons.

(f)      Guarantor waives all rights of indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.  Guarantor hereby waives the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of guarantors or sureties thereunder.

(g)      Guarantor waives all rights and defenses that Guarantor may have because the debtor's (Borrower's) debt is secured by real property.  This means, among other things:

(i)      The creditor (Lender) may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by the debtor.

(ii)      If the creditor forecloses on any real property collateral pledged by the debtor:  (A) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the creditor may collect from Guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the debtor.

(h)      This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the debtor's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the Code of Civil Procedure.  Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal (Borrower) by the operation of Section 580d of the Code of Civil Procedure or otherwise.  Any summary of statutory provisions is for convenience only, and Guarantor has read and is familiar with the entirety of such provisions.

27.    Entire Agreement.    The Loan Documents constitute the entire understanding and agreement between Borrower, Guarantor and Lender with respect to the transactions arising in connection with the Loan and this Guaranty.  The Loan Documents supersede all prior written or oral understandings and agreements between Borrower, Guarantor and Lender with respect to the Loan and this Guaranty.


[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK SIGNATURE PAGE FOLLOWS]

Guarantor has executed this Guaranty to be effective on the Effective Date.


**GUARANTOR:**

_____
**ALAN GOMPERTS**, an individual

_____
**DANIEL HALEVY**, an individual

_____
**DAVID HALEVY**, an individual

# EXHIBIT 4

## CONTINUING GUARANTY

**ALAN GOMPERTS,** an individual, **DANIEL HALEVY,** an individual, **DAVID HALEVY,** an individual**, and SUE HALEVY,** an individual (collectively "***Guarantor***"), executed this Continuing Guaranty (this "***Guaranty***") on April 14, 2023 (the "***Effective Date***") in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("***Lender***").

BACKGROUND RECITALS

A.     Lender and **SLA INVESTMENTS, LLC,** a California limited liability company ("***Borrower***") have entered into the Loan Agreement (the "***Loan Agreement***"), dated as of the date hereof governing (among other things) the Loan in the amount of $125,000.00 (the "***Loan***").

B.     The Loan is secured in part by that certain deed of trust lien given by the Borrower to the Lender (the "***Security Instrument***"), and more particularly described in the Loan Agreement. The Security Instrument encumbers Borrower's interest in and to the "Property" described in the Security Instrument (the "***Property***").

C.     Lender would not have entered into the Loan Agreement or made the Loan to Borrower without Guarantor making and delivering this Guaranty.

Therefore, Guarantor (1) acknowledges the receipt and sufficiency of good and adequate consideration for making this Guaranty, and (2) agrees as follows:

1.     <u>Definitions</u>.  Capitalized terms not otherwise defined in this Guaranty will have the meanings set forth in the Loan Agreement.  Within this Guaranty, words of any gender include all other genders and words in the singular number include the plural, unless the context otherwise requires.  The following terms have the following meanings:

"***Bankruptcy Event***" means any of the following events:  (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding).  A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"***Conveyance Event***" means that (1) legal or equitable title to any part of, or any interest in, the Collateral is vested in any Person other than Borrower or Lender, or (2) Borrower creates or permits any lien (except for the lien for Taxes which are not delinquent), security interest or other encumbrance against or covering the Collateral.

"***Enforcement Costs***" means all reasonable attorneys' fees, legal expenses and other costs Lender incurs to collect or enforce the Guaranteed Obligations or the Loan Documents.

"***Guaranteed Obligations***" means all (a) 100% of the Indebtedness and Interest, and/or (b) the operating costs of the Property, and/or (c) Enforcement Costs, and/or (d) Recourse Amounts.

"***Indebtedness***" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"***Interest***" means all accrued and unpaid interest on the Principal Amount.

"***Loan Documents***" means the Loan Agreement, the Security Instrument, the Hazardous Materials Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"***Liquid Assets***" means unencumbered (a) cash on hand or on deposit (including certificates of deposit which mature in less than twelve months) in commercial banks operating in the United States, (b) readily marketable securities issued by the United States, and (c) readily marketable commercial paper rated A-1 by Standard & Poor's Corporation (or a similar rating by any similar organization that rates commercial paper).

"***Recourse Amounts***" any loss, damage, cost, expense, liability, claim or other obligation (including attorneys' fees and costs reasonably incurred), causes of action, suits, claims, demands and judgments of any nature or description whatsoever, which may be imposed upon, incurred by or awarded against Lender or any affiliate thereof as a result of, arising out of or in connection with the following:

(a)    misapplication or misappropriation of Rents, security deposits, or other income, issues, profits and revenues derived from the Property at any time an Event of Default by Borrower exists, provided that any prepaid rent paid more than 1 month in advance as of the date of an Event of Default hereunder by Borrower shall be considered to have been collected after the event of Borrower's default;

(b)    fraud or material misrepresentation of Borrower or Guarantor;

(c)    (i) misapplication or misappropriation of any insurance policies by reason of damages, loss or destruction to any portion of the Property or the Improvements thereon to the full extent of such misapplied or misappropriated proceeds, or (ii) the misapplication or misappropriation of proceeds or awards resulting from the condemnation or taking in lieu of condemnation of any portion of the Property, to the full extent of such misapplied or misappropriated proceeds or awards;

(d)    intentional physical waste of the Property or any portion thereof, and all costs, including reasonable attorney's fees, incurred by Lender to repair or remediate such intentional physical waste, to the full extent of the actual loss incurred by Lender as a result thereof;

(e)    any taxes, assessments or insurance premiums, to the extent not covered by amounts paid into escrow by Borrower to Lender, for which Borrower is liable under the Note, the Security Instrument or any other loan document executed in connection therewith, but only to the extent that Revenue from the Property is sufficient to pay such taxes, assessments or insurance premiums;

2

(f)        failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property;

(g)        loss arising under the Hazardous Materials Indemnity Agreement executed by Borrower in favor of Lender, or Borrower's breach of the hazardous substances covenants, warranties or representation provisions contained in the Security Instrument or other loan documents executed in connection with the Note and Security Instrument, which loss is not caused by Lender after Lender takes title to the Property;

(h)        loss by fire or casualty to the extent not compensated by insurance proceeds collected by Lender;

(i)        any loss resulting from any Guarantor (or any Person comprising any Guarantor), Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Security Instrument or any other Loan Document, seeking a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserting in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, but only if and to the extent that a court of competent jurisdiction determines that such claims were frivolous (i.e., without any merit) and in bad faith; and

(j)        all costs and fees, including without limitation, reasonable attorneys' fees incurred by Lender in the enforcement of subparagraphs (a) through (j) above.

Notwithstanding the foregoing, Recourse Events shall mean the full amount of the Indebtedness upon the occurrence of either of the following events (the "***Full Recourse Events***"):

(a)        a Bankruptcy Event;

(b)        Borrower fails to obtain Lender's prior consent to any subordinate financing secured by the Property; or

(c)        a Conveyance Event; or

(d)        Borrower fails to comply with the "single purpose entity/separateness" covenants set forth in <u>Section 4.1(b)</u> of the Loan Agreement beyond the expiration of all applicable notice cure periods. and such failure results in (or is cited as a factor by a court of competent jurisdiction) the substantive consolidation of Borrower with another Person; or

(e)        Borrower fails to comply with the cash management provisions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> of the Loan Agreement beyond the expiration of all applicable notice cure periods.

"***Transfer Event***" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

2.    <u>Inducement</u>.  Guarantor has an economic investment or interest in Borrower, and an interest in the success of the Property, and Guarantor will substantially benefit from Lender's agreement to make the Loan to Borrower.

3.    <u>Guaranty</u>.  In order to induce Lender to make the Loan to Borrower, Guarantor absolutely, unconditionally and irrevocably guarantees and agrees to pay and perform the Guaranteed Obligations. Notwithstanding anything to the contrary in this Guaranty or any of the other Loan Documents, Guarantor will be liable for all of the Indebtedness and the Enforcement Costs if a Conveyance Event, or a Bankruptcy Event, occurs.

4.    <u>Waivers</u>.

(a)    Guarantor, with respect to the Guaranteed Obligations and the Indebtedness, waives:  (i) **PRESENTMENT FOR PAYMENT**; (ii) **DEMAND**; (iii) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (iv) **NOTICE OF INTENTION TO ACCELERATE**; (v) **NOTICE OF ACCELERATION**; (vi) **NOTICE OF DISPOSITION OF COLLATERAL**; (vii) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (viii) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (ix) **PROTEST AND NOTICE OF PROTEST**; and (x) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(b)    Lender is not obligated to notify Guarantor of (i) Lender's acceptance of this Guaranty, (ii) any credit extended on the faith of this Guaranty, or (iii) Borrower's failure to pay or perform any Indebtedness which constitutes Guaranteed Obligations.  Lender is not obligated to use diligence in preserving any Person's liability for the Indebtedness or the Guaranteed Obligations.  Lender is not obligated to use diligence in bringing suit to enforce collection, or performance, of the Indebtedness or the Guaranteed Obligations.

(c)    Guarantor waives **<u>ALL DEFENSES GIVEN OR REDUCTIONS IN THE GUARANTEED OBLIGATIONS AVAILABLE TO SURETIES OR GUARANTORS AT LAW OR IN EQUITY</u>** other than the actual payment and performance of the Guaranteed Obligations, including **<u>ALL DEFENSES BASED UPON QUESTIONS AS TO (i) THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THE INDEBTEDNESS OR THE GUARANTEED OBLIGATIONS, OR (ii) THE VALUE OF ANY COLLATERAL</u>**. Guarantor is primarily liable under this Guaranty.

(d)    At any time, Lender may, in its sole discretion, without Guarantor's prior consent, and without impairing, modifying, releasing or otherwise affecting Guarantor's liability under this Guaranty:

(i)    alter, compromise, accelerate, renew, extend, or change the time or manner for the payment of, the Indebtedness;

(ii)    increase or reduce the rate of interest on the Indebtedness;

(iii)    take, surrender, exchange, withdraw, subordinate, alter, modify or eliminate security;

(iv)    (1) add, release, discharge, or (2) settle or compromise with, any Borrower Party or other Person liable for the Indebtedness or the Guaranteed Obligations;

(v)    make any change to the Loan Documents or the manner in which Lender does business with Borrower; or

4

(vi)     apply any moneys received from Borrower or any other source, or from any security or collateral, in the manner Lender determines, without being required to marshal securities or assets or to apply any part of the moneys or security to any particular part of the Guaranteed Obligations.

Lender is not required to retain, hold, protect, exercise due care with respect thereto, perfect security interests in or otherwise assure or safeguard any security for the Indebtedness or the Guaranteed Obligations; and Guarantor's obligations under this Guaranty and any other Loan Documents will not be affected by, and Guarantor will not have any recourse from, Lender's failure (x) to do any of the foregoing with respect to any security for the Indebtedness or the Guaranteed Obligations, or (y) to exercise or not exercise any right or remedy of Lender under the Loan Documents, at law or in equity.

5.     <u>Guaranty Absolute</u>.  Guarantor's liability under this Guaranty is absolute, and will not be modified, released or impaired, for any reason, including because:

(a)     any Person (including any Borrower Party) dies, or is or becomes incapacitated, disabled, dissolved or terminated;

(b)     Lender fails to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of any Borrower Party or another Person;

(c)     Lender cannot recover the Indebtedness from any Borrower Party or another Person for any reason, including any statute of limitations or Applicable Bankruptcy Law;

(d)     Any Borrower Party or another Person is entitled to any defense, setoff or counterclaim related to the Loan, the Indebtedness or the Guaranteed Obligations;

(e)     a Conveyance Event or a Transfer Event occurs;

(f)     Borrower Party (other than Guarantor) or another Person liable for the payment or performance of Indebtedness or the Guaranteed Obligations is released or discharged by operation of law or otherwise (other than a discharge resulting from the payment of the Indebtedness);

(g)     this Guaranty or any other Loan Document is modified, extended, amended, released or waived; or

(h)     Lender fails to give Guarantor notice of an Event of Default under any Loan Document.

6.     <u>Subordination</u>.  Until the Indebtedness is repaid in full (and including all interest accruing, after any Bankruptcy Event, on the Indebtedness):

(a)     Guarantor subordinates all rights to repayment of any current or future indebtedness from Borrower to Guarantor to Lender's prior right to receive or require payment in full of the Indebtedness.

(b)     Guarantor shall not accept any payment or satisfaction of any indebtedness of Borrower to Guarantor.

(c)     Guarantor shall not accept any security for any indebtedness of Borrower to Guarantor.

(d)     If Guarantor receives any payment, satisfaction or security for any indebtedness of Borrower to Guarantor, then Guarantor shall immediately deliver the payment, satisfaction or security to Lender.  Lender will apply the payment, satisfaction or security as set forth in the Loan Agreement.  Guarantor will hold any payment, satisfaction or security Guarantor receives in trust for Lender until the payment, satisfaction or security is delivered to Lender.

7.     <u>Waiver of Right of Subrogation</u>.  To the fullest extent permitted by Applicable Law, Guarantor waives all rights at law or in equity to seek subrogation, contribution, indemnification or any

other form of reimbursement or repayment from any Borrower Party or any other guarantor of, or any other party secondarily liable for, the payment or performance of the Indebtedness or the Guaranteed Obligations until the Indebtedness has been paid and performed in full. When the Indebtedness has been indefeasibly paid and fully performed, Guarantor will be subrogated to the rights of Lender against Borrower and any endorsers, sureties or other guarantors to the extent of the payments that Guarantor makes on the Guaranteed Obligations.

8.    No Usury. Lender and Guarantor intend that this Guaranty and the other Loan Documents strictly comply with applicable usury law. Therefore, Lender and Guarantor agree that: (i) none of the terms of this Guaranty or the other Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; and (ii) no Person (including any Borrower Party) will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness. If at any time the interest received for the Guaranteed Obligations exceeds the Maximum Rate, then Lender will, at its option, either refund to Guarantor the amount of the excess or credit the amount of the excess against the Guaranteed Obligations. Guarantor agrees that the Loan and the Guaranty are not usurious and agrees that if, at any time, Guarantor believes that the Loan or the Guaranty is usurious, it shall give Lender (a) notice of the condition and (b) 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

9.    Representations and Warranties. On the Effective Date, Guarantor represents to Lender that:

(a)    Guarantor (i) is solvent, (ii) is not bankrupt and (ii) has no outstanding liens, garnishments, bankruptcies or court actions which could cause Guarantor to become insolvent or bankrupt. No Bankruptcy Event has occurred.

(b)    Each Guarantor financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly presents the financial condition and the results of operations of each Guarantor on the date and for the period covered by the financial statements. All other reports, statements and other data that any Guarantor furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading. Since the date of the last financial statements each Guarantor delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) Guarantor's business, condition (financial or otherwise) or operations, or (b) Guarantor's ability to perform or satisfy, or Lender's ability to enforce, any of the Guaranteed Obligations. For the purposes of Subsection 9(a) and 9(b), "Guarantor" includes any joint ventures, managing member or general partner of Guarantor.

(c)    There are no suits or proceedings (including condemnation) pending, or to Guarantor's knowledge threatened, against or affecting any Guarantor, another Borrower Party or the Collateral, or involving the validity, enforceability or priority of this Guaranty or any of the Loan Documents.

(d)    If Guarantor is not a natural person, then Guarantor: (i) is duly organized, validly existing, and in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own its other assets and transact its present or proposed business.

(e)    Guarantor has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty, and has taken all necessary actions to authorize its execution, delivery and performance of the Guaranteed Obligations. Guarantor has duly executed and delivered this Guaranty, and each other Loan Document to which it is a party or under which

6

it is obligated.  Each obligation under this Guaranty or any other Loan Document constitutes, Guarantor's legal, valid and binding obligation, enforceable in accordance with the Loan Document's terms, except to the extent enforcement of any Loan Document is subject to the effect of (i) Applicable Bankruptcy Law, or (ii) general principles of equity.

(f)      Guarantor's execution, delivery and performance of this Guaranty and the other Loan Documents, and compliance with the terms and provisions of this Guaranty and the other Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, or constitute a default under, the terms of any other instrument to which Guarantor is a party or by which Guarantor is bound or may be subject, or (iii) violate any term of Guarantor's certificate of formation or other documents and agreements governing Guarantor's existence, management or operation.  Guarantor is not required to obtain any Person's consent to execute, deliver or perform this Guaranty or the other Loan Documents.

(g)      Guarantor is intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

10.    <u>Covenants</u>.  Guarantor absolutely and unconditionally covenants that:

(a)      Guarantor shall pay and perform the Guaranteed Obligations even if, for any reason, (i) Borrower does not pay or perform the Indebtedness or any other Borrower obligations under the Loan Documents, or (ii) the Indebtedness or the Guaranteed Obligations are disaffirmed or terminated (except for payment and performance in full).

(b)      Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower is (for any reason) liable for any portion of the Indebtedness or the Guaranteed Obligations.

(c)      Guarantor will at all times remain intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

(d)      Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower's organizational structure changes.

(e)      Notwithstanding any prior reduction or termination of this Guaranty, Guarantor will remain liable for, and (after Lender's demand) pay to Lender, the amount of any prior Indebtedness payment that Lender must (for any reason) pay to Borrower or any other Person.

(f)      Guarantor will not (i) benefit from, (ii) be able to direct the application of, or (iii) have any right to participate in, any Collateral.

(g)      Guarantor will remain obligated under this Guaranty for the Guaranteed Obligations even if Guarantor loses (for any reason) any right against (i) any Borrower Party or other Person, or (ii) the Collateral.

(h)      Lender is not required to pursue any remedies against any Person or the Collateral before demanding that Guarantor pay or perform the Guaranteed Obligations.

(i)      Lender may maintain an action on this Guaranty without joining any other Borrower Party or bringing a separate action against a Borrower Party.

(j)      Until all Indebtedness is indefeasibly repaid, Guarantor shall maintain (a) at least $12,500.00 of Liquid Assets (the "***Liquidity Requirement***"), and (b) a tangible net worth of at least $125,000.00 (the "***Net Worth Requirement***").   Guarantor will provide Lender with evidence (which may include a certificate), satisfactory to Lender in its discretion, establishing Guarantor's satisfaction of the Liquidity Requirement and the Net Worth Requirement within 60 days after the end of each calendar quarter.

11.    <u>Financial Statements and Reports</u>.   Guarantor shall deliver to Lender all financial statements, reports and certificates, if any, required under the Loan Agreement.

12.    <u>Multiple Guarantors</u>.  If there are more than one Guarantor, then this <u>Section 12</u> is in effect. Unless the context clearly indicates otherwise, all references to "*Guarantor*" mean either or any Guarantor.

(a)    **Joint Liability**.  Lender may sue any Guarantor, jointly or individually, without impairing Lender's rights against each Guarantor under this Guaranty.  Lender may compromise with any Guarantor or any other Person for any sum Lender sees fit.  Lender may release any Guarantor or any other Person from any liability for the Indebtedness or the Guaranteed Obligations without impairing Lender's right to demand and collect the balance of the Indebtedness or the Guaranteed Obligations from any Guarantor or other Person.  No compromise or release will, except as specifically set forth in this Guaranty, impair Guarantors' rights amongst themselves.

(b)    **Disputes**.  Each Guarantor shall indemnify, defend and hold Lender harmless from and against any Claim Lender may suffer arising from any dispute between Guarantors, **INCLUDING THOSE CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM LENDER'S SOLE, COMPARATIVE OR CONTRIBUTORY NEGLIGENCE, OR STRICT LIABILITY**, unless a court of competent jurisdiction determines in a final non-appealable judgment that the Claim actual resulted from the intentional misconduct or gross negligence of Lender.

13.    <u>Revival and Reinstatement</u>.  This Guaranty remains in full force and effect during any Bankruptcy Event.  Notwithstanding the full payment and performance of the Obligations and the Guaranteed Obligations, this Guaranty will be reinstated in full force and effect immediately upon the occurrence of any Bankruptcy Event.  If any prior payment or performance of the Obligations or Guaranteed Obligations is rescinded or reduced, or Lender must otherwise restore or return any prior payment or performance of the Obligations or Guaranteed Obligations, then the Guaranteed Obligations will be reinstated to the extent of the payment or performance actually rescinded, reduced, restored or returned.

14.    <u>Rights Cumulative</u>.  Lender's rights under this Guaranty, at law and in equity are cumulative.  Until the Indebtedness is paid and performed in full and this Guaranty is terminated, Lender may exercise, as many times and as often as Lender elects (in its discretion) any rights under this Guaranty, at law and in equity.  This Guaranty does not diminish or discharge Lender's rights under any prior or future guaranty by Guarantor in favor of Lender.

15.    <u>Notices</u>.  Any notice or communication required or permitted under this Guaranty must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

To Lender:           Archway Real Estate Income Fund I SPE I, LLC
                     1875 Century Park East. Suite #900
                     Los Angeles, CA 90067
                     Attention: Joshua Kohan
                     Phone: (310) 893-5277
                     Email: joshua@archwayfund.com

with a copy to:      Thompson Coburn LLP
                     10100 Santa Monica Blvd., Suite 500
                     Los Angeles, CA 90067
                     Attention: Joshua Mogin
                     Phone: (310) 282-2520
                     Email: jmogin@thompsoncoburn.com

8

|  |  |
|---|---|
| To Guarantor: | David Halevy/Sue Halevy |
|  | 257 S. Linden Drive |
|  | Beverly Hills CA 90212 |
|  | Phone: (310) 666-2885 |
|  | Email: danhalevy@gmail.com |
|  |  |
|  | Alan Gomperts |
|  | 264 S. Oakhurst Drive |
|  | Beverly Hills CA 90212 |
|  | Phone: (310) 621-5350 |
|  | Email: alangomperts@hotmail.com |
|  |  |
| with a copy to | Locke Lord LLP |
|  | 300 S. Grand Ave., Suite 2600 |
|  | Los Angeles, CA 90071 |
|  | Attention: David S. Kupetz |
|  | Phone: (213) 687-6774 |
|  | Email: David.Kupetz@lockelord.com |

or to such other address as Lender or Guarantor may designate in writing and deliver in accordance with this <u>Section</u>. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this <u>Section</u>. Any notice or communication sent in accordance with this <u>Section</u> will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this <u>Section</u>. Guarantor consents to Lender recording any telephone communications between Lender and Guarantor.

16.    <u>Applicable Law</u>.  The Laws of the **STATE OF CALIFORNIA** (without giving effect to its principles of conflicts of law) and of the **UNITED STATES** will govern and control this Guaranty.  If any provision of this Guaranty or the application thereof to any person or circumstance, for any reason and to any extent, shall be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

17.    <u>Consent to Forum</u>.  **GUARANTOR IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS.  BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN <u>SECTION 15</u> ABOVE.**

18.    <u>Waiver of Jury Trial</u>.  **GUARANTOR WAIVES ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.  GUARANTOR HAS BEEN ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

19.    <u>Counterparts</u>.  The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument.  All counterparts of each Loan Document must be construed together and will constitute one instrument.

20.    <u>Modification or Termination</u>.    This Guaranty may only be amended, modified or terminated by a written instrument executed by Lender and Guarantor.  Guarantor agrees that it will be bound by any written amendment or modification of the Loan Documents, with or without notice to Guarantor, and Guarantor's obligations under this Guaranty and the other Loan Documents will not be impaired because of any such amendment or modification.

21.    <u>Successors and Assigns; Unenforceability of Certain Provisions, Headings</u>.  The terms of this Guaranty are binding on Guarantor and its heirs, devisees, representatives, successors and assigns and inure to the benefit of Lender and all of its transferees, credit participants, successors and assignees.  The headings in this Guaranty are for convenience only and will not limit or otherwise affect any of the terms of this Guaranty.  If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents.  All remaining portions of the Loan Documents will remain enforceable and valid.

22.    <u>Damage Waiver</u>.  Guarantor agrees that Lender will not be liable to Guarantor, any other Borrower Party or any other Person for any punitive, exemplary or consequential damages which may actually or allegedly arise from this Guaranty, the Loan, the other Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**.  The foregoing waiver does not limit or otherwise impair the terms of any other waiver or indemnity in the Loan Agreement.

23.    <u>Assignment</u>.  Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents (including this Guaranty) and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan or this Guaranty, including credit information on Borrower Parties and any of their respective principals.  If Lender makes any assignment or sells any interest in the Loan or this Guaranty, then Guarantor shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Guaranty as will facilitate Lender's sale or assignment, provided that no modification will materially add to Guarantor's obligations under this Guaranty or the other Loan Documents.

24.    <u>Imaging</u>.  Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Guarantor waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

25.    <u>Time</u>.  Time is of the essence for this Guaranty and the other Loan Documents.

26.    <u>California Provisions</u>.  In addition to the waivers set forth elsewhere in this Guaranty:

(a)    Guarantor hereby waives marshaling of assets and liabilities, rights of offset, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any liability to which it applies or may apply, acceleration, presentment, demand for payment, protest, notice of non-payment, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and demands, collection suit or the taking of any other action by Lender.

(b)    Guarantor expressly waives any and all benefits, rights and/or defenses which might otherwise be available to Guarantor under the following sections of the California Civil Code:  Section 2809 (the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal), Section 2810 (a surety is not liable if, for any reason other than the mere personal disability of the principal, there is no liability upon the part of the principal at the time of execution of the contract, or the liability of the principal thereafter ceases), Section 2819 (a surety is exonerated if the creditor alters the original obligation of the principal without the consent of the surety), Section 2822 (a surety's right to have the principal

designate the portion of any obligation to be satisfied by the surety in the event that the principal provides partial satisfaction of such obligation), Section 2845 (a surety is exonerated to the extent that the creditor fails to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue and which would lighten the surety's burden), Section 2846 (a surety may compel the principal to perform the obligation when due), Section 2847 (if a surety satisfies the principal obligation, or any part thereof, the principal is obligated to reimburse the surety for the amounts paid by the surety), Section 2850 (whenever the property of a surety is hypothecated with property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation), Section 2899 (where one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort to the property in a certain order, on the demand of any party interested) and Section 3433 (where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons).

(c)    Guarantor expressly agrees not to exercise or take advantage of any rights, benefits and/or defenses which might be available to Guarantor under the following California Civil Code Sections, unless and until the Guaranteed Obligations shall have been indefeasibly paid and satisfied in full:  Section 2839 (performance of the principal obligation, or an offer of such performance, duly made as provided in the Civil Code, exonerates a surety), Section 2848 (a surety, upon satisfaction of the obligation of the principal, is entitled to enforce remedies which the creditor then has against the principal and to pursue his co-sureties or other third parties after the surety has satisfied the underlying debt, or at least more than his share of it), and Section 2849 (a surety is entitled to the benefit of security held by the creditor for the performance of the principal obligation held by the creditor).

(d)    Guarantor waives any defense that Guarantor may have by reason of the failure of Lender to provide Guarantor with any material facts about Borrower, including any information respecting the financial condition of Borrower, Borrower's ability to perform the Loan obligations or the sufficiency of Lender's security.

(e)    Guarantor waives any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other Person, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons.

(f)    Guarantor waives all rights of indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.  Guarantor hereby waives the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of guarantors or sureties thereunder.

(g)    Guarantor waives all rights and defenses that Guarantor may have because the debtor's (Borrower's) debt is secured by real property.  This means, among other things:

(i)    The creditor (Lender) may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by the debtor.

(ii)    If the creditor forecloses on any real property collateral pledged by the debtor:  (A) the amount of the debt may be reduced only by the price for which that

collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the creditor may collect from Guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the debtor.

(h)     This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the debtor's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the Code of Civil Procedure.  Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal (Borrower) by the operation of Section 580d of the Code of Civil Procedure or otherwise.  Any summary of statutory provisions is for convenience only, and Guarantor has read and is familiar with the entirety of such provisions.

27.     <u>Entire Agreement</u>.  The Loan Documents constitute the entire understanding and agreement between Borrower, Guarantor and Lender with respect to the transactions arising in connection with the Loan and this Guaranty.  The Loan Documents supersede all prior written or oral understandings and agreements between Borrower, Guarantor and Lender with respect to the Loan and this Guaranty.

[**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK SIGNATURE PAGE FOLLOWS**]

Guarantor has executed this Guaranty to be effective on the Effective Date.


**GUARANTOR:**

_____

**DAVID HALEVY,** by Daniel Halevy as his attorney in fact

_____

**SUE HALEVY,** an individual

_____

**ALAN GOMPERTS,** an individual

_____

**DANIEL HALEVY,** an individual

# EXHIBIT 5

1



# L E A D   S H E E T

00 1845897

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA

**NOV   28   2000**    AT 8 A.M.

SPACE ABOVE THIS LINE FOR RECORDERS USE

## TITLE(S)

*Deed*

**FEE**


FEE
$7
X

(10) $726 ⁰⁰

**D.T.T.**

NOTIFICATION SENT-$4 ©

**CODE
20**

**CODE
19**

**CODE
9___**

**Assessor's Identification Number (AIN)**
**To Be Completed By Examiner OR Title Company In Black Ink**        **Number of Parcels Shown**

4  3  3  1    0 0  5    0 1  1                    0 0  1



**THIS FORM IS NOT TO BE DUPLICATED**

RECORDING REQUESTED BY:
**Gateway Title Company**
**AND WHEN RECORDED MAIL TO:**

**00  1845897**

Mr. and Mrs. David Halevy
133 South Palm
Beverly Hills, CA 90212

THIS SPACE FOR RECORDER'S USE ONLY:

| ESCROW NO. 15630-EL | TITLE ORDER NO. 173943-152 |
|---|---|

## INDIVIDUAL GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(s)
    **DOCUMENTARY TRANSFER TAX is $726.00**
    [X]    computed on full value of property conveyed, or
    [ ]    computed on full value less value of liens or encumbrances remaining at time of sale.
    [ ]    Unincorporated area    [X]City of Beverly Hills, **AND**

**FOR A VALUABLE CONSIDERATION,** receipt of which is hereby acknowledged,

**Olga Sophia Czerwatiuk an undivided four-fifths interest an Olga Sophia Czerwatiuk in trust for the Benefit of Aiden Heckaman, an undivided one-fifth interest**

hereby GRANT(s) to:

**DAVID HALEVY and SUE HALEVY, Husband and Wife as Community Property with rights of survivorship**

the real property in the city of Beverly Hills, County of Los Angeles, State of California, described as:
**Lot 1887 in Tract No. 6380 in the City of Beverly Hills, County of Los Angeles, as per Map recorded in Book 69, Pages 11 to 20 inclusive of Maps, in the Office of the County Recorder of Los Angeles County, California.**

A.P. # 4331-005-011

DATED November 20, 2000
STATE OF CALIFORNIA
COUNTY OF  Los Angeles
On  11/21/00
before me,  *EVELYNE LACHKAR*
a Notary Public in and for said State, personally appeared

Olga Sophia Czerwatiuk
_____

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _____

_____
Olga Sophia Czerwatiuk

_____
Olga Sophia Czerwatiuk

**EVELYNE LACHKAR**
**Commission # 1250177**
**Notary Public - California**
**Los Angeles County**
**My Comm. Expires Jan 16, 2004**

(This area for official notarial seal)

Mail tax statements to: Mr. and Mrs. David Halevy, 133 South Palm, Beverly Hills, CA 90212

EXHIBIT 6

**This page is part of your document - DO NOT DISCARD**





## 20161153679

**Pages:
0004**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**09/22/16 AT 11:59AM**

| | |
|---|---:|
| FEES: | 28.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 28.00 |



**L E A D S H E E T**



201609223240036

**00012677293**



007821377

**SEQ:
05**

**DAR - Courier (Upfront Scan)**



**THIS FORM IS NOT TO BE DUPLICATED**

E475702

**RECORDING REQUESTED BY**

David Halevy

**WHEN RECORDED MAIL TO**

NAME    David & Sue Halevy

MAILING    341 S. Canon Drive
ADDRESS

CITY, STATE  Beverly Hills, CA
ZIP CODE        90212

**SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE**

# T I T L E(S)

TRUST TRANSFER DEED

LS-201

RECORDING REQUESTED BY:
DAVID HALEVY
AND WHEN RECORDED MAIL THIS DEED AND, UNLESS:
OTHERWISE SHOWN BELOW, MAIL TAX STATEMENTS TO
DAVID & SUE HALEVY
341 S. CANON DR
BEVERLY HILLS, CA 90212

Order No..:
Escrow No:

A.P.N.: 4331-005-011

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

# TRUST TRANSFER DEED

*This Document Provided by Fidelity National Title*

**GRANT DEED** (EXCLUDED FROM REAPPRAISAL UNDER PROPOSITION 13, I.E., CALIF. CONST. ART 13A§1 ET.SEQ.)

THE UNDERSIGNED GRANTOR(S) DECLARE(S) UNDER PENALTY OF PERJURY THAT THE FOLLOWING IS TRUE AND CORRECT:
DOCUMENTARY TRANSFER TAX IS $ _____

[  ] Computed on full value of property conveyed, or  [  ] computed on full value less value of liens or encumbrances remaining at time of sale or transfer
[ X ] There is no Documentary transfer tax due.  This conveyance transfers grantors interest into or out of a revocable living trust. R&T 11930

[  ] Unincorporated area:          [ X ] city of BEVERLY HILLS          AND

This is a Trust Transfer under §62 of the Revenue and Taxation Code and Grantor(s) has (have) checked the applicable exclusion:

[ X ] Transfer to a revocable trust;  [  ] Transfer to a short-term trust not exceeding 12 years with Trustor holding the reversion;

[  ] Transfer to a trust where the Trustor or the Trustor's spouse is the sole beneficiary;  [  ] Change of trustee holding title;

[  ] Transfer from trust to Trustor or Trustor's spouse where prior transfer to trust was excluded from reappraisal and for a valuable consideration, receipt of which is acknowledged.

[  ] Other:_____

**GRANTOR(S):   DAVID HALEVY & SUE HALEVY**

hereby **GRANT(S) TO: DAVID HALEVY AND SUE HALEVY AS TRUSTEE OF THE HALEVY FAMILY TRUST**

the following described real property in the
County of LOS ANGELES, State of California:
SEE EXHIBIT "A" ATTACHED HERETO FOR LEGAL DESCRIPTION
COMMON ADDRESS: 341 S. CANON DR, BEVERLY HILLS, CA 90212

Dated: SEPTEMBER      , 2016

_____          _____
**SUE HALEVY**                                      **DAVID HALEVY**

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES_____}SS.
On Sept. 16, 2016 , before me, _____, a Notary Public, personally appeared DAVID HALEVY & SUE HALEVY, who proved to me on the basis of satisfactory evidence to be the person(s) whose name is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature  *Victoria C Sand*

(This area for official notarial seal)

**EXHIBIT "A"**

Lot(s)  1887  of Tract No. 6380, in the City of Beverly Hills, County of Los Angeles, State of California, as per map recorded in Book 69 Page(s) 11 to 20 inclusive of Maps, in the office of the County Recorder of said County.

# EXHIBIT 7

# California Secretary of State
## Electronic Filing



**FILED**
Secretary of State
State of California

## LLC Registration – Articles of Organization

| | |
|---|---|
| Entity Name: | **341 South Cannon  LLC** |

| | |
|---|---|
| Entity (File) Number: | 202130910155 |
| File Date: | 11/03/2021 |
| Entity Type: | Domestic LLC |
| Jurisdiction: | California |

Detailed Filing Information

1. Entity Name:                                 341 South Cannon  LLC

2. Business Addresses:

    a. Initial Street Address of                   257 S. Linden Drive
        Designated Office in California:        Beverly Hills, California 90212
                                        United States

    b. Initial Mailing Address:                    257 S. Linden Drive
                                        Beverly Hills, California 90212
                                        United States

3. Agent for Service of Process:         Craig  Berman
                                        20750 Ventura Blvd., Ste. 201
                                        Woodland Hills California 91364
                                        United States

4. Management Structure:                 More than One Manager

5. Purpose Statement:                     The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

Electronic Signature:

The organizer affirms the information contained herein is true and correct.

Organizer:                                    Craig Berman

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

# EXHIBIT 8

BA20231403266

B2090-5795 09/05/2023 3:57 PM Received by California Secretary of State



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**STATEMENT OF INFORMATION**
**LIMITED LIABILITY COMPANY**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: BA20231403266

Date Filed: 9/5/2023

---

**Entity Details**

| | |
|---|---|
| Limited Liability Company Name | 341 SOUTH CANNON LLC |
| Entity No. | 202130910155 |
| Formed In | CALIFORNIA |

**Street Address of Principal Office of LLC**

| | |
|---|---|
| Principal Address | 257 S. LINDEN DRIVE<br>BEVERLY HILLS, CA 90212 |

**Mailing Address of LLC**

| | |
|---|---|
| Mailing Address | 257 S. LINDEN DRIVE<br>BEVERLY HILLS, CA 90212 |
| Attention | |

**Street Address of California Office of LLC**

| | |
|---|---|
| Street Address of California Office | None |

**Manager(s) or Member(s)**

| Manager or Member Name | Manager or Member Address |
|---|---|
| ➕ Sue Halevy | 257 S. LINDEN DRIVE<br>BEVERLY HILLS, CA 90212 |

**Agent for Service of Process**

| | |
|---|---|
| Agent Name | CRAIG BERMAN |
| Agent Address | 20750 VENTURA BLVD., STE. 201<br>WOODLAND HILLS, CA 91364 |

**Type of Business**

| | |
|---|---|
| Type of Business | Real Estate |

**Email Notifications**

| | |
|---|---|
| Opt-in Email Notifications | Yes, I opt-in to receive entity notifications via email. |

**Chief Executive Officer (CEO)**

| CEO Name | CEO Address |
|---|---|
| None Entered | |

**Labor Judgment**

No Manager or Member, as further defined by California Corporations Code section 17702.09(a)(8), has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal is pending, for the violation of any wage order or provision of the Labor Code.

**Electronic Signature**

☒ By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

*Alan Gomperts*
_____
Signature

*09/05/2023*
_____
Date

280

# EXHIBIT 9



**This page is part of your document - DO NOT DISCARD**

## 20230643326





**Pages:
0005**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**09/25/23 AT 08:00AM**

| | | |
|---|---|---|
| FEES: | | 49.00 |
| TAXES: | | 0.00 |
| OTHER: | | 0.00 |
| PAID: | | 49.00 |

**PCOR SURCHARGE $20.00**



**L E A D S H E E T**



202309250120005

**00023803020**



014291598

**SEQ:
01**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

E441953



2135805

RECORDING REQUESTED BY:
Stewart Title of California, Inc.

AND WHEN RECORDED MAIL TO:

Halevy Family Trust
c/o Sue Halevy, Surviving Trustee
341 S. Canon Dr.
Beverly Hills, CA  90212

Title Order No.: 2135805
Escrow No.: 02-040468-AC

SPACE ABOVE THIS LINE FOR RECORDERS USE

## AFFIDAVIT - DEATH OF TRUSTEE

State of California )
County of Los Angeles ) ss

**Exempt from fee per GC 27388.1 and 27388.2; Document transfers real property that is a residential dwelling to an owner-occupier.**

Sue Halevy, of legal age, being first duly sworn, deposes and says:

1. That David Halevy, the decedent mentioned in the attached certified copy of Certificate of Death is the same person as David Halevy named as the Trustee in that certain Declaration of Trust dated September 8, 2010 executed by David Halevy and Sue Halevy as Trustor(s).

2. At the time of the demise of the decedent, the decedent was the record owner, as Trustee, of real property commonly known as 341 S. Canon Dr., Beverly Hills, CA  90212, which property is described in a Deed executed by David Halevy and Sue Halevy, as Grantor(s) recorded on September 22, 2016, as Instrument No. 20161153679 of Official Records in the office of the County Recorder of Los Angeles County.  Said property is shown on Exhibit "A" attached hereto.

3. I am the named successor Trustee under the above referenced Trust, which was in effect at the time of the death of the decedent mentioned in paragraph 1 above, and which has not been revoked and I hereby consent to act as such.

4. There is no Federal Estate Tax due as a result of the death of said decedent.

Signature _____   Dated _Sep 21_____, 20 _23_

    Sue Halevy, Surviving Trustee    * TRUSTEE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
COUNTY OF _Los Angeles_ ) ss

Subscribed and sworn to (or affirmed) before me on this _21st_ day of _September_ 20 _23_, by _Sue Halevy_

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me

Signature _Jackie Padilla_ (Seal)

JACKIE PADILLA
Notary Public - California
Los Angeles County
Commission # 2421859
My Comm. Expires Oct 17, 2026

## EXHIBIT 'A'

Lot 1887 of Tract No. 6380, in the City of Beverly Hills, County of Los Angeles, State of California, as per Map recorded in Book 69, Pages 11 to 20 inclusive of Maps, in the Office of the County Recorder of said County.

# State of California
## Secretary of State

This Certificate is not valid for use anywhere within the United States of America, its territories or possessions.

| | |
|---|---|
| **APOSTILLE**<br>(Convention de La Haye du 5 octobre 1961) | |
| **1. Country:**<br>Pays / País· | United States of America |
| **This public document**<br>Le présent acte public / El presente documento público | |
| **2. has been signed by**<br>a été signé par<br>ha sido firmado por | *Muntu Davis, M.D.* |
| **3. acting in the capacity of**<br>agissant en qualité de<br>quien actúa en calidad de | *Health Officer* |
| **4. bears the seal / stamp of**<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | *County of Los Angeles,  State of California* |
| **Certified**<br>Attesté / Certificado | |

| | | | |
|---|---|---|---|
| **5. at**<br>à / en | Sacramento, California | **6. the**<br>le / el día | *31st day of July 2023* |
| **7. by**<br>par / por | Secretary of State, State of California | | |
| **8. Nº**<br>sous nº<br>bajo el número | *32676* | | |
| **9. Seal / stamp:**<br>Sceau / timbre:<br>Sello / timbre: | | **10. Signature:**<br>Signature:<br>Firma: | |

This Apostille only certifies the authenticity of the signature and the capacity of the person who has signed the public document, and, where appropriate, the identity of the seal or stamp which the public document bears.
To verify the issuance of this Apostille, see: apostille-search.sos.ca.gov/.
**This certificate does not constitute an Apostille under the Hague Convention of 5 October 1961, when it is presented in a country which is not a party to the Convention. In such cases, the certificate should be presented to the consular section of the mission representing that country.**

---

Cette Apostille atteste uniquement la véracité de la signature, la qualité en laquelle le signataire de l'acte a agi et, le cas échéant, l'identité du sceau ou timbre dont cet acte public est revêtu.
Cette Apostille ne certifie pas le contenu de l'acte pour lequel elle a été émise
Cette Apostille peut être vérifiée à l'adresse suivante: apostille-search.sos.ca.gov/.
Ce certificat ne constitue pas une Apostille en vertu de la Convention de La Haye du 5 Octobre 1961, lorsque présenté dans un pays qui n'est pas partie à cette Convention. Dans ce cas, le certificat doit être présenté à la section consulaire de la mission qui représente ce pays.

---

Esta Apostilla certifica únicamente la autenticidad de la firma, la calidad en que el signatario del documento haya actuado y, en su caso, la identidad del sello o timbre del que el documento público está revestido.
Esta Apostilla no certifica el contenido del documento para el cual se expidió.
Esta Apostilla se puede verificar en la dirección siguiente: apostille-search.sos.ca.gov/.
Este certificado no constituye una Apostilla en virtud del Convenio de La Haya de 5 de octubre de 1961 cuando se presenta en un país que no es parte del Convenio. En estos casos, el certificado debe ser presentado a la sección consular de la misión que representa a ese país.

Sec/State Form NP-40 SAC (rev. 01/2021)



# COUNTY OF LOS ANGELES
## DEPARTMENT OF PUBLIC HEALTH

**CERTIFICATE OF DEATH**

| 1. NAME OF DECEDENT — FIRST (Given) | 2. MIDDLE | 3. LAST (Family) |
|---|---|---|
| DAVID | | HALEVY |

| 4. DATE OF BIRTH (mm/dd/ccyy) | 5. AGE Yrs. | 7. SEX |
|---|---|---|
| | | M |

| 10. SOCIAL SECURITY NUMBER | 12. DATE OF DEATH (mm/dd/ccyy) | C. HOUR (24 hours) |
|---|---|---|
| 2860 | 06/03/2023 | 1838 |

| 13. MARITAL STATUS | 14. USUAL OCCUPATION | 15. KIND OF BUSINESS OR INDUSTRY |
|---|---|---|
| MARRIED | BUILDER | REAL ESTATE |

| 18. YEARS IN OCCUPATION |
|---|
| 70 |

**DECEDENT'S PERSONAL DATA**

| 21. CITY | 22. COUNTY/PROVINCE | 23. ZIP CODE | 24. YEARS IN COUNTY | 25. STATE / FOREIGN COUNTRY |
|---|---|---|---|---|
| 257 S LINDEN DRIVE | | | | |
| BEVERLY HILLS | LOS ANGELES | 90212 | 41 | CA |

| 26. INFORMANT'S NAME, RELATIONSHIP | 27. INFORMANT'S MAILING ADDRESS |
|---|---|
| DANIEL HALEVY, SON | 257 S. LINDEN DRIVE, BEVERLY HILLS, CA 90212 |

**SPOUSE/SRP AND PARENT INFORMATION**

| 47. SIGNATURE OF EMBALMER | 48. LICENSE NUMBER |
|---|---|

| 46. LICENSE NUMBER | 47. DATE (mm/dd/ccyy) |
|---|---|
| | 06/04/2023 |

**PLACE OF DEATH**

**CAUSE OF DEATH**

| 112. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? |
|---|

**PHYSICIAN'S CERTIFICATION**

| 116. SIGNATURE AND TITLE OF CERTIFIER | 116. LICENSE NUMBER | 117. DATE (mm/dd/ccyy) |
|---|---|---|
| STEVEN EDMOND KAMARA, MD | G74800 | 06/04/2023 |

| 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE |
|---|
| STEVEN EDMOND KAMARA, MD |
| 6221 WILSHIRE BLVD STE 617, LOS ANGELES, CA 90048 |

**CORONER'S USE ONLY**

| A | B | C | D | E | FAX AUTH# | CENSUS TRACT |
|---|---|---|---|---|---|---|
| STATE REGISTRAR | | | | | | |

**CERTIFIED COPY OF VITAL RECORD**
STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

This is a true certified copy of the record filed in the County of Los Angeles Department of Public Health if it bears the Registrar's signature in purple ink.





_____ MD
Health Officer and Registrar     DATE ISSUED

JUN 22 2023

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar.

*003921285*

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



# EXHIBIT 10



**This page is part of your document - DO NOT DISCARD**



## 20230646027



**Pages:**
**0003**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**09/26/23 AT 08:00AM**

| | |
|---|---|
| FEES: | 27.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 102.00 |



**L E A D S H E E T**



202309260110018

00023806620



014293751

**SEQ:**
**01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

*E442318*



**RECORDING REQUESTED BY:**
Stewart Title of California, Inc.

**WHEN RECORDED MAIL DOCUMENT AND
TAX STATEMENTS TO:**

341 South Cannon LLC
257 S. Linden Drive
Beverly Hills, CA  90212

THIS SPACE FOR RECORDER'S USE ONLY:

| | | |
|---|---|---|
| **Title Order No.:** 2135805 | | **Escrow No.:** 02-040468-AC |
| **AP#:** 4331-005-011 | **GRANT DEED** | |

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

"This conveyance transfers an interest into or out of a Living Trust, R & T 11930."

### DOCUMENTARY TRANSFER TAX is $0.00

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area    [X] City of Beverly Hills **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Sue Halevy, as Surviving Trustee of the Halevy Family Trust, dated September 8, 2010**

hereby GRANT(s) to:

**341 South Cannon LLC, a California limited liability company**

the real property in the City of Beverly Hills, County of Los Angeles, State of California, described as:

Lot 1887 of Tract No. 6380, in the City of Beverly Hills, County of Los Angeles, State of California, as per Map recorded in Book 69, Pages 11 to 20 inclusive of Maps, in the Office of the County Recorder of said County.

**Also Known as:** 341 S. Canon Dr., Beverly Hills, CA  90212

**DATED: September 20, 2023**

**Signature Page attached hereto
and made a part hereof**

MAIL TAX STATEMENTS AS DIRECTED ABOVE:

**Title Order No.: 2135805**          **Escrow No.: 02-040468-AC**          **AP#: 4331-005-011**

## SIGNATURE PAGE

**Title of Document:  GRANT DEED**

**Date of Document:  September 20, 2023**

○ Sue Halevy, as Surviving Trustee of the Halevy Family
Trust, dated September 8, 2010

By: _____
Sue Halevy, Surviving Trustee

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF  Los Angeles
On Sept. 21 2023
before me, Jackie Padilla ,
A Notary Public personally appeared
Sue Halevy

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.**

WITNESS my hand and official seal.

Signature _Jackie Padilla_                     (Seal)

JACKIE PADILLA
Notary Public - California
Los Angeles County
Commission # 2421859
My Comm. Expires Oct 17, 2026

# EXHIBIT 11



**This page is part of your document - DO NOT DISCARD**

# 20230646028





**Pages:**
**0025**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**09/26/23 AT 08:00AM**

| | |
|---|---|
| FEES: | 164.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 150.00 |
| PAID: | 314.00 |



**L E A D S H E E T**



202309260110018

**00023806621**



014293751

**SEQ:**
**02**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E442318

2135805



RECORDING REQUESTED BY:
STEWART TITLE OF CALIFORNIA INC

AND WHEN RECORDED MAIL TO:

# VIG PRIVATE LENDING

8383 WILSHIRE BLVD SUITE 430

BEVERLY HILLS, CA 90211

SPACE ABOVE THIS LINE FOR RECORDER'S USE

DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, FIXTURE FILINGS

AND SECURITY AGREEMENT ; REQUEST FOR NOTICE

Exempt from fee per GC27388.1;
Fee cap of $225 reached

*This page is added to provide adequate space for recording information.*

**WHEN RECORDED, RETURN TO:**

VIG Private Lending, Inc.
8383 Wilshire Blvd, Ste 430
Beverly Hills, CA 90211

Property ID No.: 4331-005-011

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, FIXTURE FILINGS, AND SECURITY AGREEMENT

~~Exempt from fee per GC27388.1;~~
~~Fee cap of $225 reached~~

**Note Amount:**          **$1,300,000.00**
**Property Address:**     **341 S Canon Drive, Beverly Hills, CA 90212**

THIS DOCUMENT CONSTITUTES A FIXTURE FILING IN ACCORDANCE WITH THE CALIFORNIA UNIFORM COMMERCIAL CODE.

This Deed of Trust, Assignment of Leases and Rents, Fixture Filings, and Security Agreement (the "Security Instrument" or "Deed of Trust") is made as of September 20, 2023, among 341 South Cannon LLC, a California limited liability company ("Borrower"), whose address is 257 South Linden Drive, Beverly Hills, CA 90212; Stewart Title of California, Inc., as trustee ("Trustee"); and Eastern Financial Mortgage Corporation, a Florida Corporation as to an undivided 650,000.00/1,300,000.00 interest; and Yarden Consulting LLC, a Delaware limited liability company as to an undivided 650,000.00/1,300,000.00 interest as beneficiary (collectively, "Lender"), whose address is c/o VIG Private Lending, Inc, 8383 Wilshire Blvd, Ste 430, Beverly Hills, CA 90211.

**TRANSFER OF RIGHTS IN THE PROPERTY**

To secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations, Borrower GRANTS, BARGAINS, SELLS, AND CONVEYS to Trustee the Mortgaged Property, with power of sale and right of entry, subject only to the Permitted Encumbrances, to have and to hold the Mortgaged Property to Trustee, its successors in trust, and the Trustee's assigns forever, and Borrower does hereby bind itself, its successors, and its assigns to warrant and forever defend the title to the Mortgaged Property to Trustee against anyone lawfully claiming it or any part of it; provided, however, that if the Indebtedness is paid in full as and when it becomes due and payable and the Obligations are performed on or before the date they are to be performed and discharged, then the liens, security interests, estates, and rights granted by the Loan Documents shall terminate; otherwise, they shall remain in full force and effect. As additional security for the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations, Borrower grants to Lender a security interest in the Personalty, Fixtures, Leases, and Rents under Article Nine of the Uniform Commercial Code in effect in the state where the Mortgaged Property is located. Borrower further grants, bargains, conveys, assigns, transfers, and sets over to Trustee, acting as both a trustee and an agent for Lender under this Security Instrument, a security interest in and to all of Borrower's right, title, and interest in, to, and under the Personalty, Fixtures, Leases, Rents, and Mortgaged Property (to the extent characterized as personal property) to secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations.

Borrower agrees to execute and deliver, from time to time, such further instruments, including, but not limited to, security agreements, assignments, and UCC financing statements, as may be requested by Lender to confirm the lien of this Security Instrument on any of the Mortgaged Property. Borrower further

Deed of Trust

Borrower's Initials:

irrevocably grants, transfers, and assigns to Lender the Rents. This assignment of Rents is to be effective to create a present security interest in existing and future Rents of the Mortgaged Property.

TO MAINTAIN AND PROTECT THE SECURITY OF THIS SECURITY INSTRUMENT, TO SECURE THE FULL AND TIMELY PERFORMANCE BY BORROWER OF EACH AND EVERY OBLIGATION, COVENANT, AND AGREEMENT OF BORROWER UNDER THE LOAN DOCUMENTS, AND AS ADDITIONAL CONSIDERATION FOR THE INDEBTEDNESS AND OBLIGATIONS EVIDENCED BY THE LOAN DOCUMENTS, BORROWER HEREBY COVENANTS, REPRESENTS, AND AGREES AS FOLLOWS:

## DEFINITIONS.

**1.      Definitions.** For purposes of this Security Instrument, each of the following terms shall have the following respective meanings:

**1.1      "Attorney Fees."** Any and all attorney fees (including the allocated cost of in-house counsel), paralegal, and law clerk fees, including, without limitation, fees for advice, negotiation, consultation, arbitration, and litigation at the pretrial, trial, and appellate levels, and in any bankruptcy proceedings, and attorney costs and expenses incurred or paid by Lender in protecting its interests in the Mortgaged Property, including, but not limited to, any action for waste, and enforcing its rights under this Security Instrument.

**1.2      "Borrower."**

1.2.1.    The named Borrower in this Security Instrument;

1.2.2.    The obligor under the Note, whether or not named as Borrower in this Security Instrument; and

1.2.3.    Subject to any limitations of assignment as provided for in the Loan Documents, the heirs, legatees, devisees, administrators, executors, successors in interest to the Mortgaged Property, and the assigns of any such person.

All references to Borrower in the remainder of the Loan Documents shall mean the obligor under the Note.

**1.3      "Event of Default."** An Event of Default as defined in the Loan Agreement.

**1.4      "Fixtures."** All right, title, and interest of Borrower in and to all materials, supplies, equipment, apparatus, and other items now or later attached to, installed on or in the Land or the Improvements, or that in some fashion are deemed to be fixtures to the Land or Improvements under the laws of the state where the Mortgaged Property is located, including the Uniform Commercial Code. "Fixtures" includes, without limitation, all items of Personalty to the extent that they may be deemed Fixtures under Governmental Requirements.

**1.5      "Governmental Authority."** Any and all courts, boards, agencies, commissions, offices, or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, or otherwise) whether now or later in existence.

**1.6      "Governmental Requirements."** Any and all laws, statutes, codes, ordinances, regulations, enactments, decrees, judgments, and orders of any Governmental Authority.

**1.7      "Impositions."** All real estate and personal property taxes; water, gas, sewer, electricity, and other utility rates and charges; charges imposed under any subdivision, planned unit development, or condominium declaration or restrictions; charges for any easement, license, or agreement maintained for the benefit of the Mortgaged Property, and all other taxes, charges, and assessments and any interest, costs, or penalties of any kind and nature that at any time before or after the execution of this Security Instrument may be assessed, levied, or imposed on the Mortgaged Property or on its ownership, use, occupancy, or enjoyment.

**1.8      "Improvements."** Any and all buildings, structures, improvements, fixtures, and appurtenances now and later placed on the Mortgaged Property, including, without limitation, all apparatus and equipment, whether or not physically affixed to the land or any building, which is used to provide or

Deed of Trust

Borrower's Initials: _DH_

supply air cooling, air conditioning, heat, gas, water, light, power, refrigeration, ventilation, laundry, drying, dish washing, garbage disposal, or other services; and all elevators, escalators, and related machinery and equipment, fire prevention and extinguishing apparatus, security and access control apparatus, partitions, ducts, compressors, plumbing, ovens, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains, curtain rods, mirrors, cabinets, paneling, rugs, attached floor coverings, furniture, pictures, antennas, pools, spas, pool and spa operation and maintenance equipment and apparatus, and trees and plants located on the Mortgaged Property, all of which, including replacements and additions, shall conclusively be deemed to be affixed to and be part of the Mortgaged Property conveyed to Trustee under this Security Instrument.

    **1.9**    "**Indebtedness.**" The principal of, interest on, and all other amounts and payments due under or evidenced by the following:

    1.9.1.    The Note (including, without limitation, the prepayment premium, late payment, and other charges payable under the Note);

    1.9.2.    The Loan Agreement;

    1.9.3.    This Security Instrument and all other Loan Documents;

    1.9.4.    All funds later advanced by Lender to or for the benefit of Borrower under any provision of any of the Loan Documents;

    1.9.5.    Any future loans or amounts advanced by Lender to Borrower when evidenced by a written instrument or document that specifically recites that the Obligations evidenced by such document are secured by the terms of this Security Instrument, including, but not limited to, funds advanced to protect the security or priority of the Security Instrument; and

    1.9.6.    Any amendment, modification, extension, rearrangement, restatement, renewal, substitution, or replacement of any of the foregoing.

    **1.10**    "**Land.**" The real estate or any interest in it described in Exhibit "A" attached to this Security Instrument and made a part of it, together with all Improvements and Fixtures and all rights, titles, and interests appurtenant to it.

    **1.11**    "**Leases.**" Any and all leases, subleases, licenses, concessions, or other agreements (written or verbal, now or later in effect) that grant a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Mortgaged Property, and all other agreements, including, but not limited to, utility contracts, maintenance agreements, and service contracts that in any way relate to the use, occupancy, operation, maintenance, enjoyment, or ownership of the Mortgaged Property, except any and all leases, subleases, or other agreements under which Borrower is granted a possessory interest in the Land.

    **1.12**    "**Lender.**" The named Lender in this Security Instrument and the owner and holder (including a pledgee) of any Note, Indebtedness, or Obligations secured by this Security Instrument, whether or not named as Lender in this Security Instrument, and the heirs, legatees, devisees, administrators, executors, successors, and assigns of any such person.

    **1.13**    "**Loan.**" The extension of credit made by Lender to Borrower under the terms of the Loan Documents.

    **1.14**    "**Loan Agreement.**" The Loan and Security Agreement given by Borrower evidencing the Loan, in such form as is acceptable to Lender, together with any and all rearrangements, extensions, renewals, substitutions, replacements, modifications, restatements, and amendments thereto.

    **1.15**    "**Loan Documents.**" Collectively, this Security Instrument, the Note, and all other instruments and agreements required to be executed by Borrower or any guarantor in connection with the Loan.

    **1.16**    "**Mortgaged Property.**" The Land, Improvements, Fixtures, Personalty, Leases, and Rents that is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF,

commonly known as:    **341 S Canon Drive, Beverly Hills, CA 90212**

Deed of Trust

Borrower's Initials: _DH_

**Property ID No.: 4331-005-011**

together with:

  1.16.1. All right, title, and interest (including any claim or demand or demand in law or equity) that Borrower now has or may later acquire in or to such Mortgaged Property; all easements, rights, privileges, tenements, hereditaments, and appurtenances belonging or in any way appertaining to the Mortgaged Property; all of the estate, right, title, interest, claim, demand, reversion, or remainder of Borrower in or to the Mortgaged Property, either at law or in equity, in possession or expectancy, now or later acquired; all crops growing or to be grown on the Mortgaged Property; all development rights or credits and air rights; all water and water rights (whether or not appurtenant to the Mortgaged Property) and shares of stock pertaining to such water or water rights, ownership of which affects the Mortgaged Property; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Mortgaged Property and all royalties and profits from any such rights or shares of stock; all right, title, and interest of Borrower in and to any streets, ways, alleys, strips, or gores of land adjoining the Land or any part of it that Borrower now owns or at any time later acquires and all adjacent lands within enclosures or occupied by buildings partly situated on the Mortgaged Property;

  1.16.2. All intangible Mortgaged Property and rights relating to the Mortgaged Property or its operation or used in connection with it, including, without limitation, permits, licenses, plans, specifications, construction contracts, subcontracts, bids, deposits for utility services, installations, refunds due Borrower, trade names, trademarks, and service marks;

  1.16.3. All of the right, title, and interest of Borrower in and to the land lying in the bed of any street, road, highway, or avenue in front of or adjoining the Land;

  1.16.4. Any and all awards previously made or later to be made by any Governmental Authority to the present and all subsequent owners of the Mortgaged Property that may be made with respect to the Mortgaged Property as a result of the exercise of the right of eminent domain, the alteration of the grade of any street, or any other injury to or decrease of value of the Mortgaged Property, which award or awards are assigned to Lender and Lender, at its option, is authorized, directed, and empowered to collect and receive the proceeds of any such award or awards from the authorities making them and to give proper receipts and acquittances for them;

  1.16.5. All certificates of deposit of Borrower in Lender's possession and all bank accounts of Borrower with Lender and their proceeds, and all deposits of Borrower with any Governmental Authority and/or public utility company that relate to the ownership of the Mortgaged Property;

  1.16.6. All Leases of the Mortgaged Property or any part of it now or later entered into and all right, title, and interest of Borrower under such Leases, including cash or securities deposited by the tenants to secure performance of their obligations under such Leases (whether such cash or securities are to be held until the expiration of the terms of such Leases or applied to one or more of the installments of rent coming due immediately before the expiration of such terms), all rights to all insurance proceeds and unearned insurance premiums arising from or relating to the Mortgaged Property, all other rights and easements of Borrower now or later existing pertaining to the use and enjoyment of the Mortgaged Property, and all right, title, and interest of Borrower in and to all declarations of covenants, conditions, and restrictions as may affect or otherwise relate to the Mortgaged Property;

  1.16.7. Any and all proceeds of any insurance policies covering the Mortgaged Property, whether or not such insurance policies were required by Lender as a condition of making the loan secured by this Security Instrument or are required to be maintained by Borrower as provided below in this Security Instrument; which proceeds are assigned to Lender, and Lender, at its option, is authorized, directed, and empowered to collect and receive the proceeds of such insurance policies from the insurers issuing the same and to give proper receipts and acquittances for such policies, and to apply the same as provided below;

  1.16.8. If the Mortgaged Property includes a leasehold estate, all of Borrower's right, title, and interest in and to the lease, more particularly described in Exhibit "A" attached to this Security

Deed of Trust

Instrument (the Leasehold) including, without limitation, the right to surrender, terminate, cancel, waive, change, supplement, grant subleases of, alter, or amend the Leasehold;

1.16.9. All plans and specifications for the Improvements; all contracts and subcontracts relating to the Improvements; all deposits (including tenants' security deposits; provided, however, that if Lender acquires possession or control of tenants' security deposits Lender shall use the tenants' security deposits only for such purposes as Governmental Requirements permit), funds, accounts, contract rights, instruments, documents, general intangibles, and notes or chattel paper arising from or in connection with the Mortgaged Property; all permits, licenses, certificates, and other rights and privileges obtained in connection with the Mortgaged Property; all soils reports, engineering reports, land planning maps, drawings, construction contracts, notes, drafts, documents, engineering and architectural drawings, letters of credit, bonds, surety bonds, any other intangible rights relating to the Land and Improvements, surveys, and other reports, exhibits, or plans used or to be used in connection with the construction, planning, operation, or maintenance of the Land and Improvements and all amendments and modifications; all proceeds arising from or by virtue of the sale, lease, grant of option, or other disposition of all or any part of the Mortgaged Property (consent to same is not granted or implied); and all proceeds (including premium refunds) payable or to be payable under each insurance policy relating to the Mortgaged Property;

1.16.10. All trade names, trademarks, symbols, service marks, and goodwill associated with the Mortgaged Property and any and all state and federal applications and registrations now or later used in connection with the use or operation of the Mortgaged Property;

1.16.11. All tax refunds, bills, notes, inventories, accounts and charges receivable, credits, claims, securities, and documents of all kinds, and all instruments, contract rights, general intangibles, bonds and deposits, and all proceeds and products of the Mortgaged Property;

1.16.12. All money or other personal property of Borrower (including, without limitation, any instrument, deposit account, general intangible, or chattel paper, as defined in the Uniform Commercial Code) previously or later delivered to, deposited with, or that otherwise comes into Lender's possession;

1.16.13. All accounts, contract rights, chattel paper, documents, instruments, books, records, claims against third parties, money, securities, drafts, notes, proceeds, and other items relating to the Mortgaged Property;

1.16.14. All construction, supply, engineering, and architectural contracts executed and to be executed by Borrower for the construction of the Improvements; and

1.16.15. All proceeds of any of the foregoing.

As used in this Security Instrument, "Mortgaged Property" is expressly defined as meaning all or, when the context permits or requires, any portion of it and all or, when the context permits or requires, any interest in it.

**1.17** **"Note."** The Secured Note payable by Borrower to the order of Lender in the principal amount of **One Million Three Hundred Thousand and 00/100 Dollars ($1,300,000.00), which matures on October 1, 2024,** evidencing the Loan, in such form as is acceptable to Lender, together with any and all rearrangements, extensions, renewals, substitutions, replacements, modifications, restatements, and amendments to the Secured Note.

**1.18** **"Obligations."** Any and all of the covenants, warranties, representations, and other obligations (other than to repay the Indebtedness) made or undertaken by Borrower to Lender or Trustee as set forth in the Loan Documents; any lease, sublease, or other agreement under which Borrower is granted a possessory interest in the Land; each obligation, covenant, and agreement of Borrower in the Loan Documents or in any other document executed by Borrower in connection with the loan(s) secured by this Security Instrument whether set forth in or incorporated into the Loan Documents by reference; each and every monetary provision of all covenants, conditions, and restrictions, if any, pertaining to the Mortgaged Property and on Lender's written request, the enforcement by Borrower of any covenant by third parties to pay maintenance or other charges, if they have not been paid, or valid legal steps taken to enforce such payment within 90 days after such written request is made; if the Mortgaged Property consists of or includes a leasehold estate, each obligation, covenant, and agreement of Borrower arising under, or contained in, the

Deed of Trust

Borrower's Initials: _DH_

instrument(s) creating any such leasehold; all agreements of Borrower to pay fees and charges to Lender whether or not set forth in this Security Instrument; and charges, as allowed by law, when they are made for any statement regarding the obligations secured by this Security Instrument.

The Obligations specifically exclude the Environmental Indemnity Agreement dated the date of this Security Instrument, executed by Borrower and any guarantor of the Loan, which is not secured by this Security Instrument.

**1.19** **"Permitted Encumbrances."** At any particular time, (a) liens for taxes, assessments, or governmental charges not then due and payable or not then delinquent; (b) liens, easements, encumbrances, and restrictions on the Mortgaged Property that are allowed by Lender to appear in Schedule B, with Parts I and II of an ALTA title policy to be issued to Lender following recordation of the Security Instrument; and (c) liens in favor of or consented to in writing by Lender.

**1.20** **"Person."** Natural persons, corporations, partnerships, unincorporated associations, joint ventures, and any other form of legal entity.

**1.21** **"Personalty."** All of the right, title, and interest of Borrower in and to all tangible and intangible personal property, whether now owned or later acquired by Borrower, including, but not limited to, water rights (to the extent they may constitute personal property), all equipment, inventory, goods, consumer goods, accounts, chattel paper, instruments, money, general intangibles, letter-of-credit rights, deposit accounts, investment property, documents, minerals, crops, and timber (as those terms are defined in the Uniform Commercial Code) and that are now or at any later time located on, attached to, installed, placed, used on, in connection with, or are required for such attachment, installation, placement, or use on the Land, the Improvements, Fixtures, or on other goods located on the Land or Improvements, together with all additions, accessions, accessories, amendments, modifications to the Land or Improvements, extensions, renewals, and enlargements and proceeds of the Land or Improvements, substitutions for, and income and profits from, the Land or Improvements. The Personalty includes, but is not limited to, all goods, machinery, tools, equipment (including fire sprinklers and alarm systems); building materials, air conditioning, heating, refrigerating, electronic monitoring, entertainment, recreational, maintenance, extermination of vermin or insects, dust removal, refuse and garbage equipment; vehicle maintenance and repair equipment; office furniture (including tables, chairs, planters, desks, sofas, shelves, lockers, and cabinets); safes, furnishings, appliances (including ice-making machines, refrigerators, fans, water heaters, and incinerators); rugs, carpets, other floor coverings, draperies, drapery rods and brackets, awnings, window shades, venetian blinds, curtains, other window coverings; lamps, chandeliers, other lighting fixtures; office maintenance and other supplies; loan commitments, financing arrangements, bonds, construction contracts, leases, tenants' security deposits, licenses, permits, sales contracts, option contracts, lease contracts, insurance policies, proceeds from policies, plans, specifications, surveys, books, records, funds, bank deposits; and all other intangible personal property. Personalty also includes any other portion or items of the Mortgaged Property that constitute personal property under the Uniform Commercial Code.

**1.22** **"Rents."** All rents, issues, revenues, income, proceeds, royalties, profits, license fees, prepaid municipal and utility fees, bonds, and other benefits to which Borrower or the record title owner of the Mortgaged Property may now or later be entitled from or which are derived from the Mortgaged Property, including, without limitation, sale proceeds of the Mortgaged Property; any room or space sales or rentals from the Mortgaged Property; and other benefits paid or payable for using, leasing, licensing, possessing, operating from or in, residing in, selling, mining, extracting, or otherwise enjoying or using the Mortgaged Property.

**1.23** **"Uniform Commercial Code."** The uniform commercial code as found in the statutes of the state in which the Mortgaged Property is located.

**1.24** **"Water Rights."** All water rights of whatever kind or character, surface or underground, appropriative, decreed, or vested, that are appurtenant to the Mortgaged Property or otherwise used or useful in connection with the intended development of the Mortgaged Property.

Any terms not otherwise defined in this Security Instrument shall have the meaning given them in the Loan Agreement and Note, dated of even date herewith between Borrower and Lender.

Deed of Trust

Borrower's Initials: _OH_

**UNIFORM COVENANTS**

**2.      Repair and Maintenance of Mortgaged Property.** Borrower shall (a) keep the Mortgaged Property in good condition and repair; (b) not substantially alter, remove, or demolish the Mortgaged Property or any of the Improvements except when incident to the replacement of Fixtures, equipment, machinery, or appliances with items of like kind; (c) restore and repair to the equivalent of its original condition all or any part of the Mortgaged Property that may be damaged or destroyed, including, but not limited to, damage from termites and dry rot, soil subsidence, and construction defects, whether or not insurance proceeds are available to cover any part of the cost of such restoration and repair, and regardless of whether Lender permits the use of any insurance proceeds to be used for restoration under this Security Instrument; (d) pay when due all claims for labor performed and materials furnished in connection with the Mortgaged Property and not permit any mechanics' or materialman's lien to arise against the Mortgaged Property or furnish a loss or liability bond against such mechanics' or materialman's lien claims; (e) comply with all laws affecting the Mortgaged Property or requiring that any alterations, repairs, replacements, or improvements be made on it; (f) not commit or permit waste on or to the Mortgaged Property, or commit, suffer, or permit any act or violation of law to occur on it; (g) not abandon the Mortgaged Property; (h) cultivate, irrigate, fertilize, fumigate, and prune in accordance with prudent agricultural practices; (i) if required by Lender, provide for management satisfactory to Lender under a management contract approved by Lender; (j) notify Lender in writing of any condition at or on the Mortgaged Property that may have a significant and measurable effect on its market value; (k) if the Mortgaged Property is rental property, generally operate and maintain it in such manner as to realize its maximum rental potential; and (l) do all other things that the character or use of the Mortgaged Property may reasonably render necessary to maintain it in the same condition (reasonable wear and tear expected) as existed at the date of this Security Instrument.

**3.      Use of Mortgaged Property.** Unless otherwise required by Governmental Requirements or unless Lender otherwise provides prior written consent, Borrower shall not change, nor allow changes in, the use of the Mortgaged Property from the current use of the Mortgaged Property as of the date of this Security Instrument. Borrower shall not initiate or acquiesce in a change in the zoning classification of the Mortgaged Property without Lender's prior written consent.

**4.      Condemnation and Insurance Proceeds.**

      **4.1      Assignment to Lender.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of or damage or injury to the Mortgaged Property, or any part of it, or for conveyance in lieu of condemnation, are assigned to and shall be paid to Lender, regardless of whether Lender's security is impaired. All causes of action, whether accrued before or after the date of this Security Instrument, of all types for damages or injury to the Mortgaged Property or any part of it, or in connection with any transaction financed by funds lent to Borrower by Lender and secured by this Security Instrument, or in connection with or affecting the Mortgaged Property or any part of it, including, without limitation, causes of action arising in tort or contract or in equity, are assigned to Lender as additional security, and the proceeds shall be paid to Lender. Lender, at its option, may appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement of such action. Borrower shall notify Lender in writing immediately on obtaining knowledge of any casualty damage to the Mortgaged Property or damage in any other manner in excess of $2,000.00 or knowledge of the institution of any proceeding relating to condemnation or other taking of or damage or injury to all or any portion of the Mortgaged Property. Lender, in its sole and absolute discretion, may participate in any such proceedings and may join Borrower in adjusting any loss covered by insurance. Borrower covenants and agrees with Lender, at Lender's request, to make, execute, and deliver, at Borrower's expense, any and all assignments and other instruments sufficient for the purpose of assigning the aforesaid award or awards, causes of action, or claims

of damages or proceeds to Lender free, clear, and discharged of any and all encumbrances of any kind or nature.

    **4.2**    **Insurance Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments that Borrower may receive or to which Lender may become entitled with respect to the Mortgaged Property if any damage or injury occurs to the Mortgaged Property, other than by a partial condemnation or other partial taking of the Mortgaged Property, shall be paid over to Lender and shall be applied first toward reimbursement of all costs and expenses of Lender in connection with their recovery and disbursement, and shall then be applied as follows:

    4.2.1.   Lender shall consent to the application of such payments to the restoration of the Mortgaged Property so damaged only if Borrower has met all the following conditions (a breach of any one of which shall constitute a default under this Security Instrument, the Loan Agreement, the Note, and any Loan Documents): (a) Borrower is not in default under any of the terms, covenants, and conditions of the Loan Documents; (b) all then-existing Leases affected in any way by such damage will continue in full force and effect; (c) Lender is satisfied that the insurance or award proceeds, plus any sums added by Borrower, shall be sufficient to fully restore and rebuild the Mortgaged Property under then current Governmental Requirements; (d) within 60 days after the damage to the Mortgaged Property, Borrower presents to Lender a restoration plan satisfactory to Lender and any local planning department, which includes cost estimates and schedules; (e) construction and completion of restoration and rebuilding of the Mortgaged Property shall be completed in accordance with plans and specifications and drawings submitted to Lender within 30 days after receipt by Lender of the restoration plan and thereafter approved by Lender, which plans, specifications, and drawings shall not be substantially modified, changed, or revised without Lender's prior written consent; (f) within 3 months after such damage, Borrower and a licensed contractor satisfactory to Lender enter into a fixed price or guaranteed maximum price contract satisfactory to Lender, providing for complete restoration in accordance with such restoration plan for an amount not to exceed the amount of funds held or to be held by Lender; (g) all restoration of the Improvements so damaged or destroyed shall be made with reasonable promptness and shall be of a value at least equal to the value of the Improvements so damaged or destroyed before such damage or destruction; (h) Lender reasonably determines that there is an identified source (whether from income from the Mortgaged Property, rental loss insurance, or another source) sufficient to pay all debt service and operating expenses of the Mortgaged Property during its restoration as required above; and (i) any and all funds that are made available for restoration and rebuilding under this Section shall be disbursed, at Lender's sole and absolute discretion to Lender, through Lender, the Trustee, or a title insurance or trust company satisfactory to Lender, in accordance with standard construction lending practices, including a reasonable fee payable to Lender from such funds and, if Lender requests, mechanics' lien waivers and title insurance date-downs, and the provision of payment and performance bonds by Borrower, or in any other manner approved by Lender in Lender's sole and absolute discretion; or

    4.2.2.   If fewer than all conditions (a) through (i) above are satisfied, then such payments shall be applied in the sole and absolute discretion of Lender (a) to the payment or prepayment, with any applicable prepayment premium, of any Indebtedness secured by this Security Instrument in such order as Lender may determine, or (b) to the reimbursement of Borrower's expenses incurred in the rebuilding and restoration of the Mortgaged Property. If Lender elects under this Section to make any funds available to restore the Mortgaged Property, then all of conditions (a) through (i) above shall apply, except for such conditions that Lender, in its sole and absolute discretion, may waive.

    **4.3**    **Material Loss Not Covered.** If any material part of the Mortgaged Property is damaged or destroyed and the loss, measured by the replacement cost of the Improvements according to then current Governmental Requirements, is not adequately covered by insurance proceeds collected or in the process of collection, Borrower shall deposit with Lender, within 30 days after Lender's request, the amount of the loss not so covered.

    **4.4**    **Total Condemnation Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments that Borrower may receive or to which Borrower may

Deed of Trust

Borrower's Initials: _DH_

301

become entitled with respect to the Mortgaged Property in the event of a total condemnation or other total taking of the Mortgaged Property shall be paid over to Lender and shall be applied first to reimbursement of all Lender's costs and expenses in connection with their recovery, and shall then be applied to the payment of any Indebtedness secured by this Security Instrument in such order as Lender may determine, until the Indebtedness secured by this Security Instrument has been paid and satisfied in full. Any surplus remaining after payment and satisfaction of the Indebtedness secured by this Security Instrument shall be paid to Borrower as its interest may then appear.

**4.5      Partial Condemnation Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments ("funds") that Borrower may receive or to which Borrower may become entitled with respect to the Mortgaged Property in the event of a partial condemnation or other partial taking of the Mortgaged Property, unless Borrower and Lender otherwise agree in writing, shall be divided into two portions, one equal to the principal balance of the Note at the time of receipt of such funds and the other equal to the amount by which such funds exceed the principal balance of the Note at the time of receipt of such funds. The first such portion shall be applied to the sums secured by this Security Instrument, whether or not then due, including but not limited to principal, accrued interest, and advances, and in such order or combination as Lender may determine, with the balance of the funds paid to Borrower.

**4.6      Cure of Waiver of Default.** Any application of such amounts or any portion of it to any Indebtedness secured by this Security Instrument shall not be construed to cure or waive any default or notice of default under this Security Instrument or invalidate any act done under any such default or notice.

**5.      Taxes and Other Sums Due.** Borrower shall promptly pay, satisfy, and discharge: (a) all Impositions affecting the Mortgaged Property before they become delinquent; (b) such other amounts, chargeable against Borrower or the Mortgaged Property, as Lender reasonably deems necessary to protect and preserve the Mortgaged Property, this Security Instrument, or Lender's security for the performance of the Obligations; (c) all encumbrances, charges, and liens on the Mortgaged Property. with interest, which in Lender's judgment are, or appear to be, prior or superior to the lien of this Security Instrument or all costs necessary to obtain protection against such lien or charge by title insurance endorsement or surety company bond; (d) such other charges as Lender deems reasonable for services rendered by Lender at Borrower's request; and (e) all costs, fees, and expenses incurred by Lender in connection with this Security Instrument, whether or not specified in this Security Instrument.

On Lender's request, Borrower shall promptly furnish Lender with all notices of sums due for any amounts specified in the preceding clauses 5(a) through (e), and, on payment, with written evidence of such payment. If Borrower fails to promptly make any payment required under this Section, Lender may (but is not obligated to) make such payment. Borrower shall notify Lender immediately on receipt by Borrower of notice of any increase in the assessed value of the Mortgaged Property and agrees that Lender, in Borrower's name, may (but is not obligated to) contest by appropriate proceedings such increase in assessment. Without Lender's prior written consent, Borrower shall not allow any lien inferior to the lien of this Security Instrument to be perfected against the Mortgaged Property and shall not permit any improvement bond for any unpaid special assessment to issue.

**6.      Leases of Mortgaged Property by Borrower.** At Lender's request, Borrower shall furnish Lender with executed copies of all Leases of the Mortgaged Property or any portion of it then in force. If Lender so requires, all Leases later entered into by Borrower are subject to Lender's prior review and approval and must be acceptable to Lender in form and content. Each Lease must specifically provide, inter alia, that (a) it is subordinate to the lien of this Security Instrument; (b) the tenant attorns to Lender (and Borrower consents to any such attornment), such attornment to be effective on Lender's acquisition of title to the Mortgaged Property; (c) the tenant agrees to execute such further evidence of attornment as Lender may from time to time request; (d) the tenant's attornment shall not be terminated by foreclosure; and (e) Lender, at Lender's option, may accept or reject such attornment. If Borrower learns that any tenant proposes to do, or is doing, any act that may give rise to any right of setoff against rent, Borrower shall immediately (i) take measures reasonably calculated to prevent the accrual of any such right of setoff; (ii) notify Lender of

Deed of Trust

Borrower's Initials: _____

all measures so taken and of the amount of any setoff claimed by any such tenant; and (iii) within 10 days after the accrual of any right of setoff against rent, reimburse any tenant who has acquired such right, in full, or take other measures that will effectively discharge such setoff and ensure that rents subsequently due shall continue to be payable without claim of setoff or deduction.

At Lender's request, Borrower shall assign to Lender, by written instrument satisfactory to Lender, all Leases of the Mortgaged Property, and all security deposits made by tenants in connection with such Leases. On assignment to Lender of any such Lease, Lender shall succeed to all rights and powers of Borrower with respect to such Lease, and Lender, in Lender's sole and absolute discretion, shall have the right to modify, extend, or terminate such Lease and to execute other further leases with respect to the Mortgaged Property that is the subject of such assigned Lease.

Neither Borrower, tenant nor any other occupant of the Mortgaged Property shall use the Mortgaged Property, except in compliance with all applicable federal, state, and local laws, ordinances, rules and regulations; nor shall Borrower, tenant or any other occupant cause the Mortgaged Property to become subject to any use that is not in compliance with all applicable federal, state, and local laws, ordinances, rules and regulations.

If Borrower suspects any tenant or other occupant of the Mortgaged Property is using the Mortgaged Property in a manner that is not in compliance with any Governmental Requirement to which Borrower, tenant, or any other occupant of the Mortgaged Property is subject, Borrower shall immediately take appropriate action to remedy the violation, and shall notify Lender of any potential violation within one (1) day of discovery of any such potential violation. Any potential violation by a tenant or any other occupant of the Mortgaged Property of any Governmental Requirement is an Event of Default under the terms of the Loan Agreement, the Note and this Security Instrument, then Lender, at Lender's option, may, without prior notice, declare all sums secured by this Security Instrument, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in the Loan Documents.

7.  **Right to Collect and Receive Rents.** Despite any other provision of this Security Instrument, Lender grants permission to Borrower to collect and retain the Rents of the Mortgaged Property as they become due and payable; however, such permission to Borrower shall be automatically revoked on default by Borrower in payment of any Indebtedness secured by this Security Instrument or in the performance of any of the Obligations, and Lender shall have the rights set forth in the laws and regulations where the Mortgaged Property is located regardless of whether declaration of default has been delivered, and without regard to the adequacy of the security for the Indebtedness secured by this Security Instrument. Failure of or discontinuance by Lender at any time, or from time to time, to collect any such Rents shall not in any manner affect the subsequent enforcement by Lender at any time, or from time to time, of the right, power, and authority to collect these Rents. The receipt and application by Lender of all such Rents under this Security Instrument, after execution and delivery of declaration of default and demand for sale as provided in this Security Instrument or during the pendency of trustee's sale proceedings under this Security Instrument or judicial foreclosure, shall neither cure such breach or default nor affect such sale proceedings, or any sale made under them, but such Rents, less all costs of operation, maintenance, collection, and Attorney Fees, when received by Lender, may be applied in reduction of the entire Indebtedness from time to time secured by this Security Instrument, in such order as Lender may decide. Nothing in this Security Instrument, nor the exercise of Lender's right to collect, nor an assumption by Lender of any tenancy, lease, or option, nor an assumption of liability under, nor a subordination of the lien or charge of this Security Instrument to, any such tenancy, lease, or option, shall be, or be construed to be, an affirmation by Lender of any tenancy, lease, or option.

If the Rents of the Mortgaged Property are not sufficient to meet the costs, if any, of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an Indebtedness of Borrower to Lender secured by this Security Instrument. Unless Lender and Borrower agree in writing to other terms of payment, such amounts shall be payable on notice from Lender to Borrower requesting such payment and shall bear interest from the date of disbursement at the rate stated in the Note unless payment of interest at such rate would be contrary to Governmental

Deed of Trust

Borrower's Initials. _Ø H_

Requirements, in which event the amounts shall bear interest at the highest rate that may be collected from Borrower under Governmental Requirements.

Borrower expressly understands and agrees that Lender will have no liability to Borrower or any other person for Lender's failure or inability to collect Rents from the Mortgaged Property or for failing to collect such Rents in an amount that is equal to the fair market rental value of the Mortgaged Property. Borrower understands and agrees that neither the assignment of Rents to Lender nor the exercise by Lender of any of its rights or remedies under this Security Instrument shall be deemed to make Lender a "mortgagee-in-possession" or otherwise responsible or liable in any manner with respect to the Mortgaged Property or the use, occupancy, enjoyment, or operation of all or any portion of it, unless and until Lender, in person or by agent, assumes actual possession of it. Nor shall appointment of a receiver for the Mortgaged Property by any court at the request of Lender or by agreement with Borrower, or the entering into possession of the Mortgaged Property or any part of it by such receiver be deemed to make Lender a mortgagee-in-possession or otherwise responsible or liable in any manner with respect to the Mortgaged Property or the use, occupancy, enjoyment, or operation of all or any portion of it.

During an Event of Default, any and all Rents collected or received by Borrower shall be accepted and held for Lender in trust and shall not be commingled with Borrower's funds and property, but shall be promptly paid over to Lender.

**8.    Assignment of Causes of Action, Awards, and Damages.** All causes of action, and all sums due or payable to Borrower for injury or damage to the Mortgaged Property, or as damages incurred in connection with the transactions in which the Loan secured by this Security Instrument was made, including, without limitation, causes of action and damages for breach of contract, fraud, concealment, construction defects, or other torts, or compensation for any conveyance in lieu of condemnation, are assigned to Lender, and all proceeds from such causes of action and all such sums shall be paid to Lender for credit against the Indebtedness secured by this Security Instrument. Borrower shall notify Lender immediately on receipt by Borrower of notice that any such sums have become due or payable and, immediately on receipt of any such sums, shall promptly remit such sums to Lender.

After deducting all expenses, including Attorney Fees, incurred by Lender in recovering or collecting any sums under this Section, Lender may apply or release the balance of any funds received by it under this Section, or any part of such balance, as it elects. Lender, at its option, may appear in and prosecute in its own name any action or proceeding to enforce any cause of action assigned to it under this Section and may make any compromise or settlement in such action whatsoever. Borrower covenants that it shall execute and deliver to Lender such further assignments of any such compensation awards, damages, or causes of action as Lender may request from time to time. If Lender fails or does not elect to prosecute any such action or proceeding and Borrower elects to do so, Borrower may conduct the action or proceeding at its own expense and risk.

**9.    Defense of Security Instrument; Litigation.** Borrower represents and warrants that this Security Instrument creates a second position lien and security interest against the Mortgaged Property. Borrower shall give Lender immediate written notice of any action or proceeding (including, without limitation, any judicial, whether civil, criminal, or probate, or nonjudicial proceeding to foreclose the lien of a junior or senior mortgage or deed of trust) affecting or purporting to affect the Mortgaged Property, this Security Instrument, Lender's security for the performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender under the Loan Documents. Despite any other provision of this Security Instrument, Borrower agrees that Lender or Trustee may (but is not obligated to) commence, appear in, prosecute, defend, compromise, and settle, in Lender's or Borrower's name, and as attorney-in-fact for Borrower, and incur necessary costs and expenses, including Attorney Fees in so doing, any action or proceeding, whether a civil, criminal, or probate judicial matter, nonjudicial proceeding, arbitration, or other alternative dispute resolution procedure, reasonably necessary to preserve or protect, or affecting or purporting to affect, the Mortgaged Property, this Security Instrument, Lender's security for performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender or Trustee under the Loan Documents, and that if Lender and Trustee elect not to do so, Borrower shall commence, appear in,

Deed of Trust

Borrower's Initials:

prosecute, and defend any such action or proceeding. Borrower shall pay all costs and expenses of Lender and Trustee, including costs of evidence of title and Attorney Fees, in any such action or proceeding in which Lender or Trustee may appear or for which legal counsel is sought, whether by virtue of being made a party defendant or otherwise, and whether or not the interest of Lender or Trustee in the Mortgaged Property is directly questioned in such action or proceeding, including, without limitation, any action for the condemnation or partition of all or any portion of the Mortgaged Property and any action brought by Lender to foreclose this Security Instrument or to enforce any of its terms or provisions.

**10.    Borrower's Failure to Comply With Security Instrument.** If Borrower fails to make any payment or do any act required by this Security Instrument, or if there is any action or proceeding (including, without limitation, any judicial or nonjudicial proceeding to foreclose the lien of a junior or senior mortgage or deed of trust) affecting or purporting to affect the Mortgaged Property, this Security Instrument, Lender's security for the performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender or Trustee under the Loan Agreement, the Note or this Security Instrument, Lender or Trustee may (but is not obligated to) (a) make any such payment or do any such act in such manner and to such extent as either deems necessary to preserve or protect the Mortgaged Property, this Security Instrument, or Lender's security for the performance of Borrower's Obligations and payment of the Indebtedness, or the rights or powers of Lender or Trustee under the Loan Documents, Lender and Trustee being authorized to enter on the Mortgaged Property for any such purpose; and (b) in exercising any such power, pay necessary expenses, retain attorneys, and pay Attorney Fees incurred in connection with such action, without notice to or demand on Borrower and without releasing Borrower from any Obligations or Indebtedness.

**11.    Sums Advanced to Bear Interest and to Be Secured by Security Instrument.** At Lender's request, Borrower shall immediately pay any sums advanced or paid by Lender or Trustee under any provision of this Security Instrument or the other Loan Documents. Until so repaid, all such sums and all other sums payable to Lender and Trustee shall be added to, and become a part of, the Indebtedness secured by this Security Instrument and bear interest from the date of advancement or payment by Lender or Trustee at the same rate as provided in the Note, unless payment of interest at such rate would be contrary to Governmental Requirements. All sums advanced by Lender under this Security Instrument or the other Loan Documents, whether or not required to be advanced by Lender under the terms of this Security Instrument or the other Loan Documents, shall conclusively be deemed to be mandatory advances required to preserve and protect this Security Instrument and Lender's security for the performance of the Obligations and payment of the Indebtedness, and shall be secured by this Security Instrument to the same extent and with the same priority as the principal and interest payable under the Note.

**12.    Inspection of Mortgaged Property.** In addition to any rights Lender may have under the laws and regulations where the Mortgaged Property is located, Lender may make, or authorize other persons, including, but not limited to, appraisers and prospective purchasers at any foreclosure sale commenced by Lender, to enter on or inspect the Mortgaged Property at reasonable times and for reasonable durations. Borrower shall permit all such entries and inspections to be made as long as Lender has given Borrower written notice of such inspection at least 24 hours before the entry and inspection.

**13.    Uniform Commercial Code Security Agreement.** This Security Instrument is intended to be and shall constitute a security agreement under the Uniform Commercial Code for any of the Personalty specified as part of the Mortgaged Property that, under Governmental Requirements, may be subject to a security interest under the Uniform Commercial Code, and Borrower grants to Lender a security interest in those items. Borrower authorizes Lender to file financing statements in all states, counties, and other jurisdictions as Lender may elect, without Borrower's signature if permitted by law. Borrower agrees that Lender may file this Security Instrument, or a copy of it, in the real estate records or other appropriate index or in the Office of the Secretary of State and such other states as the Lender may elect, as a financing statement for any of the items specified above as part of the Mortgaged Property. Any reproduction of this Security Instrument or executed duplicate original of this Security Instrument, or a copy certified by a County Recorder in the state where the Mortgaged Property is located, or of any other security agreement

Deed of Trust

Borrower's Initials: _____

or financing statement, shall be sufficient as a financing statement. In addition, Borrower agrees to execute and deliver to Lender, at Lender's request, any UCC financing statements, as well as any extensions, renewals, and amendments, and copies of this Security Instrument in such form as Lender may require to perfect a security interest with respect to the Personalty. Borrower shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Lender may reasonably require. Without the prior written consent of Lender, Borrower shall not create or suffer to be created any other security interest in the items, including any replacements and additions.

On any Event of Default, Lender shall have the remedies of a secured party under the Uniform Commercial Code and, at Lender's option, may also invoke the remedies provided in the Non-Uniform Covenants section of this Security Instrument as to such items. In exercising any of these remedies, Lender may proceed against the items of Mortgaged Property and any items of Personalty separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies under the Uniform Commercial Code or of the remedies provided in the Non-Uniform Covenants section of this Security Instrument.

**14.    Fixture Filing.** This Security Instrument constitutes a financing statement filed as a fixture filing under Uniform Commercial Code, as amended or recodified from time to time, covering any portion of the Mortgaged Property that now is or later may become a fixture attached to the Mortgaged Property or to any Improvement.

**15.    Waiver of Statute of Limitations.** Borrower waives the right to assert any statute of limitations as a defense to the Loan Documents and the Obligations secured by this Security Instrument, to the fullest extent permitted by Governmental Requirements.

**16.    Default.** Any Event of Default, as defined in the Loan Agreement, shall constitute an "Event of Default" as that term is used in this Security Instrument (and the term "Default" shall mean any event which, with any required lapse of time or notice, may constitute an Event of Default, whether or not any such requirement for notice or lapse of time has been satisfied).

**17.    Acceleration on Transfer or Encumbrance.**

**17.1    Acceleration on Transfer or Encumbrance of Mortgaged Property.** If Borrower sells, gives an option to purchase, exchanges, assigns, conveys, encumbers (including, but not limited to PACE/HERO loans, any loans where payments are collected through property tax assessments, and super-voluntary liens which are deemed to have priority over the lien of the Security Instrument) (other than with a Permitted Encumbrance), transfers possession, or alienates all or any portion of the Mortgaged Property, or any of Borrower's interest in the Mortgaged Property, or suffers its title to, or any interest in, the Mortgaged Property to be divested, whether voluntarily or involuntarily; or if there is a sale or transfer of any interests in Borrower; or if Borrower changes or permits to be changed the character or use of the Mortgaged Property, or drills or extracts or enters into any lease for the drilling or extracting of oil, gas, or other hydrocarbon substances or any mineral of any kind or character on the Mortgaged Property; or if title to such Mortgaged Property becomes subject to any lien or charge, voluntary or involuntary, contractual or statutory, without Lender's prior written consent, then Lender, at Lender's option, may, without prior notice, declare all sums secured by this Security Instrument, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in the Loan Documents.

**17.2    Replacement Personalty.** Notwithstanding anything to the contrary herein, Borrower may from time to time replace Personalty constituting a part of the Mortgaged Property, as long as (a) the replacements for such Personalty are of equivalent value and quality; (b) Borrower has good and clear title to such replacement Personalty free and clear of any and all liens, encumbrances, security interests, ownership interests, claims of title (contingent or otherwise), or charges of any kind, or the rights of any conditional sellers, vendors, or any other third parties in or to such replacement Personalty have been expressly subordinated to the lien of the Security Instrument in a manner satisfactory to Lender and at no cost to Lender; and (c) at Lender's option, Borrower provides at no cost to Lender satisfactory evidence that the Security Instrument constitutes a valid and subsisting lien on and security interest in such

Deed of Trust

Borrower's Initials: _DH_

replacement Personalty of the same priority as this Security Instrument has on the Mortgaged Property and is not subject to being subordinated or its priority affected under any Governmental Requirements.

**17.3    Permitted Encumbrances.** If Lender consents in writing, which consent may not be unreasonably withheld, the due-on-encumbrance prohibition shall not apply to a junior voluntary deed of trust or mortgage lien in favor of another lender encumbering the Mortgaged Property (the principal balance of any such junior encumbrance shall be added to the principal balance of the Indebtedness for purposes of determining compliance with the financial covenants of the Loan Agreement and the Note); as long as Borrower gives Lender at least 30 days written notice of the further encumbrance and reimburses Lender for all out-of-pocket costs and expenses incurred in connection with such encumbrance.

**18.    Waiver of Marshaling.** Despite the existence of interests in the Mortgaged Property other than that created by this Security Instrument, and despite any other provision of this Security Instrument, if Borrower defaults in paying the Indebtedness or in performing any Obligations, Lender shall have the right, in Lender's sole and absolute discretion, to establish the order in which the Mortgaged Property will be subjected to the remedies provided in this Security Instrument and to establish the order in which all or any part of the Indebtedness secured by this Security Instrument is satisfied from the proceeds realized on the exercise of the remedies provided in this Security Instrument. Borrower and any person who now has or later acquires any interest in the Mortgaged Property with actual or constructive notice of this Security Instrument waives any and all rights to require a marshaling of assets in connection with the exercise of any of the remedies provided in this Security Instrument or otherwise provided by Governmental Requirements.

**19.    Consents and Modifications; Borrower and Lien Not Released.** Despite Borrower's default in the payment of any Indebtedness secured by this Security Instrument or in the performance of any Obligations under this Security Instrument or Borrower's breach of any obligation, covenant, or agreement in the Loan Documents, Lender, at Lender's option, without notice to or consent from Borrower, any guarantor of the Indebtedness and of Borrower's Obligations under the Loan Documents, or any holder or claimant of a lien or interest in the Mortgaged Property that is junior to the lien of this Security Instrument, and without incurring liability to Borrower or any other person by so doing, may from time to time (a) extend the time for payment of all or any portion of Borrower's Indebtedness under the Loan Documents; (b) accept a renewal note or notes, or release any person from liability, for all or any portion of such Indebtedness; (c) agree with Borrower to modify the terms and conditions of payment under the Loan Documents; (d) reduce the amount of the monthly installments due under the Note; (e) reconvey or release other or additional security for the repayment of Borrower's Indebtedness under the Loan Documents; (f) approve the preparation or filing of any map or plat with respect to the Mortgaged Property; (g) enter into any extension or subordination agreement affecting the Mortgaged Property or the lien of this Security Instrument; and (h) agree with Borrower to modify the term, the rate of interest, or the period of amortization of the Note or alter the amount of the monthly installments payable under the Note. No action taken by Lender under this Section shall be effective unless it is in writing, subscribed by Lender, and, except as expressly stated in such writing, no such action will impair or affect (i) Borrower's obligation to pay the Indebtedness secured by this Security Instrument and to observe all Obligations of Borrower contained in the Loan Documents; (ii) the guaranty of any Person of the payment of the Indebtedness secured by this Security Instrument; or (iii) the lien or priority of the lien of this Security Instrument. At Lender's request, Borrower shall promptly pay Lender a reasonable service charge, together with all insurance premiums and Attorney Fees as Lender may have advanced, for any action taken by Lender under this Section.

Whenever Lender's consent or approval is specified as a condition of any provision of this Security Instrument, such consent or approval shall not be effective unless such consent or approval is in writing, signed by two authorized officers of Lender.

**20.    Future Advances.** On request by Borrower, Lender, at Lender's option, may make future advances to Borrower. All such future advances, with interest, shall be added to and become a part of the

Deed of Trust

Borrower's Initials: _DH_

Indebtedness secured by this Security Instrument when evidenced by promissory notes reciting that such note(s) are secured by this Security Instrument.

**21.    Prepayment.** If the Loan Documents provide for a fee or charge as consideration for the acceptance of prepayment of principal, Borrower agrees to pay said fee or charge if the Indebtedness or any part of it shall be paid, whether voluntarily or involuntarily, before the due date stated in the Note, even if Borrower has defaulted in payment or in the performance of any agreement under the Loan Documents and Lender has declared all sums secured by this Security Instrument immediately due and payable.

**22.    Governing Law; Consent to Jurisdiction and Venue.** This Security Instrument is made by Lender and accepted by Borrower in the State of California except that at all times the provisions for the creation, perfection, priority, enforcement and foreclosure of the liens and security interests created in the Mortgaged Property under the Loan Documents shall be governed by and construed according to the laws of the state in which the Mortgage Property is situated. To the fullest extent permitted by the law of the state in which the Mortgaged Property is situated, the law of the State of California shall govern the validity and enforceability of all Loan Documents, and the debt or obligations arising hereunder (but the foregoing shall not be construed to limit Lender's rights with respect to such security interest created in the state in which the Mortgaged Property is situated). The parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Mortgaged Property, shall be Los Angeles County, California, or the applicable federal district court that covers said County, and Borrower submits to personal jurisdiction in that forum for any and all purposes. Borrower waives any right Borrower may have to assert the doctrine of forum non conveniens or to object to such venue.

BORROWER'S INITIALS: _OH_

**23.    Taxation of Security Instrument.** In the event of the enactment of any law deducting from the value of the Mortgaged Property any mortgage lien on it, or imposing on Lender the payment of all or part of the taxes, charges, or assessments previously paid by Borrower under this Security Instrument, or changing the law relating to the taxation of mortgages, debts secured by mortgages, or Lender's interest in the Mortgaged Property so as to impose new incidents of tax on Lender, then Borrower shall pay such taxes or assessments or shall reimburse Lender for them; provided, however, that if in the opinion of Lender's counsel such payment cannot lawfully be made by Borrower, then Lender may, at Lender's option, declare all sums secured by this Security Instrument to be immediately due and payable without notice to Borrower. Lender may invoke any remedies permitted by this Security Instrument.

**24.    Mechanic's Liens.** Borrower shall pay from time to time when due, all lawful claims and demands of mechanics, materialmen, laborers, and others that, if unpaid, might result in, or permit the creation of, a lien on the Mortgaged Property or any part of it, or on the Rents arising therefrom, and in general shall do or cause to be done everything necessary so that the lien and security interest of this Security Instrument shall be fully preserved, at Borrower's expense, without expense to Lender; provided, however, that if Governmental Requirements empower Borrower to discharge of record any mechanic's, laborer's, materialman's, or other lien against the Mortgaged Property by the posting of a bond or other security, Borrower shall not have to make such payment if Borrower posts such bond or other security on the earlier of (a) 10 days after the filing or recording of same or (b) within the time prescribed by law, so as not to place the Mortgaged Property in jeopardy of a lien or forfeiture.

**25.    Liability for Acts or Omissions.** Lender shall not be liable or responsible for its acts or omissions under this Security Instrument, except for Lender's own gross negligence or willful misconduct, or be liable or responsible for any acts or omissions of any agent, attorney, or employee of Lender, if selected with reasonable care.

**26.    Notices.** Except for any notice required by Governmental Requirements to be given in another manner, any notice required to be provided in this Security Instrument shall be given in accordance with the Loan Agreement.

Deed of Trust

Borrower's Initials: _OH_

**27.    Statement of Obligations.** Except as otherwise provided by Governmental Requirements, at Lender's request, Borrower shall promptly pay to Lender such fee as may then be provided by law as the maximum charge for each statement of obligations, Lender's statement, Lender's demand, payoff statement, or other statement on the condition of, or balance owed, under the Note or secured by this Security Instrument.

**28.    Remedies Are Cumulative.** Each remedy in this Security Instrument is separate and distinct and is cumulative to all other rights and remedies provided by this Security Instrument or by Governmental Requirements, and each may be exercised concurrently, independently, or successively, in any order whatsoever.

**29.    Obligations of Borrower Joint and Several.** If more than one Person is named as Borrower, each obligation of Borrower under this Security Instrument shall be the joint and several obligations of each such Person.

**30.    Delegation of Authority.** Whenever this Security Instrument provides that Borrower authorizes and appoints Lender as Borrower's attorney-in-fact to perform any act for or on behalf of Borrower or in the name, place, and stead of Borrower, Borrower expressly understands and agrees that this authority shall be deemed a power coupled with an interest and such power shall be irrevocable.

**31.    Funds for Taxes and Insurance.** If Borrower is in default under this Security Instrument or any of the Loan Documents, regardless of whether the default has been cured, then Lender may at any subsequent time, at its option to be exercised on 30 days written notice to Borrower, require Borrower to deposit with Lender or its designee, at the time of each payment of an installment of interest or principal under the Note, an additional amount sufficient to discharge the obligations of Borrower under the Note and this Security Instrument as they become due. The calculation of the amount payable and of the fractional part of it to be deposited with Lender shall be made by Lender in its sole and absolute discretion. These amounts shall be held by Lender or its designee not in trust and not as agent of Borrower and shall not bear interest, and shall be applied to the payment of any of the Obligations under the Loan Documents in such order or priority as Lender shall determine. If at any time within 30 days before the due date of these obligations the amounts then on deposit shall be insufficient to pay the obligations under the Note and this Security Instrument in full, Borrower shall deposit the amount of the deficiency with Lender within 10 days after Lender's demand. If the amounts deposited are in excess of the actual obligations for which they were deposited, Lender may refund any such excess, or, at its option, may hold the excess in a reserve account, not in trust and not bearing interest, and reduce proportionately the required monthly deposits for the ensuing year. Nothing in this Section shall be deemed to affect any right or remedy of Lender under any other provision of this Security Instrument or under any statute or rule of law to pay any such amount and to add the amount so paid to the Indebtedness secured by this Security Instrument. Lender shall have no obligation to pay insurance premiums or taxes except to the extent the fund established under this Section is sufficient to pay such premiums or taxes, to obtain insurance, or to notify Borrower of any matters relative to the insurance or taxes for which the fund is established under this Section. Notwithstanding the preceding, Borrower and Lender may agree to impounds of taxes and insurance which impounds shall be identified in the Note.

Lender or its designee shall hold all amounts so deposited as additional security for the sums secured by this Security Instrument. Lender may, in its sole and absolute discretion and without regard to the adequacy of its security under this Security Instrument, apply such amounts or any portion of it to any Indebtedness secured by this Security Instrument, and such application shall not be construed to cure or waive any default or notice of default under this Security Instrument.

If Lender requires deposits to be made under this Section, Borrower shall deliver to Lender all tax bills, bond and assessment statements, statements for insurance premiums, and statements for any other obligations referred to above as soon as Borrower receives such documents.

If Lender sells or assigns this Security Instrument, Lender shall have the right to transfer all amounts deposited under this Section to the purchaser or assignee. After such a transfer, Lender shall be relieved and have no further liability under this Security Instrument for the application of such deposits,

Deed of Trust

Borrower's Initials: _D H_

and Borrower shall look solely to such purchaser or assignee for such application and for all responsibility relating to such deposits.

**32.    General Provisions.**

   **32.1    Successors and Assigns.** Except as otherwise expressly provided herein, this Security Instrument applies to, inures to the benefit of, and binds, the respective heirs, legatees, devisees, administrators, executors, successors, and assigns of each party to this Security Instrument.

   **32.2    Meaning of Certain Terms.** As used in this Security Instrument and unless the context otherwise provides, the words "herein," "hereunder" and "hereof" mean and include this Security Instrument as a whole, rather than any particular provision of it.

   **32.3    Authorized Agents.** In exercising any right or remedy, or taking any action provided in this Security Instrument, Lender may act through its employees, agents, or independent contractors, as Lender expressly authorizes.

   **32.4    Gender and Number.** Wherever the context so requires in this Security Instrument, the masculine gender includes the feminine and neuter, the singular number includes the plural, and vice versa.

   **32.5    Captions.** Captions and section headings used in this Security Instrument are for convenience of reference only, are not a part of this Security Instrument, and shall not be used in construing it.

**33.    Dispute Resolution: Waiver of Right to Jury Trial.**

   **33.1    ARBITRATION.** CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO ARBITRATE ANY DISPUTES TO RESOLVE ANY CLAIMS (AS DEFINED IN THE ARBITRATION AGREEMENT).

   **33.2    WAIVER OF RIGHT TO JURY TRIAL.** CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT AND WAIVER OF RIGHT TO JURY TRIAL WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM (AS DEFINED IN THE ARBITRATION AGREEMENT) OR CAUSE OF ACTION BASED ON OR ARISING FROM THE LOAN.

BORROWER'S INITIALS: _O H_

   **33.3    PROVISIONAL REMEDIES; FORECLOSURE AND INJUNCTIVE RELIEF.** Nothing in the Section above, shall be deemed to apply to or limit the right of Lender to: (a) exercise self-help remedies, (b) foreclose judicially or nonjudicially against any real or personal property collateral, or to exercise judicial or nonjudicial power of sale rights, (c) obtain from a court provisional or ancillary remedies (including, but not limited to, injunctive relief, a writ of possession, prejudgment attachment, a protective order or the appointment of a receiver), or (d) pursue rights against Borrower or any other party in a third party proceeding in any action brought against Lender (including, but not limited to, actions in bankruptcy court). Lender may exercise the rights set forth in the foregoing clauses (a) through (d), inclusive, before, during, or after the pendency of any proceeding referred to in the Section above. Neither the exercise of self-help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies or the opposition to any such provisional remedies shall constitute a waiver of the right of any Borrower, Lender or any other party, including, but not limited to, the claimant in any such action, to require submission of the dispute, claim or controversy occasioning resort to such remedies to any proceeding referred to in the Section above.

   **33.4    Contractual Right to Appoint a Receiver Upon Default.** Upon an Event of Default under this Security Instrument or a breach of any clause of any agreement signed in connection with the loan to Borrower, Borrower agrees that Lender may appoint a receiver to control the Mortgaged Property within seven (7) days of any default. Borrower agrees to cooperate with the receiver and turn over all control to said receiver and otherwise cooperate with the receiver appointed by Lender.

Deed of Trust

Borrower's Initials: _O H_

**33.5**   **Loan Agreement.** This Security Instrument is subject to the provisions of the Loan Agreement. As specifically provided in the Loan Agreement, if Borrower defaults under this Security Instrument, Lender has the right and option to foreclose against any Collateral provided under the Loan Agreement.

## NON-UNIFORM COVENANTS.

Notwithstanding anything to the contrary elsewhere in this Security Instrument, Borrower and Lender further covenant and agree as follows:

**34.**   **Acceleration and Sale on Default.** If an Event of Default occurs, Lender, at its option, in addition to other remedies provided at law, may declare all sums secured by this Security Instrument immediately due and payable by delivering to Trustee a written affidavit or declaration of default and demand for sale, executed by Lender and reciting facts demonstrating such default by Borrower, together with a written notice of default and election to sell the Mortgaged Property. Lender shall also deposit with Trustee the Note, this Security Instrument, and documents evidencing any additional advances or expenditures secured by this Security Instrument. On receipt by Trustee of such affidavit or declaration of default and such notice of default and election to sell, Trustee shall accept such election to sell as true and conclusive of all facts and statements in such affidavit or declaration of default and shall cause such notice of default and election to sell to be recorded as required by Governmental Requirements. On the expiration of such period as may then be required by Governmental Requirements following recordation of such notice of default, and after notice of sale has been given in the manner and for the period required by Governmental Requirement, Trustee, without demand on Borrower, shall sell the Mortgaged Property at the time and place fixed in such notice of sale, either in whole or in separate parcels, and in such order as Trustee may determine or Lender may direct (Borrower waives any right it may have under Governmental Requirements to direct the order of sale), at public auction to the highest bidder for cash in lawful money of the United States, payable at the time of sale; provided, however, that Lender may offset its bid at such sale to the extent of the full amount owed to Lender under the Loan Documents, including, without limitation, Trustee's fees, expenses of sale, and costs, expenses, and Attorney Fees incurred by or on behalf of Lender in connection with collecting, litigating, or otherwise enforcing any right under the Loan Documents. Trustee may postpone the sale of all or any portion of the Mortgaged Property by public announcement made at the initial time and place of sale, and from time to time later by public announcement made at the time and place of sale fixed by the preceding postponement. Trustee shall deliver to the purchaser at such public auction its deed conveying the Mortgaged Property sold, but without any covenant or warranty, express or implied. The recital in such deed of any matter of fact concerning notices shall be conclusive proof of its truthfulness. Any person, including Borrower, Trustee, or Lender, may purchase at such sale.

The proceeds or avails of any sale made under or by virtue of this Security Instrument, together with any other sums secured by this Security Instrument, which then may be held by the Trustee or Lender or any other person, shall be applied as follows: (1) To the payment of the costs and expenses of such sale, including Trustee's fees, costs of title evidence, Attorney Fees, and reasonable compensation to Lender and its agents and consultants, and of any judicial proceedings in which the same costs and expenses of sale may be made, and of all expenses, liabilities, and advances made or incurred by the Trustee or Lender under this Security Instrument, together with interest at the rate set forth in the Note on all advances made by the Trustee or Lender and all taxes or assessments, except any taxes, assessments, or other charges subject to which the Mortgaged Property was sold; (2) to the payment of the whole amount then due, owing, or unpaid on the Note for interest and principal, with interest on the unpaid principal at the Default Rate (as defined in the Note), from the due date of any such payment of principal until the same is paid; (3) to the payment of any other Indebtedness required to be paid by Borrower under any provision of this Security Instrument, the Note, or any of the other Loan Documents; and (4) to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive it.

Deed of Trust

Borrower's Initials: _O H_

**35.    Trustee.** The Trustee shall be deemed to have accepted the terms of this trust when this Security Instrument, duly executed and acknowledged, is made a public record as provided by law. The Trustee shall not be obligated to notify any party to this Security Instrument of any pending sale under any other Security Instrument or of any action or proceeding in which Borrower, Lender, or Trustee is a party, unless such sale relates to or reasonably might affect the Mortgaged Property, this Security Instrument, Lender's security for the payment of the Indebtedness and the performance of the Obligations, or the rights or powers of Lender or Trustee under the Loan Documents, or unless such action or proceeding has been instituted by Trustee against the Mortgaged Property, Borrower, or Lender.

**36.    Power of Trustee to Reconvey or Consent.** At any time, without liability and without notice to Borrower, on Lender's written request and presentation of the Note and this Security Instrument to Trustee for endorsement, and without altering or affecting (a) the personal liability of Borrower or any other person for the payment of the Indebtedness secured by this Security Instrument, or (b) the lien of this Security Instrument on the remainder of the Mortgaged Property as security for the repayment of the full amount of the Indebtedness then or later secured by this Security Instrument, (c) or any right or power of Lender or Trustee with respect to the remainder of the Mortgaged Property, Trustee may (i) reconvey or release any part of the Mortgaged Property from the lien of this Security Instrument; (ii) approve the preparation or filing of any map or plat of the Mortgaged Property; (iii) join in the granting of any easement burdening the Mortgaged Property; or (iv) enter into any extension or subordination agreement affecting the Mortgaged Property or the lien of this Security Instrument.

**37.    Duty to Reconvey.** On Lender's written request reciting that all sums secured hereby have been paid, surrender of the Note and this Security Instrument to Trustee for cancellation and retention by Trustee, and payment by Borrower of any reconveyance fees customarily charged by Trustee, Trustee shall reconvey, without warranty, the Mortgaged Property then held by Trustee under this Security Instrument. The recitals in such reconveyance of any matters of fact shall be conclusive proof of their truthfulness. The grantee in such reconveyance may be described as "the person or persons legally entitled to the Mortgaged Property." Such request and reconveyance shall operate as a reassignment of the Rents assigned to Lender in this Security Instrument.

**38.    Substitution of Trustee.** Lender, at Lender's option, may from time to time, by written instrument, substitute a successor or successors to any Trustee named in or acting under this Security Instrument, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties in which the Mortgaged Property is located, shall constitute conclusive proof of the proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the predecessor Trustee, succeed to all right, title, estate, powers, and duties of such predecessor Trustee, including, without limitation, the power to reconvey the Mortgaged Property. To be effective, the instrument must contain the names of the original Borrower, Trustee, and Lender under this Security Instrument, the book and page or instrument or document number at which, and the county or counties in which, this Security Instrument is recorded, and the name and address of the substitute Trustee. If any notice of default has been recorded under this Security Instrument, this power of substitution cannot be exercised until all costs, fees, and expenses of the then acting Trustee have been paid. On such payment, the then acting Trustee shall endorse receipt of the payment on the instrument of substitution. The procedure provided in this Section for substitution of Trustees is not exclusive of other provisions for substitution provided by Governmental Requirements.

**39.    Assignment of Rents.** This assignment of Rents is to be effective to create a present security interest in existing and future Rents of the Mortgaged Property under California Civil Code §2938.

**40.    Waiver of Right of Offset.** No portion of the Indebtedness secured by this Security Instrument shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross-claim, whether liquidated or unliquidated, that Borrower may have or claim to have against Lender. Borrower hereby waives, to the fullest extent permitted by Governmental Requirements, the benefits of California Code of Civil Procedure section 431.70, which provides:

Deed of Trust

Borrower's Initials. _O H_

Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations. If the cross-demand would otherwise be barred by the statute of limitations, the relief accorded under this Section shall not exceed the value of the relief granted to the other party. The defense provided by this Section is not available if the cross-demand is barred for failure to assert it in a prior action under Section 426.30. Neither person can be deprived of the benefits of this Section by the assignment or death of the other. For the purposes of this Section, a money judgment is a "demand for money" and, as applied to a money judgment, the demand is barred by the statute of limitations when enforcement of the judgment is barred under Chapter 3 (commencing with Section 683.010) of Division 1 of Title 9.

41.    **California Business & Professions Code § 10238 Notice.** If there are multiple beneficiaries to this Security Instrument, the provisions of California Business & Professions Code Section 10238(i) and California Civil Code Section 2941.9 may control the actions to be taken by the beneficiaries. Section 10238(i) provides "[t]he holders of more than 50 percent of the recorded beneficial interests of the notes or interests may govern the actions to be taken on behalf of all holders in accordance with Section 2941.9 of the Civil Code in the event of default or foreclosure for matters that require direction or approval of the holders, including designation of the broker, servicing agent, or other person acting on their behalf, and the sale, encumbrance, or lease of real property owned by the holders resulting from foreclosure or receipt of a deed in lieu of foreclosure."

**[Signatures Follow]**

Deed of Trust

Borrower's Initials: _____

IN WITNESS WHEREOF, Borrower has executed and delivered this Security Instrument as of the date first written above.

**BORROWER:**

**341 SOUTH CANNON LLC, A CALIFORNIA LIMITED LIABILITY COMPANY**

By: _____
    Daniel Halevy, Manager

---

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of _California_ )

County of _Los Angeles_ )

On _Sept. 21 2023_ before me, _Jackie Padilla_ , Notary Public
       *Date*                        *Here Insert Name of the Officer*

Personally Appeared _Daniel Halevy_
                    *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _CA_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JACKIE PADILLA
Notary Public - California
Los Angeles County
Commission # 2421859
My Comm. Expires Oct 17, 2026

Signature _____
              *Signature of Notary Public*

Deed of Trust

Borrower's Initials: _____

EXHIBIT "A"
LEGAL PROPERTY DESCRIPTION

Deed of Trust

Borrower's Initials. ___

# EXHIBIT "A"

## LEGAL DESCRIPTION

Order No.: 2135805
Escrow No.: 2135805

The land referred to herein is situated in the State of California, County of Los Angeles, City of Beverly Hills and described as follows:

Lot 1887 in Tract No. 6380 in the City of Beverly Hills, County of Los Angeles, as per Map recorded in Book 69, Pages 11 to 20 inclusive of Maps, in the Office of the County Recorder of Los Angeles County, California.

APN: 4331-005-011

(End of Legal Description)